## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

THE STATE OF ARIZONA, By and through
its Attorney General, MARK BRNOVICH;

THE STATE OF LOUISIANA,
By and through its Attorney General,
JEFF LANDRY;

THE STATE OF MISSOURI,
By and through its Attorney General,
ERIC S. SCHMITT;

THE STATE OF ALABAMA,
By and through its Attorney General,
STEVE MARSHALL;

THE STATE OF ALASKA,
By and through its Attorney General,
TREG R. TAYLOR;

THE STATE OF ARKANSAS,
By and through its Attorney General,
 LESLIE RUTLEDGE;

THE STATE OF FLORIDA,
By and through its Attorney General,
ASHLEY MOODY;

THE STATE OF GEORGIA,
By and through its Attorney General,
CHRISTOPHER M. CARR;

THE STATE OF IDAHO,
By and through its Attorney General,
LAWRENCE G. WASDEN;

THE STATE OF KANSAS,
By and through its Attorney General,
DEREK SCHMIDT;

THE COMMONWEALTH OF KENTUCKY,
By and through its Attorney General,
DANIEL CAMERON;

CIVIL ACTION NO. 6:22-cv-00885-RRS-
CBW

1

THE STATE OF MISSISSIPPI,
By and through its Attorney General,
LYNN FITCH;

THE STATE OF MONTANA,
By and through its Attorney General,
AUSTIN KNUDSEN;

THE STATE OF NEBRASKA,
By and through its Attorney General,
DOUGLAS J. PETERSON;

THE STATE OF OHIO,
By and through its Attorney General,
DAVE YOST;

THE STATE OF OKLAHOMA,
By and through its Attorney General,
JOHN M. O'CONNOR;

THE STATE OF SOUTH CAROLINA,
By and through its Attorney General,
ALAN WILSON;

THE STATE OF TENNESSEE
By and through its Attorney General,
HERBERT H. SLATERY III;

THE STATE OF UTAH,
By and through its Attorney General,
SEAN D. REYES;

THE STATE OF WEST VIRGINIA,
By and through its Attorney General,
PATRICK MORRISEY;

THE STATE OF WYOMING,
By and through its Attorney General,
BRIDGET HILL;

PLAINTIFFS,

v.

CENTERS FOR DISEASE CONTROL &
PREVENTION;

ROCHELLE WALENSKY , in her official capacity as Director of the Centers for Disease Control & Prevention;

U.S. DEPARTMENT OF HEALTH & HU-MAN SERVICES;

XAVIER BECERRA , in his official capacity as Secretary of Health and Human Services;

the UNITED STATES DEPARTMENT OF HOMELAND SECURITY;

ALEJANDRO MAYORKAS in his official ca-pacity as Secretary of Homeland Security;

U.S CUSTOMS AND BORDER PROTEC-TION;

CHRISTOPHER MAGNUS in his official ca-pacity Commissioner of U.S. Customs and Bor-der Protection;

U.S. IMMIGRATION AND CUSTOMS EN-FORCEMENT;

TAE JOHNSON in his official capacity as Sen-ior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement;

U.S. CITIZENSHIP AND IMMIGRATION SERVICES;

UR M. JADDOU in her official capacity as Di-rector of U.S. Citizenship and Immigration Ser-vices;

U.S. BORDER PATROL;

RAUL ORTIZ in his official capacity as Chief of the U.S. Border Patrol;

The UNITED STATES DEPARTMENT OF JUSTICE;

MERRICK GARLAND in his official capacity
as Attorney General of the United States of
America;

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW;

DAVID NEAL in his official capacity as Direc-
tor of the Executive Office for Immigration Re-
view;

JOSEPH R. BIDEN, J R., in his official
capacity as President of the United
States; and

the UNITED STATES OF AMERICA;

DEFENDANTS.

## FIRST AMENDED COMPLAINT

The States of Arizona, Louisiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia,

Idaho, Kansas, Kentucky, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Ten-

nessee, Utah, West Virginia, and Wyoming bring this civil action against the above-listed Defendants

for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.      This suit challenges an imminent, man-made, self-inflicted calamity: the abrupt elimi-

nation of the *only* safety valve preventing this Administration's disastrous border policies from devolv-

ing into unmitigated chaos and catastrophe. Specifically, this action challenges the Biden Administra-

tion's revocation of Title 42 border control measures, which will, absent judicial relief, become effec-

tive May 23, 2022.

2.      This is not merely the opinion of the Plaintiff States, but also that of some of the

Administration's otherwise-most-ardent supporters. Indeed, to date *seven* Democratic Senators have

come out unambiguously in opposition to the challenged actions here. For example, one Democratic

Senator observed: "This is the wrong decision…. [I]t's clear that this administration's lack of a plan to deal with this crisis will further strain our border communities."

3.     Similarly, Senator Kyrsten Sinema explained that the "decision to announce an end to Title 42 despite not yet having a comprehensive plan ready shows a lack of understanding about the crisis at our border."

4.     Eight days prior, these two Democratic Senators wrote a letter to President Biden telling him: "To date, we have not yet seen evidence that DHS has developed and implemented a sufficient plan to maintain a humane and orderly process in the event of an end to Title 42."

5.     A third Democratic Senator, Joe Manchin, described the Title 42 revocation as an outright "*frightening* decision."[1] He further explained that "[w]e are *nowhere near prepared to deal with that influx*. Until we have comprehensive, bipartisan immigration reform that commits to securing our borders and providing a pathway to citizenship for qualified immigrants, *Title 42 must stay in place*."[2] In addition, "Title 42 has been an essential tool in combatting the spread of COVID-19 and controlling the influx of migrants at our southern border," said Senator Manchin.[3] "We are already facing an unprecedented increase in migrants this year, and that will only get worse if the Administration ends the Title 42 policy."[4]

6.     And a fourth Democratic Senator, Maggie Hassan, similarly declared that: "Ending Title 42 prematurely will likely lead to a migrant surge that the administration does not appear to be ready for."[5] Senator Jon Tester has similarly observed (correctly) that "[e]nding Title 42 is expected to

---

[1]  Joe Manchin, *Title 42 Must Stay In Place Until We Have Major Immigration Reforms* (April 1, 2022) https://bit.ly/37azEI0 (emphasis added).
[2]  *Id.* (emphasis added).
[3]  *Id.*
[4]  *Id.*
[5]  https://twitter.com/SenatorHassan/status/1509936999267983364

cause a *significant increase* of migration to the United States and put more pressure on an already broken system."[6] And Senator Raphael Warnock has likewise declared that "I think this is the wrong time and I haven't seen a plan that gives me comfort."[7] And Senator Catherine Cortez Masto has opined that: "This is the wrong way to do this and it will leave the administration unprepared *for a surge at the border.*"[8]

7.     And these are just the opinions of Senators of President Biden's *own party*—hardly disinterested, neutral observers. To be fair, these views appear to be widely shared—though in more-circumspect/less-candid statements—by many members of the Biden Administration itself, even at the highest levels. For example, the White House's own Communications Director, Kate Bedingfield, outright admitted that the Administration "ha[s] every expectation that when the CDC ultimately decides it's appropriate to lift Title 42, *there will be an influx* of people to the border."[9]

8.     Senator Bill Cassidy of Louisiana similarly criticized the Biden Administration's plans, stating "Removing Title 42 is a mistake that will encourage another wave of illegal migration and drug trafficking to overwhelm the Southern border. There is no justification for this." See Press Release, Cassidy Reacts to Rescinding Trump-Era Policy to Stop Mass Migration, www.cassidy.senate.gov.

9.     The National Border Patrol Council President, Brandon Judd, similarly declared: "We know this is going to *cause chaos of epic proportions.*"[10] He also noted the obvious incongruity of

---

[6]  *See* Jon Tester, Statement (Apr. 5, 2022) *available at* https://www.tester.senate.gov/?p=press_release&id=9018 (emphasis added).

[7]  Tim Mitchell, *The Jolt: Immigrant groups unhappy with Warnock criticism of new border policy*, Atlanta Journal-Constitution (Apr. 7, 2022) *available at* https://www.ajc.com/politics/politics-blog/the-jolt-immigrant-groups-unhappy-with-warnock-criticism-of-new-border-policy/A4R3Q3N62VHPZBHWT-CYYKNYD3Q/.

[8]  *See* https://kesq.com/news/2022/04/12/democrats-intensify-fight-against-biden-immigration-policy/ (Apr. 12, 2022).

[9]  Catherine E. Shoichet, *We're expecting a big increase in migrants at the US-Mexico border. But this time is different*, CNN, (April 1, 2022) (emphasis added), https://cnn.it/3LrtLoC.

[10]  Adam Shaw, *Border Patrol agents bracing for new migrant wave if Title 42 lifts: 'We are expecting to get wrecked*,

Administration policy: "We can't even fly on airplanes without masks, but we're going to end Title 42 which is going to cause the single largest [in]flux of illegal immigration in our history?"[11] "It's impossible for me to overstate how demoralized the average agent is," Judd said. "They're asking themselves, 'Why am I putting on this uniform?' every day. This administration is responsible for the single largest crisis on the border and they're about to make it worse."[12]

10.     Similarly, DHS put out an official "fact sheet" in anticipation of the Title 42 revocation declaring that "There is broad agreement that our immigration system is *fundamentally broken*."[13] But the Administration's "answer" to that problem is to break it further.

11.     Other DHS officials, shielded by anonymity, have been even more candid, explaining that "ending Title 42 would lead to what one DHS agent described as a 'surge on top of a surge.'"[14]

12.     One anonymous agent succinctly explained the sentiment at the Border Patrol: "We are expecting to get wrecked."[15]

13.     The Center for Disease Control's ("CDC's") April 1, 2022 order revoking its prior Title 42 policy is also plainly at war with other policies of the Biden Administration. The Title 42 Termination is expressly premised on the "rapid[] decrease" of COVID-19 cases following the recent wave of the Omicron variant of the virus. Ex. A at 12. But the Administration has not seen fit elsewhere to act upon these improvements by, for example, lifting the mask mandate on airline travel,[16]

---

Fox News, (Mar, 31, 2022), https://fxn.ws/3uKEx2B

[11]  *Id.*

[12]  Callie Patteson and MaryAnn Martinez, *Immigration authority Title 42 to be terminated on May 23, CDC says*, NY Post (Apr. 1, 2022), https://nypost.com/2022/04/01/title-42-to-be-terminated-on-may-23-cdc-says/.

[13]   DHS, *Fact Sheet: DHS Preparations for a Potential Increase in Migration* (Mar. 30, 2022), https://bit.ly/3j3LEgR.

[14]  Adam Shaw and Peter Hasson, *Border Patrol agents bracing for new migrant wave if Title 42 lifts: "We are expecting to get wrecked"*, Fox News (Mar. 31, 2022), https://fxn.ws/3IZjApt.

[15]  *Id.*

[16]  Jonathan Franklin, *U.S. airline CEOs call on President Biden to end the federal mask mandate on planes*, NPR

or loosening or repealing its vaccination mandates,[17] or ending its relentless campaign to discharge members of our military who have applied for religious exemptions for vaccination requirements— which have been almost uniformly denied.[18] The Title 42 Revocation thus stands as a radical outlier— seemingly the only COVID-19-based restriction the Administration sees fit to end.

14.     But the CDC's Termination Order is not merely unfathomably bad public policy. It is also profoundly illegal. That is principally so for two reasons: (1) Defendants unlawfully flouted the notice-and-comment requirements for rulemaking under the Administrative Procedure Act ("APA") and (2) Defendants' Termination Order is arbitrary and capricious, thus violating the APA, because it has numerous omissions that each independently render it illegal.

15.     First, the notice-and-comment violation: Defendants do not deny that the Termination Order would ordinarily be subject to the requirement of providing notice of a proposed rule, taking comment upon it, and responding to those comments. They seek to excuse their flouting of that requirement for two reasons: they invoke the "good cause" and "foreign affairs" exceptions of 5 U.S.C. § 553(a)(1) and (b)(3)(B). But neither applies.

---

(Mar. 24, 2022), https://www.npr.org/2022/03/24/1088669929/airlines-federal-travel-mask-mandate (noting request from airline CEOs to the Biden Administration that the air travel mask mandate be lifted, and noting that "the White House has not yet commented on the group's request).

[17] *E.g.*, *Georgia v. Biden*, --- F.Supp.3d ----, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021) (granting nationwide preliminary injunction of federal contractor vaccine mandate); *Georgia v. Biden*, 21-cv-00163, ECF No. 96 (S.D. Ga. Dec 9, 2021) (federal government's notice of appeal of nationwide injunction of federal contractor vaccine mandate); *Feds for Med. Freedom v. Biden*, --- F.Supp.3d ----, 2022 WL 188329, at *8 (S.D. Tex. Jan. 21, 2022) (granting nationwide preliminary injunction of federal employee vaccine mandate); *Feds for Med. Freedom v. Biden*, 21-cv-00356, ECF No. 37 (S.D. Tex. Jan. 21, 2022) (federal government's notice of appeal of nationwide injunction of federal employee vaccine mandate).

[18] *E.g.*, *U.S. Navy SEALs 1-26 v. Biden*, --- F.Supp.3d ----, 2022 WL 34443, at *1, *13, and *14 (N.D. Tex. Jan. 3, 2022) ("[t]he Navy has not granted a religious exemption to any vaccine in recent memory"; noting punitive measures taken against Navy SEALS who refused to take vaccine, including threat of discharge from military; and enjoining military vaccine mandate); *U.S. Navy SEALs 1-26 v. Biden*, 21-cv-01236, ECF No. 82 (N.D. Tex. Jan. 21, 2022) (federal government's notice of appeal). .

16.     As to the good cause exception, CDC argues that "it would be impracticable and con-

trary to the public interest" to take public comments on the Title 42 Revocation, and that DHS

"need[s] time to implement an orderly and safe termination of the order." Order at 29. These skeletal

assertions fail to satisfy the good cause exception for four reasons.

17.     *First*, CDC had *ample* time to take public comment on revoking Title 42 and lacks any

pressing need or minimally persuasive excuse for failing to do so. President Biden issued an executive

order on February 2, 2021, directing CDC and DHS to *consider* rescinding Title 42. Defendants thus

had one day short of *fourteen months* to take public comment on potentially rescinding Title 42. They

simply refused to do so. That willful failure to take public comments in that time is not "good cause"

under the APA.

18.     *Second*, Defendants ignore that while the initial promulgation of Title 42 invoked the

good cause exception—because its issuance was during the rapidly unfolding beginning of the Covid-

19 pandemic—the same is not true here. This Order arises two full years into the pandemic, where it

is waning in some areas while a new variant threatens others. The exigency of the initial order simply

does not exist here. There is no "pandemic exception" to notice-and-comment requirements, partic-

ularly two years into that pandemic.

19.     *Third*, the CDC ignores that it *did take* public comment in connection with the issuance

of the Title 42 system under the Trump Administration, from March 24 to April 24, 2022, and then

issued a final rule less than five months after the comment period closed. 85 Fed. Reg. 56424, 56488

(Sept. 11, 2020). There is no reason that the CDC could not have taken the same approach again

here—and the CDC certainly does not supply any. The CDC is thus simply wrong in contending that

the "extraordinary nature" of Title 42 orders necessarily eliminates the APA's requirement for taking

public comment, as its own actions demonstrate.

20.     *Fourth*, the CDC's rationale is self-refuting: if Defendants "need time" to implement the Title 42 revocation, which the Order effectively concedes will be extraordinarily challenging, that is a reason to *take* comments so the agency can have the benefit of public input and can use the needed time to obtain it. Moreover, the disaster that the Administration correctly predicts could easily be less calamitous if they take suggestions from the public and states and incorporate those suggestions. But the CDC's arrogant assertion that there is *no value to be had* from public commenting does not constitute "good cause."

21.     As to the foreign affairs exception, the CDC offers only a single unspecific sentence contending that "this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders." Order at 29. That is patently insufficient.

22.     The "foreign affairs exception applies in the immigration context only when ordinary application of the public rulemaking provisions [*i.e.*, taking public comment] *will provoke definitely undesirable international consequences.*" *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018) (cleaned up) (emphasis added). But the CDC does not identify *any* potential "undesirable international consequences," let alone establish with certainty that such consequences will occur. Instead, the CDC's order merely alludes to the fact that the Administration is engaged in unspecified talks with Canada and Mexico about Covid-19. That is woefully insufficient. The Administration cannot evade notice-and-comment requirements by the expedient of simply talking with its neighboring countries about the same subject in lieu of seeking comment from its own citizens. But that is all Defendants offer here.

23.     For these reasons, neither the good cause nor foreign affairs exceptions apply here. The CDC's refusal to take public comment thus violates the APA and alone requires invalidation of the Termination Order.

24.    That conclusion is perhaps unsurprising. The Biden Administration's violation of no-
tice-and-comment requirements in the immigration context is by now notorious with federal courts.
*See, e.g., Texas v. United States*, __ F. Supp. 3d ___, 2021 WL 3683913, at *51-58 (S.D. Tex. Aug. 19,
2021) (holding that DHS's issuance of Interim Guidance, which similarly and severely reduced remov-
als of aliens with criminal convictions, violated notice-and-comment requirements); *Texas v United
States*, 524 F. Supp. 3d 598, 656-62 (S.D. Tex. 2021) (holding same for 100-day moratorium on immi-
gration removals). Indeed, at oral argument Justice Kagan recently observed another potential viola-
tion by DHS, explaining that "[t]he real issue to me is [DHS's] evasion of notice-and-comment."[19]

25.    The Termination Order also violates the APA as arbitrary and capricious decision-
making. "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and con-
siders all "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring
"reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evi-
dence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

26.    The CDC's Order is arbitrary and capricious most obviously because it expressly re-
fuses to analyze the impacts it will have upon the States. That is, after all, an "important aspect of the
problem." *Michigan*, 576 U.S. at 752. Indeed, the Supreme Court has repeatedly recognized "the im-
portance of immigration policy to the States," particularly as the States "bear[] many of the conse-
quences of unlawful immigration. *Arizona v. United States*, 567 U.S. 387, 397 (2012)

27.    The CDC does not even attempt to deny that its Title 42 Termination Order will im-
pose enormous costs upon the States. Nor did it make *any* attempt to analyze those substantial
harms—even though it was legally required to do so under the APA. *See, e.g., Arizona v. Biden*, 2022
WL 839672, at *30 (holding that DHS violated APA by providing "no explanation of how its policy—

---

[19]  Transcript at 47-48, *Arizona v. San Francisco*, No. 20-1775 (Feb. 23, 2022) available at
https://bit.ly/3itwfq7

that relaxes mandatory detention standards set by Congress—might increase state criminal justice expenses"); *Texas v. United States*, 2021 WL 3683913, at *49 (explicitly rejecting "the Government's argument that it need not consider the States' costs and expenses stemming from the new [immigration] guidelines" under the APA). Defendants thus violated the APA by failing to consider the impacts of their Order on the States, which is manifestly an "important aspect of the problem." *Michigan*, 576 U.S. at 752.

28.     Rather than attempting to analyze the costs that its Order will impose on the States *whatsoever*, CDC denies that it has any obligation to consider those harms *at all*. Instead, it reasons that "no state or local government could be said to have legitimately relied on the CDC [Title 42] Orders … because those orders are, by their very nature, short-term orders, authorized only when specified statutory criteria are met, and subject to change at any time in response to an evolving public health crisis." Order at 23.

29.     The CDC's argument fails for two reasons. *First*, regardless of the purported illegitimacy of the State's reliance on the CDC's Title 42 Orders, the CDC still had an obligation to consider the harms to the States since that is an "important aspect of the problem." *Michigan*, 576 U.S. at 752. The CDC has no license to inflict wanton harms on the States without at least first considering what the magnitude of those harms might be and whether they could be mitigated if the agency considered alternatives with those harms in mind. See, *e.g.*, *id.* at 759 (explain that agencies "must consider cost … before deciding whether regulation is appropriate and necessary"). Here the CDC failed to do so— and indeed *expressly refused* to consider those harms. Defendants' APA violation is thus *explicit and admitted*.

30.     *Second*, even if the CDC were correct that the "short-term" nature of the Title 42 Orders—which have been in place for two entire years and counting—meant that the States could not rely on the Orders being in place *permanently*, the States still could reasonably rely on the CDC not to

revoke the Orders abruptly at a truly terrible time to do so. The Order's timing will greatly exacerbate an already extant meltdown of operational control at the southern border—which even the Administration and its *supporters* fully expect. *Supra* ¶¶ 2-7, 10. Simply put, the States could reasonably rely on the CDC not suddenly revoking its Title 42 Orders now, thereby stacking crisis upon crisis—or in the words of DHS officer, inflicting a "surge on top of a surge." Furthermore, the States could reasonably rely on the CDC only to revoke the Orders after following the APA's notice-and-comment requirements.

31.     A second principal deficiency of the Termination Order is that it fails to analyze meaningfully the entirely predictable—and *actually predicted*—surge of illegal migration that it will cause. Indeed, the Administration has internally predicted that the Termination Order could triple the daily number of illegal aliens attempting to cross the border. *See infra* ¶ 108. But the Termination Order never meaningfully analyzes these impacts or considers ways in which they might be mitigated.

32.     These are only the most flagrant of the defects of the Order. It is also arbitrary and capricious because it, for example, (1) failed to consider alternative effective dates, (2) failed to consider DHS's inability to cope with the resulting surge and failure to plan adequately for it, (3) failed to consider the impacts of the fact that there are *huge* numbers of aliens waiting at the southern border to cross the moment that Title 42 is rescinded, and (4) failed to consider the cumulative effects of the rescission of the Title 42 rescission with the Administration's attempted termination of the Migrant Protection Protocol, *see Texas v. Biden*, 20 F.4th 928, 990 (5th Cir. 2021) *cert. granted*, 142 S. Ct. 1098 (2022), whose impacts will snowball upon each other.

33.     For all of these reasons, the CDC's Title 42 Termination Order violates the APA many times over. This Court should accordingly "hold unlawful and set aside" that Order. 5 U.S.C. § 706(2).

**PARTIES**

34.     Plaintiff State of Arizona is a sovereign state of the United States of America. Arizona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Arizona brings this suit through its Attorney General, Mark Brnovich. He is the chief legal officer of the State of Arizona and has the authority to represent the State in federal court. His offices are located at 2005 North Central Avenue, Phoenix, Arizona 85004.

35.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Louisiana brings this suit through its Attorney General, Jeff Landry. He is authorized by Louisiana law to sue on the State's behalf. His offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

36.     Plaintiff State of Missouri is a sovereign State of the United States of America. Missouri sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Missouri brings this suit through its Attorney General, Eric S. Schmitt. He is authorized by Missouri law to sue on the State's behalf. His address is P.O. Box 899, Jefferson City, Missouri 65102.

37.     Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Alabama brings this suit through its Attorney General, Steve Marshall. He is authorized by Alabama law to sue on the State's behalf. His address is 501 Washington Avenue, P.O. Box 300152, Montgomery, Alabama 36130-0152.

38.     Plaintiff State of Alaska is a sovereign State of the United States of America. Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Alaska brings this suit through its Attorney General, Treg R. Taylor. He is

authorized by Alaska law to sue on the State's behalf. His address is 1031 West 4th Avenue, Suite 200, Anchorage, Alaska 99501-1994.

39.     Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Arkansas brings this suit through its Attorney General, Leslie Rutledge. She is authorized by Arkansas law to sue on the State's behalf. Her address is 323 Center Street, Suite 200, Little Rock, Arkansas 72201.

40.     Plaintiff State of Florida is a sovereign State of the United States of America. Florida sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Florida brings this suit through its Attorney General Ashley Moody. She is authorized by Florida law to sue on the State's behalf. Her address is The Capitol, Pl-01, Tallahassee, Florida 32399-1050.

41.     Plaintiff State of Georgia is a sovereign State of the United States of America. Georgia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Georgia brings this suit through its Attorney General, Christopher M. Carr. He is authorized by Georgia law to sue on the State's behalf. His address is 40 Capitol Square, S.W., Atlanta, Georgia 30334.

42.     Plaintiff State of Idaho is a sovereign State of the United States of America. Idaho sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Idaho brings this suit through its Attorney General, Lawrence G. Wasden. He is authorized to sue on the State's behalf. His address is P.O. Box 83720, Boise, Idaho 83720-0010.

43.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Kansas brings this suit through its Attorney General, Derek Schmidt. He is

authorized by Kansas law to sue on the State's behalf. His address is 120 SW Tenth Avenue, 3rd Floor, Topeka, Kansas 66612-1597.

44.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Kentucky brings this suit through its Attorney General, Daniel Cameron. He is authorized by Kentucky law to sue on the State's behalf. His address is 700 Capital Avenue, Suite 118, Frankfort, Kentucky 40601.

45.     Plaintiff State of Mississippi is a sovereign State of the United States of America. Mississippi sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Mississippi brings this suit through its Attorney General, Lynn Fitch. She is authorized by Mississippi law to sue on the State's behalf. Her address is 550 High Street, Suite 1200, Jackson, Mississippi 39201.

46.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Montana brings this suit through its Attorney General, Austin Knudsen. He is authorized to sue on the State's behalf. His address is 215 N Sanders St., Helena, Montana 59601.

47.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Nebraska brings this suit through its Attorney General, Douglas J. Peterson. He is authorized to sue on the State's behalf. His address is 2115 State Capitol, Lincoln, Nebraska 68509.

48.     Plaintiff State of Ohio is a sovereign State of the United States of America. Ohio sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting the health and well-being of its citizens.

49.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Oklahoma brings this suit through its Attorney General, John M. O'Connor. He is authorized by Oklahoma law to sue on the State's behalf. His address is 313 NE 21st Street, Oklahoma City, Oklahoma 73105.

50.     Plaintiff State of South Carolina is a sovereign State of the United States of America. South Carolina sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. South Carolina brings this suit through its Attorney General, Alan Wilson. He is authorized by South Carolina law to sue on the State's behalf. His address is P.O. Box 11549, Columbia, South Carolina 29211.

51.     Plaintiff State of Tennessee is a sovereign State of the United States of America. Tennessee sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Tennessee brings this suit through its Attorney General, Herbert H. Slatery III. He is authorized by Tennessee law to sue on the State's behalf. His address is P.O. Box 20207, Nashville, Tennessee 37202-0207.

52.     Plaintiff State of Utah is a sovereign State of the United States of America. Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Utah brings this suit through its Attorney General, Sean D. Reyes. He is authorized by Utah law to sue on the State's behalf. His address is 350 North State Street, Suite 230, Salt Lake City, Utah 84114.

53.     Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. West Virginia brings this suit through its Attorney General, Patrick

Morrisey. He is authorized by West Virginia law to sue on the State's behalf. His address is State Capitol, Bldg 1, Room E-26, Charleston, WV 25305.

54.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens. Wyoming brings this suit through its Attorney General, Bridget Hill. She is authorized by Wyoming law to sue on the State's behalf. Her address is 109 State Capitol, Cheyenne, Wyoming 82002.

55.     Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing the Rule.

56.     Defendant Centers for Disease Control and Prevention is constituent agency of the U.S. Department of Health and Human Services ("HHS"). It conducts specified functions under the Public Health Service Act, including exercising authority delegated by HHS.

57.     Defendant Rochelle Walensky is the Director of the CDC. She is sued in her official capacity.

58.     Defendant U.S. Department of Health and Human Services is an executive department of the United States Government.

59.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

60.     Defendant United States Department of Homeland Security ("DHS") is an executive department of the United States Government.

61.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

62.     Defendant U.S. Customs and Border Protection ("USBP") is an agency within DHS that is headquartered in Washington, D.C.

63.     Defendant Christopher Magnus serves as Commissioner of USBP. Defendant Magnus is sued in his official capacity.

64.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an agency within DHS that is headquartered in Washington, D.C.

65.     Defendant Tae Johnson serves as Acting Director of ICE. Defendant Johnson is sued in his official capacity.

66.     Defendant U.S. Citizenship and Immigration Services ("USCIS") is an agency within DHS that is headquartered in Camp Springs, Maryland.

67.     Defendant Ur Jaddou serves as the Director for USCIS. Defendant Jaddou is sued in her official capacity.

68.     Defendant U.S. Border Patrol is an agency within DHS that is headquartered in Washington, D.C.

69.     Raul Ortiz serves as the Chief of the U.S. Border Patrol.

70.     Defendant Department of Justice ("DOJ") is an executive department of the United States Government.

71.     Defendant Merrick Garland is the Attorney General of the United States of America. He is sued in his official capacity.

72.     Defendant Executive Office for Immigration Review ("EOIR") is an agency within DOJ that is headquartered in Bailey's Crossroads, Virginia.

73.     Defendant David Neal is Director of EOIR. He is sued in his official capacity.

74.     Defendant Joseph R. Biden, Jr., is the President of the United States. He is sued in his official capacity.

75.     Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346 and includes the departments and agencies thereof.

## JURISDICTION AND VENUE

76.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 701-06.

77.     An actual controversy exists between the parties within the meaning of 28 U.S.C. §§ 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201-02, 5 U.S.C. §§ 705-06, 28 U.S.C. § 1361, and its inherent equitable powers.

78.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because (1) Defendants are United States agencies or officers sued in their official capacities, (2) the State of Louisiana is a resident of this judicial district, (3) no real property is involved, and (4) a substantial part of the events or omissions giving rise to the Complaint occur within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

## FACTUAL AND LEGAL BACKGROUND

### The INA's Requirements

79.     The Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, charge DHS with enforcing the United States' immigration laws. Under the immigration laws, "several classes of aliens are 'inadmissible' and therefore 'removable.'" *Dept. of Homeland Sec. v. Thuraissigiam*, 140 S.Ct. 1959, 1964 (2020), citing 8 U.S.C. §§ 1182, 1229a(e)(2)(A). Among these classes are aliens who lack a valid entry document when they apply for admission. 8 U.S.C. § 1182(a)(7)(A)(i)(I). This includes aliens who arrive in the United States and aliens who are present in the United States without having been lawfully admitted, who are deemed to have applied for admission. 8 U.S.C. § 1225(a)(1).

80.     An inadmissible alien may be removed; the usual process involves an evidentiary hearing before an immigration judge at which the alien may present evidence and argue against removal.

20

*Thuraissigiam*, 140 S.Ct. at 1964. However, this process is slow, and while "removal is being litigated, the alien will either be detained, at considerable expense, or allowed to reside in this country, with the attendant risk that he or she may not later be found." *Id.*

81.     To address these problems, Congress created more expedited procedures that apply to aliens who are "present in the United States who [have] not been admitted" and to aliens "who arrive[] in the United States (whether or not at a designated port of arrival ...)[.]" 8 U.S.C. § 1225(a)(1).

82.     These aliens are subject to expedited removal if they (1) are inadmissible because they lack a valid entry document; (2) have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) are among those whom the Secretary of Homeland Security has designated for expedited removal. *Id.* § 1225(b)(1)(A). Once an immigration officer determines that such an alien is inadmissible, the alien must be ordered "removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(A)(i).

83.     Whether subject to the standard removal process or the expedited process, aliens who intend to claim asylum or who claim a credible fear of persecution are not deportable while that claim is being investigated. *See* 8 U.S.C. §§ 1158, 1225(b)(1). But those aliens must be detained until their entitlement to asylum is determined. *Id.* § 1225(b)(2).

84.     It has been generally accepted that DHS has the discretion as to whether to place aliens, other than unaccompanied children, into the standard removal process or into expedited removal. *See, e.g.*, *Matter of M-S-*, 27 I&N Dec. 509, 510 (A.G. 2019); *Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 524 (BIA 2011); 8 U.S.C. § 1232(a)(5)(D) (exception). Whichever path DHS chooses, aliens placed in removal proceedings must be detained until DHS has finished considering the asylum application or the removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 844–45 (2018), (citing 8 U.S.C. § 1225(b)(1), (2)). DHS may "for urgent humanitarian reasons or significant public benefit"

temporarily parole these aliens, but it may do so "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A).

85.     Another class of inadmissible aliens is those who have a "communicable disease of public health significance[.]" 8 U.S.C. § 1182(a)(1)(A)(i). The INA defines a "communicable disease of public health significance" by referring to "regulations prescribed by the Secretary of Health and Human Services." *Id.*

86.     There are two circumstances under which aliens must be detained to determine whether they are inadmissible for public-health reasons. First, they must be detained if DHS has reason to believe they are "afflicted with" such a disease. 8 U.S.C. § 1222(a). Second, they must be detained if DHS "has received information showing that any aliens are coming from a country or have embarked at a place" where such a disease is "prevalent or epidemic[.]" This detention must enable "immigration officers and medical officers" to conduct "observation and an examination sufficient to determine whether" the aliens are inadmissible. *Id.*

### *Covid-19 And The Requirements of the PHSA*

87.     In the words of the CDC itself, Covid-19 "is a quarantinable communicable disease caused by the SARS-CoV-2 virus." Order Suspending the Right to Introduce Certain Persons, 86 Fed. Reg. 42,828, 42,830 (Aug. 5, 2021). Since it emerged in late 2019, "SARS–CoV–2, the virus that causes COVID–19, has spread throughout the world, resulting in a pandemic." *Id.*

88.     Since COVID-19 was first declared a public-health emergency in January 2020, "the U.S. government and CDC have implemented a number of COVID–19 mitigation and response measures.

89.     The first Title 42 Order was issued on March 24 as an interim final rule. 85 Fed. Reg. 16,559 (Mar. 24, 2020). At the same time, the CDC expressly invited "comment on all aspects of this interim final rule, including its likely costs and benefits and the impacts that it is likely to have on the

public health, as compared to the current requirements under 42 CFR part 71." *Id.* at 16,559.

90.     After receiving 218 comments during the 30-day comment window that closed April 24, 2020, the CDC published a final rule September 11, 2020; that rule "establishe[d] final regulations under which the Director [of the CDC] may suspend the right to introduce and prohibit, in whole or in part, the introduction of persons into the United States for such period of time as the Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States." 85 Fed. Reg. 56,424, 56,424, 56, 448 (Sep. 11, 2020) (codified at 42 C.F.R. § 71.40). This Final Rule, issued under the authority granted by the PHSA, 42 U.S.C. § 265, became effective October 13, 2020. On October 13, 2020, the day the Final Order became effective, the CDC issued its Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists. 85 Fed. Reg. 65,806–12 (Oct. 13, 2020). Collectively, the Final Rule and this October Order work together in a process generally known as "Title 42" or "Title 42 Order(s)."

91.     Though issued under the Final Rule, the October Order was the latest in a series of orders issued under the original March 24, 2020 interim final rule. As had the earlier orders, the October Order suspended introducing covered aliens into the United States, a suspension lasting until CDC determined that "the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health[.]" 85 Fed. Reg. at 65,810. The suspension was based on findings that:

   • COVID-19 is a communicable disease that poses a danger to the public health;

   • COVID-19 is present in numerous foreign countries, including Canada and Mexico;

   • Because COVID-19 is so globally widespread, there is a serious danger that it will be carried into the land points of entry and Border Patrol stations at or near the United States' borders with Canada and Mexico, and from there into the interior of the country;

• If their entry were not suspended, covered aliens would be go through immigration processing at the land points of entry and Border Patrol stations that would require many of them (typically aliens who lack valid travel documents and are therefore inadmissible) to be held in the congregate areas of the facilities, in close proximity to one another, for hours or days;

• Holding them in such settings would increase the already serious danger to the public health of the United States; and

• This increased danger rose to the level that it required a temporary suspension of the introduction of covered aliens into the United States.

*Id.*

92.     Customs and Coast Guard officers have the duty to "aid in the enforcement of quarantine rules and regulations," PHSA, 42 U.S.C. § 268, and the Order noted that the CDC had requested "that DHS aid in the enforcement [of] this Order because CDC does not have the capability, resources, or personnel needed to do so." *Id.* at 65,812. The CDC needed this assistance because of its own public health tools not being "viable mechanisms given CDC resource and personnel constraints, the large numbers of covered aliens involved, and the likelihood that covered aliens do not have homes in the United States." *Id.*

93.     The October Order applied to all covered aliens, defined as aliens "seeking to enter the United States … who lack proper travel documents," "whose entry is otherwise contrary to law," or "who are apprehended at or near the border seeking to unlawfully enter the United States." *Id.* at 65,807.

94.     The October Order noted that expulsions under CDC's prior orders had "reduced the risk of COVID-19 transmission in [points of entry] and Border Patrol Stations, and thereby reduced risks to DHS personnel and the U.S. health care system." *Id.* It further noted that "[t]he public health risks to the DHS workforce—and the erosion of DHS operational capacity—would have been

greater" without the initial suspension order. Further, the suspension orders "significantly reduced the population of covered aliens in congregate settings in [points of entry] and Border Patrol stations, thereby reducing the risk of COVID-19 transmission for DHS personnel and others within these facilities." *Id.*

95.     DHS began using its Title 42 authority to expel aliens in March 2020, and the population of aliens processed under Title 8 (the ordinarily applicable immigration rules) plummeted. Out of more than 253,000 total southwest border encounters under Title 8 in Fiscal Year 2020, fewer than 25,000 occurred in the last six months of the year.[20] During that same six-month period, nearly 200,000 aliens were rapidly expelled under Title 42.

96.     On July 19, 2021, the CDC issued a new order excepting unaccompanied children from the October Order. Public Health Determination Regarding an Exception for Unaccompanied Noncitizen Children, 86 Fed. Reg. 38,717 (July 22, 2021) (signed July 19, 2021)

97.     On August 3, 2021, Defendants issued an order superseding the October Order and incorporating by reference the July Order excepting unaccompanied children. Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons, 86 Fed. Reg. 48,828 (Aug. 5, 2021) ("August Order").

98.     The August Order summarized the current state of emergency and nature of the pandemic:

- "Congregate settings, particularly detention facilities with limited ability to provide adequate physical distancing and cohorting, have a heightened risk of COVID-19 outbreaks." *Id.* at 42,833. CBP facilities themselves have "[s]pace constraints [that]

---

[20]   The CBP statistics cited in this Complaint are available at *Sw. Border Land Encounters*, U.S. CUSTOMS AND BORDER PROT., https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Aug. 23, 2021).

preclude implementation of cohorting and consequence management such as quarantine and isolation." *Id.* at 42,837.

- "Countries of origin for the majority of incoming covered [aliens] have markedly lower vaccination rates." Of the top five originating countries, El Salvador, at 22%, had the highest rate of vaccinated persons; Guatemala and Honduras, the two lowest, had 1.6% and 1.8%, respectively. *Id.* at 42,834 & n.57.

99.     The August Order concedes that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." 86 Fed. Reg. at 42,835. It came only days after the Defendants released more than 1,500 COVID-positive unauthorized immigrants into the city of McAllen, Texas.[21]

100.     On March 11, 2022, CDC Director Walensky issued a new order (the "March Order") superseding the August Order. 87 Fed. Reg. 15243. The March Order apparently was issued in response to litigation in Texas[22] challenging Defendants' practice of not applying Title 42 to unaccompanied alien children ("UAC"). The March Order found that suspending entry of UACs was "not necessary to protect U.S. citizens," and that the August Order's provisions were terminated as to UACs, but not as to "individuals in family units (FMU) or single adults (SA)." 87 Fed. Reg. 15243, 15245.

***Termination of the August and March Orders***

101.     On April 1, 2022, CDC Director Walensky issued an order terminating the Title 42 policy (the "Termination Order") effective May 23, 2022. Exhibit A, Public Health Determination

---

[21]   Adam Shaw & Bill Melugin, "Texas border city says more than 7,000 COVID-positive migrants released since February, 1,500 in last week," FOX NEWS (Aug. 4, 2021), https://www.foxnews.com/politics/texas-border-city-covid-positive-migrants-released-february-last-week.

[22]   *Texas v. Biden*, 21-cv-00579 (N.D. Tex.)

And Order Regarding The Right To Introduce Certain Persons From Countries Where A Quarantinable Communicable Disease Exists, CDC (Apr. 1, 2022), available at https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/Final-CDC-Order-Prohibiting-Introduction-of-Persons.pdf.

102.    The Termination Order claimed that it was "not a rule subject to notice and comment under the Administrative Procedure Act." Ex. A at 29. It did so on two putative bases. First it asserted the good cause exception applied because "it would be impracticable and contrary to the public interest." Second, it asserted that the APA's foreign affairs exception by claiming without offering any detail or explanation that "this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders." *Id.*

103.    Even members of President Biden's own party have criticized the Termination Order. Senator Joe Manchin warned in a letter to President Biden that, "[w]ith encounters along our southern border surging and the highly transmissible Omicron BA.2 subvariant emerging as the dominate strain in the United States, now is not the time to throw caution to the wind" and cancel the Title 42 policy.[23]

***Harms to Plaintiffs***

104.    States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. The States thus rely significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

105.    As a result, there is little the States can do about the thousands of aliens entering the United States. Record numbers of aliens are already attempting to cross the border illegally.

---

[23] Joe Manchin, Ltr. to President Biden, (Mar. 29, 2022), https://bit.ly/3J4e2dF.

106.    DHS's own statistics show the dramatic increases in the number of crossings into the United States—even with Title 42 in place. Indeed, current levels of illegal crossings are at their highest levels in at least two decades, and perhaps ever. The following is DHS's own chart graphically showing these enormous increases in crossings:

Table 1: DHS Southwest Border Encounters By Month



**U.S. Customs and Border Protection (CBP) Encounters**
US Border Patrol (USBP) Title 8 Apprehensions,
Office of Field Operations (OFO) Title 8 Inadmissible Volumes,
and Title 42 Expulsions by Fiscal Year (FY)

FY
All

Component
All

Demographic
All

Citizenship Grouping
All

Title of Authority
All

**Reset Filters**

FY    ■ 2019   ■ 2020   ■ 2021   ■ 2022 (FYTD)

**FY Southwest Land Border Encounters by Month**

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 (FYTD) | 164,841 | 174,870 | 179,256 | 154,745 | 164,973 |  |  |  |  |  |  |  | 838,685 |
| 2021 | 71,929 | 72,113 | 73,994 | 78,414 | 101,099 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | 1,734,686 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 34,460 | 17,106 | 23,237 | 33,049 | 40,929 | 50,014 | 57,674 | 458,088 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |

Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

107.    DHS sources have indicated that "there have been more than 300,000 known 'gota-ways' —migrants who were not apprehended or turned themselves in and who got past agents -- since fiscal year 2022 began on October 1st."[24] In addition, "former Border Patrol Chief Rodney Scott said there had been approximately 400,000 gotaways in the entirety of FY 2021." [25]

108.    Defendants' unlawful termination of the Title 42 policy will induce a significant in-crease of illegal immigration into the United States, with many migrants asserting non-meritorious asylum claims. Indeed, press reports state that Defendants themselves predict that the Termination Order will create an unprecedented surge at the border that will overwhelm Defendants' capacity to enforce immigration laws at the border—they predict that the daily number of aliens unlawfully trying to enter the United States will nearly *triple*.[26] White House Communications Director Kate Bedingfield admitted on the record that the Termination Order will cause "an influx of people to the border."[27] This predicted influx will injure the Plaintiff States in multiple ways, including through increased ex-penditures on health care, education, and law enforcement, as well as through increased numbers of crimes.

109.    Another district court in this Circuit has found that reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at *6, *18–19 (N.D. Tex. Aug. 13, 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting). ("An alien ...

---

[24]  Melugin, BillFox News, *62,000+ illegal immigrants got past Border Patrol agents in March: sources* (April 1, 2022), https://fxn.ws/37fqLNq.

[25]  *Id.*

[26]  Nick Miroff and Maria Sacchetti, "Biden officials bracing for unprecedented strains at Mexicobor-der if pandemic restrictions lifted," The Washington Post, Mar. 29, 2022. https://www.washing-tonpost.com/national-security/2022/03/29/border-pandemic-title-42-immigration/.

[27]  Maria Sacchetti and Nick Miroff, "Biden administration to lift pandemic border restrictions," The Washington     Post,     Mar.     30,     2022,     https://www.washingtonpost.com/national-secu-rity/2022/03/30/title-42-border-restrictions-no-longer-needed-public-health-cdc-says/.

has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.")

110.    Defendants' unlawful termination of the Title 42 policy creates incentives to cross the border illegally by reducing the cost of being apprehended. Just as with the Migrant Protection Protocols, by removing the carrot of admission into the United States, reduced the number of false asylum claimants by requiring potential asylees to remain in Mexico, *Texas*, 2021 WL 3603341, at \*6, \*18–19, the Defendants, by removing the stick of mandatory detention, increase the number of illegal entries into the United States by erasing the possibility that an apprehension will result in anything other than the freedom to remain in the United State

111.    Since 1982, the Supreme Court has mandated that States provide public education to school-age aliens not lawfully in the United States. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). As a direct result of the influx of migrants that the Termination Order will cause, some of whom will be minors, the Plaintiff States will be compelled to spend additional moneys on education for these additional immigrants. The Termination Order is thus a direct, but-for cause of these imminent injuries.

112.    The presence of these aliens in each State violates each State's quasi-sovereign interest in its territory and the welfare of their citizens.

113.    The Termination Order will cost Plaintiffs millions, as explained in further detail below.

**Arizona**

114.    As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration.

115.    Defendant DHS has previously recognized that Arizona "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Arizona's] law enforcement needs and

budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona."

Exhibit B, Memorandum of Understanding Between DHS and the State of Arizona at 2. DHS has

also recognized that "rules, policies, procedures, and decisions that could result in significant increases

to the number of people residing in a community" will "result in direct and concrete injuries to [Ari-

zona], including increasing the rate of crime, consumption of public benefits and services, strain upon

the healthcare system, and harm to the environment, as well as increased economic competition with

the State of Arizona 's current residents for, among other things, employment, housing, goods and

services." *Id.* at 3.

116.     Arizona is required to expend its scarce resources when DHS acts unlawfully to in-

duce increased illegal immigration. This includes resources expended by Arizona's law enforcement

community.

117.     Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts

to tens of millions of dollars each year, as reflected by Arizona's State Criminal Assistance Program

(SCAAP) requests, the great majority of which are not reimbursed by the federal government.

118.     Arizona has approximately 275,000 to 365,000 immigrants living in the State that are

not lawfully in the United States; about 54% of them do not have health insurance; about 32% of

them have incomes below the poverty level; and they cost Arizona taxpayers more than $1.7 billion a

year.[28] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[28]  The number of unauthorized aliens is notoriously difficult to calculate. Several studies, however, estimate the number of unauthorized aliens in Arizona to be in this approximate range. *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AZ (273,000, 54% uninsured); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (275,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (365,000, $1.7 billion annual cost).

119.    Drug cartels use human trafficking routes to also traffic illegal drugs into the United States. Increased illegal immigration means increased quantities of illegal drugs. For example, drug cartels coordinate surges of unauthorized immigrants who cross the border in large groups and then make non-meritorious asylum claims. This serves as a distraction to Border Patrol personnel. While all available Border Patrol personnel are busy processing these aliens' asylum claims, they are unable to patrol the border, which allows drug mules to enter the United States unimpeded. Individuals believed to be cartel drug smugglers are regularly caught on camera crossing the border, dressed in camouflage and carrying weapons to protect their drug loads.[29] Cartel scouts appear to even brazenly "occupy strategically-selected hilltops for dozens of miles inside Arizona," establishing a presence on American territory to track Border Patrol movements and coordinate surges of aliens entering the United States.[30] Even the drugs themselves are becoming more dangerous, as smugglers are trading large bags of marijuana for smaller packs of more potent "cocaine, fentanyl, heroin, [and] meth."[31] In December 2021, police in Scottsdale, Arizona seized 1.7 million fentanyl pills that were worth $9 million; they also seized ten kilograms of powdered fentanyl and one pound of methamphetamine.[32] The seized drugs were from the Sinaloa Cartel.[33] According to the DEA, "[t]he Sinaloa Cartel primarily

---

[29]   Brian Brennan, *'People don't need to die': Border rancher deals with constant flow of migrants, drug packers*, KGUN 9 (May 20, 2019), https://www.kgun9.com/border-watch/people-dont-need-to-die-border-rancher-deals-with-constant-flow-of-migrants-drug-packers

[30]   U.S. House of Representatives, Committee on Homeland Security, *Testimony of Jim Chilton on "Examining the Effect of Border Wall on Private and Tribal Landowners"*, (February 27, 2020), https://homeland.house.gov/imo/media/doc/Testimony%20-%20Chilton1.pdf

[31]   Natasha Yee, *As marijuana profits fade, cartels increasingly smuggle fentanyl across the border*, (October 18, 2021), https://gilaherald.com/as-marijuana-profits-fade-cartels-increasingly-smuggle-fentanyl-across-the-border/

[32]   Steven Hernandez, *Scottsdale police, DEA seize record 1.7 million fentanyl pills in Arizona*, Arizona Republic, (Dec. 16, 2021), https://www.azcentral.com/story/news/local/phoenix-breaking/2021/12/16/authorities-arizona-seize-9-million-fentanyl-pills-narcotics/8929613002/

[33]   *Id.*

uses trafficking routes that go through Arizona,"[34] and the Phoenix area is a major cartel drug trans-shipment hub.[35]

**Louisiana**

120.    Plaintiff Louisiana is also gravely injured by the Termination Order. Louisiana will be required to stretch its scare resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially.. The Rule will create increased crime and drug trafficking in Louisiana's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Rule will force Louisiana to expend limited resources on education, healthcare, public assistance, and general government services.

121.    Defendant DHS has previously recognized that Louisiana "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona." Exhibit C, Memorandum of Understanding Between DHS and the Louisiana Department of Justice at 2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased

---

[34]  *Id.*

[35]  Alex Gallagher, *Record fentanyl seizure by Scottsdale cops, DEA*, Scottsdale Progress, (Dec. 19, 2021), https://www.scottsdale.org/news/record-fentanyl-seizure-by-scottsdale-cops-dea/article_fbf7c02e-6074-11ec-91ab-b35932ed58da.html

economic competition with the State of Louisiana's current residents for, among other things, employment, housing, goods and services." *Id.* at 3.

122.    Louisiana has approximately 70,000 to 78,000 aliens living in the State that are not lawfully in the United States; more than 70% of them do not have health insurance; about 34% of them have incomes below the poverty level; and they cost Louisiana taxpayers more than $362 million a year.[36] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

123.    DHS operates multiple alien detention facilities in the Western District of Louisiana, including the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana, and others in Oberlin, Plain Dealing, Jonseboro, Jena, Natchitoches, Monroe, Ferriday, Basile, and Winnfield, Louisiana. DHS releases illegal aliens from those detention facilities to Louisiana cities throughout the Western District, including Lafayette, Monroe and Shreveport. Releases in Lafayette are so common that a California business advertises "immigration bail bonds in Lafayette" and urges illegal immigrants and their families to "contact our Lafayette bail bondsmen" "if you have a family member who finds him or herself in custody of [DHS]." Upon information and belief, DHS "paroles" many illegal immigrants into Louisiana cities without even the minimal security of a bond. The Termination Order will increase the use of DHS detention facilities and lead to the increased release of aliens into the Western District and throughout the State.

---

[36] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/LA (70,000, 73% uninsured, 34% poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (70,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (78,820, $362 million annunal cost).

**Missouri**

124.    Missouri is directly and adversely affected by increases in illegal immigration at the southern border. Based on recent statistics, approximately 56 out of every 1,000 unlawful aliens who enter the United States end up residing in Missouri. These unlawful aliens impose pocketbook injuries on Missouri in the form of education, healthcare, and criminal-justice costs. These pocketbook injuries are irreparable because Missouri has no plausible recourse to recoup them.

125.    "Missouri likewise faces a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license." *Texas*, 2021 WL 3603341, at *10.The total costs to … Missouri … of providing public education for illegal alien children will rise in the future as the number of illegal alien children present in the State increases." *Id.*

126.    "Some aliens who … are being released or paroled into the United States and will use state-funded healthcare services or benefits in … Missouri." *Id.* "The total costs to the State will increase as the number of aliens within the state increases." *Id.*

127.    Missouri is also a destination state and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. Such crimes disproportionately afflict illegal aliens, and these crimes (and other crimes committed by illegal aliens) impose irreparable law-enforcement and criminal-justice costs on Missouri. As another district court recently found, "[s]ome aliens who … are being released or paroled into the United States and will commit crimes in … Missouri," and "Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally." *Id.* Both crimes committed by unlawful aliens, and human-trafficking crimes committed by and against unlawful aliens, inflict irreparable costs on Missouri, both in law-enforcement costs and providing resources for victims. "Human trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri." *Id.*

128.     An increased influx of illegal aliens also affect the labor market and reduce job opportunities for U.S. citizens and lawfully present aliens in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri is a State with large agricultural sector. The presence of large numbers of unlawful aliens distorts Missouri's job markets and inflicts irreparable injury on both the State and its citizens.

### Alabama

129.     Plaintiff Alabama is also injured by the Termination Order. Alabama will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Alabama's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Alabama to expend limited resources on education, healthcare, public assistance, and general government services.

130.     Alabama has approximately 55,000 to 73,000 illegal aliens living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and they cost Alabama taxpayers more than $324.9 million a year.[37] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[37] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AL (62,000, 68% uninsured, 34% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (55,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (73,190, $324.9 million annual cost).

## Alaska

131.    Plaintiff Alaska is also injured by the Termination Order. Alaska will be required to stretch its scarce resources under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Alaska 's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Alaska to expend limited resources on education, healthcare, public assistance, and general government services.

132.    Alaska has approximately 5,000 to 11,260 illegal aliens living in the State; they cost Alaska taxpayers more than $72 million a year.[38] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Arkansas

133.    Plaintiff Arkansas is also injured by the Termination Order. Arkansas will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Arkansas's communities, requiring additional expenditure by law enforcement. In

---

[38]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles (10,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (11,260; $72 million annual cost).

addition, by incentivizing further illegal immigration, the Termination Order will force Arkansas to expend limited resources on education, healthcare, public assistance, and general government services.

134.    Arkansas has approximately 58,000 to 79,000 illegal aliens living in the State; about 63% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Arkansas taxpayers more than $339.5 million a year.[39] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Florida

135.    Plaintiff Florida is also injured by the Termination Order. Florida will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Florida's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Florida to expend limited resources on education, healthcare, public assistance, and general government services.

136.    Florida has approximately 772,000 to 957,000 illegal aliens living in the State; about 61% of them are uninsured; about 28% of them have incomes below the poverty line; and they cost Florida taxpayers more than $4.7 billion a year.[40] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[39] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AR (58,000, 63% uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (55,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (78,820, $339.5 million annual cost).

[40]    *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute,

137.     Florida spends over $100 million per year incarcerating illegal immigrants who commit crimes in the State. Florida also provides a variety of public benefits regardless of immigration status. In some circumstances, Florida law requires the State to provide benefits to illegal immigrants released at the border. § 443.101(7), Fla. Stat. (providing unemployment benefits for certain aliens who are paroled under 8 U.S.C. § 1182(d)(5)).

## Georgia

138.     Plaintiff State of Georgia is directly and adversely affected by any changes to federal immigration policy. When illegal immigration increases, Georgia must redirect its scarce resources. The Termination Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. Illegal aliens in Georgia receive numerous state services, including healthcare, education, drivers-license, and criminal justice-related costs, among others. Ending the Title 42 policy would injure Georgia by increasing the number of illegal aliens receiving these services at its expense.

139.     For instance, Georgia has approximately 339,000 to 422,000 aliens living unlawfully in the State; about 70% of them are uninsured; about 36% of them have incomes below the poverty level; and they cost Georgia taxpayers more than $1.8 billion a year.[41] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/FL (772,000, 61% uninsured, 28% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (775,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (957,100, $4.7 billion annual cost).

[41] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.mi-grationpolicy.org/data/unauthorized-immigrant-population/state/GA (339,000, 70% uninsured, 36% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-

140.     The CDC's action will also increase crime and criminal justice expenses in Georgia. In fiscal year 2020, which ended September 2020, ICE's Atlanta Office removed 9,137 aliens, of which 5,889 were convicted criminals and 1,111 had pending criminal charges.[42] If additional illegal aliens migrate to Georgia, some will commit crimes. That will impose irreparable law-enforcement and criminal-justice costs on Georgia.

### Idaho

141.     Plaintiff Idaho is also injured by the Termination Order. Idaho will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Idaho's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Idaho to expend limited resources on education, healthcare, public assistance, and general government services.

142.     Idaho has approximately 29,000 to 51,000 illegal aliens living in the State; about 60% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost Idaho taxpayers more than $225.4 million a year.[43] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

by-state/ (400,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (422,250, $1.8 billion annual cost).

[42] Local Statistics, ERO FY 2020 Report, U.S. Immigration & Customs Enforcement (Oct. 2021), https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf

[43] *See, e.g.,* Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/ID (29,000, 60% uninsured, 27% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (35,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform

## Kansas

143.    Plaintiff Kansas is also injured by the Termination Order. Kansas will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Kansas communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Kansas to expend limited resources on education, healthcare, public assistance, and general government services.

144.    Kansas has approximately 69,000 to 85,000 illegal aliens living in the State; about 64% of them are uninsured; about 25% of them have incomes below the poverty line; and they cost Kansas taxpayers more than $377 million a year.[44] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Kentucky

145.    Plaintiff Kentucky is also injured by the Termination Order. Kentucky will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the

---

(2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (50,670, $225.4 million annual cost).

[44] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/KS (69,000, 64% uninsured, 25% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (75,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (84,450, $377 million annual cost).

number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Kentucky's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Kentucky to expend limited resources on education, healthcare, public assistance, and general government services.

146.     Kentucky has approximately 35,000 to 56,000 illegal aliens living in the State; about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and they cost Kentucky taxpayers more than $261 million a year.[45] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Mississippi

147.     Plaintiff Mississippi is also injured by the Termination Order. Mississippi will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Mississippi's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Mississippi to expend limited resources on education, healthcare, public assistance, and general government services.

---

[45] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/KY (46,000, 60% uninsured, 37% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (35,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (56,300, $261 million annual cost).

148.     Mississippi has approximately 20,000 to 28,150 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost Mississippi taxpayers more than $117 million a year.[46] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### Montana

149.     Plaintiff Montana is also injured by the Termination Order. Montana will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Montana communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Montana to expend limited resources on education, healthcare, public assistance, and general government services.

150.     Montana has approximately 3,000 to 6,000 illegal aliens living in the State, and they cost Montana taxpayers more than $27 million a year.[47] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[46] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MS (25,000, 75% uninsured, 49% below poverty level); U.S. Unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (20,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), https://www.fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (28,150, $117 million annual cost).

[47] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MT (3,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (<5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-

## Nebraska

151.     Plaintiff Nebraska is also injured by the Termination Order. Nebraska will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Nebraska's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Nebraska to expend limited resources on education, healthcare, public assistance, and general government services.

152.     Nebraska has approximately 42,000 to 60,000 illegal aliens living in the State; about 56% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Nebraska taxpayers more than $233.1 million a year.[48] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Ohio

153.     Plaintiff Ohio is also affected by the Termination Order. By drastically increasing the number of aliens who enter the United States without legal authorization, previously expelled under the Title 42 Order, Ohio will be forced to expend limited resources on education, healthcare, public assistance, and general government services on those aliens who are either not apprehended at the border or who are released and travel to Ohio. Ohio, according to a 2019 estimate, has almost 90,000

---

Immigration-2017.pdf (<6,000, $27 million annual cost).

[48]  *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NE (42,000, 56% uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (60,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (50,670, $233.1 million annual cost).

illegal migrants living in the State.[49] According to the same estimate, half of this population is uninsured, two-thirds live below 200 percent of the poverty level, and 92 percent of school aged children attend school. Ohio is required to pay the cost of emergency medical services for uninsured immigrants who otherwise qualify for Medicaid, through the Emergency Medicaid program. Any increase in this population will increase costs to the State.

154.    In addition, Defendants will be unable to adequately screen, mitigate, and treat for communicable diseases—of all types—when illegal border crossings (including crossings of "covered aliens") reach their predicted levels. This presents a serious threat to the public health of Ohio and every State where the unvetted aliens travel.

## Oklahoma

155.    Plaintiff Oklahoma is also injured by the Termination Order. Oklahoma will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Oklahoma's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Oklahoma to expend limited resources on education, healthcare, public assistance, and general government services.

156.    Oklahoma has approximately 90,000 to 107,000 illegal aliens living in the State; about 68% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost

---

[49] Profile of the Unauthorized Population: Ohio, Migration Policy Institute (last visited Nov. 9, 2021), https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/OH.

Oklahoma taxpayers more than $467 million a year.[50] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## South Carolina

157.    Plaintiff South Carolina is also injured by the Termination Order. South Carolina will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in South Carolina's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force South Carolina to expend limited resources on education, healthcare, public assistance, and general government services.

158.    South Carolina has approximately 88,000 to 98,000 illegal aliens living in the State; about 69% of them are uninsured; about 33% of them have incomes below the poverty line; and they cost South Carolina taxpayers more than $471 million a year.[51] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[50] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/OK (90,000, 68% uninsured, 27% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (85,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (106,970, $467 million annual cost).

[51] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/SC (88,000, 69% uninsured, 33% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (85,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (95,710, $471 million annual cost).

**Tennessee**

159.     Plaintiff Tennessee is also injured by the Termination Order. Tennessee will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Tennessee's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Tennessee to expend limited resources on education, healthcare, public assistance, and general government services for the influx of aliens

160.     Tennessee has approximately 128,000 to 135,000 illegal aliens living in the State; about 73% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Tennessee taxpayers more than $593 million a year.[52] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

**Utah**

161.     Plaintiff Utah is also injured by the Termination Order. Utah will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens

---

[52] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TN  (128,000,  73%  uninsured, 30% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center  (2016),  https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (130,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (135,120, $593 million annual cost).

Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Utah's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Utah to expend limited resources on education, healthcare, public assistance, and general government services.

162.     Utah has approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year.[53] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

### West Virginia

163.     Plaintiff West Virginia is also injured by the Termination Order. West Virginia will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in West Virginia's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force West Virginia to expend limited resources on education, healthcare, public assistance, and general government services.

---

[53] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/UT (89,000, 61% uninsured, 23% below poverty level); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (95,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (112,600, $521 million annual cost).

164.    West Virginia has approximately 4,000 to 6,000 illegal aliens living in the State, and they cost West Virginia taxpayers more than $26.3 million a year.[54] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

## Wyoming

165.    Plaintiff Wyoming is also injured by the Termination Order. Wyoming will be required to stretch its scarce resources even further under the Termination Order, because the Order will cause an influx of aliens at the border no longer subject to expulsion, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially. The Termination Order will create increased crime and drug trafficking in Wyoming's communities, requiring additional expenditure by law enforcement. In addition, by incentivizing further illegal immigration, the Termination Order will force Wyoming to expend limited resources on education, healthcare, public assistance, and general government services.

166.    Wyoming has approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year.[55] If more illegal aliens enter the State, that will increase the costs of the State's healthcare system.

---

[54] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WV (4,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (<5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $26.3 million annual cost).

[55] *See, e.g.*, Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WY (7,000); U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (5,000); The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (<6,000, $26.1 million annual cost).

**All Plaintiffs**

167.   The CDC's Termination Order will result in the entry of tens or hundreds of thousands of aliens unlawfully entering the United States, who would otherwise not be able to gain entry into the United States. This, in turn, will cause Plaintiff States to spend money on healthcare, detention, education, and other services for aliens that would otherwise not have to be spent. For example, Arizona, Louisiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming are required to spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c).

168.   By ignoring the requirements of the INA and PHSA, and thus facilitating the entry of unauthorized aliens into the United States, the Termination Order encourages a greater influx of unauthorized aliens into Plaintiff States, further increasing law enforcement costs in Plaintiff States, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

169.   Federal law also requires that emergency medical services be provided to unlawfully present aliens. 42 C.F.R. § 440.255(c).

170.   Plaintiff States' emergency medical providers deliver millions of dollars in medical services to unauthorized aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves.

171.   While these costs are impactful in typical years, the COVID-19 pandemic makes the potential for harm to Plaintiff States through additional emergency healthcare costs to unauthorized aliens exceptionally high.

172.   The Termination Order necessarily increases the number of aliens in Arizona, Louisiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Mississippi,

Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia, and Wyoming who are subject to receiving such medical care at the expense of Plaintiff States' healthcare institutions.

173.    The Termination Order will allow a far greater number of aliens with meritless asylum claims to enter the United States. Such aliens rarely leave the United States of their own accord, and Defendants rarely remove such aliens, even after their asylum claims have been denied. The Termination Order will therefore increase Plaintiff States' costs of providing emergency medical care to these individuals who would otherwise never have been allowed into the United States. Additionally, the Termination Order encourages a greater influx of unauthorized aliens into Plaintiff States, further increasing the population of unauthorized aliens for whom Plaintiff States must bear the cost of emergency medical care, education, and other social services.

174.    The Termination Order will increase illegal immigration into the United States. Some of the additional illegal aliens will migrate into each of the Plaintiff States, and some of those aliens will commit crimes in each of the Plaintiff States. The increased number of illegal aliens in the Plaintiff States will thus also increase crime and criminal justice expenses in Plaintiff States, thus injuring the States through increased law enforcement, incarceration, and crime prevention costs. The increased crime will also injure the citizens of Plaintiff States.

175.    In addition, Defendants will be unable to adequately screen, mitigate, and treat for communicable diseases—of all types—when illegal border crossings (including crossings of "covered aliens") reach their predicted levels. This presents a serious threat to the public health of Plaintiff States.

**CLAIMS FOR RELIEF**

**COUNT I**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Lack of Notice and Comment**

176.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

177.     The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

178.     The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, *id.* § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c). The Termination Order, therefore, only can be issued, if at all, pursuant to notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

179.     Such requirements "are not mere formalities" but rather "are basic to our system of administrative law." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018). "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984); *see also NRDC*, 894 F.3d at 115 (notice and comment serves "the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking"); *Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review").

180.    The Defendants did not conduct the statutorily required notice-and-comment process for the Termination Order.

181.    The Termination Order is not an interpretive rule, general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking. Rather, the Termination Order is a substantive rule for APA purposes because it binds agency discretion. 5 U.S.C. § 551(4)–(5). Further, it is a final order because it represents the culmination of the agency's consideration and affects the rights and obligations of those to whom they apply. Indeed, the title of the Termination Order the "right" affected by the rule, specifically "the right to introduce certain persons from countries where a quarantinable communicable disease exists." Ex. A at 1.

182.    The CDC offered two bases for excusing notice-and-comment requirements: the good cause exception and the foreign affairs exception. Ex. A at 29. In assessing whether good cause exists, this Court "must rely only on the 'basis articulated by the agency itself' at the time of the rulemaking. 'Post hoc explanations'" do not suffice. *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (cleaned up).

183.    The good-cause exception to the APA's notice-and-comment requirement does not apply here, and Defendants' rationale for invoking that exception is insufficient as a matter of law. *See supra* ¶¶ 15-20.

184.    Defendants' attempt to invoke the good cause exception ignores that there is a difference between putting in place emergency measures against the backdrop of a rapidly *escalating* pandemic of epic proportions versus taking action in the context of a slowly *dissipating* pandemic—it may be an emergency at the start of the pandemic, when quick action is needed, but not when it is tapering off slowly at a predictable pace. For example, there was ample time for Defendants to notify the public of its intention to revoke and to gather and consider comments on that proposal. On February 2,

2021, President Biden signed Executive Order 14010, in which he ordered that "[t]he Secretary of HHS and the Director of CDC, in consultation with the Secretary of Homeland Security, shall promptly review and determine whether termination, rescission, or modification of the [Title 42 orders] is necessary and appropriate." 86 Fed. Reg. 8267. Defendants have therefore been considering the ending Title 42 for over 14 months. Defendants have had ample time to put potential termination up for notice-and-comment. And Defendants' preparations for the Termination Order has apparently been continuous up until the moment of its issuance. On March 17, 2022, in response to a question about the possible termination of the Title 42 policy, White House spokesperson Vedant Patel affirmed that "the Administration is doing our due diligence to prepare for potential changes at the border."[56] Apparently, however, that diligence did not include fulfilling the Administration's legal obligation under the APA to subject their planned policy change to notice and comment.

185.    Nor does the foreign affairs exception to the APA's notice-and-comment requirement apply. "[T]he foreign affairs exception requires the Government to do more than merely recite that the Rule 'implicates' foreign affairs." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775 (9th Cir. 2018). A mere "reference in [a] Rule ... to our 'southern border with Mexico' is not sufficient." *Id.* Thus, "the foreign affairs exception applies in the immigration context only when ordinary application of the public rulemaking provisions will provoke definitely undesirable international consequences…. [I]t would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." *Id.* at 776 (cleaned up) (citations and quotation marks omitted).

---

[56]  Jonathan Swan and Stef W. Kight, "Scoop: Biden officials fear "mass migration event" if COVID policies end," Axios, Mar. 17, 2022, https://www.axios.com/biden-border-mexico-migrants-title-42-a91b6441-2197-463f-ab1f-2435824a9566.html.

186.     In the immigration context, the foreign affairs exception only applies if "the public rulemaking provisions [w]ould provoke definitely undesirable international consequences"; otherwise, "the foreign affairs exception would become distended." *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (citation omitted), superseded by statute on other grounds, by 8 U.S.C. § 1101(a)(42). In the Termination Order, Defendants never even claim at all that the Title 42 policy–either its continuance or termination—implicates any "undesirable international consequences." Instead, Defendants attempt to invoke the foreign affairs exception merely by making the obvious and unexceptional disclosure that the Title 42 policy "concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration." Ex. A at 29. This weak attempt to invoke the foreign affairs exception is insufficient. That the United States is engaged in "ongoing discussions with Canada, Mexico, and other countries" *id.* at 29, does not entitle the Defendants to except the Termination Order from the APA's procedures. There is no evidence that complying with the APA's rulemaking procedures would cause a diplomatic incident.

187.     Under these circumstances, Defendants' failure to comply with the APA's notice and comment provisions is fatal to the Rule. *Id.* at 928-29 ("Without good cause, we must enforce Congress's choice in favor of the traditional, deliberative rulemaking process.").

## COUNT II
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Arbitrary and Capricious Agency Action
### Contrary to 8 U.S.C. §§ 103(g)

188.     Plaintiff States repeat and incorporate by reference each of the Complaint's allegations stated above.

189.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

190.     "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

191.     For starters, an agency cannot "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gresham v. Azar*, 363 F. Supp. 3d 165, 177 (D.D.C. 2019) ("The bottom line: the Secretary did no more than acknowledge—in a conclusory manner, no less—that commenters forecast a loss in Medicaid coverage.").

192.     Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered ... is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016).

193.     The Termination Order is arbitrary and capricious for several independently sufficient reasons.

194.     *First*, Defendants failed to estimate or account for the costs to the States of the Termination Order, such as the increased health care costs for aliens infected with COVID-19 and the cost of increased illegal immigration caused by the Termination Order, and the presence of much greater numbers of paroled aliens with non-meritorious asylum claims who were induced to enter the United States because of the Termination Order.

195.     Federal policy as it relates to immigration "has more than just an incidental effect on the States" because "the States engage in an immigration cost-sharing partnership" with the federal government. *Arizona*, 2022 WL 839672, at *24. Defendants, therefore "cannot so easily dismiss how [their] administration of the immigration laws impacts the States." *Id.* "Immigration 'ha[s] a discernable

impact on traditional state concerns,' considering that 'unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service.'" *Id.* at *30 (quoting *Plyler*, 457 U.S. at 228 n.23) (alteration in original).

196.    Thus, when DHS "only considered whether its enforcement policies generally influence state expenditures" and "gave no explanation of how its policy ... might increase state criminal justice expenses," the Southern District of Ohio recently found that DHS had "'entirely failed to consider' an important consequence of its policy," and its rule was therefore arbitrary and capricious. *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The CDC has committed the same APA violation here by disclaiming any responsibility for analyzing negative impacts on the States from its Termination Order.

197.    *Second* and relatedly, the Termination Order is arbitrary and capricious because the Defendants did not consider Plaintiffs States' reliance interests in the continuation of the Title 42 policy. In particular, the Defendants did not consider whether States relied on continuation of the Title 42 policy when Plaintiffs determined how they would marshal and distribute their resources to address the public-health, safety, and economic effects of the COVID-19 pandemic, as well as their decisions about resource allocations to deal with the number of unauthorized aliens entering their states.

198.    Defendants' cursory dismissal of the existence of any reliance interests in the Title 42 policy misses the mark. Ex. A at 23-24. Their analysis is entirely legal in nature and fails to undertake any kind of policy analysis of the actual real-world effects of the Title 42 policy and how States might have legitimately relied on it. The Termination Order even acknowledges that "state or local government[s]" may have "reliance interest[s]" in the Title 42 policy, but characterizes such interests as "misplaced" and claims that delaying the effective date of Termination Order until May 23 would be enough time for states "to adjust their planning in anticipation of the full resumption of Title 8 border

processing." *Id.* at 29. The Termination Order offers no explanation, however, of how 53 days might be enough time for states to "adjust their planning," when the Title 42 policy has been in place for more than two years and when Defendants have in the meantime abdicated most of their other border enforcement obligations, thus leaving Title 42 as the only remaining bulwark against the rising flood of migrants pouring across the border illegally. The Termination Order is arbitrary and capricious because it utterly ignores Plaintiffs' reliance interests, and it must therefore be set aside. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-14 (2020).

199.    *Third*, Defendants also failed to consider the immigration consequences of the Termination Order. Indeed, this failure is particularly brazen, as press reports state that Defendants have made internal assessments of the immigration effects, and are predicting unprecedented waves of new illegal immigration. *See supra* ¶¶ 7, 108. Indeed, the Termination Order itself acknowledges the likelihood of these public health and immigration consequences, as it delays the effective date of Termination Order until May 23, 2022 "to give DHS time to implement additional COVID-19 mitigation measures" and "to provide DHS time to implement operational plans for fully resuming Title 8 processing." Ex. A at 26, 28. By delaying the effective date until May 23, Defendants thus recognize the Termination Order will have consequences and that they have the authority and capacity to delay the Termination Order to account for immigration-related consequences. But they failed to analyze whether they should exercise that authority in a different manner given the enormous immigration consequences that even they predict will occur.

200.    *Fourth*, Defendants failed to consider or arbitrarily rejected obvious alternatives to Termination Order, such as continuing the Title 42 policy, rigorous enforcement of immigration laws to deter illegal immigration, or implementing in good faith the Migrant Protection Protocols ("MPP") and withdrawing their challenge to the Fifth Circuit's invalidation of it.

201.     *Fifth*, Defendants failed to consider obvious and relevant consequences of the Termination Order, such as the public health and public policy consequences of the emergence of new variants of the COVID-19 virus.

202.     *Sixth*, Defendants failed to justify their deviation from prior practice of continuing the Title 42 policy.

203.     *Seventh*, Defendants have failed to analyze and consider how their own failure to maintain alien detention capacity affects the purported need to parole aliens into the United States. For example, at the same time Defendants claim that their detention facilities are at overcapacity, Defendants have submitted budget requests to Congress requesting for a *decrease* in funding for detention and detention facilities.[57] Moreover, Defendants have affirmatively degraded their own detention capacity by cancelling contracts with private detention facilities and by closing detention facilities.[58]

204.     *Eighth*, Defendants failed to consider alternative timing of the Termination so that the Termination would not coincide with the current unprecedented, continuing surge of migrants unlawfully crossing the border.

205.     *Ninth*, Defendants failed to consider accumulated groups of aliens (*e.g.* Haitians) waiting on the Mexican side of the border who are waiting to cross the moment Title 42 is rescinded.[59] "Department of Homeland Security intelligence estimates that perhaps 25,000 migrants already are

---

[57] Eileen Sullivan, "Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds," New York Times, Mar. 25, 2022, https://www.nytimes.com/2022/03/25/us/politics/biden-immigration-detention-beds.html.

[58] *Id.*; Priscilla Alvarez, "Biden administration to close two immigration detention centers that came under scrutiny," CNN. May 20, 2021, https://www.cnn.com/2021/05/20/politics/ice-detention-center/index.html.

[59] Maria Sacchetti and Nick Miroff, "Biden administration to lift pandemic border restrictions," The Washington Post, Mar. 30, 2022, https://www.washingtonpost.com/national-security/2022/03/30/title-42-border-restrictions-no-longer-needed-public-health-cdc-says/ ("Thousands [of] Haitian migrants are believed to be waiting in Mexico in anticipation of the end of Title 42, according to DHS officials familiar with the government's planning and preparations.").

waiting in Mexican shelters just south of the border for Title 42 to end."[60] A federal law enforcement official told CNN that the number of aliens in northern Mexico waiting to cross illegally into the United States is "[b]etween 30,000 to 60,000."[61]

206.    *Tenth*, Defendants failed adequately to consider the spread of infection in DHS facilities resulting from Title 42 termination, because the INA requires that aliens awaiting removal proceedings must be detained.

207.    *Eleventh*, Defendants failed to consider the interaction of the Termination with termination of MPP.

208.    This list is not exclusive but merely illustrative of the Termination Order's obvious deficiencies. For each of these independently sufficient reasons and others, the Rule is arbitrary and capricious.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs request an order and judgment:

1.    Declaring, under 28 U.S.C. § 2201, that the Termination Order violates the APA because it was promulgated without notice and comment;

2.    Declaring, under 28 U.S.C. § 2201, that the Termination Order is arbitrary and capricious and unlawful under the APA;

3.    Vacating the Termination Order;

4.    Preliminarily and permanently enjoining, without bond, Defendants from applying the Termination Order;

---

[60]  Jonathan Swan and Stef W. Kight, "Scoop: Biden officials fear "mass migration event" if COVID policies end," Axios, Mar 17., 2022, https://www.axios.com/biden-border-mexico-migrants-title-42-a91b6441-2197-463f-ab1f-2435824a9566.html.

[61]  Catherine E. Shoichet, "We're expecting a big increase in migrants at the US-Mexico border. But this time is different." CNN, Apr. 1, 2022, https://www.cnn.com/2022/03/31/politics/border-title-42-whats-next-cec/index.html.

5.      Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

6.      Granting any and all other such relief as the Court finds appropriate.

Dated:   April 14, 2022

MARK BRNOVICH
   Attorney General
BRUNN ("BEAU") W. ROYSDEN III *
   Solicitor General
DREW C. ENSIGN *
   Deputy Solicitor General
JAMES K. ROGERS *
   Senior Litigation Counsel
ANTHONY R. NAPOLITANO
   Assistant Attorney General
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

STEVE MARSHALL
   Alabama Attorney General
EDMUND G. LACOUR JR.*
   Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

Respectfully submitted,

By:*/s/ Elizabeth B. Murrill*

ELIZABETH B. MURRILL (La #20685)
   Solicitor General
J. SCOTT ST. JOHN (La #36682)
   Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
   Attorney General
D. JOHN SAUER *
   Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

TREG R. TAYLOR
   Attorney General of Alaska
CORI M. MILLS*
   Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
   Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*


CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
OFFICE OF THE KANSAS ATTORNEY
GENERAL
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*


LAWRENCE G. WASDEN
  Attorney General,
BRIAN KANE*
  Chief Deputy Attorney General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DAVE YOST
  Ohio Attorney General
BENJAMIN M. FLOWERS*
  Solicitor General
OFFICE OF THE OHIO ATTORNEY
GENERAL
30 E. Broad St., 17th Fl.
Columbus, OH 43215
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee
ANDRÉE S. BLUMSTEIN
  Solicitor General
CLARK L. HILDABRAND*
BRANDON J. SMITH*
  Assistant Solicitors General
OFFICE OF THE TENNESSEE ATTOR-
NEY GENERAL AND REPORTER
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

PATRICK MORRISEY
  Attorney General
LINDSAY SEE*
  Solicitor General
OFFICE OF THE WEST VIRGINIA AT-
TORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

* Pro hac vice application forthcoming

SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK*
  Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*