**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| THE STATE OF ARIZONA,<br>By and through its Attorney General, Mark<br>Brnovich, et al.,<br><br>          PLAINTIFFS,<br><br>v.<br><br>CENTERS FOR DISEASE CONTROL &<br>PREVENTION; et al.,<br><br>          DEFENDANTS. | CIVIL ACTION NO. 6:22-cv-00885-RRS-CBW |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iv

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................5

    I.    Title 42 and CDC Authority In The Immigration Context .....................................5

        A.   History Of Title 42 Orders During Covid-19 Pandemic .................................5

           1.   The March 2020 IFR ..........................................................................5

           2.   Title 42 Orders .................................................................................6

    II.   CDC's Termination Order ....................................................................................8

    III.  TITLE 42 AND THE UNPRECEDENTED SURGE IN ILLEGAL IMMIGRATION AT THE SOUTHERN BORDER ........................................................................................9

        A.   The Failing Situation At the Border .................................................................9

        B.   The Effect of Title 42 At The Border .............................................................9

        C.   The Order's (Non-)Consideration of Immigration Consequences ...............10

LEGAL STANDARD .......................................................................................................11

ARGUMENT ................................................................................................................11

    I.    Plaintiff States Have Standing .........................................................................11

    II.   Plaintiff States Are Likely to Succeed on Their Notice-And-Comment Claim18

        A.   The Termination Order Is A Substantive Rule Generally Requiring Notice-And-Comment Rulemaking ............................................................................18

        B.   Defendants' Attempt To Invoke The Good Cause Exception Fails ...............19

           1.   Defendants Had Ample Time To Conduct Notice-And-Comment Rulemaking.20

           2.   CDC Improperly Ignores Its Prior Use Of Notice-And-Comment Procedures And Instead Relies On The Covid-19 Pandemic As A Categorical Exception .....21

           3.   The Current Circumstances Do Not Constitute Good Cause ...............22

           4.   CDC's Timing Rationale Is Unpersuasive ........................................23

        C.   Defendants' Reliance On The "Foreign Affairs" Exception Is Unavailing ...24

        D.   Defendants' Circumvention Of Notice-And-Comment Requirements Is Part Of A Broader Pattern ...........................................................................................25

    III.  Plaintiffs Are Likely To Prevail On Their Arbitrary-And-Capricious claim ....26

A.   CDC's Failure to Consider Financial Harms to the States and Other Reliance Interests Is Arbitrary and Capricious ..................................................................................26

    1.   CDC did not consider financial harms to the States or other reliance interests....27

    2.   The Supreme Court and Fifth Circuit have rejected the CDC's justification for refusing to consider State reliance interests................................................................28

    3.   The CDC was obligated to consider financial harms to the States flowing from its Termination Order, even without a showing of prior "resource-allocation" decisions based on the Title 42 policy ..............................................................30

    4.   The CDC's other arguments are meritless, arbitrary, and capricious .....................32

B.   The CDC's Failure to Consider the Immigration Consequences of Its Termination Order Is Arbitrary and Capricious ................................................................33

    1.   The Termination Order contradicts itself in failing to consider immigration consequences ....................................................................................34

    2.   Under the APA, the CDC must consider non-public-health impacts of its policy change ....................................................................................37

    3.   CDC's Recent Extension Of Its Transportation Mask Mandate Underscores The Termination Order's Deficiencies ....................................................39

IV.   PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION ............40

V.   AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST ..........................................41

VI.   THIS COURT SHOULD ENTER A NATIONWIDE INJUNCTION. ....................................41

CONCLUSION....................................................................................42

# TABLE OF AUTHORITIES

## CASES

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ....................................................................................24

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ......................................................................................26

*Arizona v. San Francisco*,
No. 20-1775 (U.S. Feb. 23, 2022) .................................................................................26

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................................27, 40

*Biden v. Texas*,
No. 21-954, 2021 WL 6206109 (U.S. 2021) ................................................................12

*BST Holdings, L.L.C. v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ........................................................................................22

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
981 F.3d 742 (9th Cir. 2020) ........................................................................................40

*Corrosion Proof Fittings v. EPA*,
947 F.2d 1201 (5th Cir. 1991) ................................................................................33, 39

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ..............................................................................................3, 39

*DHS v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................4, 28, 29, 30, 31, 32, 33, 34, 37, 38

*East Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) .....................................................................................4, 25

*Env't Def. Fund, Inc. v. EPA*,
716 F.2d 915 (D.C. Cir. 1983) ......................................................................................20

*Getty v. Fed. Sav. and Loan Ins. Corp.*,
805 F.2d 1050 (D.C. Cir. 1986) ....................................................................................39

*Huisha-Huisha v. Mayorkas*,
2021 WL 4206688 (D.D.C. Sept. 16, 2021) .................................................................32

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) ....................................................................................24

*Jean v. Nelson*,
727 F.2d 957 (11th Cir. 1984) ......................................................................................24

*Jicarilla Apache Nation v. DOI*,
613 F.3d 1112 (D.C. Cir. 2010) ....................................................................................22

*Louisiana v. Becerra*,
__ F. Supp. 3d __, 2022 WL 16571 (W.D. La. January 1, 2022) ...........................20, 22

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012) ..................................................................................19, 23

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ........................................................................................................11

*Michigan v. EPA,*
   576 U.S. 743 (2015) ...........................................................................................26, 27, 28

*New Jersey v. EPA,*
   626 F.2d 1038 (D.C.Cir.1980) .....................................................................................19

*Northern Mariana Islands v. United States,*
   686 F.Supp.2d 7 (D.D.C. 2009) ...................................................................................40

*NRDC v. Abraham,*
   355 F.3d 179 (2d Cir. 2004) .........................................................................................21

*NRDC v. NHTSA,*
   894 F.3d 95 (2d Cir. 2018) ...........................................................................................21

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) .......................................................................................11

*P.J.E.S. v. Wolf,*
   502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................................32

*Rajah v. Mukasey,*
   544 F.3d 427 (2d Cir. 2008) .........................................................................................24

*Sorenson Commc'ns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) .....................................................................................19

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021) ...................................................2, 12, 27, 31, 33, 39, 40

*Texas v. Biden,*
   554 F. Supp. 3d 818 (N.D. Texas 2021) ...............................................................32, 41

*Texas v. Biden,*
   No. 2:21-cv-67, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) ..............................9, 30

*Texas v. Biden,*
   142 S. Ct. 1098 (2022) .....................................................................................2, 12, 31

*Texas v. United States,*
   __ F. Supp. 3d ___, 2021 WL 3683913 (S.D. Tex. Aug. 19, 2021) ...........................26

*Texas v. United States,*
   136 S. Ct. 2271 (2016) .................................................................................................40

*Texas v. United States,*
   524 F. Supp. 3d 598 (S.D. Tex. 2021) .........................................................................26

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ..................................................................................40, 41

*U.S. Telecom Ass'n v. FCC,*
   400 F.3d 29 (D.C. Cir. 2005) .......................................................................................19

*United States v. Garner,*
   767 F.2d 104 (5th Cir.1985) .........................................................................................19

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011).................................................................................19, 20, 22

*United Techs. Corp. v. EPA,*
   821 F.2d 714 (D.C. Cir. 1987).........................................................................................19

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021).........................................................................................41

*Winter v. NRDC,*
   555 U.S. 7 (2008)..............................................................................................................11

*Yassini v. Crosland,*
   618 F.2d 1356 (9th Cir. 1980).........................................................................................24

*Zadvydas v. Davis,*
   533 U.S. 678 (2001)...........................................................................................................9

## STATUTES

42 C.F.R. § 440.255 ..........................................................................................................14

42 C.F.R. § 71.40 ..............................................................................................................28

42 U.S.C. § 265 ...................................................................................................................5

42 U.S.C. § 268 ...................................................................................................................7

5 U.S.C. § 551 ...................................................................................................................22

5 U.S.C. § 553 ...................................................................................................................25

5 U.S.C. § 804 ...................................................................................................................18

## REGULATIONS

85 Fed. Reg. 16,559 (Mar. 24, 2020) ...............................................................................5

85 Fed. Reg. 17,060 (Mar. 26, 2020) ...............................................................................6

85 Fed. Reg. 22,424 (Apr. 22, 2020) ................................................................................6

85 Fed. Reg. 31,503 (May 26, 2020) ................................................................................6

85 Fed. Reg. 56,424 (Sep. 11, 2020) ................................................................................6

85 Fed. Reg. 65,806 (Oct. 16, 2020) .............................................................................6, 7

86 Fed. Reg. 42,828  (Aug. 5, 2021) ................................................................................8

86 Fed. Reg. 8,267 (Feb. 5, 2021) ....................................................................................8

87 Fed. Reg. 15,243 (Mar. 17, 2022) ...............................................................................8

87 Fed. Reg. 19,941 (Apr. 6, 2022) ..................................................................................8

## INTRODUCTION

The Plaintiff States seek this Court's intervention to forestall an imminent calamity: Defendants' attempt to terminate the Title 42 system, which is the only safety valve preventing this Administration's already disastrous border control policies from descending into an unmitigated catastrophe. Indeed, it is estimated that *half a million* migrants will illegally cross into the United States in the *first month* that the challenged order ("Termination Order" or "Order") goes into effect. Ex. A, Declaration of James K. Rogers ("Rogers Decl."), Ex. 5. The Administration has presented *no* possible way it can identify, quarantine, treat, or mitigate communicable disease risk given the flood of border crossings it predicts. If not enjoined, the Termination Order will inflict devastating injuries upon the Plaintiff States and the entire nation.

This is not merely the opinion of the Plaintiff States, but an expectation widely shared even by many of the Administration's otherwise-ardent *supporters*. Specifically, no less than seven Democratic Senators so far have come out in opposition to the Title 42 Termination, and have even gone so far as to describe it as a "*frightening decision*" (Senator Manchin - WV) and to explain that "Ending Title 42 is expected to cause a *significant increase* of migration to the United States and put more pressure on an already broken system." (Senator Tester - MT). Rogers Decl. Exs. 2, 15 (emphases added). Those same senators are equally clear that the Administration has no plan for addressing the resulting surge in unlawful border crossings that the Termination Order will occasion, explaining variously:

- The "decision to announce an end to Title 42 despite not yet having a comprehensive plan ready shows a lack of understanding about the crisis at our border." (Senator Sinema - AZ).

- "Ending Title 42 prematurely will likely lead to a migrant surge that the administration does not appear to be ready for." (Senator Hassan - NH).

- "We are nowhere near prepared to deal with that influx." (Senator Manchin - WV).

- "This is the wrong way to do this and it will leave the administration unprepared for a surge at the border." (Senator Cortez Masto - NV).

1

- "I think this is the wrong time and I haven't seen a plan that gives me comfort." (Senator Warnock - GA).

Rogers Decl. Exs. 10, 13-16.

Moreover, the Administration itself has admitted that the Termination Order *will* cause a massive increase of illegal crossings, with the White House's own Communications Director outright declaring that the Administration "ha[s] *every expectation* that when the CDC ultimately decides it's appropriate to lift Title 42, *there will be an influx* of people to the border." Rogers Decl. Ex. 9 (emphasis added). U.S. Customs and Border Protection Commissioner Chris Magnus issued a public statement admitting that "[a]s a result of the CDC's termination of its Title 42 public health order, we will likely face an increase in encounters above the current high levels." Rogers Decl. Ex. 20.

Thus, there should be no serious debate that the Termination Order will cause a dramatic surge in illegal migration into the U.S. if it is not enjoined. And the Fifth Circuit has already recognized, the States will suffer harms establishing Article III standing "if the total number of in-State aliens increase." *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) *cert. granted* 142 S. Ct. 1098 (2022). Those harms occur principally in the form of increased expenditures on law enforcement (including jails and prisons), health care, and education. And because the States cannot recover against the United States and its agencies for these harms, their irrecoverable injuries constitute irreparable harm.

The Termination Order also stands out as a radical outlier in Administration policy. While the Order is expressly premised on claimed improvements in the Covid-19 pandemic, those same improvements notably have not resulted in Defendants: (1) lifting the CDC transportation mask mandate, (2) loosening or repealing any of their numerous vaccination mandates, or (3) ending their relentless campaign to discharge members of our military who have applied for religious exemptions for vaccination requirements—which have been almost uniformly denied. First Amended Complaint ("FAC") ¶¶ 9, 13. Amazingly, the "science" underlying these discordant Covid-19 measures just happens to align perfectly with the Administration's political assessments of the relative desirability of

those measures for their partisan objectives. This Court, however, is "'not required to exhibit a naiveté from which ordinary citizens are free.'" *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted).

Defendants' Termination Order is not merely terrible public policy that will inflict enormous injuries upon the States. It is also profoundly illegal. That is principally so for two reasons: (1) Defendants unlawfully flouted the notice-and-comment requirements for rulemaking under the Administrative Procedure Act ("APA"), and (2) Defendants' Order is arbitrary and capricious, thus violating the APA, because it has numerous omissions that each independently render it illegal.

As to the notice-and-comment claim, Defendants seek to excuse their flouting of that APA requirement for two reasons: invoking the "good cause" and "foreign affairs" exceptions of 5 U.S.C. §§ 553(a)(1) and (b)(3)(B). But neither applies.

As to the good cause exception, CDC had *ample* time to take public comment on revoking Title 42 and lacks any pressing need or minimally persuasive excuse for failing to do so. Indeed, CDC had been considering taking that action for *fourteen months*—far more time than needed to take public comment. Defendants also ignore completely that CDC *did take* public comment when implementing the Title 42 system, and offers no reason why it could not do so again. Moreover, while the initial emergency promulgation of Title 42 properly invoked the good cause exception—because its issuance was during the rapidly unfolding beginning of the Covid-19 pandemic—the same is not true here. This Order arises two full years into the pandemic, where it is waning in some areas while a new variant threatens others. The initial exigency simply does not exist anymore. There is no "pandemic exception" to notice-and-comment requirements, particularly two years into it.

Consider next the foreign affairs exception, which "applies in the immigration context only when ordinary application of the public rulemaking provisions [*i.e.*, taking public comment] *will provoke definitely undesirable international consequences*." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76

3

(9th Cir. 2018) (cleaned up) (emphasis added). But CDC offered only a single unspecific sentence supporting its foreign-affairs-exception claim, which does not identify *any consequences whatsoever*. Instead, it treats the mere existence of talks with Canada and Mexico about the same subject as a *carte blanche* blessing to dispense with notice-and-comment rulemaking entirely. It is not.

The Termination Order is also unlawful because it is arbitrary and capricious. That is so for two overarching reasons: (1) it fails to consider harms to the States and their reliance interests in the prior Title 42 Orders, and (2) it fails—indeed expressly refuses—to consider the immigration consequences of its actions, which are virtually certain to be calamitous and necessarily poses a serious danger to public health—at least one that must be considered.

As to the harms to the States, that is undeniably an "important aspect of the problem," which the APA mandated reasoned analysis of. But CDC refused to supply even a scintilla of the required analysis. Defendants similarly refused explicitly to consider the States' reliance interests—a position that the Fifth Circuit recently rejected as "astonishing[]" and "squarely foreclosed by" Supreme Court precedent. *Texas v. Biden*, 20 F.4th at 990. Indeed, even if the original Title 42 orders were outright *illegal*—and they plainly were not—CDC *still* would have been required to consider the States' reliance interests in them. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). CDC's position that the States' interests can be ignored entirely simply because the original Title 42 orders were purportedly "short-term"—though lasting two entire years—is thus preposterous.

The Termination Order's contention that CDC lacks authority to consider immigration consequences is also at war with the Order itself. In particular CDC explicitly delayed the effective date of the termination based on *immigration consequences*—demonstrating that it has authority to consider such impacts, but lacks the willingness to do so. That is perhaps unsurprising, as CDC would have to take the requisite "hard look" at the man-made disaster that the Termination Order will occasion. But unfortunately for Defendants, that is precisely what the APA demands.

For all of these reasons, and those explained below, this Court should issue a preliminary injunction against implementation of the Termination Order.

## BACKGROUND

### I.   TITLE 42 AND CDC AUTHORITY IN THE IMMIGRATION CONTEXT

The Public Health Services Act ("PHSA") establishes that, whenever the director of the CDC:

> determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health ... the [CDC Director], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265. Prior to the COVID-19 pandemic, the applicable § 265 regulations only permitted "suspend[ing] the introduction of property" and "quarantin[ing] or isolat[ing] persons," but did "not address the suspension of the introduction of persons into the United States under section 362." 85 Fed. Reg. 16,559, 16,560 (Mar. 24, 2020).

### A.   History Of Title 42 Orders During Covid-19 Pandemic

#### 1.   The March 2020 IFR

On March 20, 2020, in response to the COVID-19 pandemic, HHS issued an Interim Final Rule amending the applicable regulations to create "an efficient regulatory mechanism to suspend the introduction of persons" to prevent Covid-19 spread into the U.S. *Id.* at 16,562.

In doing so, CDC invoked the APA's good cause exception to the APA, citing "the national emergency caused by COVID-19." *Id.* at 16,565. At the same time, however, CDC expressly invited "comment on all aspects of this interim final rule, including its likely costs and benefits and the impacts that it is likely to have on the public health[.]" *Id.* After receiving 218 comments during the 30-day comment window that closed April 24, 2020, CDC published a final rule September 11, 2020. That

rule "establish[d] final regulations under which the [CDC] may suspend … the introduction of persons into the United States for such period of time as the Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States." 85 Fed. Reg. 56,424, 56,424, 56,448 (Sep. 11, 2020) (codified at 42 C.F.R. § 71.40). This Final Rule became effective October 13, 2020. (CDC's collective policies of excluding aliens are hereinafter referred to as the "Title 42 Policy" and "Title 42 Orders.")

### 2.    Title 42 Orders

Concurrently with the March 2020 IFR, the CDC Director issued an order suspending the introduction into the United States of all "persons traveling from Canada or Mexico," except for "U.S. citizens, lawful permanent residents, and their spouses and children" and other limited exceptions. 85 Fed. Reg. 17,060 (Mar. 26, 2020) (the "March 2020 Order").

The March 2020 Order was set to expire after thirty days, but was subsequently renewed twice. *See* 85 Fed. Reg. 22,424, 22,427 (Apr. 22, 2020); 85 Fed. Reg. 31,503 (May 26, 2020). In May, the 30-day renewal requirement was abandoned and instead replaced with a mandatory review of the policy's continued necessity every 30 days. 85 Fed. Reg. at 31,504. When the Final Rule became effective, CDC issued a new order, the "October 2020 Order," under its aegis.

The October 2020 Order was "substantially the same as" prior orders, was subject to 30-day periodic reviews, and was to remain in force until CDC had "publish[ed] a notice in the Federal Register terminating this Order and its Extensions." 85 Fed. Reg. 65,806, 65,807, 65,810, 65,812 (Oct. 16, 2020). The October 2020 Order's suspension of the entry of aliens, together with the orders that preceded it, was based on findings that:

- COVID-19 is a communicable disease that poses a danger to the public health;

- COVID-19 is present in numerous foreign countries, including Canada and Mexico;

- Because COVID-19 is so globally widespread, there is a serious danger that it will be carried

into the land points of entry and Border Patrol stations at or near the United States' borders

with Canada and Mexico, and from there into the interior of the country;

- If their entry were not suspended, covered aliens would go through immigration processing that would require many of them (typically aliens who lack valid travel documents and are therefore inadmissible) to be held in the congregate areas of the facilities, in close proximity to one another, for hours or days;

- Holding them in such settings would increase the risk of spreading Covid-19; and

- This increased danger rose to the level that it required a temporary suspension of the introduction of covered aliens into the United States.

*Id.* at 65,810.

The October 2020 Order noted that CDC had requested "that DHS aid in the enforcement

[of] this Order because CDC does not have the capability, resources, or personnel needed to do so."

*Id.* at 65,812; *see also* 42 U.S.C. § 268 (stating that Customs and Coast Guard officers have the duty to

"aid in the enforcement of quarantine rules and regulations" under the PHSA). As with the prior

orders, the October 2020 Order applied to all covered aliens, defined as aliens "seeking to enter the

[U.S.] … who lack proper travel documents," "whose entry is otherwise contrary to law," or "who are

apprehended at or near the border seeking to unlawfully enter the United States." *Id.* at 65,807.

The October 2020 Order noted that expulsions under CDC's prior Title 42 Orders had

"reduced the risk of COVID-19 transmission … and thereby reduced risks to DHS personnel and the

U.S. health care system." *Id.* at 65,810. It further noted that "[t]he public health risks to the DHS

workforce—and the erosion of DHS operational capacity—would have been greater" without the

initial Title 42 Order. Further, the Title 42 Orders "significantly reduced the population of covered

aliens in congregate settings in [points of entry] and Border Patrol stations, thereby reducing the risk

of COVID-19 transmission for DHS personnel and others within these facilities." *Id.*

7

On July 19, 2021, CDC issued a new order excepting unaccompanied children. 86 Fed. Reg. 38,717 (July 22, 2021) (the "July 2021 Order"). It subsequently suspended the October 2020 Order and incorporating by reference the July 2021 Order excepting unaccompanied children. 86 Fed. Reg. 48,828 (Aug. 5, 2021) (the "August 2021 Order"). That order conceded that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both." 86 Fed. Reg. 42,828 42,835 (Aug. 5, 2021).

On March 11, 2022, CDC issued a new order (the "March 2022 Order") superseding the August 2021 Order. 87 Fed. Reg. 15,243 (Mar. 17, 2022). The March 2022 Order apparently was issued in response to litigation in Texas challenging Defendants' practice of not applying Title 42 to unaccompanied alien children ("UAC"). *See Texas v. Biden*, 21-cv-00579 (N.D. Tex.). The March 2022 Order found that suspending entry of UACs was "not necessary to protect U.S. citizens." *Id.* at 15,245.

## II.   CDC'S TERMINATION ORDER

On February 2, 2021, President Biden signed Executive Order 14010, in which he ordered that "[t]he Secretary of HHS and the Director of CDC, in consultation with [DHS], shall promptly review and determine whether termination, rescission, or modification of the [Title 42 orders] is necessary and appropriate." 86 Fed. Reg. 8,267 (Feb. 5, 2021). The federal government has therefore been actively considering termination of the Title 42 Policy for over 14 months.

On April 1, 2022, CDC Director Walensky issued an order terminating the Title 42 policy (the "Termination Order" or "Order") effective May 23, 2022. FAC, Exhibit A; *see also* 87 Fed. Reg. 19,941 (Apr. 6, 2022). The Termination Order claimed that it was "not a rule subject to notice and comment under the Administrative Procedure Act." Order at 29. It did so on two putative bases: the "good cause" and "foreign affairs" exceptions of 5 U.S.C. §§ 553(a)(1) and (b)(3)(B). *Id.*

### III.   TITLE 42 AND THE UNPRECEDENTED SURGE IN ILLEGAL IMMIGRATION AT THE SOUTHERN BORDER

#### A.   The Failing Situation At the Border

As explained in greater detail in the FAC (at ¶¶ 104-110), the Administration has lost operational control of the border and is facing historically unprecedented levels of illegal crossings even with Title 42 in place. *See also* Appendix Table 1 (DHS Encounters). Indeed, DHS sources have indicated that "there have been more than 300,000 known 'gotaways'—migrants who were not apprehended or turned themselves in and who got past agents—since fiscal year 2022 began on October 1st." Rogers Decl. Ex. 1. In addition, "former Border Patrol Chief Rodney Scott said there had been approximately 400,000 gotaways in the entirety of FY 2021." *Id.*

#### B.   The Effect of Title 42 At The Border

Against the backdrop of historically unprecedented numbers of encounters and "gotaways," the Title 42 Policy resulted in over one million expulsions of aliens unlawfully entering the United States in Fiscal Year 2021, and over 400,000 to date in FY 2022. *See* Appendix Table 2.

As the Northern District of Texas properly recognized, reducing the likelihood that an alien will be released into the United States reduces the number of aliens who attempt to enter the United States illegally. *Texas v. Biden*, No. 2:21-cv-67, 2021 WL 3603341, at *6, *18–19 (N.D. Tex. Aug. 13, 2021); *cf. Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting). ("An alien ... has less incentive to cooperate or to facilitate expeditious removal when he has been released, even on a supervised basis, than does an alien held at an [ICE] detention facility.") The Termination Order will thus predictably lead to greater numbers of attempted (and successful) crossings.

Recognizing the essential role that the Title 42 Policy serves, even members of President Biden's own party have severely and extensively criticized the Termination Order. *See* FAC ¶¶ 2-7. They are equally alarmed that this Termination Order will lead to disaster, with Senator Manchin calling it a "*frightening* decision," and adding that "[w]e are *nowhere near prepared to deal with that influx*."

9

Rogers Decl. Ex. 15 (emphasis added). Since the Complaint, Senator Jon Tester has added his voice to the chorus of criticism even amongst Democratic Senators, explaining that the Title 42 Order "risks undermining our national security" and "is expected to cause a significant increase of migration to the United States." Rogers Decl. Ex. 2.

DHS officials and officers have similarly made clear that the Order will greatly increase illegal crossings into the United States. *See* FAC ¶¶ 9-12, 31, 108, 199, 205. Indeed, DHS "intelligence estimates that perhaps 25,000 migrants already are waiting in Mexican shelters just south of the border for Title 42 to end." Rogers Decl. Ex. 3. A federal law enforcement official told CNN that the number of aliens in northern Mexico waiting to cross illegally into the United States is "[b]etween 30,000 to 60,000." Rogers Decl. Ex. 4.

### C.     The Order's (Non-)Consideration of Immigration Consequences.

The Termination Order acknowledged the likelihood that it would cause major public health and immigration consequences, as it delayed the effective date of Termination Order until May 23, 2022 "to give DHS time to implement additional COVID-19 mitigation measures" and "to provide DHS time to implement operational plans for fully resuming Title 8 processing." Order at 26, 28. CDC recognizes that terminating the Order will increase COVID-19 risk and spread, because it "will lead to an increase in the number of noncitizens being processed in DHS facilities which could result in overcrowding in congregate setting." Order at 28 The Order itself, however, contains no meaningful analysis of the likely increases in crossings into the United States, or the likely consequences of that increase in migration in the current context.

This failure is particularly noteworthy, as Defendants apparently made internal assessments of the immigration effects, and are predicting that the daily number of aliens unlawfully trying to enter the United States could nearly *triple* to 18,000 crossing per day. Rogers Decl. Ex. 5. According to a former DHS Secretary under the Obama administration, 1,000 crossings in a day is a "relatively bad

number" and 4,000 daily crossings is a "crisis." Rogers Decl. Ex. 6. Neither DHS nor CDC has explained whether or how either agency will be capable of safely *screening* that number of migrants for communicable disease, nor could they.

Furthermore, the Termination Order is in notable conflict with other policies of the Biden Administration. The Title 42 Termination is expressly premised on the "rapid[] decrease" of COVID-19 cases following the recent wave of the Omicron variant of the virus. FAC, Ex. A at 12. Yet, the CDC itself still classifies the level of COVID-19 danger for travelers to Mexico to be "Level 3: High" out of a 4-point scale. Rogers Decl. Ex. 7 In fact, every single country or territory in the Western Hemisphere that has been rated by the CDC is still rated as either "Level 3: High" or "Level 4: Very High." Rogers Decl. Ex. 8.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiff States "must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012); *accord Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.   PLAINTIFF STATES HAVE STANDING

States are "entitled to special solicitude in" the "standing analysis" when they are suing to protect their "procedural right[s] and ... [their] quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). And even if Plaintiffs were not entitled to special solicitude, here the harms are obvious. The Termination Order *will* cause increased illegal immigration into the United States. No one—least of all the Administration—harbors any doubt about that. In the words of the White House Communications Director: "there *will be* an influx of people to the border." Rogers Decl. Ex. 9

(emphasis added). That prediction is well-grounded: during Title 42's operation, it resulted in roughly 1.7 *million* summary expulsions of those crossing into the U.S. illegally. Appendix Table 2.

Such large increases in illegal immigration will cause the Plaintiff States harm, principally in the form of increased health care, education, law enforcement, and imprisonment costs. *See, e.g.*, *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) *cert. granted* 142 S. Ct. 1098 (2022) (recognizing that "if the total number of in-State aliens increases, the States will spend more on healthcare" (emphasis added)). Indeed, the Fifth Circuit has been perfectly clear that these sorts of large-scale immigration policies are "precisely the sort of large-scale polic[ies] that [are] amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And [the State's] standing is robustly supported by just such big-picture evidence." *Id.* at 971. Even more tellingly, while DHS sought Supreme Court review of that decision, it made *zero attempt* to challenge that standing holding, either in its petition for certiorari or its merits brief. *See* Petition for Certiorari, *Biden v. Texas*, No. 21-954, 2021 WL 6206109 (U.S. 2021); Brief for Petitioners, *Biden v. Texas*, No. 21-954, 2022 WL 815341 (U.S. 2022); Reply Brief for the Petitioners, *Biden v. Texas*, No. 21-954, 2022 WL 340629 (U.S. 2022).

As in *Texas*, the government's only conceivable standing defense is that the Title 42 Termination won't "cause[] either an increase in entries or an increase in parolees." *Texas*, 20 F.4th at 969. But that would be wholly untenable in light of the Administration's concessions that the Order *will* cause an "influx." *Supra* at 1-2, 11. Moreover, a central premise of the delayed May 23 effective date is that this influx will be *so severe* that DHS needs additional time to prepare for it (with even Democratic Senators publicly doubting that such planning is remotely sufficient). That conceded severe influx precludes any colorable standing defense.

In addition, the States have submitted evidence showing that changes in federal immigration policy cause increased illegal immigration into their states and that illegal immigration causes increased costs to the states for law enforcement and social services. *See* Exhibits B-F.

There is universal agreement that Termination Order will induce a flood of additional illegal immigration. Arizona's recent experience helps to quantify just how staggering the impact of this will be. Cochise County, Arizona, operates "a sophisticated camera system that views remote areas of the border region across a large section of southern Arizona." Ex. B, Declaration of Anthony R. Napolitano ("Napolitano Decl."), Ex. 1 ¶ 4. That camera system shows that "only 27.6%" of "undocumented persons" crossing the southern border were apprehended by the Border Patrol from July 2020 to January 2021. *Id.* Thus, the percentage of "gotaway" aliens who are not apprehended by Border Patrol is 72.4%. Put differently, for every three migrants that Border Patrol apprehends, another seven successfully enter the U.S. without actually being stopped.

Defendants' own internal estimates are that the Termination Order could cause daily illegal border crossings to triple. Rogers Decl. Ex. 5. Because the Border Patrol already has a staffing shortage of "more than 1,000 officers," Rogers Decl. Ex. 2, it cannot triple its capacity in response to the Termination Order. Assuming that Border Patrol capacity at the southern border remains constant and that the Border Patrol continues apprehending the same number of aliens post-Termination Order, then the gotaway percentage could increase to 90.8%. Given that the Biden Administration predicts that, after Termination Order, 18,000 aliens could illegally cross the border per day, Rogers Decl. Ex. 5, there could be an additional 16,341 gotaways *every day*. A month of such flows could mean 490,230 unauthorized aliens entering the country undetected—rougly the population of Atlanta. And because the Cochise County data was collected *before* the start of the 2021 border crisis that stressed the Border Patrol's capacity even further, these numbers likely *under*estimate the number of post-Termination gotaways.

Similarly, the Border Patrol reported 25 notable apprehensions of dangerous criminal aliens at the Arizona border in December 2021. Napolitano Dec. ¶¶ 10-11. The Cochise County data of an approximate three-to-one ratio of gotaways to apprehensions thus suggests that 75 criminal aliens

whose apprehension would have been worth noting publicly managed to enter Arizona undetected in December 2021. Once again applying the federal government's estimate that the number of illegal entries will triple and the assumption that Border Patrol capacity may stay static (or increase only modestly), then the number of dangerous criminal aliens crossing the border into Arizona undetected could increase to 275 per month.

Criminal aliens impose significant law enforcement costs on the State of Arizona and other Plaintiff States. A tripling of illegal crossings will lead to an even greater increase in gotaways, and will significantly increase law enforcement costs as a result of the Termination Order. *See* Napolitano Dec. ¶¶ 2-4. These costs include environmental damage due to those crossing illegally, as well as an increase in the law enforcement costs incident to combatting the illegal drug trade. *See* Napolitano Dec. ¶ 4. Additionally, some of those who cross illegally will commit crimes and impose incarceration and supervised release costs on Arizona. *See* Napolitano Dec. ¶¶ 6-7.

 Furthermore, decreased enforcement at the border leads also to increased drug trafficking. Law enforcement officials in Louisiana have "confiscated drugs suspected to have been moved from the border into Louisiana, including but not limited to marijuana, fentanyl, methamphetamine, and heroin. This criminal activity requires substantial law enforcement resources to apprehend, detain, prosecute, and incarcerate the individuals involved." Ex. C, Declaration of Tommy Romero, "Romero Dec.," ¶ 4. Law enforcement in Louisiana "is adversely affected by having to devote resources to respond to this criminal activity. Those resources are necessarily diverted from other public safety activities." *Id.*

Illegal immigration imposes significant costs on healthcare providers and on social services. Under federal law, the Plaintiff States are required to spend state monies on Emergency Medicaid for aliens not lawfully in the United States. *See* 42 C.F.R. § 440.255(c). The increased illegal immigration induced by the Termination Order will imposes real and significant harm on Plaintiffs. For example,

Yuma Regional Medical Center ("YRMC") in Arizona was forced to provide $546,050 in unreimbursed medical care for unauthorized aliens during, for example, the first six months of 2019, when border crossings were lower than even their current level. Napolitano Dec. ¶ 4. Applying the Cochise County data about gotaways and Defendants' prediction that illegal border crossings will triple suggests that YRMC's unreimbursed medical care for unauthorized aliens would increase dramatically. Similarly, "Missouri expended $361,702 in emergency medical care costs for treatment of ineligible aliens during Fiscal Year 2020," and Missouri had to spend $30,114.11 just on database inquiries to "verify unlawful individuals' lawful immigration status." Ex. D, Declaration of Maddie Green "Green Dec.", ¶¶ 11-12. If the Termination Order causes an influx of three times the prior number of illegal aliens into Missouri, then these expenditures for Missouri could increase by approximately $1.2 million a year.

Since 1982, the Supreme Court has mandated that States provide public education to school-age aliens not lawfully in the United States. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). A tripling of the number of illegal alien minors in Plaintiff States will significantly increase education costs the States must spend. For example, "Missouri spent an average of $10,654 per student in school year 2019-2020," in in 2018 "an estimated 3,000 illegal alien school-aged children were enrolled in Missouri schools." Green Dec., ¶¶ 8-9. This works out to approximately $32 million spent to educate illegal aliens in Missouri during the 2019-2020 school year. If the Termination Order causes an influx of three times the prior number of illegal alien children into Missouri, then the cost to Missouri could increase by an additional $98 million a year.

Every Plaintiff State has a population of illegal immigrants residing therein, and will experience similar increases to healthcare and social service costs. *Id.*, Ex. C (chart showing illegal alien population estimates for each state; *see also* FAC ¶¶ 114-166 (allegations about illegal alien populations in each

Plaintiffs State and the related costs to each state). Compounded across all medical and social services in every Plaintiff State, the resulting costs of the Termination Order will be enormous.

Furthermore, because the Termination Order amplifies Defendants' lax border enforcement policies, it will also incentivize human trafficking for sexual exploitation: "Destination countries with weak border security and lax immigration policies in effect create an open door for traffickers to enter and do business. It creates more opportunity for them to make money and in turn motivates traffickers to recruit more victims from origin countries. Put simply, traffickers would not invest the time and resources to groom, recruit and transport large numbers of potential victims to the U.S. border if they had reason to believe a crossing would not be possible. There's no money in that.… Russian mafia, Asian organized crime, and Mexican cartels smuggle people into the United States for the purpose of human trafficking. Much of this occurs across the U.S.-Mexico border…. Unaccompanied and undocumented minors who enter the United States via smugglers are extremely vulnerable to traffickers and other abusers. There is no one to file a missing child report, or issue an Amber Alert. There is no record that the child is even here in this country. No one even knows to look. In the eyes of a trafficker, children in these circumstances make ideal victims." Ex. E, Declaration of Alison Philips, ¶¶ 7-8, 13. Such exploitation occurs in every Plaintiff State. *See id.*. at 6 and ¶ 20.

Cross-border human trafficking imposes significant costs on the States and their citizens in three ways. First, there are direct costs on the "states for things like law enforcement; and other criminal justice system resources, social service costs, [and] the public health system." *Id.* ¶ 17. Second, human trafficking of aliens to provide unskilled labor "results in lost wages and tax revenue and puts downward pressure on wages in general, especially in unskilled labor pools. This further exacerbates the economic challenges for individuals working in those areas of the economy which often impacts increased demand for assistance with housing and food." *Id.* ¶¶ 17, 33-37 And third, "[t]he money made through human trafficking by international organized criminal organizations operating in the

United States further empowers these entities and contributes to an increase in crime in general." *Id.* ¶ 17.

Cross-border human trafficking affects not only border states such as Plaintiff Arizona, but all Plaintiffs States. For example, "[f]or the three years 2017 through 2019, between 9% and 12% of calls made to the National Human Trafficking Hotline for the state of Missouri involved foreign nationals." *Id.* ¶ 19. Cases of trafficked aliens are likely underreported because "[m]ost of these victims are very isolated and marginalized by physical, geographical, cultural and linguistic factors. They, like many human trafficking victims, do not self-identify as victims, do not know their rights, and do not know who or how to ask for help." *Id.* These victims usually were able to "gain entry into the United States due to weaknesses in immigration policy." *Id.* Human trafficking, including of minors for sexual purposes, has become so pervasive that local law enforcement agencies in Plaintiff States often lack the necessary resources to investigate cases that present horrifying circumstances. *See, e.g., id.* ¶¶ 23-33 (detailing cases of lack of law enforcement resources to investigate 1) unaccompanied three year girl from Ecuador, possibly for sexual purposes; 2) pregnant 12-year-old girl from Honduras; 3) 11-year-old Central American illegal alien rape victim who had been photographed "wearing lingerie and had sent thousands of nude photos of herself to adult men on her phone"; 4) "50 Hispanic children between the ages of 10 and 16" being trafficking in the back of a "tractor trailer for over 20 hours," where they "had been malnourished and beaten" and were abandoned when the semi-truck pulling the trailer broke down).

And beyond the costs to the States and their citizens, the trafficking which will be facilitated by the Termination Order will do untold harm to the lives of the victims of such trafficking.

Defendant DHS itself has acknowledged the immense harm caused by (intentionally) weak border enforcement. It specifically has acknowledged that both Arizona and Louisiana are "directly and concretely affected by changes ... that have the effect of easing, relaxing, or limiting immigration

enforcement. Such changes can negatively impact [Arizona's and Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests." Napolitano Dec., Ex. 7, Memorandum of Understanding Between DHS and the Arizona Attorney General ("DHS-Arizona MOU") at 2; Ex. F, Declaration of Wilbur "Bill" Stiles ("Stiles Dec."), Ex. A, Memorandum of Understanding Between DHS and the Louisiana Department of Justice ("Louisiana-DHS MOU") at 2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and concrete injuries to [Arizona and Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona 's current residents for, among other things, employment, housing, goods and services." DHS-Arizona MOU at 3; DHS-Louisiana MOU at 2-3.

Given the multitude and magnitude of the harms that the Title 42 Termination will have upon the Plaintiff States, those States readily satisfy the requirements for Article III standing.

## II. PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THEIR NOTICE-AND-COMMENT CLAIM

Plaintiffs are likely to prevail on the merits as Defendants issued the Termination Order in violation of the notice-and-comment requirements of the APA.

### A. The Termination Order Is A Substantive Rule Generally Requiring Notice-And-Comment Rulemaking

As an initial matter, there is little doubt that the Termination Order is a "rule" under the APA: the Order itself concedes that it is "a major rule … [under] the Congressional Review Act," Order at 29 n.185—thereby necessarily making it a "rule" under the APA. *See* 5 U.S.C. § 804(2)-(3).

The Termination Order also does not fall within the exception for procedural rules, interpretive rules, or general statements of policy. Where "the rule is based on an agency's power to

exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one," requiring notice and comment. *United Techs. Corp. v. EPA*, 821 F.2d 714, 719-20 (D.C. Cir. 1987). Here CDC is doing just that—exercising its judgment (albeit poorly). Moreover, "the Supreme Court has said that if an agency ... effects '*a substantive change in* the regulation,' notice and comment are required." *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) ((emphases added) (citation omitted). The Termination Order plainly does so for the prior Title 42 Orders.

Seemingly recognizing that notice-and-comment rulemaking was otherwise required, the Termination Order attempts to invoke the "good cause" and "foreign affairs" exceptions of 5 U.S.C. §§ 553(a)(1) and (b)(3)(B). The validity of its entire rule thus turns on whether CDC has met its burden of establishing those exceptions apply—for which CDC offered only a single paragraph (on page 29 of the Termination Order). As explained next, that skeletal paragraph does not satisfy either exception.

### B.     Defendants' Attempt To Invoke The Good Cause Exception Fails

For decades now, it has been "commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive." *New Jersey Dep't of Env't Prot. v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). For that reason, "it is well established that the 'good cause' exception to notice-and-comment should be 'read narrowly in order to avoid providing agencies with an 'escape clause' from the requirements Congress prescribed.'" *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (quoting *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985)). Indeed, all of the "various exceptions ... will be narrowly construed and only reluctantly countenanced" by federal courts. *Id.* at 1045 n.88 (quoting *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (good-cause exception is not an "escape clause[]" to be "arbitrarily utilized at the agency's whim").

Federal courts' "review of the agency's legal conclusion of good cause is de novo." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014). In assessing whether good cause exists, this

Court "must rely only on the 'basis articulated by the agency itself' at the time of the rulemaking. 'Post hoc explanations'" do not suffice. *Johnson*, 532 F.3d at 928 (cleaned up).

Here, CDC's rationale that "good cause" exists is fatally infirm for four independent reasons.

### 1.      Defendants Had Ample Time To Conduct Notice-And-Comment Rulemaking

CDC's "good cause" invocation fails most obviously because the agency had ample time to take and respond to public comment about terminating the Title 42 Orders during the 14 months in which it was explicitly considering that very question. The Fifth Circuit has made plain that "the good cause exception should not be used to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them." *Johnson*, 632 F.3d at 929. But that is all that CDC's rationale amounts to.

Under *Johnson*—binding authority here—a central question is whether "[f]ull notice-and-comment procedures *could have been run in the time taken to issue the [challenged] rule*." *Id.* at 929 (emphasis added). Here it plainly could: 14 months is more than sufficient time to take and respond to comments, particularly as CDC did so in *6 months* for the issuance of the October 13, 2020 final rule following the March 20, 2020 interim-final rule that amended 42 C.F.R. § 71.40 to permit Title 42 Orders to reach individuals. *Supra* at 5-7. Similarly, in *Johnson* the available time period was "seven months"—which precluded good cause. *Id.*; *see also Env't Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920-21 (D.C. Cir. 1983) (holding eight-month delay was similarly infirm). CDC had *twice* as much time here.

More specifically in the Covid-19 context, this Court has held that HHS lacked good cause where it "took Agency Defendants almost three months (eighty-two days) from September 9, 2021 [when the mandates were announced], to November 30, 2021, to prepare the Head Start Mandate. The situation was not so urgent that notice and comment were not required." *Louisiana v. Becerra*, __ F. Supp. 3d __, 2022 WL 16571, at *13 (W.D. La. January 1, 2022). But here CDC had nearly *five times* that long between when EO 14010 mandated consideration of terminating Title 42 and its actual

termination. And the federal government tellingly *did not even appeal* from that preliminary injunction.

Moreover, given that CDC has been actively considering whether to revoke Title 42 since February 2021, any "emergency" here was of the agency's "own making [and] can[not] constitute good cause." *NRDC v. Abraham*, 355 F.3d 179, 205 (2d Cir. 2004). Indeed, "'[o]therwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the good cause banner and promulgate rules without following APA procedures.'" *NRDC v. NHTSA*, 894 F.3d 95, 114-15 (2d Cir. 2018) (collecting cases). That is precisely what CDC has done here.

> 2.      **CDC Improperly Ignores Its Prior Use Of Notice-And-Comment Procedures And Instead Relies On The Covid-19 Pandemic As A Categorical Exception**

For similar reasons, CDC's "good cause" rationale is obviously deficient and would fail even under arbitrary-and-capricious review—not the applicable *de novo* standard here—because it entirely ignores the agency's prior use of notice-and-comment procedures in this context.

CDC's principal "good cause" rationale appears to be that Title 42 Orders relating to the Covid-19 pandemic need not comply with Section 553: "Given the *extraordinary nature of an order under Section 265* [*i.e.*, Title 42], the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirements that an CDC order under the authority last no longer than necessary to protect the public health [good cause exists]." Order at 29 (emphasis added). But essentially all of that rationale could be said for the issuance of the March 20, 2020 regulations that permitted CDC to issue Title 42 orders—which the agency *did* take public comment on. *Supra* at 5-7.

By failing to address the fact that CDC previously did not regard major changes in the Title 42 system as "extraordinary" actions for which notice-and-comment could be dispensed with entirely, CDC violated the APA. And just as the initial promulgation of the Title 42 system was sufficiently

significant to demand notice-and-comment, its repeal is equally significant under CDC's own precedents. *See also* 5 U.S.C. § 551(5) (APA requirements apply for "repealing a rule").

Federal courts "have never approved an agency's decision to *completely ignore relevant precedent*." *Jicarilla Apache Nation v. DOI*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) (emphasis added). But that is exactly what CDC has done here. At a bare minimum, the Termination Order's complete failure to *acknowledge* the prior public commenting—let alone *explain* the differential treatment here—violates the APA. And while DOJ will undoubtedly now attempt to backfill those omissions, such "[p]ost hoc explanations" cannot cure APA violations. *Johnson*, 532 F.3d at 928 (cleaned up).

### 3.     The Current Circumstances Do Not Constitute Good Cause

CDC's good-cause rationale also fails to account for the current context—which differs radically from the initial issuance of the Title 42 Order. We are not—unlike March 2020—in the first month of a once-in-a-century pandemic of rapidly exploding infection numbers. Instead, we have now begun the *third* year of this pandemic, and have a very clear sense of available testing, treatment, and prevention capacities and the rates at which those tools are becoming available. The risk CDC appears to be calculating (which, of course, irrationally omits the risk of an immigration surge) was entirely predictable. In short, as predictability has increased, the exigencies have substantially decreased. But agencies' willingness to exploit the pandemic to evade notice-and-comment requirements has simultaneously grown ever bolder even as case numbers *decrease*. And lawless. As the Fifth Circuit has explained in strikingly similar circumstances, the OSHA vaccine mandate's "stated impetus—a purported 'emergency' that the entire globe has now endured for nearly two years … is unavailing." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021); *see also Louisiana v. Becerra*, 2022 WL 16571, at *13 (collecting cases rejecting reliance on Covid-19 pandemic to invoke good cause exception). And unlike fine wines, this legal gambit does not improve with age into this pandemic.

Moreover, good cause does not exist where agency action "does not stave off any imminent threat to the environment or safety or national security." *Mack Trucks, Inc.*, 682 F.3d at 93. But here, CDC rather ironically invokes the "good cause" exception to *rescind* a regulation that even Democratic Senators acknowledge *has staved off an imminent threat*, and instead dispenses with notice-and-comment so that the agency can *ensure that imminent threat comes to pass*. CDC cannot invoke the "good cause" exception to *inflict* a disaster on the U.S. border, rather than "stave [one] off." But that is just what it seeks to do here.

### 4.    CDC's Timing Rationale Is Unpersuasive

Finally, CDC's "good case" invocation rests on a timing rationale that is both counter-intuitive and pretextual. Specifically, CDC relies overwhelmingly on its purported need for *more time* as a basis for dispensing with notice-and-comment requirements—just apparently not sufficient additional to permit taking and responding to public comment. Within CDC's threadbare one-paragraph rationale, it remarkably makes this point twice, demonstrating its centrality:

- "In light of … DHS's *need for time* to implement an orderly and safe termination of this order, there is good cause *not to delay issuing this termination … past* May 23, 2022."

- "It would be impracticable … to delay the effective date … *beyond May 23, 2022*."

CDC's apparent position is thus simultaneously (1) some delay of the effective date of the Termination Order is absolutely essential to avoiding "significant disruption" but that (2) sufficient delay to permit notice-and-comment compliance must be avoided at all costs because … well CDC doesn't ever say. Order at 29. The Order does allude to the purported "statutory and regulatory requirement that a CDC order under the authority last *no longer than necessary to protect public health*." *Id.* (emphasis added). But two problems with that: (1) no such requirement exists (and CDC supplies no citation to it) and (2) that rationale is contradicted on the face of the Order: CDC is explicitly delaying

implementation until May 23 not because of any public-health based reason, but explicitly based on "*DHS's need* for time to implement an orderly and safe termination of the order." *Id.* (emphasis added).

The Termination Order is thus self-contradictory on its face and cannot establish good cause.

### C.   Defendants' Reliance On The "Foreign Affairs" Exception Is Unavailing

Defendants alternatively attempt to excuse notice-and-comment compliance by invoking the "foreign affairs" exception of 5 U.S.C. § 553(a)(1). That too is unavailing.

As an initial matter, this is hardly the first time that an administration has attempted to invoke the "foreign affairs" exception in the immigration context—which courts have frequently and repeatedly struck down. Defendants' attempt here is particularly flimsy and merits decisive rejection.

Immigration matters, by their very nature, have implications for "foreign affairs." But federal courts have long ago made clear that such implications do not provide generalized immunity from notice-and-comment requirements: "The foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980). Instead, for the exception to apply, "'the public rulemaking provisions should provoke *definitely undesirable international consequences.*" *East Bay,* 932 F.3d at 775 (quoting *Yassini*, 618 F.2d at 1360 n.4); *accord Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (applying same "definitely undesirable international consequences" standard); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (same); *Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) *vacated and rev'd on other grounds*, 727 F.2d 957 (11th Cir. 1984) (en banc) (same).[1]

CDC offers the sum total of *one sentence* of reasoning to meet this demanding definitely-undesirable-consequences standard: "this Order concerns ongoing discussions with Canada, Mexico,

---

[1]  The Fifth Circuit does not appear to have addressed the "foreign affairs" exception yet. But there is no reason to believe that it would split from, and adopt a less-stringent standard than, the four circuits have adopted the "definitely undesirable consequences" standard.

and other countries regarding immigration and how best to control COVID-19 transmission over shared borders and therefore directly 'involves a foreign affairs function of the United States.'" Order at 29 (quoting 5 U.S.C. § 553(a)(1)). That is not even conceivably sufficient.

That single sentence does not identify *any* potential "undesirable international consequences"—let along ones that will "definitely" occur. That rationale is thus insufficient on its face. Indeed, it is *exactly* what courts have made clear does not suffice: "the foreign affairs exception requires the Government to do more than merely recite that the Rule 'implicates' foreign affairs." *East Bay*, 932 F.3d at 775. But that is all CDC has done here, with the slight modification of swapping the word "implicates" for "involves." Moreover, just as while the "reference in the Rule that refers to our 'southern border with Mexico' [wa]s not sufficient" in *East Bay*, the mere allusion to discussions with Canada, Mexico, and unspecified other counties does not suffice here.

Accepting CDC's threadbare rationale here would have particularly pernicious effects. It would effectively permit any agency to avoid notice-and-comment rulemaking through the expedient of *talking* perfunctorily with foreign nations about the same subject—which is all that CDC says here. In other words, the executive branch could avoid any obligation to give notice to, and take comments from, the *American* public by talking to a foreign government or two instead. If that were the law, why would an agency *ever* trouble itself with intentionally burdensome notice-and-comment requirements when it could instead engage in a cursory and *un*burdensome conversation with a foreign government? Thankfully, federal courts have never permitted such naked circumvention of the APA under the foreign affairs exception, and there is no reason for this case to be the first.

### D.     Defendants' Circumvention Of Notice-And-Comment Requirements Is Part Of A Broader Pattern

It is also important to note that Defendants' skirting of notice-and-comment requirements in the immigrant context is hardly an outlier. Indeed, those APA violations are by now notorious with federal courts. *See, e.g., Texas v. United States*, __ F. Supp. 3d ___, 2021 WL 3683913, at *51-58 (S.D.

Tex. Aug. 19, 2021) (holding that DHS's issuance of Interim Guidance, which similarly and severely reduced removals of aliens with criminal convictions, violated notice-and-comment requirements); *Texas v. United States*, 524 F. Supp. 3d 598, 656-62 (S.D. Tex. 2021) (holding same for 100-day moratorium on immigration removals). Indeed, Justice Kagan recently observed at oral argument another potential violation by DHS, explaining that "[t]he real issue to me is [DHS's] evasion of notice-and-comment."[2]

Defendants' violation of notice-and-comment requirements is thus no one-off aberration, but rather part of a recidivous pattern that requires decisive judicial response—particularly as the judicial decisions cited above were apparently insufficient to convince Defendants to comply with notice-and-requirements here.

## III.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR ARBITRARY-AND-CAPRICIOUS CLAIM

The Plaintiff States are also independently likely to prevail on the merits as the Termination Order is arbitrary and capricious. It is well-established that "agency action is lawful only if it rests on a consideration of the relevant factors" and considers all "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750-52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Here, Defendants ignored entire "important aspects of the problem," and thus violated the APA.

### A.   CDC's Failure to Consider Financial Harms to the States and Other Reliance Interests Is Arbitrary and Capricious

As discussed above, the termination of the Title 42 policy will impose significant financial harms on the States by generating an enormous new influx of illegal immigrants. *Supra* at 1-2, 9-14; *see also* FAC ¶¶ 104-175. CDC's Order gives no consideration to such financial harms and reliance

---

[2]   Transcript at 47-48, *Arizona v. San Francisco*, No. 20-1775 (U.S. Feb. 23, 2022) available at https://bit.ly/3itwfq7

interests. Instead, CDC insists that it *does not have* to consider them because, on CDC's current view, such reliance interests would not be "reasonable" or "legitimate." Order at 23. As the agency states, "CDC has determined that no state or local government could be said to have *legitimately* relied on CDC Orders issued under [Title 42] to implement long-term or permanent changes to its operations because those orders are, by their very nature, short-term orders…." *Id.* This is erroneous as a matter of law. In fact, as the Fifth Circuit recently held, the federal government's argument that it "had no obligation to consider the States' reliance interests at all" is "astonishing[]" and "squarely foreclosed by" Supreme Court precedent. *Texas v. Biden*, 20 F.4th at 990. It is no less astonishingly bad here.

1.  **CDC did not consider financial harms to the States or other reliance interests**

As an initial matter, it is perfectly clear that the CDC did not actually consider any financial or public-health harms to the States or other reliance interests, because the CDC repeatedly admits that it has no idea whether or to what extent such harms exist. *See* Order at 25 ("As a factual matter, CDC *is not aware* of any reasonable or legitimate reliance on the continued expulsion of covered noncitizens…"); *id.* (discounting "any reliance interest *that might be said to exist*"); *id.* ("*To the extent* that any state or local government did rely on the expulsion of noncitizens for purpose of resource allocation…") (emphases added). CDC's professed ignorance is unsurprising, because CDC did not bother to consult with the States before terminating Title 42. Most notably, CDC did not provide the notice-and-comment procedure required by the APA, and thus its failure to consider State reliance interests was preordained—the CDC did not know what they were, and it did not try to find out.

This violated the APA. The financial impact on the States is unquestionably an "important aspect of the problem." *Michigan*, 576 U.S. at 752. Indeed, the Supreme Court has repeatedly recognized "the importance of immigration policy to the States," particularly as the States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The CDC has no license to inflict massive financial injuries on the States without at least first

27

considering what the magnitude of those harms might be and whether they could be mitigated if the agency considered alternatives with those harms in mind. *Michigan*, 576 U.S. at 752; *id.* at 759 (explaining that agencies "must consider cost … before deciding whether regulation is appropriate and necessary").

In fact, CDC's failure to consider State reliance interests commits a twofold violation of the APA. First, the States' financial and public-health harms and other injuries from CDC's termination decision are themselves an "important aspect of the problem." *Michigan*, 576 U.S. at 752. In addition, by refusing to consider them, CDC necessarily abandoned its duty to consider whether alternative approaches would be less burdensome for the States. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternatives' that are 'within the ambit of the existing policy.'" *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (cleaned up) (citation omitted). Here, CDC did not consider any "alternatives … within the ambit of the existing policy," *id.*, that might alleviate the burdens on the States, because it did not consider those burdens in any fashion.

The CDC's failure to consider the practical impact of its Order on the States is particularly egregious because, as discussed further below, the CDC *did* consider the practical impact on *federal* agencies like DHS. The CDC makes clear that, although it has determined that the public-health justification for the Title 42 policy no longer exists *now*, it delays implementation of the termination until May 23, 2022, to allow DHS to "ready its operational capacity." Order at 28. In fact, the CDC's own regulations authorize it to "consult with any State or local authorities" before issuing Title 42 orders. 42 C.F.R. § 71.40(d). The CDC's decision to consider practical impacts on *federal* agencies but not *state* agencies is the antithesis of reasoned decision-making.

### 2. The Supreme Court and Fifth Circuit have rejected the CDC's justification for refusing to consider State reliance interests

The CDC's stated justification for categorically discounting financial harms and other reliance interests of the States contradicts governing law from the Supreme Court and the Fifth Circuit. In

*Regents*, the Supreme Court held that DHS acted arbitrarily and capriciously in failing to consider "whether there was 'legitimate reliance' on the DACA Memorandum," which established the Deferred Action for Childhood Arrivals program. 140 S. Ct. at 1913. "When an agency changes course," the Supreme Court held, "it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (citation omitted)). "It would be arbitrary and capricious to ignore such matters." *Id.*

In so holding, the Supreme Court rejected the same reasoning that the CDC employed to avoid considering State reliance interests here. In *Regents*, as here, the Government contended that it did not need to consider reliance interests because there could be no legitimate, reasonable reliance on DACA as a matter of law: "[T]he Government does not contend that [the Secretary] considered potential reliance interests; it counters that she did not need to." *Id.* at 1913. The Government argued that "DACA recipients have no 'legally cognizable reliance interests' because the DACA Memorandum stated that the program 'conferred no substantive rights' and *provided benefits only in two-year increments*." *Id.* (emphasis added). In other words, echoing the CDC here, the Government argued that any reliance interests were not reasonable or legitimate because the program created no vested rights and was inherently temporary. *Compare id. with* Order at 23-24. The Supreme Court rejected this argument as putting the cart before the horse: "[N]either the Government nor the lead dissent cites any legal authority establishing that such features automatically preclude reliance interests, and we are not aware of any. These disclaimers are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Regents*, 140 S. Ct. at 1913-14.

Thus, the Supreme Court rejected the same reasoning that the CDC employed to absolve itself of considering reliance interests here. Even if the CDC believes such reliance interests will turn out to

be attenuated or illegitimate, it must at least consider them: "[T]hat consideration must be undertaken by the agency in the first instance." *Id.*

> ### 3.     The CDC was obligated to consider financial harms to the States flowing from its Termination Order, even without a showing of prior "resource-allocation" decisions based on the Title 42 policy

The CDC's reasoning suffers from another fatal defect. The Termination Order assumes that, to establish "legitimate" reliance interests, the States must show that they made specific *resource-allocation* decisions in reliance on the Title 42 policy. Order, at 23 (determining that "no state or local government could be said to have legitimately relied on the CDC Orders issued under [Title 42] *to implement long-term or permanent changes to its operations…*") *id.* at 25 ("To the extent that any state or local government did rely on the expulsion of noncitizens *for purposes of resource allocation….*"); *id.* ("CDC concludes that *resource allocation concerns* do not outweigh CDC's determination…") (emphases added). Again, governing precedent squarely forecloses this reasoning. The Supreme Court in *Regents* specifically held that the reliance interests that the agency must consider include financial costs to the States, noting that "States and local governments could lose $1.25 billion in tax revenue each year." *Regents*, 140 S. Ct. at 1914. The Supreme Court did not hold that specific resource-allocation decisions were required to render such costs a "noteworthy concern[]" that the agency must consider. *Id.*

Likewise, in *Texas v. Biden*, which considered the termination of another major border-control policy—the Trump Administration's Migrant Protection Protocols ("MPP")—the district court explicitly held that "fiscal harm from the termination of MPP" to the States was an important aspect of the problem that the agency was required to consider. *Texas v. Biden*, 2021 WL 3603341 at *19. "[T]he fact that the agency did not consider the costs to the States at all" rendered the termination decision "arbitrary and capricious." *Id.* "Fiscal burdens on states are 'one factor to consider' — even if the agency could conclude that 'other interests and policy concerns outweigh' those costs." *Id.* (quoting *Regents*, 140 S. Ct. at 1914). Again, in *Texas v. Biden*, there was no showing of specific resource-

30

allocation decisions made by the States in reliance on MPP—the fact that terminating MPP would impose significant costs on the States was itself an important aspect of the problem that must be considered under the APA.

The Fifth Circuit affirmed this holding, agreeing that the "States' reliance interests" included "costs to States." *Texas v. Biden*, 20 F.4th at 990, *cert. granted on other grounds*, 142 S. Ct. 1098 (2022). Citing *Regents*, the Fifth Circuit agreed that "the States' reliance interests" included financial harms, such as *Regents*' assertion that "States and local governments could lose $1.25 billion in tax revenue each year." *Id.* (quoting *Regents*, 140 S. Ct. at 1914). Thus, under governing Fifth Circuit precedent, the States need not demonstrate that they engaged in specific resource-allocation decisions to establish important interests in the Title 42 program. The fact that the program's abrupt termination will impose significant financial costs on them is an important aspect of the problem that the CDC was obliged to consider—regardless of each State's "resource-allocation" decisions. Indeed, in *Texas v. Biden*, the Government made the same argument that the CDC makes here, and the Fifth Circuit rejected it as "astonishing[]": "Astonishingly, the Government responds that DHS had no obligation to consider the States' reliance interests at all. Yet again, that contention is squarely foreclosed by *Regents*." *Id.* (quotation omitted).

Finally, it makes good sense to treat new financial costs and harms to the States as inherently disrupting State reliance interests, as both the Supreme Court and Fifth Circuit have done. As the federal Government acknowledged in its Agreements with Arizona and Louisiana, State agency budgets are typically "set months or years in advance," and each State typically "has no time to adjust its budget in response to [immigration] policy changes." Doc. 1-2, at 1; Doc. 1-3, at 1. Thus, new and unanticipated costs and financial harms from a change in federal immigration policy, arising in the midst of a budget cycle, necessarily disrupt State reliance interests—regardless of whether the States made specific "resource-allocation" decisions in conscious reliance on the former policy.

### 4.    The CDC's other arguments are meritless, arbitrary, and capricious

The CDC's other justifications for refusing to consider reliance interests are equally arbitrary and capricious. The Termination Order argues that no one could have relied on CDC's two-year-long Title 42 policy because its scope has "fluctuated due to litigation, further rendering it unreasonable for any state or local government to have acted in reliance on the continued exercise of the authority." Order at 24. This is just another variation of the same argument rejected in *Regents*, *i.e.*, that the program was inherently short-term and conferred no guarantee of future benefits. *Regents*, 140 S. Ct. at 1913. It fares no better than the CDC's reliance on the temporary nature of Title 42 orders. In any event, the CDC's claim that its legal authority has "fluctuated due to litigation," Order at 24, is unsupportable. The CDC cites only two cases. First, it cites a preliminary injunction in *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020), which it admits was *stayed pending appeal by the D.C. Circuit*. Order at 24 & n.163 (admitting that "the Government obtained a stay of the injunction in January 2021"). Second, it cites an injunction against "the expulsion of FMU" [*i.e.*, individuals in family units] in *Huisha-Huisha v. Mayorkas*, 2021 WL 4206688, at *12 (D.D.C. Sept. 16, 2021), but it then admits that the "D.C. Circuit recently *upheld* the government's authority under 42 U.S.C. § 265 to expel FMU." *Id.* (emphasis added). In other words, CDC's evidence of "fluctuation due to litigation" consists of two cases where the Court of Appeals effectively *upheld* the CDC's authority. This reasoning is itself arbitrary and capricious. *See Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Texas 2021) (mischaracterizing evidence and considering "irrelevant" factors is arbitrary and capricious).

Next, the CDC argues that States could not reasonably rely "on CDC's indefinite use of its expulsion authority under Section 265," because the pandemic would eventually subside, and "42 U.S.C. § 265 only authorizes CDC to prevent the introduction of noncitizens when it is required in the interest of public health." Order at 24-25. These arguments merely rehash the CDC's claim that there could be no "legitimate" reliance on the Title 42 policy because it was inherently temporary. As

discussed above, this argument is "squarely foreclosed by *Regents*." *Texas v. Biden*, 20 F.4th at 990. In particular, *Regents* anticipated and rejected the CDC's argument that it need not consider any reliance interests because it supposedly lacks legal authority to extend it further. The dissent in *Regents* made a similar argument, *i.e.*, that the agency did not need to consider reliance on DACA because *the entire program was illegal. See, e.g., Regents*, 140 S. Ct. at 1919 (Thomas, J., dissenting) (arguing that the DACA "program was unlawful from its inception"). Nevertheless, the majority held that the agency was still required to consider reliance interests before terminating the program: "[B]ecause DHS was 'not writing on a blank slate,' it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915. So too here.

Finally, the CDC purports to assert, in the alternative, that it would have treated the States' reliance interests as "outweigh[ed]" even if it had considered them. Termination Order, Order at 25. But "[s]tating that a factor was considered ... is not a substitute for considering it." *Texas v. Biden*, 20 F.4th at 993 (citation omitted)). Simply put, the CDC cannot cure its failure to do its job by stating, in conclusory fashion, that it would have come to the same conclusion if it *had* done its job. The CDC's "failure to consider the regulatory alternatives … cannot be substantiated by conclusory statements." *Id.* (quoting *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226 (5th Cir. 1991)).

**B.     The CDC's Failure to Consider the Immigration Consequences of Its Termination Order Is Arbitrary and Capricious**

As even the President's allies admit, the Termination Order is likely to have catastrophic consequences for an already-fraught situation at the border. The Government itself predicts a massive increase in illegal immigration as a result of the Order, potentially doubling or even tripling unlawful border encounters over the current historic highs. *Supra* at 9-11. Yet the CDC gave no meaningful consideration to this harsh reality as it assessed only mitigation measures as applied to *current* border

trends, or its impact on the States, border communities, and lawfully present Americans. The CDC's refusal to consider the immigration consequences of its Termination Order is arbitrary and capricious.

> 1. **The Termination Order contradicts itself in failing to consider immigration consequences**

As with its refusal to consider State reliance interests, the CDC erroneously contends that it "did not need to" consider the catastrophic immigration and border-control consequences of terminating its Title 42 policies at the worst possible time—right at the beginning of summer migration. *Regents*, 140 S. Ct. at 1913. The CDC reasons that it need not—indeed, cannot—consider such consequences because Title 42 is not an immigration-control provision: "[T]he CDC Orders issued under [Title 42] are not, and do not purport to be, policy decisions about controlling immigration; rather … CDC's exercise of its authority under Section 265 depends on the existence of a public health need." Order at 25. The CDC argues, "42 U.S.C. § 265 only authorizes the CDC to prevent the introduction of noncitizens when it is required in the interest of public health," *id.*, and thus termination of the policy is mandatory "once CDC determined that there is no longer sufficient public health risk present with respect to the introduction of covered noncitizens." *Id.* In other words, CDC argues, it lacks statutory authority to consider immigration consequences in deciding whether to extend or terminate the Title 42 policy. *Id.*

This is arbitrary and capricious for two reasons. First, it contradicts the CDC's own reasoning. Immediately after stating that termination is mandatory regardless of its immigration consequences, the CDC states that "[t]his Termination will be implemented on May 23, 2022, for the *operational* reasons outlined herein." *Id.* at 25-26 (emphasis added). But CDC makes very clear that it has determined that there is no longer a public-health justification for the Title 42 policy *now. See, e.g., id.*

at 20 ("[L]ess burdensome measures are *now* available to mitigate the introduction, transmission, and spread of COVID-19 resulting from the entry of covered noncitizens") (emphasis added).[3]

Notwithstanding its clear determination that the public-health justification for the Title 42 orders is no longer valid *now*, the CDC delays implementation of the Termination Order for seven weeks, until May 23, 2022, "for operational reasons." *Id.* at 25-26. These "operational reasons" comprise *non-public-health* considerations—notably, DHS's "resumption of border operations under Title 8 authorities." *Id.* at 28. Though the CDC insists that the seven-week delay is due, at least in part, to DHS's plan to implement a vaccination program for arriving immigrants, *id.*, it also states explicitly that the public-health justification for the Title 42 policy no longer exists regardless of whether DHS has implemented its vaccination program. *Id.* at 22 n.145 ("CDC believes the serious risk to public health that the CDC Orders were intended to address has been sufficiently alleviated, *even in the absence of complete implementation of the DHS vaccination program*.") (emphasis added). In addition, the CDC makes clear that its seven-week delay in implementation is based on other non-public-health considerations as well—particularly, DHS's ability to "operationalize" to address the additional influx of immigrants. "The implementation timeline of this termination will provide DHS with time to … ready its operational capacity … and prepare for resumption of regular migration under Title 8." *Id.* at 28. CDC acknowledges that "DHS reports that it is taking steps to plan for such increases" in illegal immigration, and that "[p]utting such plans in place, ensuring that the workforce is adequately and appropriate[ly] trained for their shifting roles, and deploying critical resources require time." *Id.* For

---

[3] *See also id.* at 21 (because "other public health measures are *now* available to provide necessary public health protection," the risk of COVID-19 transmission "does not present a sufficiently serious danger to public health to necessitate maintaining the August order"); *id.* at 22 n.145 ("[G]iven the *current* status of the pandemic and the range of measures *currently* in place … CDC believes the serious risk to public health … has been sufficiently alleviated"); *id.* at 23 ("At this point in the pandemic, the previously identified public health risk is no longer commensurate with the extraordinary measures instituted by the CDC Orders."); *id.* at 27 ("I find that there is *no longer a public health justification* for the August Order and previous Orders… [T]he justification … is *no longer* sustained.") (emphases added).

these reasons, "[t]his Termination will be implemented on May 23, 2022, to provide DHS with additional time to ready such operational plans." *Id.*

The CDC, therefore, speaks out of both sides of its mouth on this issue. To the States and others adversely affected by illegal immigration, it asserts that it has no statutory authority to consider the impact on illegal immigration in crafting and rescinding Title 42 orders. *Id.* at 25. Instead, it says that its hands are tied—it may only consider public-health justifications, and once those no longer exist, it must rescind the orders even if that would have catastrophic immigration consequences. *Id.* But to the federal agency most affected—DHS—the CDC sings a different tune. For DHS, the CDC is willing to consider "operational" concerns, "deploying critical resources," "[p]utting … plans in place," "ensuring that the workforce is adequately and appropriate [*sic*] trained," "ready[ing] operational capacity," and similar *non-public-health* practical factors, to justify a significant extension of a public-health policy that CDC insists no longer has a public-health justification. *Id.* at 26, 28. This reasoning is self-contradictory. If the CDC can consider the practical impacts of the anticipated upsurge in illegal immigration on DHS's "operational capacity," *id.* at 28, it can—and must—consider the practical impacts of that upsurge on the rest of the country, including the States.

Second, "immigration consequences" are certainly an important part of the public health problem, meaning failure to consider them is irrational decision-making. Title 42 never would have been necessary if the northern or southern borders experienced only 1-2 attempted crossers per day. Numbers are *extremely* relevant to public health risk. In forgetting that, CDC claims it has tools to combat Covid -19, and thus the Title 42 policy is no longer required—but will those tools be sufficient when the numbers climb to 18,000 border crossings per day as presently predicted? Rogers Decl. Ex. 5. It strains credulity to imagine that CDC could even screen that number of migrants for communicable diseases (including Covid-19). CDC certainly never indicates otherwise. And even if it could, CDC nowhere demonstrates it could treat or mitigate communicable diseases for that number

of migrants. At best, CDC hopes to vaccinate up to 6,000 migrants per day when fully operational. Rogers Decl. Ex. 17. That does nothing to address the serious risk presented by the Administration's own immigration assessments. By failing to consider immigration consequences in assessing danger to public health risk, CDC failed to consider an important aspect of the problem.

### 2.   Under the APA, the CDC must consider non-public-health impacts of its policy change

Second, the CDC's contention that it lacks authority to consider non-public-health concerns in adopting a major policy change contradicts the APA. As *Regents* and *State Farm* held, the CDC must consider all important aspects of the problem in adopting the rescission order. Even if the CDC ultimately decides to give them limited weight, for either legal or factual reasons, it must at least consider them. It failed to do so here.

*Regents* makes this very clear. In *Regents*, the Supreme Court considered the termination of DACA, an immigration-related policy. But in terminating DACA, the agency was not allowed to limit its consideration only to the "operational" impact on immigration policy. Instead, the Supreme Court held that it was arbitrary and capricious to fail to consider a wide range of non-operational, and even non-immigration-related, factors impacted by DACA. *Regents*, 140 S. Ct. at 1913-14. "When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 1913 (quotation marks omitted) (citation omitted)). Such interests extend beyond the immigration-related (or, here, public-health-related) considerations that led to the policy in the first place. *Id.* In *Regents*, these included the fact that "DACA recipients have enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children," *id.* at 1914; that cancelling DACA would impact "the schools where DACA recipients study and teach," and "the employers who have invested time and money in training them," *id.*; that cancelling DACA would "result in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue," *id.*; and (as discussed above)

37

that "States and local governments could lose $1.25 billion in tax revenue each year," *id.* These factors went beyond the "operational" concerns, and extended far beyond even immigration-related concerns, to areas (such as federal and state tax collection) where DHS had no statutory authority whatsoever. Yet *Regents* held that the agency (DHS) was required at least to consider these important impacts of its sudden change in policy. "[T]hat consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* at 1913-14. "There was no such consideration in the Duke Memorandum," and there was no such consideration here. *Id.* at 1914. Instead, CDC "did not appear to appreciate the full scope of [its] discretion." *Id.* at 1911.

As discussed above, the CDC's decision to consider the immigration consequences of its decision *only* in the context of accommodating DHS's "operational" concerns, Order at 28, makes its decision even worse. By considering DHS's operational concerns and delaying implementation for a full seven weeks based on them, the CDC effectively concedes that it *does* have authority to consider the impact of terminating Title 42 on illegal immigration. By delaying its Order, it effectively concedes that it *does* have authority to consider "alternatives" short of full termination "within the ambit of the existing policy." *Regents*, 140 S. Ct. at 1913. But it artificially cabins its consideration to one tiny slice of the problem—DHS's "operational" concerns—while ignoring the catastrophic non-public-health consequences of an enormous surge in illegal immigration at the height of the migration season for the States, border communities, American citizens, and lawfully present aliens.

Finally, the CDC's recital that it "recognizes that the Termination of the August Order will lead to an increase in the number of noncitizens being processed in DHS facilities," Order at 28, does not cure this problem for two reasons. First, as discussed above, this statement occurs only in the context of acknowledging (and accommodating) DHS's "operational" concerns, while giving no consideration whatsoever to the consequences of increased illegal immigration on the States and others. *Id.* Second, this one-line recital is made in conclusory terms with no discussion of the potential

scope of the problem or any of its practical impacts. As noted above, "[s]tating that a factor was considered ... is not a substitute for considering it," *Texas v. Biden*, 20 F.4th at 993 (quoting *Getty v. Fed. Sav. and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)), and the CDC's "failure to consider the regulatory alternatives … cannot be substantiated by conclusory statements." *Id.* (quoting *Corrosion Proof Fittings*, 947 F.2d at 1226).

In sum, the CDC cannot have it both ways. It cannot insist to the States that it may only consider public-health concerns, while granting a significant change in policy to accommodate DHS's non-public-health, "operational" concerns. If the CDC may consider the impact of a massive surge in illegal immigration on DHS's "operational capacity," it must consider the impact on States, border communities, and ordinary Americans as well. Its refusal to do so is arbitrary and capricious.

### 3. CDC's Recent Extension Of Its Transportation Mask Mandate Underscores The Termination Order's Deficiencies

The April 1 Termination Order is expressly predicated on *improvements* in the Covid-19 pandemic. *See, e.g.*, Order at 22-23. But a mere 12 days later, CDC extended its mask mandate for transportation (airplanes, buses, etc.) because it fears of the BA.2 variant worsening the pandemic, Rogers Decl. 18 and 19—the very same fears it downplays in the Order. Order at 13. This divergence is not yet explained, rendering the Order arbitrary and capricious. CDC cannot simultaneously take actions based upon the Covid-19 pandemic both *improving and deteriorating* at the same time.

Moreover, CDC discordant treatment of Title 42 and the mask mandate (and other restrictions) renders incredible CDC's claims that it is "aligning the public health measures response … with the best available science." Order at 20. That rationale is obviously pretextual and, at a bare minimum, the mask-mandate extension makes plain that the timing of the Title 42 Termination is overwhelmingly and self-evidently based on *political* grounds, not those of public health.

An order may not stand if it rests on a "pretextual basis" *Department of Commerce*, 139 S. Ct. at 2573. Nor is this Court "'required to exhibit a naiveté from which ordinary citizens are free.'" *Id.* at 2575 (2019) (citation omitted). And accepting that the differing treatment between Title 42 and the mask mandate is based

only on "best available science"—rather than the perfect correlation with the ideological views on the respective policies of the Administration's political base—requires a level of naiveté that even the most credulous of our citizenry likely lacks.

## IV.   PLAINTIFF STATES WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

Plaintiff States will also suffer irreparable harm in the absence of injunctive relief. As set forth above, the Termination Order will impose costs on the States in the form of increased law enforcement, education, and health care spending. *See supra* Section I. Indeed, states bear the "heavy financial costs" of supporting an increased number of immigrants "on state and local programs" as a consequence of a federal agency rulemaking. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020). The Supreme Court has similarly recognized that States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

Due to sovereign immunity, the States cannot recover damages from the federal government. Their irrecoverable injuries thus constitute irreparable harm. *See, e.g., Texas v. Biden*, 20 F.4th at 1001; *East Bay*, 993 F.3d at 677. Indeed, the Fifth Circuit has squarely recognized economic harms resulting from unlawful federal immigration policy as constituting irreparable harm. *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016).

Plaintiffs have also suffered irreparable procedural harm tied to their unrecoverable monetary damages, having been deprived of the opportunity to provide input through notice-and-comment rulemaking. *East Bay,* 993 F.3d at 677 ("Intangible injuries may also qualify as irreparable harm, because such injuries 'generally lack an adequate legal remedy.'" (citation omitted)). The States are subject to actionable harm when "depriv[ed] of a procedural protection to which [they] are entitled" under the APA, including the opportunity to shape the rules through notice and comment. *Northern Mariana Islands v. United States*, 686 F.Supp.2d 7, 17, 18 (D.D.C. 2009).

## V.   AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST

The remaining *Winter* factors also support the States' motion. As to the balance of harms, this case is unusual and the States' arguments are uniquely strong. A preliminary injunction here will not only avoid harm to the States, but also prevent the federal government from perpetrating self-inflicted harm upon itself. Even CDC backhandedly acknowledges that its Termination Order is likely to cause calamitous immigration consequences—which is the entire basis for delaying the effective date until May 23 to mitigate those harms. Order at 28. But those harms to the *federal government* can be *completely averted* by entering a preliminary injunction—as well as the harms to the States. This case is truly rare in that a preliminary injunction will *avoid* harms to all sides. Here there is no balancing to be had, because all the harms are on one side of the scale.

The public interest also favors the states: "The 'public interest is in having governmental agencies abide by the federal laws that govern their existence and operations.' And 'there is generally no public interest in the perpetuation of unlawful agency action.'" *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up). Because the Termination Order's promulgation violates the APA multiple times over, the public interest favors enjoining it.

## VI.   THIS COURT SHOULD ENTER A NATIONWIDE INJUNCTION.

This Court should enjoin implementation of the Termination Order nationwide, and not just in Plaintiff States. On this issue, "the Fifth Circuit's precedent in this area is applicable and controlling." *Texas v. United States*, 524 F. Supp. 3d at 667. In this context "a geographically-limited injunction would be ineffective" as once migrants crossed U.S. borders in other states they "would be free to move among states." *Texas v. United States*, 809 F.3d at 188. Instead, "immigration policy" is supposed to be "a comprehensive and *unified* system." *Id.* Moreover, given that Plaintiffs include 21 states, an injunction limited to those states could create an unworkable patchwork.

41

Given the magnitude of harms that even Defendants predict will occur if Title 42 is permitted to expire in the current context, it should not be permitted to go into effect anywhere.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff States' Motion for a Preliminary Injunction.

Dated: April 14, 2022

Respectfully submitted,
By:/s/ Elizabeth B. Murrill

MARK BRNOVICH
   Attorney General
BRUNN ("BEAU") W. ROYSDEN III*
   Solicitor General
DREW C. ENSIGN*
   Deputy Solicitor General
JAMES K. ROGERS*
   Senior Litigation Counsel
ANTHONY R. NAPOLITANO
   Assistant Attorney General
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

STEVE MARSHALL
   Alabama Attorney General
EDMUND G. LACOUR JR.*
   Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

ELIZABETH B. MURRILL (La #20685)
   Solicitor General
J. SCOTT ST. JOHN (La #36682)
   Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
   Attorney General
D. JOHN SAUER *
   Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

TREG R. TAYLOR
   Attorney General of Alaska
CORI M. MILLS*
   Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
   Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

43

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*


CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
  Attorney General,
BRIAN KANE*
  Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

44

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DAVE YOST
  Ohio Attorney General
BENJAMIN M. FLOWERS*
  Solicitor General
Office of the Ohio Attorney General
30 E. Broad St., 17th Fl.
Columbus, OH 43215
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee
ANDRÉE S. BLUMSTEIN
  Solicitor General
CLARK L. HILDABRAND*
BRANDON J. SMITH*
  Assistant Solicitors General
Office of the Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

PATRICK MORRISEY
  Attorney General
LINDSAY SEE*
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

* Pro hac vice application forthcoming

SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK*
  Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

## APPENDIX

Table 1: DHS Encounters by Month



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 (FYTD) | 70,305 | 84,659 | 97,203 | 75,295 | 73,460 | | | | | | | | 400,922 |
| 2021 | 7,035 | 8,883 | 11,652 | 14,110 | 26,834 | 64,028 | 66,205 | 67,205 | 84,106 | 117,341 | 114,433 | 89,328 | 671,160 |
| 2020 | 45,139 | 42,643 | 40,565 | 36,585 | 36,687 | 27,310 | 1,584 | 2,342 | 3,220 | 4,058 | 5,561 | 7,607 | 253,301 |
| 2019 | 60,781 | 62,469 | 60,794 | 58,317 | 76,545 | 103,731 | 109,415 | 144,116 | 104,311 | 81,777 | 62,707 | 52,546 | 977,509 |

Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters

Table 2: DHS Expulsions Under Title 42 Policy



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 (FYTD) | 94,536 | 90,211 | 82,053 | 79,450 | 91,513 | | | | | | | | 437,763 |
| 2021 | 64,894 | 63,230 | 62,342 | 64,304 | 74,265 | 109,249 | 112,590 | 113,392 | 104,928 | 96,252 | 95,407 | 102,673 | 1,063,526 |
| 2020 | | | | | | 7,150 | 15,522 | 20,895 | 29,829 | 36,871 | 44,453 | 50,067 | 204,787 |
| 2019 | | | | | | | | | | | | | |

Source: https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters