**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| THE STATE OF ARIZONA,<br>By and through its Attorney General, Mark<br>Brnovich, et al.,<br><br>                              PLAINTIFFS,<br><br>v.<br><br>CENTERS FOR DISEASE CONTROL &<br>PREVENTION; et al.,<br><br>                              DEFENDANTS. | CIVIL ACTION NO. 6:22-cv-00885-RRS-CBW |

**PLAINTIFF STATES' REPLY IN SUPPORT OF
THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER
AND TO COMPEL PRODUCTION OF INFORMATION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ii

INTRODUCTION .........................................................................................................................1

    I.    This Court Has Jurisdiction To Grant The States' TRO Request ...........................................2

        A.    The States' Have Article III Standing.........................................................................3

        B.    Controlling Fifth Circuit Refutes DHS's Section 1252 Jurisdictional Arguments..........4

        C.    Defendants' Programmatic Decision To Begin Partial Implementation Of The
              Termination Order Is Final Agency Action Challengeable Under The APA .................5

        D.    DHS's Remaining Throwaway Arguments Are Both Waived And Meritless.................7

    II.    The States Are Likely To Prevail On The Merits Of Their TRO Claim................................9

        A.    Plaintiffs Are Likely To Prevail On Their APA Claims .............................................9

            1.    Notice And Comment Claim .........................................................................9

            2.    Arbitrary And Capricious Claim. .................................................................11

        B.    DHS's Contention That The States' TRO Motion Is Unpled Is Unserious .................13

        C.    DHS Offers No Response To The States' Statutory Argument That It Is Violating
              Section 268 .............................................................................................................13

        D.    DHS's Early Termination Is Not Consistent With The August Title 42 Order...........14

    III.  DHS Offers No Genuine Response To The States' Motion To Compel Information.......15

    IV.  The Remaining TRO/Preliminary Injunction Factors Support The States .........................16

CONCLUSION.............................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Al Otro Lado, Inc. v. McAleenan,*
  394 F. Supp. 3d 1168 (S.D. Cal. 2019) ................................................................7

*Alabama Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) ................................................................................18

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) ................................................................................8

*Amadei v. Nielsen,*
  348 F. Supp. 3d 145 (E.D.N.Y. 2018) ................................................................6

*BNSF Ry. Co. v. EEOC,*
  385 F. Supp. 3d 512 (N.D. Tex. 2018) ................................................................7

*Brotherhood. of Locomotive Engineers & Trainmen v. FRRA,*
  972 F.3d 83 (D.C. Cir. 2020) ................................................................7

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ................................................................11

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019) ................................................................16

*Dunn McCampbell Royalty Int., Inc. v. NPS,*
  2007 WL 1032346 (S.D. Tex. Mar. 31, 2007) ................................................................6

*East Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ................................................................5

*Edmonds v. Compagnie Generale Transatlantique,*
  443 U.S. 256 (1979) ................................................................18

*Ellison v. Connor,*
  153 F.3d 247 (5th Cir. 1998) ................................................................9

*Ensco Offshore Co. v. Salazar,*
  781 F. Supp. 2d 332 (E.D. La. 2011) ................................................................6

*Environment Def. Ctr. v. BOEM,*
  2018 WL 5919096 (C.D. Cal. Nov. 9, 2018) ................................................................6

*Gomez v. Trump,*
  485 F. Supp. 3d 145 (D.D.C. 2020) ................................................................7

*Gutierrez de Martinez v. Lamagno,*
  515 U.S. 417 (1995) ................................................................14

*Independent Towers of Washington v. Washington,*
  350 F.3d 925 (9th Cir. 2003) ................................................................8

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ................................................................10

*Linda R.S. v. Richard D.,*
  410 U.S. 614 (1973) ................................................................8

*Louisiana v. Becerra,*
__ F. Supp. 3d __, 2022 WL 16571 (W.D. La. January 1, 2022)......................................11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012)..........................................................................................................9

*OSG Bulk Ships, Inc. v. United States,*
132 F.3d 808 (D.C. Cir. 1998) .........................................................................................9

*Qureshi v. Holder,*
663 F.3d 778 (5th Cir. 2011) ...........................................................................................7

*Regents of the Univ. of Cal. v. DHS,*
908 F.3d 476 (9th Cir. 2018) ...........................................................................................4

*Rosa v. McAleenan,*
2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) .................................................................7

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,*
554 U.S. 269 (2008) ..........................................................................................................4

*Texas v. Biden,*
20 F.4th 928 (5th Cir. 2021).....................................................2, 4, 5, 6, 7, 8, 9, 12

*Texas v. United States,*
524 F. Supp. 3d 598 (S.D. Tex. 2021) ........................................................................ 5, 6

*Texas v. United States,*
809 F.3d 134 (5th Cir. 2015) ....................................................................................... 5, 8

*Trevino v. Johnson,*
168 F.3d 173 (5th Cir. 1999) ...........................................................................................7

*United States v. Johnson,*
632 F.3d 912 (5th Cir. 2011) .........................................................................................11

*Velesaca v. Decker,*
458 F. Supp. 3d 224 (S.D.N.Y. 2020)........................................................................ 6, 7

*Venetian Casino Resort, L.L.C. v. EEOC,*
530 F.3d 925 (D.C. Cir. 2008) ........................................................................................7

*Western Energy All. v. Jewell,*
2017 WL 3600740 (D.N.M. Jan. 13, 2017) ....................................................................6

*Whitman v. Am. Trucking Associations,*
531 U.S. 457 (2001) ..........................................................................................................7

## STATUTES

8 U.S.C. §1252(a)(2)(A)(i), (iii)........................................................................................2

## REGULATIONS

86 Fed. Reg. 42,828 (August 5, 2021) .............................................................................5

## INTRODUCTION

DHS[1] now *admits* that it has begun implementing the Title 42 Termination Order prematurely. Its own declarant concedes: DHS "has begun *in recent weeks* [*i.e.*, post-April-1-Termination Order] to increase the use of expedited removal for some single adults eligible for removal *who would otherwise be expelled pursuant to Title 42*." Nuñez-Neto Decl. ¶16 (Doc. 27-1) (emphasis added). DHS's brief similarly admits (at 2) that it "recent[ly] increased use of expedited removal for noncitizens from the Northern Triangle countries is in preparation for the full resumption of Title 8 immigration processing"—*i.e.*, partially ended implementation of Title 42 in advance of its formal expiration date. Thus, contrary to DHS's suggestion (at 16) that the States' TRO rests on "rank speculation," the States' evidence is now supported by DHS's *own confession*. There is nothing speculative about what DHS now *admits* it is doing.

That DHS felt it must act in secret belies its attempt to portray its changed policy as "nothing to see here." DHS had *full knowledge* that (1) Plaintiff States were challenging the Title 42 Termination and actively seeking a preliminary injunction against it *before* it took effect and (2) that Plaintiffs and this Court (and the public) believed—wrongly—that the Termination Order would not start to be implemented until it became legally effective on May 23.

So DHS knew the Plaintiff States would be concerned with early partial termination. But DHS nonetheless chose to conceal its actions from the States and this Court, and Plaintiffs only learned of them through leaks to the media—which DHS surely never intended to occur. Instead, by all indications, DHS did not mean for this Court to learn of its furtive early termination *ever*, and it thus would evade judicial review entirely by the expedient of secrecy precluding judicial scrutiny. These simply are not the actions of an agency that considers its conduct to be completely above board.

DHS's "defense" appears to consist partly of arguing that things could be worse. DHS

---

[1]  For ease of reference, "DHS," "CDC," and "Federal Defendants" are used interchangeably herein to refer to all Defendants except where context indicates otherwise.

contends (at 17) for example, that only of those processed through its illegally early termination, "only 12 percent are found to have a credible fear and are referred for removal proceedings"—*i.e.*, brought in the U.S. rather than being returned across the border as Title 42 demands. But the APA has no "we could have acted even more unlawfully" exception. That DHS's clandestine actions might have been even more flagrantly illegal is hardly the persuasive defense that DHS believes it to be.

Undoubtedly recognizing the indefensibility of its actions—and that its best defense: *i.e.*, concealment, has now failed—DHS predictably relies upon DOJ to unleash an avalanche of procedural objections designed to prevent this Court from recognizing the flagrant illegality of its actions. But each of those arguments fail. Indeed, some are so clearly barred by controlling Fifth Circuit precedent as flirt with the bounds of fair argument. In particular, Defendants' abject and pervasive refusal to address *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) *cert. granted* 142 S. Ct. 1098 (2022)—which squarely precludes *most* of the arguments they now advance—is incorrigible.

As to the merits of the States' actual APA claims, Defendants have precious little to say, most of which contravenes controlling-but-ignored precedent. The States are thus likely to prevail on all of those claims, any one of which would suffice. In addition, all of the remaining requirements for a TRO are all met here. And a TRO is particularly warranted to preserve the status quo, which DHS's early termination of Title 42 has unlawfully disrupted. Because Defendants' month-early implementation of the Title 42 Termination Order inflicts irreparable injury now, this Court should issue a TRO to prevent such harms from occurring while it resolves the States' motion for a preliminary injunction.

## I.      This Court Has Jurisdiction To Grant The States' TRO Request

Understandably seeking to avoid any judicial scrutiny of its hitherto secret actions, DHS predictably raises a flurry of jurisdictional arguments. But the Fifth Circuit has already had extensive experience with this same worn-out playbook and rejected all of the arguments advanced here.

## A.      The States' Have Article III Standing

DHS raises a skeletal, one-sentence/single-cite argument (at 13) that the States lack standing, citing only to a *Sixth Circuit stay* decision. But, apparently forgetting where this Court sits, DHS ignores the *Fifth Circuit merits decision* making that contention specious: *Texas v. Biden*. Indeed, those standing arguments that DHS advanced in that case are so patently baseless that Federal Defendants *refused* to raise them in the Supreme Court, either in its petition for certiorari or merits briefs—as the States specifically noted (PI Mem. (Doc. 13-1) at 12)), which DHS now ignores. The U.S. Solicitor General's Office thus recognizes how untenable those standing arguments are. This Court should too.

Specifically, the Fifth Circuit has expressly recognized that increased crossings of migrants illegally entering the United States *inexorably* leads to increased costs by the States: "if the total number of in-State aliens increases, the States will spend more on healthcare" *inter alia. Texas v. Biden*, 20 F.4th at 969 (emphasis added)); *accord* PI Mem. at 12. The Fifth Circuit further explained that these challenges are "precisely the sort of large-scale polic[ies] that [are] amenable to challenge *using large-scale statistics* and figures, rather than highly specific individualized documents. And [the State's] standing is robustly supported by just such big-picture evidence." *Id.* at 971 (emphasis added).

The States' standing here is similarly supported by just those sorts of "large-scale statistics." *Id.* Indeed, immigration statistics rarely come larger: even by Defendants' own projections, the Termination Order could single-handedly almost *triple* the number of migrants illegally entering the United States to 18,000 per day and result in 500,000 illegal crossings in the *first month* it is fully in effect. PI Mem. at 1, 10-11. Although the TRO addresses only a partial implementation of the Title 42 Termination, even a small fraction of those historically unprecedented numbers readily establishes standing. Indeed, even "only a dollar or two" of injury satisfies Article III. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). And DHS here notably *admits* that its actions are increasing the "total number of in-State aliens," *Texas v. Biden*, 20 F.4th at 969—which the Fifth Circuit

recognized establishes standing. DHS's protests (at 1) that the numbers involved are (at least) "relatively small" thus admit the existence of the States' injury-in-fact rather than disproving it.

### B.    Controlling Fifth Circuit Refutes DHS's Section 1252 Jurisdictional Arguments

Just as in *Texas v. Biden*, DHS here "halfheartedly suggests that the INA is a statute that precludes judicial review" citing—just like here—8 U.S.C. §1252. 20 F.4th at 976 (cleaned up). DHS notably lost this argument *unequivocally* in the Fifth Circuit. Its recycling of that argument—without ever acknowledging its prior loss on this *precise* issue under binding precedent—is shameless.

By its terms, the jurisdiction limiting language of that provision apply only to individual decisions to release noncitizens on parole. *See, e.g.* 8 U.S.C. §1252(a)(2)(A)(i), (iii) (referring to "*individual* determination[s]" and "*individual* aliens" (emphasis added)). Plaintiffs do not challenge any individual enforcement decision, but rather Defendants' programmatic shift to begin implementing the Termination Order early.

For that reason, the Fifth Circuit rejected this now-regurgitated Section 1252 argument, holding that the provision "applies to removal decisions affecting *individual aliens and not broad programmatic decisions*" because "the entirety of the text and structure of §1252 indicates that it operates only on denials of relief for individual aliens." *Texas v. Biden*, 20 F.4th at 976–78 & n.11 (emphasis added). *See also Regents of the Univ. of Cal. v. DHS*, 908 F.3d 476, 503 (9th Cir. 2018), *rev'd in part on other grounds*, 140 S. Ct. 1891 (2020) (holding that under §1252 parties *can challenge* "programmatic shift[s]" in immigration enforcement even if they could not challenge "individual ... decisions"); *Texas v. United States*, 809 F.3d 134, 164–65 (5th Cir. 2015) (rejecting federal government's §1252 argument in state challenge to DHS's DAPA program); *Texas v. United States*, 524 F. Supp. 3d 598, 641–42 (S.D. Tex. 2021) (rejecting DHS constellation of jurisdiction stripping arguments, including one under §1252, and holding that those "provisions concern limits to potential suits brought by aliens themselves" and not to challenging "challenging DHS's decision to blanket *pause* the removal of thousands of aliens").

4

This is precisely what Plaintiffs' TRO asserts: a challenge to Defendants' programmatic shift in immigration enforcement.[2] Indeed, that systematic shift is conceded, with DHS admitting (at 1) that it is has "recently increased its use of expedited removal under Title 8" rather than using Title 42.

DHS could not possibly have been unaware of the *Texas v. Biden* decision—it is both cited *extensively* in the States' PI brief (at 2, 12, 27, 31, 33, 39, 40) and is being argued in the Supreme Court *tomorrow*.[3] And if DHS had any persuasive response to that dispositive decision, it would have raised it here. Instead, DHS brazenly ignores that controlling precedent in the hope that this Court will too.

## C.     Defendants' Programmatic Decision To Begin Partial Implementation Of The Termination Order Is Final Agency Action Challengeable Under The APA

Defendants concede that "DHS has begun in recent weeks to increase the use of expedited removal for some single adults ... who would otherwise be expelled pursuant to Title 42." Nuñez-Neto Decl. ¶ 16. And that clear concession directly implies a centralized decision by DHS, which DHS tellingly does not deny. DHS nevertheless contend that its actions are not final agency action. Not so.

Once again, DHS ignores *Texas v. Biden*. As here, the challenged decision "altered that status quo and caused DHS to return fewer aliens," thus rendering the policy reviewable under the APA as final agency action. 20 F.4th at 948. Those intentional non-returns both represent the culmination of DHS's decision-making and have obvious real-world legal consequences (*i.e.*, being allowed into the

---

[2]   The requirement of Section 1252(e)(3) that certain challenges be brought in the DDC does not apply because this suit is not the type of action covered by the statute—Plaintiff's claims are related to Title 42 Order and do not challenge any specific "determinations under section 1225(b)" or DHS's implementation of Section 1252. *See, e.g., East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 666 (9th Cir. 2021). Instead, they challenge DHS's unlawful early implementation of the Title 42 Order. Nor do the States ask this Court to enjoin the operation of the INA, but rather to restrain the Defendants from taking unlawful actions to implement that illegal Order.

[3]   DHS did not advance any of the instant jurisdictional arguments raised here before the Supreme Court, although it did in the Fifth Circuit and district court and lost on *all* of them. The agency could have renewed them in the Supreme Court but did not. That presumably is because the U.S. Solicitor General is apparently unwilling to make them. *Supra* at 3. But DHS lacks similar restraint here, even though this Court (unlike the Supreme Court) is squarely bound by Fifth Circuit precedent.

U.S. or not). *Id.* at 948-49. DHS offers no argument that its early partial termination could be anything other than final agency action under *Texas v. Biden.*

*Texas v. Biden* is hardly an outlier though. Although discrete exercises of enforcement discretion vis-à-vis particular individuals may not constitute final agency actions, broad enforcement policies and practices *are* reviewable final actions. Federal courts have routinely recognized as much. *See, e.g., Texas v. United States*, 524 F. Supp. 3d at 642-43 (100-day pause of deportations is final agency action).[4]

The final agency action inquiry is pragmatic. That Defendants may or may not have committed their admitted policy to writing does not insulate it from judicial review.[5] That said, DHS tellingly

---

[4]  *Accord Velesaca v. Decker*, 458 F. Supp. 3d 224, 240 (S.D.N.Y. 2020) (no-release policy is final agency action); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 (E.D.N.Y. 2018) ("policy or routine practice of CBP conducting identification searches of disembarking domestic airline passengers" constitutes final agency action); *see also Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 334, 336 (E.D. La. 2011) ("blanket moratorium on deepwater drilling in the Gulf of Mexico" is a "final agency action"); *Environment Def. Ctr. v. BOEM*, 2018 WL 5919096, at *5 (C.D. Cal. Nov. 9, 2018) (NEPA document that "effectively lift[ed] [a] moratorium" constitutes final agency action); *Dunn McCampbell Royalty Int., Inc. v. NPS*, 2007 WL 1032346, at *5 (S.D. Tex. Mar. 31, 2007) ("Plan 'effectively clos[ing]' ... areas to drilling operations, does constitute 'final agency action.'"); *Western Energy All. v. Jewell*, 2017 WL 3600740, at *14 (D.N.M. Jan. 13, 2017); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) ("adopting a policy of permitting employees to disclose confidential information without notice is surely" final agency action).

[5]  *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 479 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."); *see also Gomez v. Trump*, 485 F. Supp. 3d 145, 193 (D.D.C. 2020) ("cluster of guidance documents, cables, and directives, have ordered consular offices and embassies to cease processing and issuing visas for otherwise qualified applicants" constitutes final agency action). Rather, the final agency-action inquiry is pragmatic and elevates substance over form. *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) ("The Supreme Court's interpretation of the APA's finality requirement is 'flexible' and 'pragmatic.'" (citation omitted)); *see also BNSF Ry. Co. v. EEOC*, 385 F. Supp. 3d 512, 522 (N.D. Tex. 2018) ("Buoying this pragmatic framework is an increasing hesitance by the Supreme Court and lower courts alike to shelter agencies from judicial enforcement of congressional mandates."). Courts have thus consistently found that unwritten but clear and discrete policies constitute final agency action regardless of whether it is committed to a formal writing or published in the Federal Register. *See Brotherhood. of Locomotive Engineers & Trainmen v. FRRA*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting cases holding that "[a]gency action generally need not be committed to writing to be final and judicially reviewable"); *see also Rosa v. McAleenan*, 2019 WL 5191095, at *19 (S.D. Tex. Oct. 15, 2019) (same); *Velesaca*, 458 F. Supp. 3d at 237 n.7 ("[A] number of cases have involved courts inferring from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing."). Finality is a pragmatic

neither denies the existence of a written policy or guidance documents nor provides copies of them. Such continued evasiveness does not preclude judicial review, however—particularly as DHS has squarely admitted the existence of the policy being challenged, whether written or not.

### D.    DHS's Remaining Throwaway Arguments Are Both Waived And Meritless

DHS also appears to advance three other skeletal jurisdictional arguments (at 13), though in each is in undeveloped, single-sentence form. It is doubtful this suffices to preserve them for decision. *See, e.g., Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999) (holding that "undeveloped" and "inadequately argued" issues are waived). Indeed, DHS's approach calls to mind the discredited "'spaghetti approach,'" with DHS having "heaved the entire contents of a pot against the wall in hopes that something would stick." *Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). This Court should "decline … to sort through the noodles." *Id.*

But even if they are not waived, they can be readily dispensed with under controlling precedent, which DHS pervasively ignores. Indeed, it is notable that in virtually every case the Fifth Circuit has not only rejected the *very same argument* by DHS, but further specifically cited and distinguished the *very same precedents* DHS now cites to.

***Cognizable Interest.*** DHS's contention (at 13) that "third parties have no legally cognizable interest in enforcement of the laws against others, including under the INA" is squarely refuted by both *Texas v. Biden* and *Texas v. United States* (the DAPA case), both of which recognized just such cognizable interests. *See Texas v. Biden*, 20 F.4th at 990 (squarely rejecting DHS's argument "that the States lack 'any cognizable reliance interests in MPP'"); *Texas v. United States*, 809 F.3d at 154 (rejecting DHS's argument that "a plaintiff lacks standing to challenge decisions … not to prosecute, a third

---

test precisely so the Executive Branch cannot circumvent APA review the way Defendants are attempting to do here. *See BNSF Ry. Co.*, 385 F. Supp. 3d at 523 ("An agency cannot skirt its obligations by acting illegally and then claiming it has not acted at all."); *Al Otro Lado, Inc. v. McAleenan*, 394 F. Supp. 3d 1168, 1206–07 (S.D. Cal. 2019) ("[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'").

party" which, as here, DHS premised on *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

**Zone of Interest.** Federal courts have long-recognized that States have "quasi-sovereign interest[s] in the health and well-being—both physical and economic—of [their] residents." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 607-08 (1982). Federal Defendants' cursory contention (at 13) that the States "are outside Section 265's zone of interests"—*i.e.*, that the States have no legitimate interest in the public health of their citizens, which is the applicable "zone of interest" for Section 265—is thus specious. Indeed, it violates the most fundamental and elementary principles of federalism, under which the Federal Government is not the sole sovereign responsible for public health. In any event, the zone-of-interest test is "not ... especially demanding," with the "benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-25 (2012). The States' long-recognized interest in the health of their citizens thus easily suffices. And to the extent that DHS might be arguing that the States' interests in immigration enforcement lie outside of the relevant zone of interests, that too is precluded by *Texas v. Biden*. 20 F.4th at 975-76 (rejecting DHS's zone of interest contentions).

**Committed to Agency Discretion.** Citing *Ellison v. Connor*, 153 F.3d 247, 253 (5th Cir. 1998), Federal Defendants argue that "the CDC Director's decisions under Section 265 are 'committed to the agency's discretion by law' and therefore are not reviewable under the APA." Opp at 13 (cleaned up). As an initial matter, that premise has little relevance in the context of the instant TRO request, which challenges *DHS's* early implementation of the Termination Order, rather than any discretionary decision by CDC. But that argument fails more globally too.

With apologies for the broken-record repetition, *Texas v. Biden* again rejects that argument. As that case explains, *Ellison* "appl[ied] *Heckler*['s non-reviewability presumption] to an agency's decision *not to issue an individual permit*." 20 F.4th at 984 (emphasis added). The *Heckler* presumption does not apply here where the States challenge an admitted policy (whether of CDC's or DHS's), rather than

any individual enforcement decisions. Indeed, the Fifth Circuit has held outright that "*Heckler* cannot apply to agency actions that qualify as rules under 5 U.S.C. § 551(4)." *Id.* And here there can be no doubt that the Termination Order is a "rule" under the APA.

Moreover, "an agency's adoption of a general enforcement policy is subject to review," which is precisely what DHS's admitted premature implementation is. *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) (distinguishing *Heckler*'s presumption of unreviewability as applying only to individual cases of non-enforcement). Furthermore, a subject is not committed to agency discretion if there is a "meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Here there is just such a standard: the May 23 effective date marks the boundary between lawful and unlawful implementation of it.

## II.   The States Are Likely To Prevail On The Merits Of Their TRO Claim

Once their predictable deluge of baseless jurisdictional objections are properly set aside, precious little remains of Defendants' opposition. They barely address the merits of the States' APA claims, preferring instead to pretend that they were not pled. They were. DHS similarly offers no meaningful response to its binding statutory duty under 42 U.S.C. § 268. And DHS's suggestion that its partial early termination is in fact consistent with those orders is simply unserious.

### A.   Plaintiffs Are Likely To Prevail On Their APA Claims

CDC offers two pages (at 13-15) of perfunctory denials in response to the State's APA claims. *See* PI Mem. at 18-40. What little argument Defendants offer makes plain that the States are likely to prevail on *all* of their APA claims—any one of which would suffice to obtain a TRO or PI.

#### 1.   Notice And Comment Claim

***Foreign Affairs Exception.*** Defendants' "foreign affairs" exception argument can be readily dispensed with. CDC simply offers no response *whatsoever* to *all* applicable case law expressly requiring the Rule to identify actual international *consequences* for the exception to apply, rather than the mere existence of international discussions. See PI Mem. at 24-25 (citing five such cases). But rather than

identifying a single such consequence, CDC simply reiterates (at 14) the Rule's observation that unspecified discussions are ongoing with other countries. That does not suffice—which CDC's conspicuous failure to cite even a single case underscores.

***Good Cause Exception.*** CDC's "good cause" argument is somewhat better developed, but equally infirm. Most importantly, CDC *ignores entirely* Executive Order 14,010, which mandated in *February 2021* that CDC begin considering terminating Title 42. PI Mem. at 8, 20-21. CDC thus had *fourteen months*—ample time—to comply with notice-and-comment procedures. And whether notice and comment "*could have been run in the time taken* to issue the [challenged] rule" is a central consideration in the Fifth Circuit. *United States v. Johnson*, 632 F.3d 912, 929 (5th Cir. 2011) (emphasis added). But CDC ignores both *Johnson* and the applicable 14-month period entirely. CDC similarly ignores entirely its own use of notice-and-commend procedures when promulgating the initial Title 42 system. PI Mem. at 21-22. And CDC further ignores that the effect of its Termination Order is to *inflict* an emergency rather than prevent one. PI Mem. at 23.

Each one of these three complete non-responses is singularly fatal to CDC's "good cause" rationale here. Moreover, CDC's failure to engage with other applicable case law: *e.g.*, *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021) and this Court's decision in *Louisiana v. Becerra*, __ F. Supp. 3d __, 2022 WL 16571 (W.D. La. January 1, 2022), which Defendants tellingly did not even bother to appeal—also underscores the weakness of their good cause arguments.

What little reasoning that CDC does offer (at 13-14) ignores the obvious distinction between *short-term* actions—which by their nature often preclude notice-and-comment—with *permanent* actions, whose permanency typically provides sufficient time. Thus, 30- or 60-day extensions are fundamentally different in character that *permanent* revocation of Title 42, particularly where Title 42's operation over two years means that the effects of its termination are now calamitous—as which is now widely acknowledged, even from the Administration's *supporters*. *See* PI Mem. at 1-2.

Nor does CDC's Director having "already determined, in her expert judgment, that a suspension of entry is no longer necessary" (Opp. at 14) constitute "good cause." The APA's central premise is that such final determinations can typically be made only *after* receiving public comment. That Director Walensky purportedly has an incurably closed mind, unsusceptible to any comments she might have received, is not "good cause" under the APA—though it is strong evidence of arbitrary and capricious decision-making. And CDC offers no reasoning why it could delay the Order's effective date only 7 weeks to allow for DHS to plan for termination—with even Secretary Mayorkas now apparently telling members of Congress privately that such planning is presently inadequate to address the coming calamity[6]—but not long enough to take public comments. *See* PI Mem. at 23-24.

### 2.     Arbitrary And Capricious Claim.

***Impacts on States.*** At the outset, CDC's contention (at 15) that it "CDC did consider States' reliance interests," can be rejected out of hand. CDC did no such thing: repeatedly disclaiming any obligation to do so. CDC only "considered" impacts to States insofar as it decided *not* to analyze them *at all* because it deemed them illegitimate (an independent legal error). Similarly, CDC's apparent contention (at 15) that it necessarily considered them because it offered a conclusory statement that *all* countervailing interests were outweighed fails, once again, under *Texas v. Biden*: merely "stating that a factor was considered … is not a substitute for considering it." 20 F. 4th at 993 (cleaned up).

***Costs To States As Important Consideration.*** CDC makes no attempt to address the States' argument (PI Mem. at 27-28) that, irrespective of any purported illegitimacy of the States' reliance interests, that costs to the States were an "important aspect of the problem" that CDC was required to consider under the APA—but didn't. At all. That alone renders the Order arbitrary and capricious.

***States' Reliance Interests.*** CDC's contention (at 15) that the States' reliance interests were

---

[6] *See* Alayne Treene, Axios, *Scoop: DHS chief concerned about lifting Title 42* (Apr. 21, 2022) *available at* *https://bit.ly/37y0KJL*

illegitimate/disregardable as "misplaced because Title 42 orders were by their terms temporary measures" directly violates *Texas v. Biden*. Again. Which CDC ignores completely. Also again.

As the States explained, the Supreme Court's decision in *Regents* squarely rejects the premise that cognizable reliance interests cannot exist in temporary programs. PI Mem. at 29-30. *Regents* alone should be dispositive here (and CDC ignores *Regents* completely as well). But *Texas v. Biden* puts an exclamation point on *Regents*. Federal Defendants' argument in *Texas v. Biden*—exactly as here—was that it "had no obligation to consider the States' reliance interests at all." 20 F.4th at 553. The Fifth Circuit's response was merciless: that "contention is squarely foreclosed by *Regents*" and it was "astonishing[]" that DHS made it at all. *Id.* CDC recycling that argument here after *both Regents* **and** *Texas v. Biden*—while neither acknowledging nor distinguishing either—is unbecoming.

***Failure To Consider Immigration Consequences Generally.*** CDC does not deny that it considered immigration consequences in setting the May 23 effective date of the Order. PI Mem. at 34-36. That concession squarely refuses CDC's argument (at 15) that "impacts of immigration on the States simply are not relevant factors." CDC has no statutory authority to distinguish between immigration-related impacts to the federal government (purportedly proper considerations) and those to the States (putative "not relevant factors"). And even as to the federal government, all CDC says is that its Order is "replete with *references* to the resumption of … regular immigration processing." TRO Opp. at 15 (emphasis added). But the APA demands more than CDC merely "referencing" the actual problem—the agency actually has to *analyze* it meaningfully and provide a *reasoned explanation* of its resulting decision in light of that analysis. CDC does not even *allege* that it did anything of the sort.

Ultimately, either CDC has authority to consider immigration consequences or it doesn't. If it does not, the Order is arbitrary and capricious because it sets an effective date based on something CDC lacks authority to consider. If CDC does have such authority, it violated the APA by ignoring immigration consequences to the States. Because CDC's rationale is palpably at war with itself, it

cannot satisfy the APA.

*Failure To Consider Public Health Consequences Of Immigration Effects.* Moreover, even if CDC lacked authority to consider immigration consequences generally, it at least had to consider the resulting *public health* consequences of that immigration. As explained previously, "It strains credulity to imagine that CDC could even screen that number of migrants [up to 18,000 per day] for communicable diseases (including Covid-19) [and] CDC certainly never indicates otherwise." PI Mem. at 36-37. CDC offers no response at all, thereby conceding CDC's Termination Order is arbitrary and capricious as it failed to consider this essential issue.

### B.   DHS's Contention That The States' TRO Motion Is Unpled Is Unserious

DHS's contention that the TRO asserts claims that are unpled is similarly unavailing. DHS does not bother to deny that it has already begun implementing the Termination Order in advance of its actually becoming effective. Indeed, DHS admits as much. *Supra* at 1.

Plaintiff States' complaint uncontestably challenges the legality of that Termination Order. To the extent that the Order is unlawful, any actions by DHS to implement it are necessarily unlawful too. DHS has no lawful authority to implement illegal orders, whether partially or completely. And that is precisely what the States have pled.

More fundamentally, DHS's argument is premised on facile formalism. Of course the States' complaint did not challenge specifically DHS's actions that, until a few days ago, were intentionally hidden from them and the outside world (but now admitted). But the States have more than adequately pled a challenge to any implementation of the Termination Order since they have pled that the Order is illegal in its entirety. Rule 8 requires no more under its notice pleading standard.

### C.   DHS Offers No Response To The States' Statutory Argument That It Is Violating Section 268

As explained in the States' TRO motion, Section 268 establishes a mandatory duty for DHS to enforce the Title 42 Orders while they are in effect. TRO Br. at 4. That is underscored by the use

of the mandatory "shall" preceding "aid." 42 U.S.C. §268; *see, e.g., Gutierrez de Martinez v. Lamagno*, 515

U.S. 417, 434 n.9 (1995) (recognizing that "'shall' generally means 'must'" in statutory language).

DHS offers no specific response to this argument, thus conceding that the statutory text creates a mandatory duty generally. With respect to that provision, all that DHS does contend (at 14) is that under "§ 268, [it] should not be expected to be able to change its operations overnight."

That is a non-sequitur. The States have never argued that CDC could not implement the Termination Order on an incremental basis *after it becomes legally effective* on May 23 (if not enjoined or vacated by then). DHS thus need not turn on a dime on that day, but could instead begin implementing the Termination Order gradually then. But what DHS cannot do is intentionally sabotage its enforcement of Title 42 Orders *while they are still in effect*. And that is what DHS concedes it is doing here. DHS cannot plausibly claim to be discharging its mandatory duty to "aid … enforcement" of the Title 42 Orders by partially refusing to enforce them.

DHS's admitted violation of its concededly mandatory duties under Section 268 thus amply warranted relief by TRO.

### D.     DHS's Early Termination Is Not Consistent With The August Title 42 Order

Finally, Defendants point to language in the August 2021 Title 42 Order that provides an exception for "[p]ersons whom *customs officers* determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." Opp. at 11 (quoting 86 Fed. Reg. 42,828, 42,841 (August 5, 2021)) (emphasis added). That command is necessarily bottom-up: an individual customs officer may recommend an exception based upon an individual alien's specific circumstances. But that is simply not what DHS is plausibly doing here. Moreover, nothing in the August Order suggests that DHS has authority to implement an *illegal* termination order early, which is precisely what the States allege (and have now established) here.

Defendants further acknowledge CDC's stated "expectation that DHS will continue to apply exceptions outlined in the August Order to covered noncitizens as appropriate, including the exception based on the totality of an individual's circumstances on *a case-by-case basis*." Nuñez-Neto Decl. ¶3 (quoting Termination Order) (emphasis added). But Defendants then confirm they have changed how exceptions are handled: "DHS has begun in recent weeks to increase the use of expedited removal for some single adults ... who would otherwise be expelled pursuant to Title 42." *Id.* ¶ 16.

There is thus every indication is that change was the result of top-down, *programmatic* action, not a shift by line officers suddenly all exercising case-by-case discretion in *exactly the same manner*, but only as to the *exact same countries*. Indeed, it is powerful evidence that the Border Patrol Union felt the need to publicize DHS's actions, make clear that the Biden Administration is effectively ending Title 42 prematurely, and inform the Plaintiff States of the "huge backlog" that resulted in "pulling more agents out of the field," St. John Decl. (Dkt. 24-3) ¶¶2–4, 6–7 (emphasis added).

Defendants' suggestion that they are merely engaging in purportedly uncoordinated case-by-case decisions is thus both implausible and contrary to their own admissions. Accepting that this state of affairs is nothing more than the product of miraculously coinciding case-by-case determinations, all suddenly aligned in one direction, would require this Court to "exhibit a naiveté from which ordinary citizens are free.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted).

## III.   DHS Offers No Genuine Response To The States' Motion To Compel Information

DHS barely offers any particular response to the State's motion to compel production of information, largely (at 16) relying on its other arguments in opposition to a TRO. That does not suffice for all of the reasons explained above.

The States admit that, in light of DHS's *admissions* that DHS performed the very conduct the States feared, there is a somewhat diminished need for a precise accounting of DHS's actions. But only somewhat. DHS continues to deny the existence of irreparable harm—and indeed bizarrely

castigating (at 17) the States as relying on "rank speculation," as if its own admissions were not powerful evidence that the States' arguments were "non-speculative." TRO Opp. at 1. That is tantamount to gaslighting. But it underscores the need for DHS to disclose additional information.

More generally, given DHS's outrageous attempts to hide its actions, a full accounting would have obvious salutary effects—as well as serving as a powerful deterrent to other agencies similarly tempted to pull equivalent fast ones. And such disclosure is virtually certain to reveal evidence either supporting the States on the non-merits TRO/PI factors and/or provide evidence of Defendants' unclean hands. It therefore should be ordered—which DHS barely opposes with any specificity.

## IV.    The Remaining TRO/Preliminary Injunction Factors Support The States

Finally, DHS's arguments about irreparable harm and the balance of harms/public interest are specious. While DHS contends (at 16) that the States are relying on "rank speculation," they ignore their own *admissions* that they are engaged in the very conduct that the States have challenged.

DHS's position is also deeply inequitable. DHS's consciously hid its unlawful early termination from the Plaintiff States, this Court, and the public—which necessarily has frustrated the States' ability to make their case. They have nonetheless done so more than adequately here (particularly as now supplemented by DHS's admissions).

The States' preliminary injunction motion set forth how complete implementation of the Termination Order will cause them catastrophic irreparable harms—as even many Democratic Senators have recognized. Partial implementation would thus necessarily cause them irreparable harm sufficient to support a TRO. Moreover, DHS's intentional concealment amply warrants drawing an adverse inference as the States' harms: if the evidence was so clear that DHS's partial-repeal policy was harmless or beneficial, DHS presumably would not have been so intent on hiding it.

So too do the balance of harms and public interest factors favor the requested TRO, just as they do the States' request for a preliminary injunction. Indeed, this is hardly the first time that federal

courts have encountered unlawful CDC orders relating to the Covid-19 pandemic. As in *Alabama Ass'n of Realtors v. HHS*, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," and a TRO/PI is therefore in the public interest. 141 S. Ct. 2485, 2490 (2021).

Moreover, to the extent that DHS now contends (at 17) that its "activities are driven by the law enforcement purpose of improving DHS's deterrent capabilities and readying for the return to full immigration processing," one might fairly ask: why would they need to conceal *that*? If DHS's actions are as unimpeachable as the agency now belatedly contends—after having been caught red-handed—why didn't they disclose them publicly earlier? That conscious suppression of information is even more telling as DHS could not possibly have believed that the Plaintiff States and this Court would have been disinterested in learning about its early partial termination.

As is often the case in life, DHS's prior "silence is most eloquent." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266–67 (1979). DHS's previous, intentional concealment of its actions belies its own apparent internal belief that its actions are indefensible—and hence must be hidden rather than defended publicly and in court. All of DHS's instant arguments would have had greater plausibility if DHS had disclosed its actions and defended them contemporaneously. That DHS's defense is now offered only belatedly as a fallback to its original plan of hiding its actions entirely makes plain the enormous grains of salts with which all of the agency's instant arguments should now be taken. DHS's Plan B should fare no better than its Plan A.

## CONCLUSION

The States' request for a temporary restraining order and to compel production of information should be granted.

Dated:   April 25, 2022

Respectfully submitted,

By: _/s/  Joseph Scott St. John_

MARK BRNOVICH
  Attorney General
BRUNN ("BEAU") W. ROYSDEN III*
  Solicitor General
DREW C. ENSIGN**
  Deputy Solicitor General
JAMES K. ROGERS*
  Senior Litigation Counsel
ANTHONY R. NAPOLITANO *
  Assistant Attorney General
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

_Counsel for Plaintiff State of Arizona_

STEVE MARSHALL
  Alabama Attorney General
EDMUND G. LACOUR JR.*
  Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

_Counsel for Plaintiff State of Alabama_

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

_Counsel for Plaintiff State of Louisiana_

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

_Counsel for Plaintiff State of Missouri_

TREG R. TAYLOR
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

_Counsel for Plaintiff State of Alaska_

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*


CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
  Attorney General,
BRIAN KANE*
  Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DAVE YOST
  Ohio Attorney General
BENJAMIN M. FLOWERS*
  Solicitor General
Office of the Ohio Attorney General
30 E. Broad St., 17th Fl.
Columbus, OH 43215
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee
ANDRÉE S. BLUMSTEIN
  Solicitor General
CLARK L. HILDABRAND*
BRANDON J. SMITH*
  Assistant Solicitors General
Office of the Tennessee Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

PATRICK MORRISEY
  Attorney General
LINDSAY SEE*
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

* Pro hac vice application forthcoming
** Pro hac vice application granted

SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK*
  Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*