IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| The STATE of ARIZONA, *et al.*, | ) ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) )  Civil Action No. 6:22-cv-00885-RRS-CBW |
| CENTERS FOR DISEASE CONTROL, AND PREVENTION, *et al.*, | ) ) ) ) |
| *Defendants.* | ) ) |

**SECOND DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1) I am the Acting Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS) as of October 1, 2021. My permanent role is Chief Operating Officer at U.S. Customs and Border Protection (CBP), which I began on March 5, 2021. Since August 24, 2021, I have been concurrently serving as the Vice Chair for the Secretary of Homeland Security's Southwest Border Taskforce. I also previously served at DHS as an Advisor to CBP Commissioner Gil Kerlikowske from January 12, 2015 to January 16, 2017.

2) My April 22, 2022 declaration concerning this matter, *Arizona v. CDC,* No. 6:22-cv-00885 (W.D. La.), is incorporated by reference here as if set forth verbatim in this declaration.

1

**Preparing for the Termination of the Title 42 Public Health Order**

3) Consistent with the U.S. Centers for Disease Control and Prevention (CDC) August 2021 Title 42 Order, DHS has since last fall been taking many steps to prepare to "move[] towards the resumption of normal border operations." 86 Fed. Reg. 42,828, 42,837 (Aug. 5, 2021). The following paragraphs describe the principal measures that DHS has taken, both before and after the CDC's April 1, 2022 Order terminating its August 2021 Title 42 Order, and all related prior orders, in order to prepare for the full resumption of normal border operations.

4) *Health Measures:* On March 28, 2022, in accordance with CDC guidance and in order to better protect its personnel, the noncitizens it encounters, and border communities, DHS began implementing a COVID-19 vaccination program for all age-eligible noncitizens processed who were found inadmissible under Title 8 authorities and held in CBP custody at the U.S. Southwest Border. Vaccinations have been described by the CDC as the "single most important measure for reducing risk for SARS-CoV-2 transmission and avoiding severe illness, hospitalization, and death." *See* Memorandum from CDC to CBP re Public Health Recommendation for Proof of COVID-19 Vaccination at U.S. Land Borders (Dec. 14, 2021). CBP is now providing a first dose of FDA-approved COVID-19 vaccinations at 24 sites across the Southwest Border to age-eligible noncitizens found inadmissible under Title 8 authority who do not have proof of prior vaccination with a World Health Organization-approved vaccine. CBP continues to refine its processes to increase vaccination rates as it prepares for May 23rd.

5) *Operational Measures:* On February 17, 2022, DHS published the Southwest Border Mass Irregular Migration Contingency Plan, established the Southwest Border Coordination Center (SBCC) to support DHS-wide coordination and unity of effort along the Southwest Border, and the Secretary designated a Senior Coordination Official (SCO) to lead the effort. The

SBCC has centralized coordination within the Department in a single structure to ensure effective, holistic planning and execution, to enable the Department to respond to any potential migratory surge in the most efficient and effective manner possible.

6) As part of the SBCC planning effort, DHS has surged resources and personnel to the border. CBP currently has 23,000 officers and agents working along the Southwest Border, over 600 of whom have deployed since February 1 in response to increasing operational demands. Over the next few months, DHS is on track to deploy over 500 additional full-time contractors to the border to relieve CBP law enforcement agents and allow them to return to the field to undertake their vital border security mission. U.S. Immigration and Customs Enforcement (ICE) has also deployed over 400 staff to the border and has assigned approximately 250 special agents and criminal analysts to carry out investigations focused on the organizations taking advantage of vulnerable individuals, working to detect, disrupt, and dismantle TCOs involved in narcotics, human smuggling, and human trafficking that are putting migrants in harm's way for profit along the border. So far this month, these investigations have produced over 1,430 arrests, 230 investigations, and 290 disruptions of smuggler infrastructure like busses used to move migrants. This activity represents more than a 240% increase of human smuggling network-related disruption events in FY22 compared to the same time and region in FY21.

7) DHS is also working to increase processing efficiency and taking critical steps to mitigate potential overcrowding at Border Patrol facilities. This includes launching three new initiatives to more quickly process people in CBP custody while also ensuring that individuals are appropriately vetted: (i) Enhanced Central Processing Centers, which will co-locate key agencies to allow DHS to more efficiently process noncitizens and transfer or

release them from custody; (ii) en-route processing, which will allow CBP and ICE to undertake immigration processing of noncitizens during any appropriate transportation; and (iii) streamlined processing, which seeks to decrease the time it takes to issue documents appropriate for removal proceedings and release from custody.

8) Over the past year, DHS also has been proactively expanding its capacity to humanely and safely hold and process migrants at the border. CBP has constructed nine soft-sided facilities since January 2021, including two over the past three months, with one more under construction. By May 23, DHS will be prepared to hold approximately 18,000 noncitizens in CBP custody at a time, up from 13,000 at the beginning of 2021.

9) DHS has further taken steps to increase the ability to move noncitizens laterally—a key tool that allows CBP to relieve overcrowded sectors and maximize its processing capacity by moving noncitizens within and between Border Patrol sectors. CBP is on track to contract for 394 additional bus movements per day by April 29, almost doubling its capacity to move noncitizens laterally, and with the potential for further expansion. DOJ also has committed eight U.S. Bureau of Prisons buses with supporting personnel to replace buses and drivers currently staffed by Border Patrol Agents, enabling these agents to return to the field and perform their critical law enforcement and border security missions.

10) *Intelligence Gathering:* DHS recently established a dedicated analytic cell to anticipate changes and trends in irregular migration patterns and provide indications and warnings of concentrated surges in migration at the Southwest Border. The cell is integrating and co-locating intelligence capabilities with law enforcement to improve the Department's ability to prepare operationally and manage large numbers of migrants arriving along the Southwest Border in a humane and efficient manner. The cell will also enhance the Department's

ability to prevent transnational criminal organizations from exploiting migrating populations and migration routes to smuggle narcotics and other illicit goods across the border; and counter malicious actors' use of disinformation to exploit vulnerable migrants by encouraging dangerous journeys into the United States.

11) *International Efforts*: DHS and the U.S. State Department (DOS) have been actively engaging with foreign partners across the Western Hemisphere in preparation for the termination of the Title 42 Order and resumption of immigration processing pursuant to DHS's Title 8 authorities. In a series of bilateral engagements, DHS and DOS notified foreign governments throughout the region about the CDC's Termination Order and its May 23 implementation date and asked for increased cooperation on a number of matters related to managing migratory flows, including by increasing enforcement efforts, expanding lawful pathways, and streamlining the requirements associated with removal flights conducted under Title 8 authorities. DHS and DOS are actively working with our foreign partners to minimize hurdles to efficiently effectuate removals, including extended manifest submission deadlines, COVID testing requirements, and measures that require travel documents for all persons placed on removal flights that can significantly increase the time it takes to lawfully remove individuals and exacerbate detention space limitations in our facilities.

**Title 8 v. Title 42 Processing, including Single Adults from Northern Triangle Countries**

12) The CDC's Title 42 orders have consistently authorized DHS to except from the scope of the order "[p]ersons whom customs officers determine, with approval from a supervisor, should be excepted from this Order based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests." 86 Fed. Reg. at 42,841.

13) Pursuant to this discretionary exception authority the Department has, for law enforcement reasons, consistently excepted a small proportion of individuals who might otherwise be expelled pursuant to Title 42 and processed them for expedited removal (ER) under Title 8. The use of ER on single adults who might otherwise have been expelled to Mexico is not novel—it is something that DHS has done consistently since the very beginning of Title 42 for important law enforcement reasons, including to reduce recidivism, and is fully consistent with the exception authority included in every CDC Order since the first iteration in March 2020. There are legal consequences for individuals who enter unlawfully after having removed under Title 8 that are not applicable to those expelled pursuant to Title 42: namely, they are subject to a five-year bar on admission and potential felony charges for unlawfully re-entering the United States pursuant to 8 U.S.C. § 1326(a).

14) In March 2022, DHS expanded the use of ER on recidivist border crossers from Mexico to levy law enforcement consequences on individuals who have particularly high rates of re-encounters given the lack of meaningful consequences associated with a Title 42 expulsion. This was done partly in preparation for the potential termination of the Title 42 Order, but also for the independent law enforcement purpose of ensuring that there are substantial immigration and potential criminal consequences to unlawful reentry. Since this effort began in early March, the number of Mexican nationals processed for ER increased from 1.4% of all Mexican single adult encounters the week ending March 3 (or 255 encounters) to 3.3% (or 501 encounters) the week ending April 21. Importantly, from fiscal year (FY) 2014 through FY2019, only 4.8 percent of single adults from Mexico claimed fear during the ER process, and just 0.3 percent were granted relief or protection from removal by the Department of Justice's Executive Office for Immigration Review (EOIR). This means that more than 99%

of Mexican single adults placed in ER have historically been quickly removed back to Mexico and thereby subject to meaningful immigration and potential criminal consequences.

15) In early April 2022, as described in greater detail in my previous Declaration, the Department further expanded the use of ER to single adults from Guatemala, El Salvador, and Honduras who would have otherwise been expelled directly back to Mexico and been free to continue trying to enter the country unlawfully with no consequence. In furtherance of a legitimate law enforcement purpose—that is, to impose an immigration consequence on unlawful behavior—DHS has been placing increasing numbers of single adults from these three countries in ER. As my previous Declaration notes, only 12 percent have been found to have credible fear and therefore been referred to EOIR for INA § 240 proceedings—meaning that 88 percent of these single adults are either being removed or in the process of being removed directly back to their home countries.  This is in line with historical trends for single adults from Guatemala, Honduras, and El Salvador: from FY2014 to FY2019, 43 percent claimed fear; 28 percent were referred to EOIR for INA § 240 proceedings, and only 13 percent of completed EOIR cases have resulted in relief or protection from removal.

16) DHS also recently shifted some Title 42 expulsion flights for family units to use those flights to return family units who are subject to ER and do not claim fear, or who have been issued removal orders through other immigration proceedings. This has led to a reduction of 2 Title 42 expulsion flights a week (from 7 to 5), affecting up to 270 individuals in family units each week (135 per flight).

17) This expanded use of ER serves two critical purposes. First, it serves an important law enforcement goal by imposing meaningful immigration and criminal consequences on, and thus deterring, unlawful reentry. Second, it supports DHS' efforts to prepare for the eventual

termination of Title 42 by ensuring that DHS and its component agencies can identify ways to increase processing efficiencies and work through any issues in the ER process.

18) Prohibiting DHS from expanding its use of ER in this intervening period could have significant negative consequences on its ability to manage encounters that are already at historically high levels—and that may increase further—as a result of the termination of Title 42 on May 23.

19) *Humanitarian Exceptions:* CBP has been continuing to process particularly vulnerable individuals for humanitarian exceptions to the August 2021 Title 42 Order at ports of entry. As part of these efforts, CBP restarted a process that was in place last summer that allows non-governmental organizations to identify particularly vulnerable individuals in Mexico who could potentially qualify for a humanitarian exception from Title 42. These individuals are then scheduled for presentation at designated ports of entry for a case-by-case determination to be made by CBP personnel. Pursuant to this process, CBP processed approximately 215 people a day throughout July 2021. Consistent with these prior efforts, CBP is currently working with NGOs to reach the same level of organized and orderly exception processing at ports of entry as was in place in July 2021.

20) In addition, on March 11, in response to Russia's ongoing war of aggression against Ukraine which has displaced more than 12 million people and created a humanitarian crisis in Europe, DHS provided guidance to CBP that Ukrainian nationals arriving at the land border could be considered for humanitarian exceptions to Title 42, on a case-by-case basis. Since then, consistent with the President's commitment to support the millions displaced from Ukraine, and upon consultation with the CDC, DHS has processed more than 20,000 Ukrainian

nationals for parole and employed the discretionary authority to except these individuals from Title 42 at the land border.

21) These case-by-case exceptions have been superseded by the recently announced *Uniting for Ukraine* process, which, as of April 25, allows recently displaced Ukrainian citizens with financial supporters in the United States, who pass biometric and biographic national security and law enforcement background checks, and who meet public health requirements set by the DHS Chief Medical Officer, to receive authorization to travel to the United States to be considered for a parole on a case-by-case basis. As of April 25, Ukrainian citizens arriving at the land border will generally be referred to this process. The Department strongly encourages all potential applicants to apply directly from Europe, where they will have greater support than if they apply from Mexico or elsewhere. The Department will, as a result, be significantly curtailing its use of discretionary Title 42 exceptions for this population at the land border

**Statistics**

22) Attachment A includes preliminary statistics reflecting the number of noncitizens processed under Title 42 and Title 8 by country for each week over the past six months. These data, as well as the data cited in this Declaration, were pulled from CBP's operational data system to provide the most current available data; the April numbers will fluctuate by an average of up to 15 percent as part of CBP's data quality control process. All numbers for the current fiscal year are subject to additional more modest fluctuation as part of CBP and DHS's data quality controls. Final numbers for the current fiscal year will not be locked down until early in FY 2023 (October 2022 – December 2022). The data cited in this Declaration, and Attachment A, is thus not final and is subject to change.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 26th day of April, 2022.

_____
Blas Nuñez-Neto
Acting Assistant Secretary for Border and
Immigration Policy
Department of Homeland Security

10