IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| STATE OF ARIZONA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:22-CV-00885-RRS-CBW |
| | ) | |
| CENTERS FOR DISEASE CONTROL | ) | |
| & PREVENTION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## Table of Contents

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

    I.    Sections 362 and 365 of the Public Health Service Act ...................................4

    II.   CDC's Interim Final Rule and Accompanying Order in Response to the
          Pandemic ...........................................................................................................5

    III.  CDC's Issuance of the Final Rule Following Notice and Comment.................5

    IV.  CDC's Suspension Orders Issued Pursuant to the Final Rule and the
          Exception of Unaccompanied Children from the Suspension .........................6

    V.   CDC's Termination of Suspension Orders with Respect to Unaccompanied
          Children.............................................................................................................7

    VI.  CDC's April 1, 2022 Order Terminating All Prior Suspension Orders .........8

    VII. The Instant Suit and Motion for Preliminary Injunction ...............................10

STANDARD OF REVIEW ................................................................................................10

ARGUMENT .....................................................................................................................11

    I.    Plaintiffs Lack Standing to Challenge the Termination Order ......................11

    II.   Plaintiffs' Claimed Injuries Do Not Come Within Section 265's Zone of
          Interests...........................................................................................................15

    III.  CDC's Public-Health Determination Under Section 265 Is Not Subject to
          Judicial Review ...............................................................................................16

    IV.  CDC Need Not Have Conducted Notice-and-Comment Rulemaking in
          Issuing the Termination Order ........................................................................20

          A.   The Termination Order falls within the "good cause" exception to
                the notice-and-comment requirement. ..............................................20

          B.   The Termination Order falls within the foreign affairs exception to
                 the notice-and-comment rulemaking requirement...........................28

    V.   Plaintiffs Are Unlikely to Succeed on Their Arbitrary and Capricious Claim ...........32

          A.   CDC engaged in reasoned decision-making. ....................................32

          B.   CDC properly considered the issue of reliance interests. ................35

          C.   CDC did not need to rely upon downstream, non-COVID-19 related
                "immigration consequences" in making its public health
                determination...................................................................................39

    VI.  The Remaining Preliminary Injunction Factors Weigh in Favor of
          Defendants ......................................................................................................42

CONCLUSION..................................................................................................................45

## Table of Authorities

**CASES**

*Aid for Women v. Foulston*,
    441 F.3d 1101 (10th Cir. 2006) ................................................................................................45

*Air Courier Conf. of Am. v. Postal Workers Union, AFL-CIO*,
    498 U.S. 517 (1991) ..............................................................................................................15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) ..................................................................................................... 12, 16

*Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*,
    821 F.2d 761 (D.C. Cir. 1987) ..............................................................................................25

*Amin v. Mayorkas*,
    24 F.4th 383 (5th Cir. 2022) ......................................................................................... 32, 36

*Arizona v. Biden*,
    --- F.4th ---, 2022 WL 1090176 (6th Cir. Apr. 12, 2022) .......................................11, 12, 13

*Arpaio v. Obama*,
    27 F. Supp. 3d 185 (D.D.C. 2014) ........................................................................................14

*Associated Builders & Contractors, Inc. v. Herman*,
    976 F. Supp. 1 (D.D.C. 1997) ...............................................................................................25

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..............................................................................................................15

*Biden v. Missouri*,
    142 S. Ct. 647 (2022) ..................................................................................................... 23, 26

*Bowman Transp. Inc. v. Ark.-Best Freight Sys. Inc.*,
    419 U.S. 281 (1974) ..............................................................................................................33

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) ..............................................................................................................44

*California v. Texas*,
    141 S. Ct. 2104 (2021) ..........................................................................................................14

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................................................29

*Cent. & Sw. Servs., Inc. v. EPA*,
    220 F.3d 683 (5th Cir. 2000) ................................................................................................45

*Chambless Enters., LLC v. Redfield,*
    508 F. Supp. 3d 101 (W.D. La. 2020) ................................................................23

*City of Bos. Delegation v. FERC,*
    897 F.3d 241 (D.C. Cir. 2018) ..........................................................................41

*City of New York v. Permanent Mission of India to the United Nations,*
    618 F.3d 172 (2d Cir. 2010) ..............................................................................29

*City of Portland v. EPA,*
    507 F.3d 706 (D.C. Cir. 2007) ..........................................................................28

*Crane v. Johnson,*
    783 F.3d 244 (5th Cir. 2015) .............................................................................13

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ..........................................................................11

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ...........................................................................38, 39, 42

*Dep't of Com. v. New York,*
    139 S. Ct. 2551 (2019) ................................................................................42, 43

*Doe v. Tangipahoa Par. Sch. Bd.,*
    494 F.3d 494 (5th Cir. 2007) .............................................................................15

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) .............................................................................29

*E.B. v. U.S. Dep't of State,*
    ---F. Supp. 3d---, 2022 WL 343505 (D.D.C. Feb. 4, 2022) ..............................30

*Ecosystem Inv. Partners v. Crosby Dredging, LLC,*
    729 F. App'x 287 (5th Cir. 2018) ......................................................................16

*El Paso County v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ......................................................................13, 14

*Ellison v. Connor,*
    153 F.3d 247 (5th Cir. 1998) .................................................................16, 18, 19

*FDA v. Am. Coll. of Obstetricians & Gynecologists,*
    141 S. Ct. 578 (2021) ........................................................................................44

*Fed. Deposit Ins. Corp. v. Bank of Coushatta,*
    930 F.2d 1122 (5th Cir. 1991) ...........................................................................19

*Friends of Animals v. Bernhardt,*
   961 F.3d 1197 (D.C. Cir. 2020) ...................................................................24

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ........................................................... 16, 17, 18, 19

*Hotze v. Burwell,*
   784 F.3d 984 (5th Cir. 2015) .......................................................................11

*Huisha-Huisha v. Mayorkas,*
   27 F.4th 718 (D.C. Cir. 2022) ......................................................... 8, 21, 44

*Humana, Inc. v. Jacobson,*
   804 F.2d 1390 (5th Cir. 1986) ...................................................................43

*INS v. Orlando Ventura,*
   537 U.S. 12 (2002) ........................................................................................45

*Interstate Com. Comm'n v. Or. Pac. Indus., Inc.,*
   420 U.S. 184 (1975) ...................................................................................24

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) .......................................................................44

*Jifry v. FAA,*
   370 F.3d 1174 (D.C. Cir. 2004) ...................................................................23

*Johnson v. U.S. Dep't of Agric.,*
   734 F.2d 774 (11th Cir. 1984) .....................................................................45

*Jordan v. Fisher,*
   823 F.3d 805 (5th Cir. 2016) .......................................................................11

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ........................................................... 16, 17, 19, 20

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..........................................................................11, 13, 45

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ...................................................................................15

*Make The Rd. N.Y. v. Wolf,*
   962 F.3d 612 (D.C. Cir. 2020) .....................................................................27

*Maryland v. King,*
   567 U.S. 1301 (2012) ...................................................................................44

iv

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..........................................................................................................11

*Massachusetts v. Melon,*
    262 U.S. 447 (1923) ..................................................................................................... 12, 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................... 32, 33, 36, 38

*Munaf v. Geren,*
    553 U.S. 674 (2008) ..........................................................................................................10

*Nken v. Holder,*
    556 U.S. 418 (2009) ..................................................................................................... 43, 44

*P.J.E.S. ex rel. Francisco v. Wolf,*
    502 F. Supp. 3d 492 (D.D.C. 2020) ............................................................................ 7, 8

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ..................................................................................................2, 20, 24

*Petry v. Block,*
    737 F.2d 1193 (D.C. Cir. 1984) .....................................................................................21

*Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs,*
    No. 4:15-CV-817-A, 2016 WL 543209 (N.D. Tex. Feb. 9, 2016) .......................................19

*Raines v. Byrd,*
    521 U.S. 811 (1997) ..................................................................................................... 11, 13

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) .....................................................................................43

*Sierra Club v. EPA,*
    939 F.3d 649 (5th Cir. 2019) ............................................................................38, 40, 42

*Sierra Club v. U.S. Army Corp of Eng'rs,*
    295 F.3d 1209 (11th Cir. 2002).....................................................................................41

*Sierra Club v. U.S. Dep't of Interior,*
    990 F.3d 909 (5th Cir. 2021) ..................................................................................... 32, 33

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.,*
    632 F.3d 938 (5th Cir. 2011) .........................................................................................29

*Tex. Oil & Gas Ass'n v. EPA,*
    161 F.3d 923 (5th Cir. 1998) .........................................................................................40

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021) ............................................................................ 11, 12, 16, 19

*Texas v. Biden,*
  554 F. Supp. 3d 818 (N.D. Tex. 2021) ............................................................................39

*Texas v. Biden,*
  --- F. Supp. 3d ----, 2022 WL 658579 (N.D. Tex. Mar. 4, 2022) ...............................8, 18

*Texas v. EPA,*
  983 F.3d 826 (5th Cir. 2020) ...........................................................................................17

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ...........................................................................................12

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ...............................................................................................11, 15

*U.S. Steel Corp. v. EPA,*
  595 F.2d 207 (5th Cir. 1979) ...........................................................................................23

*Warth v. Seldin,*
  422 U.S. 490 (1975) .........................................................................................................15

*Webster v. Doe,*
  486 U.S. 592 (1988) .........................................................................................................17

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ...................................................................................................40, 41

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .......................................................................................................11, 43

*Yassini v. Crosland,*
  618 F.2d 1356 (9th Cir. 1980) .........................................................................................30

*Zhang v. Slattery,*
  55 F.3d 732 (2d Cir. 1995) ..............................................................................................32

*Zhu v. Gonzales,*
  411 F.3d 292 (D.C. Cir. 2005) .........................................................................................17

## STATUTES

5 U.S.C. § 551 .......................................................................................................................20

5 U.S.C. § 553 ................................................................................................................*passim*

5 U.S.C. § 701 .......................................................................................................................16

8 U.S.C. § 1225 ...................................................................................................................... 22, 43

8 U.S.C. § 1229 ........................................................................................................................... 22

8 U.S.C. § 1229a .................................................................................................................... 22, 43

8 U.S.C. § 1252 ........................................................................................................................... 43

19 U.S.C. § 1401 .......................................................................................................................... 5

42 U.S.C. § 264 ........................................................................................................................... 42

42 U.S.C. § 265 .................................................................................................................... passim

42 U.S.C. § 268 ............................................................................................................. 1, 5, 26, 40

42 U.S.C. § 7409 ......................................................................................................................... 40

Act of February 15, 1893, 27 Stat. 449 ......................................................................................... 5

## REGULATIONS

8 C.F.R. § 208.30 ........................................................................................................................ 22

8 C.F.R. § 235.3 .......................................................................................................................... 22

8 C.F.R. § 1003.1 ........................................................................................................................ 22

8 C.F.R. § 1208.30 ...................................................................................................................... 22

33 C.F.R. § 211.6 ........................................................................................................................ 19

33 C.F.R. § 211.9 ........................................................................................................................ 18

42 C.F.R. § 71.40 .................................................................................................................. passim

85 Fed. Reg. 16,547 (Mar. 24, 2020) .......................................................................................... 29

85 Fed. Reg. 16,548 (Mar. 24, 2020) .......................................................................................... 29

85 Fed. Reg. 16,559 (Mar. 24, 2020) ............................................................................................ 5

85 Fed. Reg. 17,060 (Mar. 26, 2020) ............................................................................................ 5

85 Fed. Reg. 22,424 (Apr. 22, 2020) ............................................................................................ 5

85 Fed. Reg. 31,503 (May 26, 2020) ............................................................................................ 5

85 Fed. Reg. 56,424 (Sept. 11, 2020) .................................................................................... passim

85 Fed. Reg. 65,806 (Oct. 16, 2020) ................................................................................. 6, 7

86 Fed. Reg. 9942 (Feb. 17, 2021) ........................................................................................7

86 Fed. Reg. 38,717 (July 22, 2021) ......................................................................................7

86 Fed. Reg. 42,828 (Aug. 5, 2021) ........................................................................ 7, 26, 31

86 Fed. Reg. 58,216 (Oct. 21, 2021) ...................................................................................30

86 Fed. Reg. 58,218 (Oct. 21, 2021) ...................................................................................30

87 Fed. Reg. 3425 (Jan. 24, 2022) .......................................................................................30

87 Fed. Reg. 15,243 (Mar. 17, 2022) ............................................................................ 8, 25

87 Fed. Reg. 19,941 (Apr. 6, 2022) ...........................................................................*passim*

Exec. Order No. 5143 (June 21, 1929) ................................................................................21

Exec. Order No. 14,010,
   86 Fed. Reg. 8267 (Feb. 2, 2021) .................................................................................25

## OTHER AUTHORITIES

H.R. Rep. No. 79-1980 (1946) ............................................................................................29

## INTRODUCTION

This Court should deny the State Plaintiffs' request to preliminarily enjoin the termination of an emergency public health order of the U.S. Centers for Disease Control & Prevention (CDC) that temporarily suspended the right to introduce into the United States certain noncitizens traveling from Mexico and Canada and encountered by the Department of Homeland Security (DHS) at or near the border.  In seeking this extraordinary relief, Plaintiffs fundamentally misunderstand the targeted nature of the CDC Director's statutory authority.  The public health order being terminated is not an immigration "safety valve" designed to regulate the flow of immigration (Memo. in Supp. of Mot. for Preliminary Inj. ["PI"] at 1, ECF No. 13-1).  Rather, it is an extraordinary, temporary measure to be used only sparingly to protect the public health at the expense of disrupting congressionally mandated immigration processing.  An injunction to prevent the termination is unwarranted when the CDC Director, in her expert judgment, has determined that this extraordinary public health measure is no longer necessary to avert a serious danger to the public health at this stage in the COVID-19 pandemic, and when DHS otherwise has the statutory duty to enforce the immigration laws.

In March 2020, as the world faced the historic COVID-19 pandemic, the CDC Director at the time exercised his discretionary authority under the Public Health Service Act, 42 U.S.C. § 265, to temporarily suspend the right to introduce into the United States certain noncitizens traveling from Mexico and Canada who would otherwise be held in congregate settings in ports of entry or U.S. Border Patrol stations.  Although this statutory authority previously had been invoked to suspend the entry of noncitizens only once in its 127-year history due to the extraordinary nature of that power, the CDC Director determined that the suspension was necessary to avert the serious danger of the introduction, transmission, or spread of COVID-19 into the United States.  The CDC order [hereinafter "Title 42 order"] accordingly required that covered noncitizens be expelled—a process carried out by DHS, which had been tasked to aid in the enforcement of the Title 42 order pursuant to the Public Health Service Act, 42 U.S.C. § 268.  Because Title 42 orders may last only "for such period of time as [the CDC Director] may deem necessary" to avert the "serious danger of the introduction of [a communicable] disease into the United States," *id.* § 265, the March 2020 order, as

1

well as all subsequent orders suspending entry, were subject to monthly or bi-monthly reviews to ensure their continued necessity. On April 1, 2022, following the latest 60-day review, the CDC Director determined that such an order is no longer required in the interest of public health and therefore terminated the operative Title 42 order issued in August 2021, as well as all prior suspension orders, and delayed implementation of the termination until May 23, 2022, to enable DHS to implement appropriate COVID-19 mitigation protocols and prepare for full resumption of regular immigration processing.

Plaintiffs bring this suit under the Administrative Procedure Act (APA), seeking to override the CDC Director's expert judgment as arbitrary and capricious. They also seek to set aside the termination decision for failure to comply with notice-and-comment rulemaking procedures. They are not likely to succeed because as a threshold matter, they lack standing to sue and their claimed injuries associated with a potential increase of noncitizens in their states are outside the zone of interest protected by the statute, 42 U.S.C. § 265. Moreover, the CDC Director's decisions under the statute are committed to the agency's discretion by law and thus are not reviewable under the APA.

Plaintiffs also are unlikely to succeed in their notice-and-comment challenge to the termination order. Just as the Title 42 orders could be issued without notice and comment to address the public health emergency caused by the pandemic, so can the operative Title 42 order be rescinded without notice and comment once the emergency need for it has dissipated—consistent with the Supreme Court's teaching that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Employing notice-and-comment rulemaking procedures is impracticable and contrary to the public interest under the circumstances here. *See* 5 U.S.C. § 553(b)(B). The termination order, like the August 2021 order it seeks to terminate, was issued pursuant to a duly promulgated regulation that provides CDC with flexibility to respond to rapidly changing public health circumstances without notice and comment, and limits CDC's authority to maintain a suspension order in the absence of a public health justification. Because the Title 42 orders issued to date were temporary emergency measures reassessed every 30 or 60 days to determine their continued necessity

2

to protect public health, CDC had good cause not to continually engage in notice-and-comment rulemaking.  Were it otherwise, the August 2021 order, which Plaintiffs prefer to maintain, would similarly be invalid because it superseded an earlier suspension order issued 10 months earlier. Although CDC has delayed implementation of the termination to account for DHS's need for time to prepare to fully resume immigration processing, that by no means suggests notice-and-comment is required after the CDC Director has already determined that a suspension of entry is no longer necessary to protect the public health.  Rather, it merely recognizes that DHS, as the agency charged by the Public Health Service Act to aid in the implementation of Title 42 orders, should not be expected to be able to change its operations overnight.

The termination order also falls within the foreign affairs exception to the notice-and-comment requirement because it "involve[s]" a "foreign affairs function of the United States."  *See* 5 U.S.C. § 553(a)(1).  The termination implicates ongoing discussions between the United States and Mexico and Canada regarding how best to control COVID-19 transmission over shared borders.  As explained in the Declaration of Emily Mendrala, Deputy Assistant Secretary in the Bureau of Western Hemisphere Affairs, U.S. Department of State, the termination "will impact our partners, our shared borders, and our efforts to advance safe, orderly, and humane migration throughout the region," and therefore "relates directly to, and has clear consequences for international relations."  Decl. of Emily Mendrala ¶ 7 (Attached as Ex. A).

Plaintiffs also argue that the termination decision is arbitrary and capricious because it fails to account for asserted interest by the States to rely on the continued existence of Title 42 orders and the potential impact of immigration on the States.  This argument as well is unlikely to succeed.  First, CDC determined that to the extent any reliance interests could reasonably exist, none outweighed the importance of terminating the August 2021 order in light of its extraordinary nature, the CDC's limited authority, and the lack of a public health justification at this stage of the pandemic to continue the Title 42 order.  CDC further determined that to the extent State or local governments relied on the indefinite continuation of Title 42 orders, such reliance was misplaced because the orders were by their terms temporary measures that CDC regularly reevaluated to determine their continued necessity.

Second, economic and other non-COVID-19 related impacts of immigration on the States are not relevant factors in issuing the Termination Order because, as noted above, CDC has no authority to use Section 265 to fix the perceived defects in the immigration system.

Finally, the remaining preliminary injunction factors weigh against issuance of a preliminary injunction.  Plaintiffs cannot fairly contend that resuming immigration processing under the immigration laws will irreparably harm them simply because it will lead to a greater number of migrants entering the United States.  The downstream impacts Plaintiffs point to are indirect and incidental, and at most traceable to operations of the immigration scheme mandated by Congress, which Plaintiffs do not challenge.  Conversely, forcing CDC to continue an extraordinary public-health measure that it judged is no longer warranted under the governing statute would harm the government and be contrary to the public interest.  Indeed, such an intrusion into CDC's statutory discretion and expertise would be especially improper because it would require CDC to continue disrupting ordinary immigration processing under the detailed procedures that Congress has mandated, despite CDC's expert judgment that such a disruption has no public health justification.  Any alleged fiscal harm to Plaintiff States does not come close to outweighing the harm that an injunction would impose on the federal government and public interest.

For these reasons, and those stated below, this Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I.  Sections 362 and 365 of the Public Health Service Act

Originally enacted in 1893, Section 362 of the Public Health Service Act provides that:

> Whenever [the CDC Director] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [CDC Director], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

4

42 U.S.C. § 265; *see* Act of February 15, 1893, ch. 114, § 7, 27 Stat. 449, 452.  A separate provision of the Public Health Service Act authorizes "customs officers" to assist in implementing any Title 42 order.  *See* 42 U.S.C. § 268(b).  Pursuant to 19 U.S.C. § 1401(i), certain DHS officers have been designated as "customs officers."

## II.     CDC's Interim Final Rule and Accompanying Order in Response to the Pandemic

In March 2020, in light of the COVID-19 pandemic, CDC issued an interim final rule to invoke the authority under Section 265.  85 Fed. Reg. 16,559 (Mar. 24, 2020).   CDC simultaneously issued an order pursuant to the interim final rule temporarily suspending the introduction into the country of certain noncitizens (most commonly those who lack valid travel documents), "traveling from Canada or Mexico . . . who would otherwise be introduced into a congregate setting in a [] Port of Entry [] or Border Patrol station" near the border, 85 Fed. Reg. 17,060, 17,061 (Mar. 26, 2020).  As CDC explained, these border facilities were "not designed for, and [were] not equipped to, quarantine, isolate, or enable social distancing."  *Id.*  An outbreak of COVID-19 could cause "further transmission and spread of COVID-19 in the interior" of the country and negatively impact local communities' healthcare resources as well as expose healthcare workers to COVID-19.  *Id.*  Thus, CDC determined that the order was necessary to avert a "serious danger of the introduction of COVID-19 into" the border facilities and "the interior of the country as a whole."  *Id.*  The order, adopted without notice and comment, was to remain effective only for "30 days, or until [CDC] determine[d] that the danger of further introduction of COVID-19 into the United States has ceased to be a serious danger to the public health, whichever is shorter."  *Id.* at 17,068.  CDC subsequently extended the order for another 30 days, *see* 85 Fed. Reg. 22,424 (Apr. 22, 2020), and further extended and amended it in May 2020, 85 Fed. Reg. 31,503 (May 26, 2020).  Thereafter (and until August 2021), CDC "reassess[ed] the order every 30 days to determine whether its" "continuation … [was] necessary to protect the public health." *Id.* at 31,509.

## III.    CDC's Issuance of the Final Rule Following Notice and Comment

In September 2020, after considering public comments on the interim final rule, CDC promulgated a regulation to govern its future exercise of authority under Section 265.  *See* 85 Fed. Reg.

5

56,424 (Sept. 11, 2020).  The regulation provides that

> The Director may prohibit, in whole or in part, the introduction into the United States of persons from designated foreign countries … or places, only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease, by issuing an order in which the Director determines that:
>
>> (1) By reason of the existence of any quarantinable communicable disease in a foreign country … or place there is serious danger of the introduction of such quarantinable communicable disease into the United States; and
>>
>> (2) This danger is so increased by the introduction of persons from such country … or place that a suspension of the right to introduce such persons into the United States is required in the interest of public health.

42 C.F.R. § 71.40(a).  The regulation defines "[p]rohibit, in whole or in part, the introduction into the United States of persons" to mean the prevention of introduction by "suspending any right to introduce into the United States, physically stopping or restricting movement into the United States, or physically expelling from the United States some or all of the persons."  *Id.* § 71.40(b)(2).  Any order under the regulation must specify, among other things, the serious danger being prevented and the period of time and circumstances under which the introduction shall be prohibited.  *Id.* § 71.40(c)(2), (c)(5).  The regulation further requires that "[w]hen issuing any order under this section, the Director shall, as practicable under the circumstances, consult with all Federal departments or agencies whose interests would be impacted by the order."  *Id.* § 71.40(d).  The regulation does not contemplate that the CDC would go through the notice-and-comment process to issue an order.

## IV.   CDC's Suspension Orders Issued Pursuant to the Final Rule and the Exception of Unaccompanied Children from the Suspension

In October 2020, CDC issued a new order pursuant to the new regulation.  *See* 85 Fed. Reg. 65,806 (Oct. 16, 2020).  As with the May 2020 order, it provided that "[e]very 30 days, the CDC shall review the latest information regarding the status of the COVID-19 pandemic and associated public health risks to ensure that the Order remains necessary to protect public health."  *Id.* at 65,812.  The October 2020 order also was issued without notice and comment.

The following month, the U.S. District Court for the District of Columbia preliminarily enjoined the application of the October order to unaccompanied children. *P.J.E.S. ex rel. Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020). The D.C. Circuit stayed the injunction pending appeal, *see P.J.E.S. v. Pekoske*, No. 20-5357 (D.C. Cir. Jan. 29, 2021), but shortly thereafter, CDC paused the expulsion of unaccompanied children pending a reassessment of the October order. 86 Fed. Reg. 9942 (Feb. 17, 2021). By July 2021, CDC determined that it was appropriate to fully except unaccompanied children from the October order. *See* 86 Fed. Reg. 38,717 (July 22, 2021) (the July Exception).

In August 2021, CDC issued a new order that superseded the October 2020 order, again without notice and comment. *See* 86 Fed. Reg. 42,828 (Aug. 5, 2021). The August order incorporated by reference the July Exception, but determined that the relevant public health conditions continued to require the order for covered single adults and family units. In particular, the order noted that, "[a]lthough several of the key indicators of transmission and spread of COVID–19 in the United States improved during the first half of 2021, variants of concern, particularly the more transmissible Delta variant, have driven a stark increase in COVID–19 cases, hospitalizations, and deaths." *Id.* at 42,831. The August order was to be reassessed "at least every 60 days" and to remain in place until the earlier of either the expiration of the Secretary of HHS's declaration of public health emergency, or the CDC Director's determination "that the danger of further introduction of COVID-19 into the United States has declined such that the continuation of the Order is no longer necessary to protect public health." *Id.* at 42,830.

## V.   CDC's Termination of Suspension Orders with Respect to Unaccompanied Children

In March 2022, two separate judicial opinions were issued relating to CDC's authority under Section 265. On March 4, 2022, the D.C. Circuit affirmed in part and denied in part a previously stayed preliminary injunction enjoining the application of Title 42 orders to family units. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). The court found that although Section 265 likely authorizes the expulsion of covered noncitizens, pursuant to the INA, such expulsion may not be "to places where [the noncitizens] will be persecuted or tortured." *Id.* at 722; *see also* No. 21-5200, Dkt.

1944106 (D.C. Cir. Apr. 22, 2022) (directing that mandate be issued on May 23, 2022).  That same day, the U.S. District Court for the Northern District of Texas preliminarily enjoined the Government from enforcing the July Exception and a portion of the August 2021 Order "to the extent that they except unaccompanied alien children from [Section 265] procedures based solely on their status as unaccompanied alien children." *Texas v. Biden*, --- F. Supp. 3d. ----, 2022 WL 658579, at *21 (N.D. Tex. Mar. 4, 2022).  The preliminary injunction was to become effective on March 11.  *Id.*

In light of that timeline, CDC accelerated its ongoing public health reassessment with respect to unaccompanied children and issued an order on March 11, 2022, terminating all prior suspension orders to the extent they apply to unaccompanied children.  87 Fed. Reg. 15,243, 15,248 (Mar. 17, 2022).  This March order is not at issue in this litigation.  *See* Am. Compl., Prayer for Relief.  Because the then 60-day review was to conclude on March 30, 2022, CDC noted that it would decide by that date whether the August order remained necessary in whole or part to protect the public health with respect to single adults and family units.  87 Fed. Reg. at 15,244.

## VI.    CDC's April 1, 2022 Order Terminating All Prior Suspension Orders

On April 1, 2022, the CDC issued a new order, terminating all prior suspension orders, with an implementation date of May 23, 2022.  87 Fed. Reg. 19,941 (Apr. 6, 2022) (Termination Order). In making its determination, CDC evaluated the current status of the COVID-19 pandemic, which is substantially different from the environment in which the August 2021 order or the earlier suspension orders were issued.  CDC cited data showing that after peaking on January 15, 2022, *id.* at 19,947-48, COVID-19 case numbers in the United States fell by 95% as of March 28, 2022, *id.* at 19,944 & n.24. Death and hospitalization rates also underwent a "swift descent."  *Id.* at 19,948.  CDC attributed these changes in part to "widespread population immunity and a generally lower overall risk of severe disease due to the nature of the Omicron variant."  *Id.*

In addition, CDC assessed that public health officials have gained an increased understanding of the science behind COVID-19.  *Id.* at 19,947-48.  "While earlier phases of the pandemic required extraordinary actions by the government and society at large," CDC explained, "epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and

therapeutics have permitted the country to safely transition to more normal routines." *Id.* at 19,948. In addition to the fact that testing is widely used and available, *id.* at 19,949, as of March 30, 2022, 73.9% of the U.S. population 12 years or older have been fully vaccinated, and 86.6% have received at least one dose. *Id.* Nearly half of those 18 years or older have received a booster shot. *Id.* And, 86% of the CBP workforce on the U.S.-Mexico border are vaccinated. *Id.* at 19,951. Globally, there are also higher levels of vaccination and infection-induced immunity, including in the countries of origin for the current majority of incoming noncitizens. *Id.* at 19,952 & n.144. Moreover, effective treatments for COVID-19 are also more widely available, including oral antiviral medications, *id.* at 19,950 & n.127, and a monoclonal antibody, *id.* at 19,950 & n.125.

Recognizing that the pandemic "has shifted to a new phase," CDC released a new framework in February 2022, using metrics designed to focus on disease control and healthcare system protection. *Id.* at 19,948. The framework classifies each county in the United States as low, medium, or high COVID-19 Community Level "to help determine which mitigation measures should be implemented within a community." *Id.* at 19,949. As the Termination Order explained, as of March 31, 2022, 94.9% of the U.S. population lives in counties classified as "low," 4.5% are classified as "medium," and only 0.5% live in counties classified as "high." *Id.* And, "all 24 U.S. counties along the U.S.-Mexico border are classified as having a 'low' COVID-19 Community Level." *Id.* at 19,953.

Finally, CDC recognized that "public health concerns may arise in congregate settings," such as DHS's border facilities, *id.* at 19,952, but it determined that "that risk does not present a sufficiently serious danger to public health to necessitate maintaining the August Order," which CDC recognized was "among the most restrictive measures CDC has undertaken." *Id.* at 19,951–52. This is so because of the availability of various mitigation measures, the increasing levels of vaccination, and the falling case counts and hospitalizations in most areas of the country. *Id.* at 19,951. CDC noted in particular CBP's use of a variety of mitigation measures, including "engineering upgrades, masking for migrants, and [Personal Protective Equipment] for its workforce"; DHS's partnership with state, local, and non-governmental organization partners in developing robust testing and quarantine programs along the Southwest Border; and DHS's plans to scale up its vaccination program by May 23, 2022. *Id.*

9

In light of these considerations, CDC determined that even taking account of the risk posed by congregate settings and that fact that COVID-19 remains a concern, "the readily available and less burdensome public health mitigation tools to combat the disease render an order under 42 U.S.C. [§] 265 to prevent a serious danger to the public health unnecessary." *Id.* at 19,953. CDC delayed implementation of the Termination Order until May 23, 2022, "to provide DHS time to implement operational plans for fully resuming Title 8 processing," "including to give DHS time to implement additional COVID-19 mitigation measures." *Id.* at 19,954–55. CDC recognized that implementation of the Termination Order "will lead to an increase in the number of noncitizens being processed in DHS facilities[,] which could result in overcrowding in congregate settings." *Id.* at 19,956. But CDC also noted that DHS "is taking steps to plan for such increases, including by readying decompression plans, deploying additional personnel and resources to support U.S. Border Patrol, and enhancing its ability to safely hold noncitizens it encounters." *Id.*

## VII.   The Instant Suit and Motion for Preliminary Injunction

On April 3, 2022, Plaintiffs brought this suit to challenge the Termination Order for failing to meet the APA's notice-and-comment requirement, *see* Am. Comp. ¶¶ 176–87, and as arbitrary and capricious agency action, *see id.* ¶¶ 188–208. On April 14, 2022, Plaintiffs amended the complaint and moved to preliminarily enjoin the Termination Order. ECF Nos. 10, 13. On April 27, 2022, the Court entered a temporary restraining order, enjoining DHS from taking certain steps to implement the Termination Order before May 23, 2022. ECF No. 37.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A plaintiff is entitled to such an "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff must show (1) "a substantial threat of irreparable injury," (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the

grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).  The movant must "clearly carr[y] the burden of persuasion on all four requirements."  *Id.*

## ARGUMENT

### I.    Plaintiffs Lack Standing to Challenge the Termination Order

"Article III of the U.S. Constitution permits federal courts to adjudicate only 'cases or controversies,' not any political dispute that happens to arise between the state and federal executive branches."  *Arizona v. Biden*, --- F.4th ---, 2022 WL 1090176, at *2 (6th Cir. Apr. 12, 2022).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997.  To have standing to bring this lawsuit, Plaintiffs must show "(i) that [they have] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Significantly, where, as here, "the plaintiff is not himself the object of the government action or inaction he challenges," the Supreme Court has recognized that "standing is . . . substantially more difficult to establish."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992); *accord Hotze v. Burwell*, 784 F.3d 984, 995 (5th Cir. 2015).

Here, Plaintiffs are unlikely to succeed in showing that they have standing.  First, Plaintiffs' assertion that they are entitled to "special solicitude" under *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007),[1] is unavailing.  PI at 11.  In *Texas v. Biden (MPP)*, 20 F.4th 928 (5th Cir. 2021), the Fifth Circuit held that Texas's "driver's-license-based-injury" entitled it to special solicitude under *Massachusetts* because such an injury "pressured Texas to change its own law."  *Id.* at 970; *see also Texas v. United States (DAPA)*, 809 F.3d 134, 153 (5th Cir. 2015) (recognizing that "States have a sovereign interest in the power to create and enforce a legal code") (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982)).  Here, by contrast, Plaintiffs do not allege that they have suffered a

---

[1] In *Massachusetts*, the Supreme Court found that the State had alleged an injury to its interest in preserving its "sovereign territory"—*i.e.* "a particularized injury in its capacity as a landowner."  549 U.S. at 520, 522; *see also Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 476 (D.C. Cir. 2009).

similar injury to their sovereign interests.  Instead, Plaintiffs assert only a "quasi-sovereign interest" in generally "protecting [their] citizens," *see* Am. Compl. ¶¶ 34–54, but the Supreme Court has held that a State cannot assert such an injury against the United States.  *See Alfred L. Snapp & Son*, 458 U.S. at 610 n.16 ("A State does not have standing as *parens patriae* to bring an action against the Federal Government."); *Massachusetts v. Melon*, 262 U.S. 447, 485–86 (1923).

Indeed, as the Sixth Circuit recently held in *Arizona v. Biden*, 2022 WL 1090176, at *3, "special solicitude" does not allow States to get around bedrock Article III requirements by citing "downstream costs to the States in the form of additional crime and public-welfare costs." *Id.* at *1-2.  Such "indirect fiscal burdens allegedly flowing from" a federal policy cannot "count as a uniquely sovereign harm" because "[a] State has no more reason to fear harms to its bottom line from federal regulations than a person or a business does." *Id.* at *4.  And in any event, "the key sovereign with authority and 'solicitude' with respect to immigration is the National Government, not the States." *Id.*

Plaintiffs next contend that they have standing based on the Fifth Circuit's decision in *Texas v. Biden (MPP)*, but Texas's theory of injury in that case was different from Plaintiffs' theory here in important respects.  Specifically, in both *Texas v. Biden (MPP)* and the prior Fifth Circuit case on which it relied concerning the Deferred Action for Parents ("DAPA") program, *Texas v. United States (DAPA)*, 809 F.3d 134 (5th Cir. 2015), Texas relied on a "driver's-license-based-injury"—that turned on specific provisions of state law—to challenge immigration policies that it alleged would lead directly to an increase in noncitizens paroled into Texas.  *See Texas v. Biden (MPP)*, 20 F.4th at 970–71; *Texas v. United States (DAPA)*, 809 F.3d at 155–60.  For example, in *Texas v. United States (DAPA)*, the federal program at issue made millions of undocumented noncitizens eligible to receive "[l]awful presence" classification, which carried "significant legal consequences," including the ability to receive various federal and state benefits.  *Id.* at 148.  The court held that "DAPA would be the primary cause and likely the only one" of a "dramatic increase in the costs of the driver's-license program." *Id.* at 160.  Here, by contrast, CDC's Termination Order is a public-health order that does not confer any form of immigration status on anyone, and so any resulting increased costs to the States would be indirect, downstream costs that are traceable to *immigration* laws, if at all.

Plaintiffs' alleged injuries here are thus identical to the State plaintiffs' alleged injuries in *Arizona*, where the States alleged that they would suffer various downstream costs from a federal immigration policy that they alleged would lead to an influx of noncitizens. 2022 WL 1090176, at *2. The Sixth Circuit, however, held that such downstream costs are insufficient to establish a legally cognizable injury. *Id.* at *2–4. Just like the States in *Arizona*, Plaintiffs here argue that the Termination Order will "cause increased illegal immigration into the United States" and lead Plaintiffs to make additional expenditures "in the form of increased health care, education, law enforcement, and imprisonment costs," PI at 11–12, as well as various other expenditures, such as social services, *id.* at 12–17. But such assertions about diffuse and widely-shared societal costs do not constitute a "concrete" and "particularized" injury, *Lujan*, 504 U.S. at 560, to a "judicially cognizable" or "legally protected" interest, *Raines*, 521 U.S. at 819. As in *Arizona*, the Termination Order "does not directly injure the States." 2022 WL 1090176, at *2. "It does not regulate the States by telling them what they can or cannot do in their jurisdiction." *Id.* Instead, it simply results in noncitizens being processed under longstanding, congressionally authorized immigration laws, which were suspended temporarily only because of the public health emergency posed by the COVID-19 pandemic.

The Fifth Circuit's decision in *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015), is also instructive. There, the court held that Mississippi lacked standing to challenge the federal Deferred Action for Childhood Arrivals ("DACA") policy under a theory that DACA would cause increases in illegal immigration, which Mississippi alleged would "cost the state money because the state provides social benefits to illegal immigrants." *Id.* The court found that such a generalized complaint did not demonstrate a "concrete and particularized" injury. *Id.* Similarly, in *El Paso County v. Trump*, 982 F.3d 332 (5th Cir. 2020), the court held that El Paso lacked standing to challenge the federal government's reallocation of funds initially appropriated for counterdrug activities and military construction projects to construct a border wall. *Id.* at 338–41. The county had argued that the reallocation injured the county in the form of lost tax revenues and lost economic benefits. *Id.* at 339. The court held that these general allegations were insufficient to establish a cognizable injury; "[a] direct link, such as the loss of a *specific* tax revenue, is necessary to demonstrate standing." *Id.* at 340 (emphasis added).

13

"[H]olding otherwise might spark a wa[ve] of unwarranted litigation against the federal government." *Id.*; *see also Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014) (states do not "suffer[] an injury in fact to a legally cognizable interest" simply because "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources"; a contrary rule would improperly "permit nearly all state officials to challenge a host of Federal laws").

In addition to failing to establish a cognizable injury, Plaintiffs also fail to show that any of their alleged financial harms are fairly traceable to the Termination Order.  Plaintiffs contend that once the Termination Order takes effect, it will "allow a far greater number of aliens with meritless asylum claims to enter the United States," Am. Compl. ¶ 173, leading to a greater number of noncitizens being temporarily paroled as opposed to detained, *id.* ¶ 84, ultimately requiring States to provide "emergency medical care, education, and other social services," *id.* ¶ 173.  But CDC's Termination Order has nothing to do with allowing asylum seekers to be paroled into the United States.  Instead, it simply ceases CDC's exercise of an extraordinary public health power and restarts the system of processing noncitizens under the long-standing immigration scheme enacted by Congress.  If an asylum seeker is paroled into the United States, it will be by operation of the immigration laws, not the Termination Order.

The Supreme Court's decision in *California v. Texas*, 141 S. Ct. 2104, 2117 (2021), is instructive on this point.  There the Court rejected—on causation grounds—some States' attempt to challenge the Affordable Care Act's "individual mandate" under a theory that the mandate costs the States money in administering their healthcare systems.  *Id.* at 2117–18.  The Court found these allegations insufficient to establish standing because the States failed to trace any increased costs to the challenged "individual mandate."  The same holds true here.  Plaintiffs' alleged injuries are at most traceable to the immigration laws not challenged here.  *Cf. El Paso Cnty.*, 982 F.3d at 342 (county had no standing to assert a reputational injury claim because the injury was at most traceable to a Presidential proclamation not challenged in that case).

14

Finally, Plaintiffs cannot establish standing by relying on certain terminated "Memoranda of Understanding" ("MOUs")[2] that a former DHS official, Ken Cuccinelli, purported to enter into with Arizona and Louisiana on DHS's behalf.  *See* PI at 17–18.  As an initial matter, standing is a fundamental jurisdictional question that is not subject to waiver, *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 496 n.1 (5th Cir. 2007), or agreement.  Rather, whether a party has standing turns on whether the party can establish "real," concrete injuries that can be traced to the challenged conduct.  *See TransUnion*, 141 S. Ct. at 2204–05.  Moreover, even if the MOUs were valid and effective, they do not provide that Plaintiffs would have standing to pursue challenges to public-health measures of Departments other than DHS simply because they have effects on immigration.  *See, e.g.*, Napolitano Decl. Ex. 7 at 1-2, ECF No. 13-3.

## II.    Plaintiffs' Claimed Injuries Do Not Come Within Section 265's Zone of Interests

Even if Plaintiffs had Article III standing, they are still unlikely to show that their asserted injuries fall within the zone of interests protected by Section 265.  The zone-of-interests-test "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975).  Even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 523-24 (1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)); *see also Bennett v. Spear*, 520 U.S. 154, 175–76 (1997).

Nothing in Section 265 suggests that Congress intended to permit the States to invoke alleged incidental financial effects to contest the CDC Director's exercise of judgment and discretion to terminate the use of the extraordinary power granted by that provision.  To the contrary, Congress's

---

[2] Both MOUs have been terminated.  *See* ECF No. 12-1 in *Arizona v. DHS*, No. 2:21-cv-00186 (D. Ariz. Mar. 8, 2021) (Arizona termination letter); ECF No. 42-4 in *Texas v. United States*, No. 6:21-cv-00016 (S.D. Tex. May 18, 2021) (Louisiana termination letter).

clear intent behind Section 265 was to allow CDC to take actions it believes are necessary to avert a serious danger of the transmission of a communicable disease into the United States, and to terminate such actions when the serious danger has sufficiently abated.  42 U.S.C. § 265.  The statute is designed to address the problem posed by communicable diseases.  Plaintiffs, however, allege injury only in the form of diffuse and widely shared societal effects stemming from an alleged "increase of illegal immigration into the United States."  Am. Compl.  ¶ 108.  This case therefore is distinguishable from litigation challenging *immigration* policies where the injuries allegedly caused by those policies were found to be within the zone of the interest of the Immigration and Nationality Act (INA).  *See, e.g.*, *Texas v. Biden (MPP)*, 20 F.4th at 975–76; *cf. Ecosystem Inv. Partners v. Crosby Dredging, LLC*, 729 F. App'x 287, 297 (5th Cir. 2018) (holding that pocketbook injuries did not fall within the zone of interests to allow an APA claim challenging the government's actions under an environmental statute).[3]

### III.   CDC's Public-Health Determination Under Section 265 Is Not Subject to Judicial Review

Even if Plaintiffs could establish Article III standing to sue and that their alleged injuries are within the zone of interests of Section 265, their claims still are unlikely to succeed because the decision to issue the Termination Order is committed to the CDC's discretion by law.  The APA precludes review of decisions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2); *see Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); *Ellison v. Connor*, 153 F.3d 247, 253 (5th Cir. 1998).  An agency action is committed to agency discretion by law when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  The Supreme Court has held that review is also unavailable if the challenged agency action is of a kind "traditionally regarded as committed to agency discretion," including various categories of discretionary judgments that "require[] 'a complicated balancing of a number of factors

---

[3] Nor can Plaintiffs rely on an asserted "'quasi-sovereign interest' in the health and well-being of their citizens to bring their claims within Section 265's zone of interests.  *See* Pls.' TRO Reply at 8, ECF No. 33.  While in some circumstances a State may assert such an injury in a *parens patriae* action, as noted, a state "does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son*, 458 U.S. at 607–08; *see also Massachusetts v. Melon*, 262 U.S. at 485–86.

which are peculiarly within [the agency's] expertise.'" *Lincoln*, 508 U.S. at 192–93 (quoting *Heckler*, 470 U.S. at 831); *see, e.g., id.* at 192–94 (no review of agency decision about how to allocate funds among various discretionary programs); *Heckler*, 470 U.S. at 831–32 (no review of decision not to undertake enforcement action).  Applying these principles, the CDC Director's decision to terminate a Title 42 order is committed to her discretion, and thus unreviewable.

The plain language of Section 265 confers broad discretion on the CDC Director:  It provides that whenever the Director "determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health," the Director may "prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose." 42 U.S.C. § 265.  Significantly, while the statute empowers the CDC Director to suspend entry in these circumstances, it does not *require* her to do so.  And Congress's use of the word "deem" further demonstrates that the "determination calls upon [the Director's] expertise and judgment unfettered by any statutory standard whatsoever." *Zhu v. Gonzales*, 411 F.3d 292, 295 (D.C. Cir. 2005); *see Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (no review where statute allowing Director of Central Intelligence to terminate employee whenever he "'shall *deem* such termination necessary or advisable in the interests of the United States'" "fairly exudes deference"); *Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (statute directing agency to make changes whenever the agency "deems necessary" is "delegated discretionary authority").  The same is true of the relevant implementing regulation, 42 C.F.R. § 71.40(a), which provides that the CDC Director may leave a Title 42 order in place for such period of time that the Director "deems necessary" to prevent the serious danger.

Nothing in the statute delineates factors the Director must consider in determining whether she deems a Title 42 order no longer necessary to avert a serious danger of transmission of a communicable disease.  The same is true of the regulation.  At most, the regulation lists information

17

that the Director must specify in a suspension order, *see* 42 C.F.R. § 71.40(c)(1)-(c)(5), including the "countries . . . from which the introduction of persons shall be prohibited," *id.* § 71.40(c)(1), and "[t]he period of time or circumstances under which the introduction of any persons . . . shall be prohibited," *id.* § 71.40(c)(2).  But that information plainly is designed to inform the public of the CDC Director's invocation of Section 265 authority and the precise scope of the Title 42 order, not to inform *how* the Director should exercise her discretion, let alone what factors to consider in terminating a Title 42 order.  Accordingly, they do not provide a "meaningful standard against which to judge the agency's exercise of discretion" in terminating the Title 42 order.  *Heckler*, 470 U.S. at 830.[4]

The statute and regulation are thus similar to the regulation at issue in *Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998), which the Fifth Circuit held was unreviewable under the APA because it committed the decision at issue to agency discretion.  *See id.* at 252–53.  The statute in *Ellison* generally authorized federal agency heads to prescribe regulations for the use of agency property, *id.* at 252, which the court found did not "contain standards or evidentiary requirements for the issuance of regulations," *id.* at 253.  As for the regulation, it permitted applications to construct property, but left the decision to an agency official to "determine whether the property in question will be 'required for public use' … and 'whether the requested grant will interfere with any operations of the United States.'"  *Id.* (quoting 33 C.F.R. § 211.9).  It "[did] not contain standards" or require "findings or the development of any additional evidentiary record."  *Id.*  "[W]ithout these," the court held, "the judiciary [is] in no position to gainsay the [agency's] determination as arbitrary, capricious or an abuse of discretion."  *Id.*  The Fifth Circuit also observed that the relevant statutory and regulatory framework "reinforce[d]" this conclusion, citing, for example, a provision that authorized the Secretary of the Army "to issue leases 'whenever he shall deem it to be advantageous to the Government.'"  *Id.* at 253-54 (quoting 33 C.F.R. § 211.6(a)(1)).

---

[4] *But cf. Texas v. Biden*, 2022 WL 658579, at *11 (finding that the August 2021 Title 42 order was reviewable after erroneously concluding that 42 C.F.R. § 71.40(c) "establishes the parameters the CDC must consider").

As in *Ellison*, the applicable statutory and regulatory language of this case "does not contain standards or evidentiary requirements," *id.* at 253, for the decision to terminate a Title 42 order. Instead, it contains language that "exudes" discretion. *Id.* Thus, review under the APA is unavailable. *See id.*; *see also Fed. Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122, 1129 (5th Cir. 1991) (finding agency's decision to issue a capital directive not reviewable based on the statute's use of "the terms 'deem' or 'discretion' in almost every provision"); *Promiseland Metro, Inc. v. U.S. Army Corps of Eng'rs*, No. 4:15-CV-817-A, 2016 WL 543209, at *3 & n.4 (N.D. Tex. Feb. 9, 2016) (same, where "plaintiffs have not cited any statute or regulation setting forth procedural requirements or specific substantive factors the [agency] was required to take into account").[5]

The CDC Director's determination under Section 265 also necessarily "involves a complicated balancing of a number of factors which are peculiarly within the agency's expertise." *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 832). While neither the statute nor the regulation requires the consideration of any specific factors, the Termination Order explains the "wide array" of factors that CDC considered, including the overall number of COVID-19 cases, the adequacy of state and local healthcare systems, and the overall shift in the U.S. government response to the pandemic. 87 Fed. Reg. at 19,955; *see also* 85 Fed. Reg. 56,424, 56,444 (Sept. 11, 2020) (listing facts and circumstances that CDC "may, in its discretion," consider when determining what is required in the interest of public health). The balancing of such factors to determine whether a Title 42 order remains "in the interest of the public health," 87 Fed. Reg. at 19,953, directly implicates the agency's expert judgment. *See Lincoln*, 508 U.S. at 193. The CDC Director's determination under Section 265 "is accordingly unreviewable under [5 U.S.C.] § 701(a)(2)." *Id.*

---

[5] Plaintiffs note that the Court in *Texas v. Biden (MPP)* stated that *Ellison* "appl[ied] *Heckler*'s non-reviewability presumption] to an agency's decision not to issue an individual permit." Pls.' TRO Reply at 8–9 (quoting *Texas (MPP)*, 20 F.4th at 984). But Defendants are not relying on *Heckler*'s presumption that an exercise of enforcement discretion is not reviewable, and *Ellison* is still binding precedent on the question whether agency action is committed to agency discretion by law and thus unreviewable.

19

## IV.    CDC Need Not Have Conducted Notice-and-Comment Rulemaking in Issuing the Termination Order

The APA generally requires an agency, in issuing a rule,[6] to provide "notice of [the] proposed rule making," "give interested persons an opportunity to" submit comments, and "consider and respond to significant comments."  *Perez*, 575 U.S. at 96 (quoting 5 U.S.C. § 553(b), (c)).  Plaintiffs argue that the Termination Order is invalid because it did not comply with these requirements.  However, "[n]ot all 'rules' must be issued through the notice-and-comment process."  *Id.* at 96–97.  For example, the APA exempts a rule from undergoing notice-and-comment rulemaking when "the agency for good cause finds … that notice and public procedure thereon are impracticable … or contrary to the public interest."  5 U.S.C. § 553(b)(B).  It also exempts a rule that "involve[s] a … foreign affairs function of the United States."  *Id.* § 553(a)(1).  Here, CDC properly invoked both of those exceptions.  *See* 87 Fed. Reg. at 19,956.

### A.   The Termination Order falls within the "good cause" exception to the notice-and-comment requirement.

The Termination Order falls within the "good cause" exception because it would have been impractical and contrary to the public interest for CDC to engage in notice and comment prior to issuing the Order.  The governing statutory and regulatory standards mandated the Director's prompt action upon her determination that the August 2021 Title 42 order was no longer required to safeguard the public health.  As explained above, her statutory and regulatory authority to issue orders under Section 265 is limited to when "the existence of any communicable disease in a foreign country [poses a] … serious danger of the introduction of such disease into the United States," *and* "this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health."  42 U.S.C. § 265; *see also* 42 C.F.R. § 71.40.  Both the statute and its implementing regulation specify that a Title 42 order is to last "only for such period of time that the Director deems necessary to avert the serious danger of the introduction of a quarantinable communicable disease."  42 C.F.R. § 71.40; *see also* 42

---

[6] A "rule" means, *inter alia*, "an agency statement of general or particular applicability and future effect" that is "designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

U.S.C. § 265 (similar language).  To comply with these requirements, the Title 42 orders issued since the beginning of the COVID-19 pandemic "have consistently been subject to periodic [30- or 60-day] reviews to ensure their continued necessity."  87 Fed. Reg. at 19,953.

That the statutory and regulatory scheme contemplates that the CDC Director will suspend entry only when she deems it necessary to avert a serious danger to public health is unsurprising because the suspension it authorizes is an extraordinary emergency measure that disrupts other laws, including immigration processing otherwise mandated by Congress.  Indeed, in its nearly 130-year history, Section 265 (or its predecessor statute) has been invoked only once before, when in 1929, President Herbert Hoover suspended the introduction of persons "from any port in China (including Hong Kong) or the Philippine Islands for such period of time as may be deemed necessary" in response to a meningitis outbreak in Asia.  Exec. Order No. 5143 (June 21, 1929); *see Huisha-Huisha*, 27 F.4th at 723.  Today, the disruption on immigration processing would be even more pronounced because Congress has since enacted the INA to comprehensively control immigration processing.

Under the "totality of the[se] circumstances," *Petry v. Block*, 737 F.2d 1193, 1200 (D.C. Cir. 1984) (finding good cause due to a "combination of several extraordinary factors"), the CDC Director reasonably concluded that she had "good cause to dispense with prior public notice and the opportunity to comment on this Termination."  87 Fed. Reg. at 19,956.  Citing the "extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirement that [a] CDC order under the authority last no longer than necessary to protect public health," the CDC Director determined that "it would be impracticable and contrary to the public interest and immigration laws that apply in the absence of an order under 42 U.S.C. [§] 265 to delay the effective date of this termination beyond May 23, 2022."  *Id.*  The Director's determination was proper.  Requiring notice and comment here would have needlessly extended the operative Title 42 order, which was issued under an extraordinary authority sparingly used at the expense of disrupting the comprehensive immigration processing set forth in the INA.  The INA reflects Congress's intent that removal proceedings for noncitizens seeking admission to the United States occur in the manner specified by

21

the INA.[7]  Thus, it would be contrary to the public interest for the issuance of the Termination Order to be delayed by the time-consuming notice-and-comment process.  As Plaintiffs themselves recognize, it took CDC more than five months to consider the hundreds of comments it received in promulgating Section 265's implementing regulation.  *See* PI at 5, 20.

Section 265's implementing regulation supports CDC's determination that undertaking notice and comment would have been contrary to the public interest and impracticable.  Plaintiffs argue that because "CDC did take public comment[s] when implementing the Title 42 system," PI at 3, it should have done the same for the Termination Order.  But the implementing regulation, 42 C.F.R. § 71.40, which itself was issued following notice and comment, contemplates precisely the opposite.  The regulation "establishes a flexible procedure for tailoring the exercise of … [Section 265] authority in response to" both "the current COVID-19 pandemic" and "future public health threats," without the need for each such exercise to be subject to lengthy notice-and-comment rulemaking. 85 Fed. Reg. at 56,426; *id.* at 56,427 (the regulation "addresses the ever-present risk that future pandemics may present new or different challenges that demand the prompt exercise of the [CDC's Section 265] authority").  The manner of terminating a Title 42 order was expressly considered during rulemaking.  Some commenters had suggested that "CDC self-impose a required expiration for each order, or, alternatively a short-interval and recurrent review of the Director's determinations and orders under [the rule], with such objective review conducted by an agency inspector general or Federal third-party

---

[7] The INA authorizes the inspection by DHS of noncitizens who are "applicants for admission" to the United States, whether they arrive at a port of entry or cross the border between ports of entry, concerning their admissibility. 8 U.S.C. § 1225(a)(1), (3), (b)(1), (b)(2)(A).  Any "applicant for admission" whom an immigration officer determines is "not clearly and beyond a doubt entitled to be admitted" may be placed in removal proceedings before an immigration judge,  *id.* § 1225(b)(2)(A); *see also id.* §§ 1229, 1229a; 8 C.F.R. § 1003.1; or, in certain circumstances, in expedited removal proceedings under 8 U.S.C. § 1225(b)(1).  In removal proceedings before an immigration judge, a noncitizen may seek asylum, withholding of removal, or any other form of relief or protection from removal from the United States.  *See* 8 U.S.C. § 1229a(a)(2), (c)(4).  And even when an immigration officer elects to place certain noncitizens in an expedited removal proceeding whereby the noncitizen may be removed without further hearing or review, *see* 8 U.S.C. § 1225(b)(1), DHS still may not remove the noncitizen under those procedures if he or she claims a fear of persecution or torture, or expresses an intent to apply for asylum and is determined to have a credible fear, *id.* § 1225(b)(1)(A)(i); 8 C.F.R. §§ 235.3(b)(4), 208.30, 1208.30.

agency." *Id.* at 56,454.  After weighing the comments, CDC decided to conduct recurrent review of its Title 42 orders.  *Id.*

As promulgated, the regulation does not require CDC to go through notice-and-comment rulemaking each time it issues an order under the regulation, and indeed, none of CDC's Title 42 orders did.  *Cf. Chambless Enters., LLC v. Redfield*, 508 F. Supp. 3d 101, 118 (W.D. La. 2020) (concluding that CDC's eviction moratorium order was an emergency action authorized by a duly promulgated regulation that did not "require yet another round of notice and comment before [the order could] take effect").  In the context of an emergency situation such as the one engendered by the COVID-19 pandemic, CDC "properly invoked the good cause exception," as Plaintiffs concede, PI at 3, when issuing its Title 42 orders.  *Cf. Biden v. Missouri*, 142 S. Ct. 647, 654 (2022) (finding good cause for order requiring vaccination of employees of healthcare providers participating in the Medicare and Medicaid programs in light of upcoming flu season); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) ("The [good cause] exception excuses notice and comment in emergency situations, or where delay could result in serious harm."); *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 214 n.15 (5th Cir. 1979) (noting that the exception has been "repeatedly approved" in the context of government price controls, where delay could cause market distortions, and gas regulations, where delay could cause supply shortages and lead to violence).

Recognizing the emergency nature of Title 42 orders, the regulation expressly lays out the limited procedural steps to be taken before issuing an order.  The CDC Director is required to consult with other federal agencies, but she is required to do so before issuing an order only if "practicable." 42 C.F.R. § 71.40(d).  "In circumstances when it is impracticable to engage in such consultation before taking action to protect the public health, the Director shall consult with the Federal departments or agencies as soon as practicable after issuing his or her order, and may then modify the order as he or she determines appropriate."  *Id.*  The Director also "may, as practicable under the circumstances, consult with any State or local authorities that he or she deems appropriate in his or her discretion." *Id.*  Nowhere do the regulations contemplate that the Director would engage in notice-and-comment rulemaking to issue a Title 42 order.  And by making clear that the Director need not even consult

23

with "Federal departments or agencies whose interests would be impacted by the order," *id.*, until after the fact, the regulations appropriately recognize the need for expeditious action.

Were Plaintiffs correct that CDC had to undertake notice and comment before issuing the Termination Order, then the same would be true of the August 2021 Title 42 order itself.  At the time CDC issued the August 2021 order, the pandemic had existed for over a year, and CDC had issued the last Title 42 order ten months earlier in October 2020.  Under Plaintiffs' theory, this ten-month gap would have also allowed CDC to undergo notice-and-comment rulemaking, so the August 2021 order would likewise be unlawful.  Plaintiffs' selective notice-and-comment challenge is thus inconsistent with the Supreme Court's teaching that the APA "'mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.'" *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1205 (D.C. Cir. 2020) (quoting *Perez*, 575 U.S. at 101). In *Friends of Animals*, for example, the D.C. Circuit rejected a similar selective notice-and-comment challenge to an agency's repeal of an agency decision that had not gone through notice and comment. *See id.* at 1201–02.  As the D.C. Circuit reasoned, the agency decision being repealed "had no legal effect" in the first place; "we do not see how a government action that illegally never went through notice and comment gains the same status as a properly promulgated rule such that notice and comment is required to withdraw it." *Id.* at 1206.  Plaintiffs' selective notice-and-comment challenge suffers from the same flaw.

Notably, Plaintiffs' argument would suggest that CDC can dispense with notice and comment when it is adopting an emergency measure, but not when it is terminating it.  But there is no authority for that proposition.  As explained, Section 265's implementing regulation makes clear that CDC does not need to undergo time-consuming notice and comment either to issue, modify, or terminate an emergency order.  That is due to the very nature of an *emergency* order; it must be issued quickly and last no longer than necessary. *See Interstate Com. Comm'n v. Or. Pac. Indus., Inc.*, 420 U.S. 184, 187 (1975) (Powell, J., concurring) ("[T]he justification for [emergency] action ends with the emergency that called it forth."); *Associated Builders & Contractors, Inc. v. Herman*, 976 F. Supp. 1, 5–7 (D.D.C. 1997) (regulations temporarily suspended in "emergency" situation, without notice or opportunity for public

comment, "were subject to implementation immediately upon expiration of the [emergency]"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*, 821 F.2d 761 (D.C. Cir. 1987) (similar).  Plaintiffs' alternative approach is not feasible and would wreak havoc on CDC's ability to issue such orders with flexibility, as it would leave unclear when the notice-and-comment requirement would apply if, for example, CDC modifies a measure, or terminates a measure only in part, or throttles down one public health measure but strengthens another.  CDC would in each case face the risk of a legal challenge for failure to conform to Plaintiffs' amorphous notice-and-comment standard.

Requiring Title 42 orders to go through notice and comment would also be impractical given the short-term nature of such orders.  Plaintiffs claim that Defendants have "been actively considering whether to revoke Title 42 since February 2021," PI at 20–21, when the President ordered HHS and CDC, in consultation with DHS, to review the use of Section 265 authority, *see* Exec. Order No. 14,010, 86 Fed. Reg. 8267 (Feb. 2, 2021).  But CDC did not engage in one continuous review during that 14-month period to reach one final decision.  The earlier Title 42 orders were only effective for 30 days or otherwise reviewed every 30 days, and the August 2021 order was reassessed at least every 60 days.  *See* 87 Fed. Reg. at 19,953.  After each review, CDC made an independent decision as to whether to continue or terminate the order based on the most current public health conditions.  CDC accordingly reviewed and *reaffirmed* the Title 42 orders no fewer than 9 times *after* the February 2021 Executive Order.  Indeed, as of March 11, 2022, when CDC "accelerated its ongoing review" and determined that the public health situation no longer justified a suspension of the right to introduce unaccompanied children, 87 Fed. Reg. at 15,248, CDC had yet to determine whether the same was true for single adults and family units, *see id.* at 15,252.  Undertaking notice and comment repeatedly every 30 or 60 days is plainly impracticable.

Plaintiffs maintain that CDC's evaluation of the risk to public health "was entirely predictable" in light of "available testing, treatment, and prevention capacitie[s], and the rates at which those tools are becoming available."  PI at 22.  The argument, however, ignores the reality that the United States has experienced multiple waves of the pandemic, "each with its own unique epidemiologic characteristics," 87 Fed Reg. at 19,944, and "[a]s the waves of COVID–19 cases have surged and

ebbed, so too have actions taken in response to the pandemic," *id.* That is, the public health conditions had been fluid and unpredictable, and thus, CDC could not prejudge the outcome before completing the requisite assessment.

Plaintiffs further argue that CDC's delay of the implementation of the Termination Order demonstrates that CDC had time to conduct notice-and-comment rulemaking. PI at 23. But CDC's invocation of the good cause exception was based on the need to avoid any *additional* delay than necessary given "the extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirement that [a] CDC order under the authority last no longer than necessary to protect public health." 87 Fed. Reg. at 19,956. *Cf. Biden v. Missouri*, 142 S. Ct. at 654 ("[W]e cannot say that . . . the two months the agency took to prepare [its rule] . . . constitutes 'delay' inconsistent with the Secretary's finding of good cause."). Plaintiffs cannot dispute that engaging in the notice-and-comment process would have further delayed the termination, likely by months—thus keeping in place an extraordinarily restrictive emergency order displacing the Title 8 immigration procedures, despite the agency's expert and discretionary conclusion that the emergency measure lacks a public health justification.

Moreover, the delay in implementation to account for DHS's need for time to operationalize the Termination Order is a necessary byproduct of the statutory scheme. Pursuant to a provision of the Public Health Service Act, 42 U.S.C. § 268, CDC had requested DHS to aid in the enforcement of its Title 42 orders because CDC does not have the capability, resources, or personnel needed to do so. *See, e.g.*, 86 Fed. Reg. at 42,841. In terminating the Title 42 order, CDC must account for the time DHS needs to prepare for full resumption of regular immigration process, including implementing additional COVID-19 mitigation measures. *See* 87 Fed. Reg. at 19,956. Simply because DHS cannot flip a switch to return to ordinary immigration processing by no means suggests that the CDC Director's public health determination should be subject to the *additional* delay of notice and comment, particularly when the Director has already determined that this extraordinary measure is no longer required in the interest of public health. Thus, while noting that DHS is working to expand its vaccination program to provide vaccinations to up to 6,000 migrants a day across 27 sites across the

Southwest Border by May 23, 2022, *id.* at 19951, CDC explained that "even in the absence of complete implementation of the [ ] program," "the serious risk to public health that the CDC Orders were intended to address has been sufficiently alleviated," *id.* at 19,952 n.145.

In addition to the fact that use of the notice-and-comment process is not contemplated by the statute or regulation and is impracticable, as already discussed, the CDC Director's decision as to whether the public health conditions justify the continued exercise of Section 265 authority is committed to her sound discretion.  "Under those circumstances, the notice-and-comment procedure would be an empty, yet time-consuming, exercise—all form and no substance." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. Cir. 2020) (where DHS Secretary has "sole discretion" to modify, "at any time," the designation of who may be subjected to expedited removal, it "necessarily means" that Secretary need not "tak[e] the time to first go through the usually lengthy notice-and-comment rulemaking process"; "The power to modify 'at any time' and in his 'sole discretion' also means that the Secretary would be free to ignore the comments that the notice-and-comment process produces."). As the D.C. Circuit has observed, "[w]here Congress leaves the notice-and-comment process no work to do and expressly authorizes the Executive Branch to exercise its unreviewable discretion … the APA does not require an agency to undertake the process for its own sake." *Id.*

Plaintiffs allege that DHS is unprepared to address the likely influx of noncitizens from the termination, PI at 1-2, and argue that CDC could have benefited from public comments to make the immigration situation "less calamitous," Am. Compl. ¶ 20.  But Plaintiffs never specify what the comments would have added to CDC's public health determination.  CDC had already consulted with DHS—the entity best suited to advise CDC on the operational realities of resuming immigration processing under the INA—and considered the already-known risk that termination of the Title 42 order would likely increase the number of noncitizens crossing the border.  Plaintiffs also do not explain how CDC could have based its decision on comments about the effects of an influx on the economies or costs of the States.  Comments about how to address an influx of migrants as a matter of immigration policy would not be relevant to CDC's public health determination under Section 265 regarding COVID-19, or within CDC's realm of expertise.  As the Termination Order explains, Title

42 orders "are not, and do not purport to be, policy decisions about controlling immigration; rather … CDC's exercise of its authority under Section 265 depends on the existence of a public health need." 87 Fed. Reg. at 19,954.  Accordingly, CDC would not have needed to respond to comments about ways to control the flow of immigration under the INA, beyond the public health implications associated with COVID-19, which CDC has already fully considered in the Termination Order.  *See City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007) (rejecting argument that an agency had inadequately responded to certain comments, "because the Agency had no obligation to respond to them in the first place"); *see also* 85 Fed. Reg. at 56,448 (explaining in the final rule that CDC/HHS did "not respond to comments that are directed at other departments or agencies").

For these reasons, CDC had good cause not to engage in notice-and-comment rulemaking for the Termination Order.

### B.  The Termination Order falls within the foreign affairs exception to the notice-and-comment rulemaking requirement.

The Termination Order is exempt from the notice-and-comment requirement for another independent reason—it involves a "foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). The "foreign affairs" exception applies to agency actions that "relat[e] directly to, and ha[ve] clear consequences for, foreign affairs." *City of New York v. Permanent Mission of India to the United Nations*, 618 F.3d 172, 201 (2d Cir. 2010).[8]

_____

[8] Plaintiffs argue that the foreign affairs exception "'applies in the immigration context only when … taking public comment … will provoke definitely undesirable international consequences.'"  PI at 3 (emphasis omitted) (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775-76 (9th Cir. 2018)). Not only is the Termination Order not an immigration rule, but the standard Plaintiffs invoke has been criticized as "unmoored from the legislative text" of the APA.  *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020).  It has no textual basis in the APA, and is based on an improper reading of the legislative history.  To hold that standard as the test for the foreign affairs exception "would turn the phrase 'provoke definitely undesirable international consequences' from an illustration given in the APA's legislative history … into the definition for 'foreign affairs function.'" *City of New York*, 618 F.3d at 202 (quoting H.R. Rep. No. 79–1980, at 23 (1946)).  It would also render the exception "superfluous since the 'good cause' exception … would apply" where taking public comment would lead to negative international consequences.  *Cap. Area Immigrants Rts. Coal.*, 471 F. Supp. 3d at 53.  Finally, requiring the Executive Branch to measure—and a reviewing court to assess— the precise impact of rulemaking on political, foreign policy decisions is in significant tension with the

Here, CDC appropriately invoked the exception because "[the Termination] Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders."  87 Fed. Reg. at 19,956.  Since the beginning of the public health emergency, "[t]he United States [has] worked collaboratively with its neighbors to … protect the health and safety of its population."  85 Fed. Reg. at 56,432.  In March 2020, "U.S. and Mexican officials [ ] mutually determined that non-essential travel between the United States and Mexico pose[d] additional risk of transmission and spread of COVID-19 and place[d] the populace of both nations at increased risk of contracting COVID-19."  85 Fed. Reg. 16,547, 16,547 (Mar. 24, 2020).  U.S. and Canadian officials made a similar "mutual[] determin[ation]" as to non-essential travel between the United States and Canada.  85 Fed Reg. 16,548, 16,549 (Mar. 24, 2020).  Accordingly, in two nearly identical orders, DHS temporarily limited any non-essential travel from Mexico and Canada into the United States at land ports of entry along the U.S.-Mexico and U.S.-Canada borders.  *See* 87 Fed. Reg. at 19,945 & n.36.

As explained in the Declaration of Deputy Assistant Secretary Mendrala, "[t]hroughout the COVID-19 pandemic, the U.S. government has undertaken extensive diplomatic engagement with partner governments on the implementation and coordination of migration management as impacted by the CDC's Title 42 [orders]."  Mendrala Decl. ¶ 5; *see also* Third Decl. of Blas Nuñez-Neto ¶ 2 (attached as Ex. B).[9]  In additional to regularly extending the restriction on travel at land ports of entry (*see, e.g.*, 86 Fed. Reg. 58,218 (Oct. 21, 2021); 86 Fed. Reg. 58,216 (Oct. 21, 2021)), the President suspended entry into the United States of persons who had been in certain countries prior to entering the United States.  *See* 87 Fed. Reg. at 19,944-45 & n.35.  As the pandemic evolved, and mitigation

---

well-established principle that "matters implicating foreign relations … are generally beyond the authority or competency of a court's adjudicative powers." *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 950 (5th Cir. 2011).

[9] Courts have long permitted declarations supporting an agency's invocation of the foreign affairs exception.  *See, e.g.*, *Yassini v. Crosland*, 618 F.2d 1356, 1361 (9th Cir. 1980) (citing affidavits from the Attorney General and the Deputy Secretary of State regarding an INS directive relating to immigration in the wake of the Iranian hostage crisis).

measures improved, the President eliminated country-by-country air travel restrictions in favor of globally-applicable requirements such as vaccination of all non-citizen, non-lawful permanent residents traveling to the United States by air.  *See id.* at 19,946 & n.66, 19,947 & n.79.  DHS similarly required all inbound non-citizen, non-lawful permanent residents traveling to the United States via land ports of entry to provide proof of vaccination upon request.  *Id.* at 19,947 & n.83.  This vaccination requirement at land ports of entry aligned with similar travel restrictions imposed nearly concurrently by Canadian authorities.  *See* 87 Fed. Reg. 3425, 3427 (Jan. 24, 2022).  *See, e.g.*, *E.B. v. U.S. Dep't of State*, ---F. Supp. 3d---, 2022 WL 343505, at *6 (D.D.C. Feb. 4, 2022) (noting that the foreign affairs exception applies in the "diplomatic context, [where] agency action may be grounded in international reciprocity").

Not only is the Termination Order issued in the context of the United States' close collaboration with its neighbors in protecting the three countries' populations against COVID-19, it also implicates diplomatic relations with Mexico and other foreign countries as to the expulsion of noncitizens subject to Title 42 orders.  *See* Mendrala Decl. ¶ 5 ("Expulsions under the Title 42 Orders to Mexico and other countries have required ongoing bilateral and sometimes multilateral engagement with respective governments to coordinate on various factors related to implementation of the Orders."); Third Nuñez-Neto Decl. ¶ 4.  For example, the Mexican government has placed certain nationality- and demographic-specific restrictions on the individuals it will accept for return via the Title 42 expulsion process.  86 Fed. Reg. at 42,836.  Moreover, along sections of the border, Mexican officials refuse to accept the return of any non-Mexican family with tender age children.  *Id.*  In addition, many countries impose travel requirements, including COVID-19 testing, consular interviews, and identity verification for individuals being expelled under Title 42 from the United States.  *Id.*  These have been topics of ongoing diplomatic engagements.  *See* Third Nuñez-Neto Decl. ¶¶ 3–4.

The Termination Order "is expected to have immediate and ongoing impacts on migratory flows throughout the region and across both U.S. land borders, with a particular impact on the shared border with Mexico."  Mendrala Decl. ¶ 6; *see also* Third Nuñez-Neto Decl. ¶ 5.  Officials from the

State Department and DHS have "engaged in preparatory planning with Mexico" and many other countries in the region to establish a collaborative working relationship "to address irregular migration in the Western Hemisphere and promote safe, humane, legal migration pathways," in light of the anticipated termination of the Title 42 order.  Mendrala Decl. ¶ 6; *see also* Third Nuñez-Neto Decl. ¶ 5. Through these engagements, the U.S. government "has secured commitments from partner governments to advance" the U.S. government's "comprehensive foreign policy framework for addressing migration challenges in the region."  Mendrala Decl. ¶ 4.  The government is currently "negotiating a declaration on migration and protection to be concluded at the June Summit of the Americas, as well as non-binding bilateral Arrangements on Migration and Protection with key partner countries throughout the hemisphere."  *Id.*  The Termination Order will impact "our partners, our shared borders, and our efforts to advance safe, orderly, and humane migration throughout the region."  *Id.* ¶ 7.  The government's credibility in advancing those efforts would be undermined by the "continuation of the Title 42 Order without a corresponding public health justification."  *Id.*; *see also* Third Nuñez-Neto Decl. ¶ 6.  Thus, the termination "involves a foreign affairs function of the United States" because it "relates directly to, and has clear consequences for international relations." Mendrala Decl. ¶ 7.

Plaintiffs argue that allowing the foreign affairs exception to apply here "would effectively permit any agency to avoid notice-and-comment rulemaking."  PI at 25.  But their concern is unwarranted.  The government has used the Title 42 authority to suspend the entry of persons only twice in approximately 130 years, and only in emergency situations to prevent the introduction of a communicable disease that respects no national boundaries.[10]  That the United States would coordinate its efforts to address migration during the pandemic with its two neighbors, as well as other countries throughout the world, is a quintessential matter of international relations.  Accordingly, the "foreign affairs" exception applies.

---

[10] In similarly unique situations, the foreign affairs exception has been applied in immigration matters.  *See Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (listing cases involving immigration policy changes affecting Iranian nationals enacted in response to the 1979-80 Iranian hostage crisis).

**V.      Plaintiffs Are Unlikely to Succeed on Their Arbitrary and Capricious Claim**

    **A.  CDC engaged in reasoned decision-making.**

Should the Court reach the merits, Plaintiffs are unlikely to succeed in showing that the Termination Order is arbitrary and capricious.   The arbitrary and capricious standard under the APA is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). In reviewing the agency's explanation, the court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Sierra Club*, 990 F.3d at 913.  The "court's task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022).   "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43; *accord Sierra Club*, 990 F.3d at 913.  "[A] court is not to substitute its judgment for that of the agency," and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*, 419 U.S. 281, 286 (1974)); *accord Sierra Club*, 990 F.3d at 913.

Here, CDC's comprehensive explanation in the Termination Order clearly satisfied this highly deferential standard.  In reaching her public health determination, the CDC Director:

    (1)  examined the evolution of the COVID-19 pandemic along with the government's multi-faceted response, including CDC's use of Section 265 authority;

    (2)  considered the current status of the pandemic by reference to the most recent public-health data, community transmission levels, population immunity, hospital admissions, and other metrics assessing the use of healthcare resources;

    (3)  considered mitigation measures, including the availability of testing, vaccines, and treatments, along with CDC's increased scientific knowledge of COVID-19;

(4)   reviewed the current operating status of congregate settings—for which the perceived risk of COVID-19 spread due to crowded conditions during initial stages of the pandemic served as a key justification for CDC's use Section 265 authority order—and DHS's use of mitigation measures at its border facilities; and

(5)   considered whether State or local governments had any legitimate reliance interests in the continued existence of a Title 42 order, and weighed those interests against other countervailing interests.

*See* 87 Fed. Reg. at 19,941-56.

Specifically, CDC examined data demonstrating that, after peaking in January 2022, *id.* at 19,947–48, the number of COVID-19 cases in the United States rapidly decreased, falling by 95% from a seven-day moving average of 806,324 cases on January 15, 2022, *id.* at 19,948 & n.84, to just 26,190 cases as of March 28, 2022, *id.* at 19,944 & n.24.  Death and hospitalization rates also swiftly decreased, with death rates dropping from a peak of 4,172 to 644 as of March 29, 2022, based on a seven-day average, and hospital admissions dropping by approximately 93%, also based on a seven-day average. *Id.* at 19,948, n.87.  CDC judged that these positive trends were due in part to "widespread population immunity and a generally lower overall risk of severe disease due to the nature of the Omicron variant."  *Id.* at 19,948.

In addition to this positive data, public health officials' understanding about the epidemiology of COVID-19 as well as the effectiveness of interventions have substantially expanded, allowing the government to transition to a more narrowly tailored set of tools to prevent and control the spread of COVID-19.  *Id.* at 19,947.  "While earlier phases of the pandemic required extraordinary actions by the government and society at large," CDC explained, "epidemiologic data, scientific knowledge, and the availability of public health mitigation measures, vaccines, and therapeutics have permitted the country to safely transition to more normal routines."  *Id.* at 19,948.  For example, during January 2022, Americans had access to over 480 million at-home tests in addition to rapid point-of-care and laboratory tests. *Id.*  at 19,949.  As of March 30, 2022, 73.9% of the U.S. population 12 years or older was fully vaccinated, and 86.6% had received at least one dose.  *Id.*  At the U.S.-Mexico border,

approximately 86% of the CBP workforce was vaccinated.  *Id.* at 19,951.[11]  Globally, there were higher levels of vaccination and infection-induced immunity than existed in August 2021, including in the countries of origin for the current majority of incoming noncitizens.  *Id.* at 19,952 & n.144.  And, the FDA had authorized the first oral antiviral medications that target the SARS-CoV-2 virus, *id.* at 19,950 & n.121, and issued an emergency use authorization for a new monoclonal antibody that is effective in combatting the Omicron variant.  *Id.* at 19,950 & n.125.  The government had also secured "20 million courses of antiviral pills, which have been shown to reduce the risk of hospitalization or death by 89%."  *Id.* at 19,950.

Indeed, recognizing that the pandemic "has shifted to a new phase," CDC released a new framework in February 2022, using metrics designed to focus on disease control and healthcare system protection.  *Id.* at 19,948.  The framework classifies each county in the United States as low, medium, or high COVID-19 Community Level "to help determine which mitigation measures should be implemented within a community."  *Id.* at 19,949.  As the Termination Order explained, as of March 31, 2022, 94.9% of the U.S. population lived in counties classified as "low," 4.5% in countries classified as "medium," and only 0.5% in counties classified as "high."  *Id.*  And, "all 24 U.S. counties along the U.S.-Mexico border are classified as having a 'low' COVID-19 Community Level."  *Id.* at 19,953.  In this much-improved public health landscape, CDC determined that its Community COVID-19 Levels framework allows public health officials to swiftly identify and respond to signs that COVID-19 cases may be on the verge of straining the healthcare system in any U.S. county.  *Id.* 19,948.

CDC recognized that "public health concerns may arise in congregate settings," such as DHS's border facilities, *id.* at 19,952, but it determined that "that risk does not present a sufficiently serious danger to public health to necessitate maintaining the August Order."  *Id.*  This is so because in addition to the availability of various mitigation measures, the increasing levels of vaccination and falling case counts and hospitalizations in most areas of the country have allowed correctional and

---

[11] In CDC's expert judgment, "[v]accines, including boosters… [are] the single most important public health tool for fighting COVID-19," 87 Fed. Reg. at 19,950, and indeed, the government has implemented other mitigation measures consistent with that judgment, *id.* 19,946 n.67.

other detention facilities to resume certain activities, "signaling the resumption of more normal operations for congregate settings." *Id.* at 19,951.  CDC noted in particular CBP's use of a variety of mitigation measures, including "engineering upgrades, masking for migrants, and [Personal Protective Equipment] for its workforce"; DHS's partnership with state, local, and non-governmental organization partners in developing robust testing and quarantine programs along the Southwest Border; and DHS's plans to scale up its vaccination program for noncitizens processed under immigration authorities and held in CBP facilities.  *Id.*

In light of these considerations, CDC determined that even taking account of the risk posed by congregate settings and the fact that COVID-19 remains a concern, "the readily available and less burdensome public health mitigation tools to combat the disease render an order under 42 U.S.C. [§] 265 to prevent a serious danger to the public health unnecessary."  *Id.* at 19,953.  CDC recognized that implementing the Termination Order "will lead to an increase in the number of noncitizens being processed in DHS facilities[,] which could result in overcrowding in congregate settings." *Id.* at 19,956.  But CDC also noted that DHS "is taking steps to plan for such increases, including by readying decompression plans, deploying additional personnel and resources to support U.S. Border Patrol, and enhancing its ability to safely hold noncitizens it encounters." *Id.*

CDC's careful and comprehensive analysis demonstrates that "the agency considered the relevant facts and articulated a satisfactory explanation for its decision." *Amin*, 24 F.4th at 393.  There is at the very least a "rational connection between the facts found and the choice made" by CDC to terminate its prior Title 42 orders. *State Farm*, 463 U.S. at 43.  The APA requires no more.

**B.  CDC properly considered the issue of reliance interests.**

Citing unspecified "new and unanticipated costs and financial harms from a change in federal immigration policy, arising in the midst of a [state] budget cycle," Plaintiffs argue that such costs and harms "necessarily disrupt State reliance interests," and contend that CDC should have considered them in the abstract, "regardless of whether the States made specific 'resource-allocation' decisions in conscious reliance on the [Title 42 order]."  PI at 31.

35

The Termination Order, however, demonstrates that CDC considered relevant costs and appropriately assessed the issue of reliance interests.  To the extent Plaintiffs' alleged future financial harm is in the form of increased health care costs due to COVID-19, *see* PI at 12, 27, CDC did examine the impact on "[h]ealthcare [s]ystems and [r]esources," 87 Fed. Reg. at 19,949, including by considering a number of metrics that bear directly on the costs of health care that may be borne by state and local government entities.  For example, while noting that an Omicron-induced peak in new COVID-19 hospitalizations in January 2022 "strained some local healthcare systems," CDC found that those cases were, on average, less severe than previous cases, and that the reduction in severity, coupled with pharmaceutical intervention, has "ma[de] it possible to minimize medically significant disease and prevent excessive strain on the healthcare sector, even with the occurrence of SARS-CoV-2 transmission."  *Id.* at 19,949.

Moreover, CDC considered "COVID-19 Community Level[]" data, which takes into account new hospital admissions rates, the percent of staffed inpatient beds occupied by patients with COVID-19, and total new COVID-19 cases, and determined that the risk of strain on healthcare resources does not continue to justify the use of a Title 42 order.  *Id.* at 19,948, 19,953.  CDC also determined that should there be signs in the future that the pandemic is potentially straining the U.S. healthcare system, the country would be able to swiftly respond.  *Id.* at 19,948.  CDC's discussion of various factors informing the potential "strain" on health care systems speaks to the health care costs that Plaintiffs incorrectly claim "CDC did not actually consider."  PI at 27.

Contrary to Plaintiffs' suggestion, *see* PI at 27-28, CDC did consider whether there are any legitimate long-term or short-term state or local government reliance interests in the continued expulsion of covered noncitizens under a Title 42 order, and determined that there was none.  87 Fed. Reg. at 19,953–54.  As CDC reasoned, Title 42 orders have been, "by their very nature, short-term orders, authorized only when specified statutory criteria are met, and subject to change at any time in response to an evolving public health crisis."  *Id.* at 19,953.  Noting that the statute itself limits CDC's ability to issue a Title 42 order to situations in which CDC has found a "serious danger" of the introduction of a communicable disease into the United States and then only "for such period of time

36

as [CDC] may deem necessary" to avert the danger, CDC explained that all Title 42 orders "have consistently been subject to periodic reviews to ensure their continued necessity." *Id.* Specifically, the 30- or 60-day periodic reviews are "based on the latest information regarding the status of the COVID-19 pandemic and associated public health risks." *Id.* The Title 42 orders thus reflect that changes in the status of the pandemic could occur rapidly, and that CDC must be able to flexibly "extend, modify, or terminate the Order … at any time" in response to such changes, *id.*

In addition, CDC's exercise of Section 265 authority to expel noncitizens "remained contested" throughout most of the pandemic, resulting in at least two preliminary injunctions enjoining the application of the Title 42 orders to unaccompanied children and family units, respectively, and one appellate court decision modifying one of the injunctions. *Id.* at 19,953–54. That legal uncertainty, CDC reasoned, "render[ed] it unreasonable for any state or local government to have acted in reliance on" the continuation of its Title 42 orders. *Id.* at 19,953. Finally, the operative, August 2021 Title 42 order itself put State and local governments on notice that CDC anticipated that the government "would be taking steps toward the resumption of normal border operations," including the "normal processing of arriving noncitizens" under the immigration laws. *Id.* at 19,954; *see also* 86 Fed. Reg. at 42,831 (CDC "view[ed] this [August 2021] public health reassessment as setting forth a roadmap toward the safe resumption of normal processing of arriving noncitizens").

In light of all these considerations, CDC reasonably concluded that "state and local governments could not have reasonably relied on CDC's indefinite use of its expulsion authority under Section 265." 87 Fed. Reg. at 19,954. Moreover, CDC judged that any reliance interest (including for purposes of resource allocation) "is not weighty enough to displace CDC's determination that there is no public health justification for [continuing the Title 42 order] at this time." *Id.* Similarly, CDC concluded that "any short-term reliance interests should be limited" for the reasons explained, and that "any such reliance does not outweigh CDC's determination that the expulsion of covered noncitizens is not required to avert a serious danger to public health." *Id.* Finally, CDC reasoned that to the extent any state or local government has made any short-term plans based on the continued existence of Title 42 orders, the delayed implementation of the Termination Order gives them "time

37

to adjust to the resumption of regular Title 8 immigration processing." *Id.*  In sum, CDC has accounted for any potential reliance interests, and its "assurance that it weighed" the relevant factors is sufficient to show "that the agency did not 'entirely fail[] to consider an important aspect of the problem.'" *Sierra Club v. EPA*, 939 F.3d 649, 673 (5th Cir. 2019) (quoting *State Farm*, 463 U.S. at 43).

Plaintiffs argue (*see* PI at 28–30) that the Termination Order is invalid under *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1913 (2020).  *Regents* involved the termination of the DACA policy, which, for five years, had allowed certain undocumented noncitizens to apply for a two-year forbearance of removal.  *Id.*  Despite the government's argument that the policy "'conferred no substantive rights' and provided benefits only in two-year increments," the Court held that the agency should have "address[ed] whether there was 'legitimate reliance' on [DACA's existence]."  *Id.*  As the Court reasoned, DACA's temporary features do not "'automatically preclude reliance interests,'" even though they "are surely pertinent in considering the strength of any reliance interests" and so must be considered "by the agency in the first instance."  *Id.*

*Regents* is distinguishable because in that case, the agency conceded that it did not consider "potential reliance interests" at all.  *Id.*  Here, in contrast, CDC expressly considered whether any legitimate reliance interests existed and whether any reliance interests are outweighed by other factors.  *See* 87 Fed. Reg. at 19,953–54.  And, CDC considered its limited statutory authority and the emergency, short-term nature of the Title 42 orders not as reasons for "automatically preclud[ing]" any reliance interests, *Regents*, 140 S. Ct. at 1913, but rather, to determine the reasonableness of such interests and the weight they carried.  This is what the Supreme Court said the agency in *Regents* could have done:

> DHS could respond that reliance on forbearance and benefits was unjustified in light of the express limitations in the DACA Memorandum. Or it might conclude that reliance interests in benefits that it views as unlawful are entitled to no or diminished weight. And, even if DHS ultimately concludes that the reliance interests rank as serious, they are but one factor to consider. DHS may determine, in the particular context before it, that other interests and policy concerns outweigh any reliance

interests. Making that difficult decision was the agency's job, but the agency failed to
do it.

*Id.* at 1914.  Here, CDC did its job, and its determination was reasonable.[12]

Finally, Plaintiffs fault CDC for considering the "practical impact on federal agencies like
DHS," but not on the States.  PI at 28.  But CDC did consider the practical impact on State and local
governments.  CDC determined that termination of the Title 42 order was unlikely to strain local
healthcare systems at this stage of the pandemic, and that because the implementation date was set
for "52 days from the date of issuance," State and local governments "[would have] time to adjust to
the resumption of regular Title 8 immigration processing."  87 Fed. Reg. at 19,954.  And it was
especially appropriate for CDC to consult with DHS, as practicable, considering that DHS is charged
by the Public Health Service Act to "aid in the enforcement of [the Title 42 orders]," 42 U.S.C.
§ 268(b); CDC does not have the capability to implement any order under Section 265 without the aid
of DHS.  Further, the regulation requires the CDC Director to "consult with all Federal departments
or agencies whose interests would be impacted by the order" 42 C.F.R. § 71.40(d), but leaves it to the
CDC Director to "consult with any State or local authorities that he or she deems appropriate in his
or her discretion."  *Id.*

## C.  CDC did not need to rely upon downstream, non-COVID-19 related "immigration consequences" in making its public health determination.

Plaintiffs argue that CDC acted arbitrarily and capriciously by not considering the
"immigration consequences" of terminating its Title 42 orders, which Plaintiffs predict will be
"catastrophic" including a "massive increase in illegal immigration."  PI at 33-34.  But it is a bedrock
APA principle that an agency may not "rel[y] on factors which Congress has not intended it to
consider."  *Sierra Club*, 939 F.3d at 663 (quoting *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th

---

[12] For similar reasons, Plaintiffs' reliance on *Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021) involving the termination of the Migrant Protection Protocols, *see* PI at 30, is misplaced.  The court there concluded that the agency "did *not* consider the costs to the States at all," *Texas*, 554 F. Supp. 3d at 849 (emphasis in original), whereas here, CDC specifically considered healthcare costs and resources, and addressed the issue of the state and local governments' reliance interests, which Plaintiffs themselves argue are directly linked to costs, *see* PI at 31 (asserting that "it makes good sense to treat new financial costs and harms to the States as inherently disrupting State reliance interests").

Cir. 1998)).  Here, CDC's authority is limited to addressing a specific and serious danger to public health posed by a communicable disease, 42 U.S.C. § 265; *see also* 42 C.F.R. § 71.40 (further limiting to a quarantinable communicable disease).  Nothing in Section 265 shows an intent by Congress to allow CDC to rely upon the downstream, immigration consequences of a Title 42 order (or the termination of such an order) in making the public health determination.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001) (holding that provision of the Clean Air Act requiring EPA to set ambient air quality standards at levels "requisite to protect the public health" with an "adequate margin of safety," 42 U.S.C. § 7409(b)(1), did not authorize the agency to consider implementation costs).

In fact, a Title 42 order involving persons or the termination of such a Title 42 order almost always will have immigration consequences because it operates by allowing CDC to temporarily suspend the right to introduce into the United States certain persons, notwithstanding the immigration laws.  CDC readily acknowledges that "the Termination of the August Order will lead to an increase in the number of noncitizens being processed in DHS facilities."  87 Fed. Reg. at 19,956.  If Congress thought that CDC's exercise of Section 265 authority must be constrained by the *degree* of such immigration consequences, it would have made that intent clear.  *Cf. Whitman*, 531 U.S. at 468 ("[W]e find it implausible that Congress would give to the EPA through these modest words [i.e., 'requisite to protect the public health' with an 'adequate margin of safety,'] the power to determine whether implementation costs should moderate national air quality standards.").

Also unlikely to succeed is Plaintiffs' argument that the Termination Order "contradicts itself" by delaying implementation until May 23 to allow DHS time to implement the Order.  PI at 34.  There is a statutory basis and a practical need for CDC's coordination with DHS.  As already discussed above, by statute, DHS is an integral part of the implementation or termination of any Title 42 order.  CDC is also required by regulation to coordinate "with all Federal departments or agencies whose interests would be impacted by the order," as practicable under the circumstances.  42 C.F.R. § 71.40(d).  It therefore was proper for CDC to account for the time DHS needs to prepare for full resumption of immigration processing, including to implement additional COVID-19 mitigation strategies.  CDC also may reasonably rely on DHS's determination as to the appropriate amount of

time DHS requires for those purposes.  Not only is DHS charged with aiding the implementation of Title 42 orders, but it is also the agency responsible for securing the Nation's border.  *See City of Bos. Delegation v. FERC*, 897 F.3d 241, 255 (D.C. Cir. 2018) ("Agencies can be expected to respect [the] views of such other agencies as to those problems for which those other agencies are more directly responsible and more competent.") (citations omitted).  Parties challenging an agency's reliance on another agency's determination on "a matter firmly within that agency's expertise" "bear[] a heavy burden to prove" that such reliance was arbitrary and capricious.  *Sierra Club v. U.S. Army Corp of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir. 2002).  Plaintiffs cannot meet this burden; in fact, they make no attempt to do so.

Plaintiffs also argue that "immigration consequences" are "an important part of the public health problem," and that "[i]t strains credulity to imagine that CDC could . . . screen" the number of migrants that potentially could cross the border on a daily basis for communicable disease.  PI at 36.  But CDC did not base its termination decision on either its ability or DHS's ability to screen everyone attempting to cross the border.  Rather, it assessed the public health circumstances and identified the tools public health officials now have to monitor the pandemic as it evolves, as well as the "readily available and less burdensome public health mitigation tools to combat the disease," in concluding that a Title 42 order was no longer necessary to "prevent a serious danger to the public health."  87 Fed. Reg. at 19,953.

Plaintiffs next argue that "[u]nder the APA, the CDC must consider non-public-health impacts of its policy change."  PI at 37 (heading).  But as discussed above, an agency may not "rel[y] on factors which Congress has not intended it to consider."  *Sierra Club*, 939 F.3d at 663.  The text of Section 265 gives no indication that non-public-health impacts should carry such weight for the public health determinations under the statute, and Plaintiffs do not attempt to demonstrate otherwise.  Instead, they pivot again back to discussing *Regents*, 140 S. Ct. 1891, in which the Supreme Court found that the agency failed to consider reliance interests potentially applicable to the termination of DACA—primarily the reliance interests of hundreds of thousands of immigrants and their families, "including their 200,000 U.S.-citizen children," *id.* at 1914.  PI at 37–38.  Again, *Regents* is inapposite.  As

41

discussed above, CDC did consider potential reliance interests here.  What CDC declined to do was to rest its decision on immigration policy concerns that lie entirely outside its statutory authority.  To the extent the States believe the potential influx of border crossings requires a remedy outside the bounds of the immigration laws enacted by Congress, the remedy is not to force CDC to engage in immigration policymaking.

Finally, Plaintiffs suggest that CDC's reasons for terminating the Title 42 order are pretext of political reasons, given CDC's extension of the transportation masking order only 12 days later.  PI at 39–40 (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019)).  But a comparison of the two CDC decisions is not relevant here because the masking order is issued pursuant to a different statutory authority with different statutory requirements, 42 U.S.C. § 264.  And the regulations are entirely different:  Asking individuals to wear a mask for a few hours while traveling in crowded spaces is not nearly as expansive an exercise of authority as suspending persons' rights to be introduced into the United States under the immigration laws.  Moreover, as the Supreme Court held in *Dep't of Commerce*, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." 139 S. Ct. at 2573.  In an APA case, the court's role is not to inquire into agency decisionmakers' motivations but rather to "evaluat[e] the agency's contemporaneous explanation in light of the existing administrative record."  *Id.*  The relevant question here is whether Plaintiffs have identified a "significant mismatch between the decision [the CDC Director] made and the rationale [she] provided" in the Termination Order.  *Id.* at 2575.  As demonstrated above, there is no such mismatch.  The Director adequately explained her reasons for terminating the Title 42 orders, and the record amply supports her decision.

For these reasons, Plaintiffs' arbitrary and capricious claim is unlikely to succeed.

## VI.    The Remaining Preliminary Injunction Factors Weigh in Favor of Defendants

Because Plaintiffs have failed to establish a likelihood of success on the merits, this Court need not consider the remaining factors for emergency injunctive relief.  *See Winter*, 555 U.S. at 20; *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (reading *Winter* "at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction"); *see*

*also Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J., concurring).  But even if the Court does, the remaining factors strongly support the denial of emergency relief. [13]

To establish irreparable injury, a party must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)).  "[A] showing of '[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.'" *Janvey v. Alguire,* 647 F.3d 585, 600 (5th Cir. 2011) (quotation omitted).

Plaintiffs argue that resuming normal immigration processing under the INA will irreparably harm them because it will lead to an influx of migrants, which, in turn, will lead to "increased law enforcement, education, and health care spending" by the States.  PI at 40.  But as explained above in the section addressing standing, Plaintiffs cannot show that their asserted harms are traceable to the termination of the Title 42 order as opposed to the immigration scheme enacted by Congress.  In contrast, the United States would suffer irreparable harm if a preliminary injunction were granted. "[A]ny time [the government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  An injunction would unduly interfere with the judgment of the Nation's chief public health expert that a Title 42 order is no longer warranted given the public health circumstances.  *Cf. Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("[T]he views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority"); *see also Huisha-Huisha*, 27 F.4th at 734-35 (noting in March 2022 that CDC's Title 42 order "look[ed] in certain respects like a relic from an era with no vaccines, scarce

---

[13] To the extent Plaintiffs request relief prohibiting the government from exercising its statutory discretion to place individuals in expedited or full removal proceedings under 8 U.S.C. § 1225(b)(1), (b)(2)(A), and 1229a, the INA explicitly prohibits the Court from issuing such relief. *See* 8 U.S.C. § 1252(f)(1) ("[N]o court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1232]."); *see also id.* § 1252(a)(2)(A)(ii) (providing that no court has authority to enjoin the decision of DHS to "invoke" section 1225(b)(1) other than as permitted by section 1252(e), which authorizes only two limited forms of review not relevant here).

testing, few therapeutics, and little certainty" and that "[t]he evidence of the difference between [March 2020] and [March 2022] is considerable").  In effect, an injunction from this Court would be requiring the Executive Branch to adopt an extraordinarily restrictive public health order, despite the Executive Branch's considered judgment that the order is no longer warranted.  Plaintiffs have provided no justification for such a grave intrusion into the Executive Branch's handling of the pandemic, particularly where Congress placed the issue in the CDC's discretion.  *See FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578, 579 (2021) (Roberts, C.J., concurring in grant of stay).  This is particularly the case when by Plaintiffs' own admission, they are seeking emergency relief for reasons *unrelated* to public health, and specifically COVID-19, the communicable disease that warranted the exercise of the Section 265 authority in the first place.

Finally, an injunction would be contrary to the public interest.  The interest of both the federal government and the public merge here because "the Government is the opposing party."  *Nken*, 556 U.S. at 435.  CDC should not be required to indefinitely extend its Title 42 order in the absence of a statutory basis for doing so, where such an extension would be at odds with Congress's intent that, except when a serious danger to public health warrants a narrow suspension of the immigration laws, the INA should govern the admissibility and removal of noncitizens.  *Cf. Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006) ("[W]e presume that all governmental action pursuant to a statutory scheme is 'taken in the public interest.'"); *see generally Lujan*, 504 U.S. at 576 (identifying "the public interest in proper administration of the laws (specifically, in agencies' observance of a particular, statutorily prescribed procedure)"); *Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 788 (11th Cir. 1984) ("Congressional intent and statutory purpose can be taken as a statement of public interest.").

Accordingly, the balance of equities weighs against issuing a preliminary injunction here.

**CONCLUSION**

For these reasons, Plaintiffs' motion for preliminary injunction should be denied.

Date:  April 29, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Civil Division

JEAN LIN
Special Litigation Counsel (NY #4074530)

   /s/ *JONATHAN D. KOSSAK*
JONATHAN D. KOSSAK (DC #991478)
JOHN ROBINSON (DC #1044072)
JOSEPH J. DEMOTT (VA #93981)
Trial Attorneys
1100 L St. N.W.
Washington, DC 20530
U.S. Department of Justice, Civil Division
Federal Program Branch
(202) 514-3716
Jean.lin@doj.gov
Jonathan.kossak@usdoj.gov
John.j.robinson@usdoj.gov
Joseph.demott@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify I served this document today by filing it using the Court's CM/ECF system, which will automatically notify all counsel of record.

Dated:  April 29, 2022                                    /s/ Jonathan D. Kossak