# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**STATE OF LOUISIANA ET AL.,**

      *Plaintiffs,*

**v.**

**CENTERS FOR DISEASE CONTROL & PREVENTION, ET AL.,**

      *Defendants.*

**Case No. 6:22-cv-00885-RRS-CBW**

---

## BRIEF OF *AMICI CURIAE* 58 LEGAL SERVICE AND ADVOCACY ORGANIZATIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Mary Yanik, LA Bar No. 36973
Gabriela Cruz, LA Bar No. 40149
Tulane Immigrant Rights Clinic
6329 Freret St, Suite 130
New Orleans, Louisiana 70118-6248
Telephone: (504) 865-5153
Facsimile: (504) 862-8753
myanik@tulane.edu
gcruz@tulane.edu
*Admitted to Practice in W.D. La*

Esther H. Sung,* CA Bar No. 255962
Karen C. Tumlin,* CA Bar No. 234691
Justice Action Center
P.O. Box 27280
Los Angeles, California 90027
Telephone: +1 323 450 7275
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
*pro hac vice applications forthcoming*

*Counsel for Amici Curiae 58 Legal Service and Advocacy Organizations*

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ................................................................................. 1

INTRODUCTION ......................................................................................................... 3

ARGUMENT ................................................................................................................ 5

    I.       THE PUBLIC INTEREST STRONGLY FAVORS TERMINATION OF THE TITLE 42 ORDER BECAUSE OF ITS ENORMOUS HUMAN COST.............. 6

          A.     The Title 42 Order Subjects Asylum Seekers to Kidnapping, Rape, Extortion, Torture, and Family Separation. ................................................ 8

          B.     Ending the Title 42 Order is Also In the Public Interest Because It Would Prevent Further Unnecessary Traumatization of Unaccompanied Children. ........................................................................................................... 15

CONCLUSION............................................................................................................ 18

i

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Arizona v. United States*, 567 U.S. 387 (2012)..................................................................... 17

*Capital Area Immigrant Rights Coal. v. Trump*, No. 1:19-cv-02117-TJK (D.D.C. filed July 16, 2019) .......................................................................................................................... 2

*Chambless Enter. LLC v. Redfield*, 508 F. Supp. 3d 101 (W.D. La. 2020)............................ 7, 11

*Dada v. Witte*, No. 1:20-CV-00458, 2020 WL 5510706 (W.D. La. Apr. 30, 2020) ..................... 7

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ............................................ 6

*Grace v. Barr*, No. 1:18-cv-01853-EGS (D.D.C. filed Aug. 7, 2018) ........................................ 2

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017).................................................................. 11

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022)......................................................... 3

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ......................................................................... 6

*Immigrant Defenders Law Center v. U.S. Dep't of Homeland Security*, No. 2:21-cv-00395-FMO-RAO (C.D. Cal. filed Jan. 14, 2021)...................................................................................... 2

*Immigrant Defenders Law Center v. Wolf*, No. 2:20-cv-09893-JGB-SHK (C.D. Cal. filed Oct. 28, 2020) ................................................................................................................................... 2

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) ................................................................. 17

*Louisiana v. Becerra*, No. 3:21-cv-04370, 2022 WL 16571 (W.D. La. Jan. 1, 2022) .................. 4

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618 (5th Cir. 1985)............. 4, 7

*Ms. L. v. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018)....................... 11

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................. passim

*O.M.G. v. Wolf*, No. 1:20-cv-00786-JEB (D.D.C. filed March 31, 2020)..................................... 2

*Peregrino Guevara v. Witte*, No. 6:20-CV-01200, 2020 WL 6940814 (W.D. La. Nov. 17, 2020) 8

*Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) ........... 6

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .................................................................. 7

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................................... 7

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page**

### *Statutes*

42 U.S.C. § 265 ................................................................................................... 2

6 U.S.C. § 279(g) ............................................................................................... 2

8 U.S.C. § 1158 .................................................................................................. 6

Refugee Act of 1980, Pub L. No. 96-212, § 101(a), 94 Stat. 102 ............................ 5, 8

### *Other Authorities*

*Extending Title 42 Would Escalate Dangers, Exacerbate Disorder, and Magnify Discrimination,*
    Human Rights First (April 27, 2022), *available at*
    https://www.humanrightsfirst.org/resource/extending-title-42-would-escalate-dangers-
    exacerbate-disorder-and-magnify-discrimination ........................................................ 6

Fed. R. App. Proc. 29(a)(4)(E) ............................................................................. 1

Hamed Aleaziz, *Border Officials Turned Away Unaccompanied Immigrant Children More Than
    13,000 Times Under Trump's Pandemic Policy*, BuzzFeed News (Oct. 28, 2020), *available at*
    https://www.buzzfeednews.com/article/hamedaleaziz/border-officials-turned-away-
    unaccompanied-immigrants .................................................................................. 16

*Mexico: Abuses Against Asylum Seekers at US Border*, Human Rights Watch (Mar. 5, 2021),
    *available at* https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-
    border .............................................................................................................. 10

Nisha Venhat, *Black Immigrants Are Facing Rampant Racism in Mexico While Waiting for US
    Asylum: "We Have No Choice,"* Buzzfeed News (March 27, 2021), *available at*
    https://www.buzzfeednews.com/article/nishavenkat/black-immigrants-racism-mexico-asylum
    ...................................................................................................................... 10

Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable
    Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020) ......................... 2

Priscilla Alvarez, *At Least 650 Migrants Died Crossing the US-Mexico Border, the Most Since
    2014, International Agency Says*, CNN (Dec. 9, 2021), *available at*
    https://www.cnn.com/2021/12/09/politics/migrants-dying-crossing-us-mexico-
    border/index.html ............................................................................................... 7

Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From
    Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828-02
    (Aug. 5, 2021) ................................................................................................... 2

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are 58 legal service and advocacy organizations—including public interest law firms—who serve immigrant communities throughout the country, including organizations based in Louisiana and many along the border in Texas, Arizona, and California.[2]  *Amici* are invested in ensuring that all people, including immigrants, are treated with dignity and share a common mission of advancing and protecting the constitutional and statutory rights of individuals seeking asylum and legal status in the United States.  *Amici* have worked for decades to improve immigrants' access to

---

[1] The parties have consented to the filing of this brief.  *See* Unopposed Motion of Justice Action Center for Leave to File Brief of *Amici Curiae* 58 Legal Service and Advocacy Organizations in Opposition to Plaintiffs' Motion for Preliminary Injunction.  No party's counsel authored this brief in whole or in part, and no person or entity other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  *Cf.* Fed. R. App. Proc. 29(a)(4)(E).

[2] *Amici* are ACLU Foundation of Louisiana, Advocating Opportunity, Al Otro Lado, ALAS, Arizona Justice For Our Neighbors, Asylum Seeker Advocacy Project (ASAP), Black Alliance for Just Immigration (BAJI), Bridges Faith Initiative, Cameroon American Council, Cleveland Jobs with Justice,  Coalition for Humane Immigrant Rights (CHIRLA), Columbia Law School Immigrants' Rights Clinic, Community Asylum Seekers Project, Comunidad Maya Pixan Ixim, Disciples Immigration Legal Counsel, Doctors for Camp Closure, Florence Immigrant & Refugee Rights Project, Freedom Network USA, HIAS, Hispanic Federation, Home is Here NOLA, Human Rights First, Human Rights Initiative of North Texas, Immigrant Defenders Law Center, Immigrant Law Center of Minnesota, Immigrants' Rights Law Group, Immigration Services and Legal Advocacy, International Refugee Assistance Project, Jewish Activists for Immigration Justice, Justice Action Center, Justice for Our Neighbors El Paso, Justice in Motion, Kids in Need of Defense (KIND), Latin America Working Group (LAWG), Lawyers for Good Government, Louisiana Advocates for Immigrants in Detention, LSN Legal LLC, Migrant Center for Human Rights, National Immigration Law Center, National Justice for Our Neighbors, Oasis Legal Services, Refugee and Immigrant Center for Education and Legal Services (RAICES), Robert F. Kennedy Human Rights, Save the Children, Service Employees International Union (SEIU), SMW Legal LLC, South Carolina Appleseed Legal Justice Center, Student Clinic for Immigrant Justice, Tahirih Justice Center, The Advocates for Human Rights, The Southern Poverty Law Center, Tulane Immigrant Rights Clinic, UCSF Health and Human Rights Initiative, VECINA, Voces Unidas: Louisiana Immigrant's Rights Coalition, Volunteer Lawyers for Justice, Women's Refugee Commission, and Young Center for Immigrant Children's Rights. This brief does not represent the institutional views of Tulane University, if any.

1

legal services and representation, to ensure immigrants arriving in the United States can pursue all relief they are entitled to seek under the law, and to ensure immigrants' constitutional due process and other rights are upheld.

Collectively, *amici* serve tens of thousands of immigrants annually, including through providing direct services and legal services.  Relevant here, many of *amici*'s clients seek relief at the U.S.-Mexico border and have been subject to Defendants' summary expulsions of immigrants pursuant to the purported health order initially adopted by the Trump administration under 42 U.S.C. § 265 (the "Title 42 Order").  *See* Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65806 (Oct. 16, 2020); Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42828-02 (Aug. 5, 2021).  Also relevant to this case, several *amici* contract with the federal government to represent unaccompanied children,[3] a particularly vulnerable population that especially suffers from expulsions under the Title 42 Order.

In addition to providing a variety of services to immigrant populations in the U.S., multiple *amici* have litigated to protect immigrants' rights to access asylum and other relief under U.S. law and have appeared as *amici* in cases like this one that impact their organizational missions and ability to serve clients.  *E.g.*, *Immigrant Defenders Law Center v. U.S. Dep't of Homeland Security*, No. 2:21-cv-00395-FMO-RAO (C.D. Cal. filed Jan. 14, 2021); *Immigrant Defenders Law Center v. Wolf*, No. 2:20-cv-09893-JGB-SHK (C.D. Cal. filed Oct. 28, 2020); *O.M.G. v. Wolf*, No. 1:20-cv-00786-JEB (D.D.C. filed March 31,2020); *Capital Area Immigrant Rights Coal. v. Trump*, No. 1:19-cv-02117-TJK (D.D.C. filed July 16, 2019).

*Amici* have a strong interest in this case, which attempts to limit the ability of immigrants to request and access a legal process afforded to them by federal law.  Indeed, Plaintiffs ask the Court

---

[3] An unaccompanied child has "no lawful immigration status in the United States;" has not turned 18 years old; and has "no parent or legal guardian in the United States [] available to provide care and physical custody."  6 U.S.C. § 279(g).

to require Defendants to summarily expel migrants under the Title 42 Order, which is itself subject to pending litigation due to its illegality.  *See, e.g.*, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733, 735 (D.C. Cir. 2022) (affirming preliminary injunction of Title 42 expulsions to prohibit the government from expelling migrants to countries where they are likely to be persecuted or tortured, and remanding for further consideration of other claims) (mandate subsequently stayed until May 23, 2022).  Given their work representing and advocating for immigrants affected by the Title 42 Order, *amici* have a compelling interest in the outcome of this litigation.

*Amici* respectfully submit this brief to assist the Court in evaluating the merits of Plaintiffs' pending Motion for Preliminary Injunction.  In light of their experience working with individuals subject to the Title 42 Order, *amici* believe they will offer the Court a unique perspective as to the public interest and why it overwhelmingly favors upholding Defendants' decision to stop summarily expelling migrants on purported public health grounds, particularly at this point in the pandemic. Plaintiffs' efforts to set aside Defendants' decisions jeopardize *amici*'s interests by potentially harming the tens of thousands of individuals whom *amici* represent.

## INTRODUCTION

In March 2020, former President Trump issued an order under Title 42 of the United States Code, ostensibly on public health grounds, that effectively prevented any asylum seeker arriving at the southern border from requesting and accessing the legal process and humanitarian protections afforded to them by U.S. law.  For the last two years, that order and subsequent extensions (collectively, the "Title 42 Order") have been used to categorically shut the door on tens of thousands of people seeking safety, notwithstanding that the Title 42 Order never had a sound public health justification and defied recommendations of the World Health Organization. Thus, for the last two years—notwithstanding a sustained chorus of objections to the purported public health rationale of the Title 42 Order—the federal government has summarily expelled (without process) vulnerable migrants, either back to their home countries and the conditions which caused them to flee in the first place, or to Mexico, where migrants are preyed upon by gangs and cartels for kidnappings, rape, violent attacks, and death.

On April 1, 2022, Director Rochelle Walensky of the Centers for Disease Control and Prevention issued a Public Health Determination and Order terminating expulsions under the Title 42 Order, with an implementation date of May 23, 2022 (the "Termination Order"). Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Apr. 1, 2022), Compl., Ex. A, ECF No. 1-1, at 29. The Director determined that the "suspension of the introduction of covered noncitizens [subject to the Title 42 Order] is no longer required in the interest of public health . . . particularly in light of less burdensome measures that are now available to mitigate the introduction, transmission, and spread of COVID-19." *Id.* at 5.

Plaintiffs seek to enjoin the Termination Order in its entirety, requesting that mass, summary expulsions of asylum-seeking migrants continue in perpetuity. Compl., ECF No. 1, at 37–38, 41. Plaintiffs argue that they will be not just injured, but irreparably harmed, if the Department of Homeland Security ("DHS") considers asylum claims through the procedure outlined in the Immigration and Nationality Act ("INA"), just as the federal government did for several decades prior to March 2020. *See* Pls. Mem. Supp. Mot. Prelim. Inj. ("Pls. Mot."), ECF. No. 13-1, at 40–41. Their arguments are unsupported by evidence and without merit.

The public interest factor of the preliminary injunction standard "requires the court to consider what public interests may be served by granting or denying a preliminary injunction," *Louisiana v. Becerra*, No. 3:21-cv-04370, 2022 WL 16571, at *15 (W.D. La. Jan. 1, 2022) (citation omitted), which reflects a "judicial concern about the impact of legal decisions on society as a whole," *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985). This factor weighs heavily against Plaintiffs' requested injunction because the Title 42 Order subjects migrants to further trauma and violence, including rape, kidnapping, extortion, and even death. The CDC's order terminating expulsions under Title 42 furthers the public interest by ensuring that these individuals are not returned to harm by the U.S. government. *See Nken v. Holder*, 556 U.S. 418, 436 (2009).

For these reasons, set forth in greater detail below, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

## ARGUMENT

Plaintiffs ask the Court to issue a preliminary injunction prohibiting Defendants from implementing the Termination Order issued by CDC Director Walensky, and thereby to require the federal government to continue applying the Title 42 Order to summarily expel migrants, en masse, without regard to the statutory procedures that Congress established in the INA.  Plaintiffs cannot justify such relief.  Defendants thoroughly explain why Plaintiffs' claims lack merit and how Plaintiffs have additionally failed to substantiate any threat of injury absent an injunction, much less a *substantial* threat of *irreparable* harm; *amici* will not repeat those arguments here.  *See* Defs. Mem. Opp'n Pls. Mot. Prelim. Inj., ECF No. 40 ("Opp.") at 20–39.  *Amici* instead address the final preliminary injunction factor relating to the public interest, which is of particular significance to them because of the effects the requested injunction would have on the tens of thousands of individuals, especially vulnerable immigrant children and families, whom *amici* serve.

Other than repeating their merits argument, Plaintiffs' solitary argument for why enjoining the Termination Order is in the public interest is their assertion that the resumed, ordinary operation of U.S. immigration law is contrary to the public interest because it will result in more immigrants in the United States and in the Plaintiff States.  *See* Pls. Mot. at 41 (claiming that an injunction would protect the federal government from the "self-inflicted harm" allegedly caused when the federal government provides migrants seeking humanitarian protection with the process Congress created).  But Congress has already decided that providing asylum seekers with its prescribed process—the process that Plaintiffs want enjoined—*is* in the public interest.  *See, e.g.*, Refugee Act of 1980, Pub L. No. 96-212, § 101(a), 94 Stat. 102 ("The objectives of [the Act] are to provide a permanent and systematic procedure for the admission to this country of refugees [and asylees] of special

humanitarian concern to the United States . . . .").[4] Plaintiffs' argument is thus plainly inadequate to satisfy their burden. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) ("[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements.") (citation omitted). This failure alone is sufficient to deny Plaintiffs' motion. *Id.*

In any event, the public interest would be substantially harmed by the requested relief. Plaintiffs' proposed injunction would continue to subject migrants—including unaccompanied children, families, and migrants with family already in the United States—to dangerous and traumatic conditions in Mexico and/or in their home countries. There is no legal, moral, or humane argument that the incalculable human cost exacted by the Title 42 Order can possibly be in the public interest.

## I.   THE PUBLIC INTEREST STRONGLY FAVORS TERMINATION OF THE TITLE 42 ORDER BECAUSE OF ITS ENORMOUS HUMAN COST

The public interest strongly favors terminating the Title 42 Order because of the enormous human cost the Order inflicts. Just since President Biden was inaugurated, there have been more than 10,000 documented cases of violence against asylum seekers stuck in Mexico because of the Title 42 Order, including kidnapping, rape, torture, and other violent attacks.[5] The Title 42 Order's effective elimination of the statutory right to apply for asylum and the closure of U.S. ports of entry have also forced migrants desperately seeking safety in the United States to take more dangerous

---

[4] *See also id.* ("[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands . . . ."); *accord I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432–33 (1987) (discussing the "abundant evidence" of Congressional intent to conform "our asylum law to the United Nation's Protocol to which the United States has been bound since 1968"); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021) (finding that 8 U.S.C. § 1158 reflects Congress's intent that "migrants arriving anywhere along the United States's borders may apply for asylum").

[5]*Extending Title 42 Would Escalate Dangers, Exacerbate Disorder, and Magnify Discrimination,* Human Rights First (April 27, 2022), *available at* https://www.humanrightsfirst.org/resource/extending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination.

border crossing routes and to cross multiple times for the chance to request asylum; last year, at least 650 migrants died trying to enter the United States from Mexico—a record high.[6]  Because so many asylum seekers already have family here, moreover, the consequences of their fate and treatment deeply affect individuals and communities throughout the United States as well.  Given these enormous human costs, the public interest weighs heavily in favor of ending the Title 42 Order.

When evaluating whether an injunction against the federal government will disserve the public interest, the impact that the requested relief will have on the general public is central to the Court's analysis.  *Chambless Enter. LLC v. Redfield*, 508 F. Supp. 3d 101, 123 (W.D. La. 2020).  Both the Supreme Court and the Fifth Circuit have emphasized the importance of considering the broader consequences of an injunction on nonparties when weighing the public interest.  *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 625–26 (5th Cir. 1985) (noting "judicial concern about the impact of legal decisions on society as a whole" and looking "beyond the immediate interests of the named litigants" when considering the public interest).[7]

Furthermore, in analyzing the public interest and balance of the equities, this Court has repeatedly recognized the significant weight accorded to the health and wellbeing of migrants.  *See* Report and Recommendation, *Dada v. Witte*, No. 1:20-CV-00458, 2020 WL 5510706, at *12 (W.D. La. Apr. 30, 2020) (recommending release of detained immigrants because of grave "potential

---

[6] *See* Priscilla Alvarez, *At Least 650 Migrants Died Crossing the US-Mexico Border, the Most Since 2014, International Agency Says*, CNN (Dec. 9, 2021), *available at* https://www.cnn.com/2021/12/09/politics/migrants-dying-crossing-us-mexico-border/index.html (reporting on data from the International Organization for Migration, which began documenting such deaths in 2014).

[7] To be sure, the impact of Plaintiffs' requested injunction on the parties is relevant to the Court's analysis.  *See Nken*, 556 U.S. at 435 (in the stay context, noting that the harm to the opposing party and the public interest "merge when the Government is the opposing party").  Defendants have catalogued the harms likely to occur if Plaintiffs' requested injunction is granted, *see* Opp. at 42–44, and such threatened injuries tip the public interest against Plaintiffs.

injuries" including "illness, discomfort, and pain"), *adopted in part, rejected in part by* 2020 WL 2614616, at *1 (W.D. La. May 22, 2020); Report & Recommendation, *Peregrino Guevara v. Witte*, No. 6:20-CV-01200, 2020 WL 6940814, at *10 (W.D. La. Nov. 17, 2020) (recommending grant of temporary restraining order to release detained immigrant because of the risk of illness and "permanent injuries, disabilities, or death"), *adopted by* 2020 WL 6929700 (W.D. La. Nov. 24, 2020).

Here, Plaintiffs seek to require the federal government to continue enforcing the Title 42 Order and to categorically expel asylum seekers indefinitely without giving them the opportunity— to which they are statutorily entitled—to seek asylum and other immigration relief.  It is beyond dispute that the injunction sought by Plaintiffs would result in the expulsion of thousands of individuals to countries where they are likely to face substantial harm, thus condemning them to physical harm, suffering, sexual assault, and possibly death.  The public's interest, including that of the thousands of vulnerable migrants whom *amici* represent and advocate for, weighs decidedly against Plaintiffs' requested injunction.

### A.   The Title 42 Order Subjects Asylum Seekers to Kidnapping, Rape, Extortion, Torture, and Family Separation.

As noted above, the Supreme Court has recognized a strong public interest in ensuring that migrants are not deported to "countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436.  Similarly, Congress declared in the Refugee Act of 1980—which created the modern asylum process—that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands." Pub. L. No. 96-212, § 101(a), 94 Stat. 102.

The public interest in providing humanitarian protection to migrants fleeing persecution and in ensuring the United States' compliance with its domestic and international law obligation of *non-refoulement* applies with particular force in this case.  As the following stories demonstrate, the Title 42 Order consigns vulnerable migrants either to abuse in their home countries or to Mexican border cities where cartels and gangs—sometimes abetted by Mexican authorities—intentionally target migrants for kidnapping, rape, extortion, and torture, in direct contravention of the public interest.

The Title 42 Order has also served as an engine of government-sanctioned family separation, inflicting widespread harm as families have been separated by gang violence, deprivation and hardship, and the federal government itself.  Given the trauma and dangers that migrants suffer upon their expulsion, denying Plaintiffs' requested injunction is overwhelmingly in the public interest.

**1.**    **The Public Interest Is Furthered by Not Sending Migrants to Places Where They Risk Substantial Harm.**

Organized gangs in Mexico commonly abuse migrants expelled under the Title 42 Order, especially those who are most vulnerable.  Not only are individuals expelled from the United States easily identifiable, but many lack the resources to protect themselves, such as access to even the most basic shelter.  Denied the opportunity to seek refuge under U.S. law, they are faced with the Hobson's choice of remaining in Mexico—vulnerable to exploitation, violence, and death—or returning to their home countries, which often presents an even graver threat to their safety.

**Gabriel**,[8] for example, fled his home country of Honduras with his wife and three young children after gangs killed three of his wife's siblings, tried to kill his brother, burglarized Gabriel's home, severely beat him after he reported the burglary to the police, and threatened to kill him and his family.  Although Gabriel received asylum for himself and his family in Mexico, he was forced to flee yet again when the gangs from Honduras tracked him to Mexico to take revenge.  U.S. immigration officials expelled Gabriel, his wife and children, and his brother to Mexico under the Title 42 Order in February 2021.  Because they feared for their lives in Honduras, Gabriel's family remained in Mexico, hoping that it would be less dangerous, even though they often went hungry and were repeatedly threatened by gangs.  In July 2021, gang members kidnapped Gabriel and his brother for ransom, subjecting both men to physical abuse until they were able to escape.

The story of Gabriel's family is unfortunately typical of many families who have sought protection from persecution in the United States, only to be expelled to hardship and trauma in

---

[8] *Amici* have used pseudonyms for all individuals whose stories are shared in this brief.  Supporting documentation for each story is held by the individual's attorney of record.

Mexico.  The abuse these families experience harms the entire family, with lasting repercussions. **Sebastian**, for instance, is a seven-year-old Black Honduran boy who witnessed the violent rape of his mother by a gang after they were expelled to Mexico under the Title 42 Order.  When Sebastian's mother later turned to the Mexican police for help, the police taunted Sebastian's mother, asking how much she would charge to give them a turn.  As advocates have documented, Mexican authorities are known to discriminate against migrants, especially Black migrants.[9]   Sebastian's post-traumatic stress and depression endure, and he has repeatedly told his mother that he wants to die.[10]

The experiences of **Luz**, a sixteen-year-old girl from Honduras, are similarly agonizing.  Luz and her mother fled to the United States because the head of a local gang was trying to force Luz to have a sexual relationship with him.  After nearly two months of perilous travel to seek safety in the United States, U.S. border authorities expelled Luz and her mother to Mexico under the Title 42 Order in July 2021.  Because they feared what would happen to them if they returned to Honduras, the family remained in Mexico, surviving on little to eat and finding places to sleep on the street and in abandoned homes.  While in Mexico, they were assaulted and robbed by Mexican officials attempting to prevent immigrants from approaching the river.  In a separate incident, a group of men also attacked them, raping Luz and attempting to rape her mother.  The Mexican police refused to provide any assistance.  Luz still suffers emotionally and psychologically from her rape, and both

---

[9] Nisha Venhat, *Black Immigrants Are Facing Rampant Racism in Mexico While Waiting for US Asylum: "We Have No Choice,"* Buzzfeed News (March 27, 2021), *available at* https://www.buzzfeednews.com/article/nishavenkat/black-immigrants-racism-mexico-asylum; *see also Mexico: Abuses Against Asylum Seekers at US Border*, Human Rights Watch (Mar. 5, 2021), *available at* https://www.hrw.org/news/2021/03/05/mexico-abuses-against-asylum-seekers-us-border ("Nearly half of those interviewed said Mexican police, immigration agents, or criminal groups targeted them for extortion.").

[10] In another instance, **Graciela**, a Honduran mother also expelled under the Title 42 Order with her eight-year-old daughter and six-year-old son, considers herself "lucky" because although she and her children were kidnapped in Mexico after their expulsion, the kidnappers gang-raped her in a separate room so that her children did not have to watch.

she and her mother need therapy to cope with the trauma they experienced in Mexico because of their expulsion.

As these stories illustrate, the Title 42 Order sends families into a nightmare that no one would wish on another human.  The public interest weighs in favor of preventing such harm from being imposed upon migrants who merely seek refuge—particularly when COVID-related public health measures have long been relaxed as to every other category of traveler to the United States.

### 2.    The Public Interest Is Furthered by Policies that Support Family Unity.

The public interest also weighs heavily in favor of ending enforcement of the Title 42 Order because it has too often resulted in the traumatic separation of minor children from their only caregivers.  These separations have many proximate causes, including violence in Mexico, the desperation to survive after being expelled, and the actions of U.S. immigration officials.  But regardless of their most direct causes, these family separations—and the concomitant trauma inflicted on all family members, especially minor children—could be avoided by ending the Title 42 Order.  Family separation "is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development."  *Ms. L. v. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1147 (S.D. Cal. 2018).  The public interest favors not only preventing such traumatic harm to families, *see Nken*, 556 U.S. at 436, but also "upholding and protecting" migrants' constitutionally protected right to "family integrity and association while their immigration proceedings are underway."  *Ms. L.*, 310 F. Supp. 3d at 1148; *see also Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (holding that "preventable human suffering" outweighs "financial concerns" with "little difficulty"); *Chambless Enter. LLC*, 508 F. Supp. 3d at 123 ("any economic harm pales in comparison to the significant loss of lives") (citation omitted). The fact that terminating the Title 42 Orders will prevent countless family separations is an additional reason why doing so is in the public interest.

Indeed, the Title 42 Order all too often results in the expulsion of vulnerable families into the waiting hands of gangs and cartels, which means that gang violence often causes traumatic family

11

separation that harms both parents and children.  **Isabel**, for example, was captured along with her husband by the Zetas cartel and separated from her two young daughters, ages four and nine, just hours after she and her family were expelled from the United States.  While nearly nine months pregnant, this wife and mother initially fled Honduras with her family after a gang killed two of her brothers—including one who was only fourteen years old—and violently attacked her husband because she told the gang that she could not pay them "protection" money.  She felt she had no choice but to leave to save her family.

When Isabel and her family attempted to seek safety in the United States in February 2021, they were expelled by U.S. border officials under the Title 42 Order.  Immediately following their expulsion, Isabel's family walked along the riverbank for four hours in search of a safe place to cross, desperate to reach safety.  When they finally attempted to cross, they found that the river was quite deep—reaching up to Isabel's husband's chest—so, like any father, he carried their children across the river first.  But while her husband was bringing their girls across, a black pick-up truck approached Isabel.  Men jumped out of the truck, grabbed Isabel by the hair, and threw her to the ground.  When Isabel's husband tried to come to her aid, the gang attacked and subdued him, capturing them both.  They were held for ransom in Mexico for over two weeks, while Isabel was nine months pregnant—and with no idea what had happened to their daughters.

The cartel, which threatened constantly to kill Isabel's husband, eventually released Isabel after she begged for the life of her unborn child.  She eventually gave birth to her baby girl in a Mexican hospital three weeks after her family had been expelled under the Title 42 Order.  Isabel's third daughter, however, weighed only three pounds at birth and required intensive medical care because the cartel had starved Isabel for weeks before her daughter's delivery.  When Isabel's husband finally escaped the Zetas and found her and their new baby at the hospital, he was so thin and malnourished that she did not recognize him.

While in the hospital, Isabel and her husband saw one of their daughters on a news program featuring interviews with children who had been "abandoned" at the U.S.-Mexico border.  They were subsequently contacted by U.S. immigration officials who accused Isabel of abandoning her

children at the border and stated that they could not allow Isabel and her husband to come to the United States to be with their children because of the Title 42 Order.  Eventually, Isabel and her husband were granted a humanitarian exception and were allowed to reunite with their daughters.

The hardship and danger that families face after their expulsion to Mexico also predictably cause traumatic family separation.  **Javier**, for example, is a sixteen-year-old boy who was forced into labor by a gang in Honduras and, as the only means of escape, fled to the United States with his parents and older brother.  In April 2021, Javier's family attempted twice to enter the United States to apply for asylum, but they were expelled both times under the Title 42 Order.  The family was returned to extraordinarily dangerous conditions in Mexico: the Mexican police harassed and extorted the family, and they also narrowly escaped an attempted kidnapping by the cartel in Ciudad Juárez. Out of desperation to protect their child, Javier's parents sent him across the border alone to keep him safe.  Fortunately, Javier crossed the border safely, after which he was identified as a victim of trafficking because of the labor he had been forced to provide in Honduras, and was taken into custody as an unaccompanied child. Javier remains severely traumatized by the experience.

In addition to family separations wrought by the actions of gangs or by the hardship families suffer in Mexico after being expelled, the practical, day-to-day enforcement of the Title 42 Order has also resulted in family separation.  To enforce the Title 42 Order, for example, Border Patrol officers separated **Esperanza**, a thirteen-year-old girl, from her older sister, who had turned eighteen just one day before they presented themselves at the port of entry to apply for asylum.  After a hurricane destroyed their home in Honduras and gangs started pursuing Esperanza's sister, the girls' mother had sent them to the United States with their family's entire savings.  At the border, CBP officers took Esperanza into custody as an unaccompanied child and expelled her sister—her only caregiver—to Mexico.  Esperanza now has only limited contact with her sister, with whom she has been unable to reunite.  Esperanza remains distraught over the separation and terrified for her sister.

Beyond separating children from older siblings and other family members, the Title 42 Order has also separated children from their parents.  For instance, **Daniel** and his two-year-old daughter were separated from his wife and six-year-old stepson when they attempted to cross the border to

13

apply for asylum in August 2021.  CBP admitted Daniel's wife and stepson pursuant to a humanitarian exception, but he and his toddler were expelled.  Daniel and his daughter were forced to stay in a crowded migrant shelter in a dangerous neighborhood in Tijuana while his wife and stepson were able to connect with extended family members in Virginia.  The separation from her mother has been severely traumatic for Daniel's two-year-old daughter, who has lost weight, suffers from numerous health issues, and displays extreme emotional swings from disconnect or withdrawal to tantrums where she cries hysterically, begging for her mother.  Daniel feels powerless to alleviate her trauma.

The experience of **Marisa** and her separation from her children is equally harsh.  After her husband was killed, Marisa fled El Salvador with her eleven- and fifteen-year-old sons to protect them.  They went directly to the border but were quickly expelled under the Title 42 Order.  After facing the conditions in Mexico, they attempted to enter the United States a second time.  On this second attempt, Marissa and her children spent seven hours wading through the river, then another hour walking, as Marisa bled from a wound on her stomach from a recent surgery.  Along this journey, they were stopped by local sheriffs' deputies, who handed the family over to CBP officials. Despite showing her children's birth certificates, Marisa was accused of trafficking her own children and then expelled under the Title 42 Order while her children were taken from her and put into custody.  After she was expelled, Marisa was taken into custody by the Mexican federal police and handed over to the cartels, who subjected her to extensive sexual, physical, and psychological abuse. The cartels tied her up and left her for dead with several other women, and she survived only because she found her way to safety after walking through the desert for days without water or food.

Although each of these families has suffered, and continues to suffer, trauma under the Title 42 Order in their own unique way, the substantial harm of family separation is common to them all and stems directly from the ordinary operation of the Title 42 Order.  The public interest weighs heavily in favor of ending the continued mass, summary expulsions under the Title 42 Order, and the Court should decline Plaintiffs' request to subject more vulnerable families to harm and the trauma of family separation.

14

**B.**     **Ending the Title 42 Order is Also In the Public Interest Because It Would Prevent Further Unnecessary Traumatization of Unaccompanied Children.**

Ending the Title 42 Order is also in the public interest because it would ensure that unaccompanied migrant children are treated humanely and permitted to access unique rights expressly granted to them under U.S. law.  Indeed, treatment of those children provide an even more acute illustration of the harms the Title 42 Order inflicts on those most vulnerable.

The story of **Nicolás** is illustrative.  For years as he was growing up in Honduras, Nicolás was persecuted because of his sexual orientation.  As he faced increasing threats on his life and safety, he fled his home at the age of 17, embarking on a 2,000-mile journey to seek the safety of the United States.  As he neared the U.S. border and prepared to request asylum, however, Nicolás was kidnapped in a Mexican border city by members of an organized crime cartel.  Although Nicolás was able to escape his captors and make it to the border, where he requested asylum, the federal government detained him and scheduled him for an expulsion flight back to Honduras.  It was only because the flight was delayed for several days due to Hurricane Hanna that an attorney called U.S. immigration officials in time to inquire on his behalf.  Through her advocacy, she persuaded the government to transfer Nicolás—as well as his cellmate, another Honduran boy booked onto the same expulsion flight—into the custody of the Office of Refugee Resettlement ("ORR"), a subagency of the U.S. Department of Health and Human Services, as unaccompanied children. Nicolás was later united with a sponsor in the United States who provided care for him as he pursued asylum.  With the help of *pro bono* legal counsel, an asylum officer found that Nicolás was indeed entitled to asylum.  He is now beginning his life in the United States, free from violence and persecution.

But for the stroke of luck that allowed him to prove he qualified for asylum, Nicolás's story is not otherwise unique.  Many other children have fled violence and persecution in their home countries to seek security in the United States, only to be further traumatized on their perilous journeys to the U.S. border.  **Samuel** fled his hometown in Mexico at the age of 15 after being repeatedly targeted by an organized crime cartel for his refusal to join the gang.  Samuel was pursued

by the cartel even while on his journey to the United States, and was kidnapped by cartel members in a border city as he prepared to ask for asylum.  He, like Nicolás, was fortunate to escape and ultimately made it to a port of entry where he requested asylum.  **Nora** and **Alma** fled their home countries in Central America at the age of 16 after being repeatedly sexually assaulted and tortured by cartel members.  Both Nora and Alma were targeted by gangs on their journeys north, and were attacked and sexually assaulted before reaching the United States.

Because of Defendants' exception from the Title 42 Order at the time for unaccompanied children, Nicolás, Samuel, Nora, Alma, and some others have been able to pursue their asylum claims in the United States with the assistance of legal counsel rather than being returned to the violence and persecution they had escaped.  But many have not been so fortunate.  For example, under the prior administration, thousands of such children were turned back at the border or expelled without being given an opportunity to request asylum or to access any of the rights Congress specially created for them.[11]  *See P.J.E.S.*, 502 F. Supp. 3d at 509 (more than 2,000 unaccompanied children were expelled under the Title 42 Order between April and July 2020).  In some cases, U.S. officials returned children to the country from which they fled; in others, the government expelled children to Mexico where the children had already encountered violence on their journey to the United States.  Whatever the outcome, however, the circumstances for these children were dire.

For example, **Isaías**, a 15-year-old from Honduras, fled his home after he received death threats from gang members who had repeatedly targeted his family.  When he presented himself to U.S. immigration officials last summer to apply for asylum, Isaías was detained and later placed on a plane.  Isaías thought would be traveling to New York to reunite with a family member and was devastated to realize upon landing that he had been flown back to the very country he had just fled.

---

[11] Hamed Aleaziz, *Border Officials Turned Away Unaccompanied Immigrant Children More Than 13,000 Times Under Trump's Pandemic Policy*, BuzzFeed News (Oct. 28, 2020), *available at* https://www.buzzfeednews.com/article/hamedaleaziz/border-officials-turned-away-unaccompanied-immigrants (reporting that there were more than 13,000 encounters with unaccompanied children, resulting in expulsions under the Title 42 Order through October 2020).

Since being returned to Honduras, Isaías has been pursued by the same gang members who had threatened to kill him.

     **Pablo** had a similar experience. He left Honduras at the age of 13 after his father was murdered by cartel members.  After traveling by himself to the U.S. border to seek asylum, Pablo was detained for several days and then placed on a deportation flight to Honduras.  **Mateo** and **Ramón** have a similar story.  The sixteen- and fourteen-year-old brothers from Mexico fled their home after being repeatedly targeted by local cartels.  After one particularly severe attack, which placed the boys in the hospital for over a month, the brothers presented at the U.S. border to seek asylum; they were then expelled back to Mexico.

<p align="center">* * * * *</p>

     As these and other stories demonstrate, the Title 42 Order has resulted in the return of children and families to the same violence and persecution that drove them to leave their homes and seek protections afforded under U.S. law—without ever having the chance to be considered for humanitarian protection.  This is not what Congress intended. *See* 8 U.S.C. §§ 1232(a)(5)(D), 1229a (requiring DHS to place children in immigration proceedings, where they can seek all forms of immigration relief available to them, before they can be removed from the United States).  Nor is it in accordance with the public interest in ensuring that their government is not returning individuals "to the countries where they are likely to face substantial harm."  *Nken*, 556 U.S. at 436; *accord Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011) (finding public interest weighs in favor of a stay where the migrant argued for the public interest in "ensuring that we do not deliver [individuals seeking asylum] into the hands of their persecutors").  Given this interest, and the humanitarian concerns central to immigration policy, *see Arizona v. United States*, 567 U.S. 387, 395–96 (2012) (noting that the enforcement of "immigration policy can affect," among other things "human concerns"), the public interest is decidedly in favor of terminating the Title 42 Order.

## CONCLUSION

Plaintiffs' request that this Court require Defendants to summarily expel all asylum-seeking migrants under the Title 42 Order disserves the public interest. As discussed above, these individuals, *amici*, and the public at large have a compelling interest in ensuring that asylum-seekers' rights to access Congressionally created protections are respected and that these individuals are not unlawfully removed to countries where they are likely to be persecuted and experience extreme suffering and trauma. The Court should deny the Motion for Preliminary Injunction.

Dated: May 5, 2022

<div style="margin-left:40%">

*/s/ Mary Yanik*
Mary Yanik, LA Bar No. 36973

*/s/ Gabriela Cruz*
Gabriela Cruz, LA Bar No. 40149

Tulane Immigrant Rights Clinic
6329 Freret St, Suite 130
New Orleans, Louisiana 70118-6248
Telephone: (504) 865-5153
Facsimile: (504) 862-8753
myanik@tulane.edu
gcruz@tulane.edu
*Admitted to Practice in W.D. La*

*/s/ Esther H. Sung*
Esther H. Sung,* CA Bar No. 255962

*/s/ Karen Tumlin*
Karen C. Tumlin,* CA Bar No. 234691

Justice Action Center
P.O. Box 27280
Los Angeles, California 90027
Telephone: +1 323 450 7275
karen.tumlin@justiceactioncenter.org
esther.sung@justiceactioncenter.org
*\*pro hac vice applications forthcoming*

</div>