# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

STATE OF ARIZONA, *et al.*,

           Plaintiffs,

v.

CENTERS FOR DISEASE CONTROL & PREVENTION, *et al.*,

           Defendants

Case No. 6:22-cv-00885-RRS-CBW

---

**BRIEF FOR *AMICI CURIAE* DOCTORS OF THE WORLD, EPIDEMIOLOGISTS, PUBLIC HEALTH AND MEDICAL EXPERTS, IN SUPPORT OF DEFENDANTS**

---

Jacob K. Weixler, 36076
WEIXLER LAW LLC
P.O. Box 52197
New Orleans, LA 70152-2197
Phone: (504) 408-2180
Fax:    (504) 814-1728
jkw@weixlerlaw.com

*Counsel for Amici Doctors of the World, and certain Epidemiologists, and Public Health and Medical Experts*

**TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ................................................................................................1
INTRODUCTION ..........................................................................................................................2
ARGUMENT ..................................................................................................................................4
I. THE TITLE 42 ORDER WAS INEFFECTIVE AS A PUBLIC HEALTH MEASURE BUT VISITED SERIOUS HARM ON REFUGEES BY PREVENTING THEM FROM SEEKING ASYLUM IN THE UNITED STATES ............................................................................................4
II. THE IMPLEMENTATION OF TITLE 42 CREATES ADDITIONAL PUBLIC HEALTH RISKS BY CREATING OPPORTUNITIES FOR INCREASED COVID-19 TRANSMISSION. 7
III. THE GOVERNMENT CAN END TITLE 42 TO PROTECT PUBLIC HEALTH, WHILE ALSO TAKING OTHER STEPS TO PROTECT THE PUBLIC FROM COVID-19 ...................8
IV. PUBLIC HEALTH CONCERNS ABOUT SPREADING OF CURRENT AND FUTURE COVID-19 VARIANTS DEMAND A MULTIFACETED PUBLIC HEALTH RESPONSE, NOT THE DENIAL OF ASYLUM..................................................................................................9
CONCLUSION .............................................................................................................................11

## TABLE OF AUTHORITIES

**Statutes**

42 U.S.C. § 265 …............................................................................................................. 2

**Regulations**

85 Fed. Reg. 17060 (2020) ............................................................................................... 4

## INTEREST OF *AMICI CURIAE*

As epidemiologists, public health and medical experts, we file this *amicus* brief to express our grave concerns about requiring the federal government to reinstate the Title 42 order based on which it has, since March 2020, been summarily expelling persons seeking asylum at U.S. land borders without considering their claims to protection. Some of us are epidemiologists or other infectious disease experts who previously worked for the Centers for Disease Control and Prevention, and/or are affiliated with some of the nation's leading public health programs or medical schools. It is our professional duty as scientists and medical professionals to protect the health of individuals and communities. With that duty comes an obligation to speak out against the misuse of public health policy to do harm. Many of the signatories of this Brief have worked at the forefront of the response to COVID-19 and have developed recommendations to both the current and the prior Administration on how safely to process people requesting refuge at U.S. borders in the midst of this pandemic. We have a profound interest in the outcome of this case, which goes to the core of our professional commitments to evidence-based COVID-19 mitigation measures and respect for the health and rights of migrants, including the right to seek asylum.

# INTRODUCTION

The forced expulsion policy at issue in this case, promulgated pursuant to 42 U.S.C. § 265 ("Title 42"), bars non-citizens from applying for asylum and other humanitarian protections in the United States at its land and sea borders, including at ports of entry, ostensibly to protect public health during the COVID-19 pandemic. Since its inception, epidemiologists and public health experts have concluded that the orders issued pursuant to Title 42 have no basis in science, discriminate against asylum seekers, disregard public health measures that can protect public health while preserving access to asylum and have "fueled the xenophobic trope that migrants are vectors of disease."[1] In force since March 2020, the Title 42 orders have exacted a terrible toll on the lives and well-being of asylum seekers, who have been deprived of their right under domestic and international law to seek protection and returned to face violence and death. As epidemiologists, public health experts, and medical professionals, we have been and remain deeply troubled by the use of U.S. public health laws as a pretext to override humanitarian laws and treaties that provide life-saving protections to refugees seeking asylum in the United States. On April 1, 2022, the Centers for Disease Control and Prevention ("CDC") rightly announced the termination of the Title 42 order and scheduled that termination to go into effect on May 23, 2022.[2]

In their motions to the Court seeking to block the termination of the Title 42 order, Plaintiffs focus their arguments on claimed harms to their states surrounding the immigration

---

[1] Monette Zard, Katherine McCann, Michele Heisler, Paul B. Spiegel & Ronald Waldman, *Public health law must never again be misused to expel asylum seekers: Title 42*, NAT. MED. (2022), available at https://www.nature.com/articles/s41591-022-01814-2; *see* Michael R. Ulrich & Sondra S. Crosby, *Title 42, asylum, and politicising public health*, 7 THE LANCET 100124 (Nov. 17, 2021), available at https://www.thelancet.com/journals/lanam/article/PIIS2667-193X(21)00120-4/fulltext.

[2] U.S. Dep't. of Homeland Security, "Statement by Secretary Mayorkas on CDC's Title 42 Order Termination" (Apr. 1, 2022), available at https://www.dhs.gov/news/2022/04/01/statement-secretary-mayorkas-cdcs-title-42-order-termination.

effects of ending the order, including financial strain on public benefits, additional border enforcement obligations, and healthcare costs, concerns remote from the public health interests §265 of Title 42 was enacted to protect. As epidemiologists and public health experts writing in the New England Journal of Medicine recently concluded: "[t]here was — and remains — no public health evidence that singling out asylum seekers or other migrants for exclusion is effective in stemming the spread of Covid-19."[3] While the underlying statutory authority by its plain terms aimed to prevent the *introduction* of communicable diseases into the United States, the CDC had already identified community transmission of COVID-19 before it first issued the Title 42 expulsion order.[4] Over two years later, there is no question that community transmission within the United States, and not the introduction of the virus from Mexico, is driving the spread of COVID-19.[5]

In this situation, public health authorities need to focus on mitigation measures that are known to work. Plaintiffs equate all COVID-19-related public health measures, criticizing the current administration for seeking to maintain mask mandates, for example, while simultaneously ending the Title 42 order. The government can end the ineffective and harmful Title 42 expulsion order while taking other steps, at the U.S.-Mexico border and elsewhere, to protect the public from

---

[3] Anne G. Beckett et al., *Misusing Public Health as a Pretext to End Asylum — Title 42*, 386 THE NEW ENGLAND JOURNAL OF MEDICINE (Apr. 21, 2022), available at https://www.nejm.org/doi/full/10.1056/NEJMp2200274#:~:text=The%20Biden%20administration's%20ongoing%20use,displayed%20by%20the%20Trump%20administration.

[4] U.S. Centers for Disease Control and Prevention, "CDC Announces Additional Covid-19 Presumptive Positive Cases," (Feb. 28, 2020), https://www.cdc.gov/media/releases/2020/s0228-additional-COVID-19-cases.html; U.S. Centers for Disease Control and Prevention, "CDC Confirms Possible Instance of Community Spread of COVID-19 in U.S." (Feb. 26, 2020), https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html; Jorden MA, Rudman SL, et al., *Evidence for Limited Early Spread of COVID-19 Within the United States, January–February 2020*, 69 MORBIDITY AND MORTALITY WEEKLY REPORT 680-84 (June 5, 2020) available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6922e1.htm.

[5] *See, e.g.*, "Dr. Fauci refutes Republican misconceptions on Covid-19 spread," CNN (Oct. 3, 2021), https://www.cnn.com/videos/politics/2021/10/03/dr-fauci-coronavirus-spread-immigrants-and-tourists-sot-sotu-vpx.cnn (Dr. Anthony Fauci, Chief Medical Advisor on COVID-19, stating: "Let's face reality here. . . . The problem is within our own country. . . . Focusing on immigrants, expelling them. . . is not the solution to an outbreak.").

3

COVID-19. With better understanding of the modes of transmission of SAR-CoV-2 and more means of mitigating it than existed at the beginning of the pandemic, and with wide availability of effective vaccines and other interventions, the United States is well equipped to process asylum seekers safely.

Given the serious harms and lack of public health protection inherent in the Title 42 order, this Court should deny Plaintiffs motion for a preliminary injunction.

## ARGUMENT

### I. THE TITLE 42 ORDER WAS INEFFECTIVE AS A PUBLIC HEALTH MEASURE BUT VISITED SERIOUS HARM ON REFUGEES BY PREVENTING THEM FROM SEEKING ASYLUM IN THE UNITED STATES

The Title 42 order is scientifically unsupported as a public health measure, but does harm migrants and asylum seekers. Over two years into this pandemic, the order has continued to exploit the COVID-19 pandemic to expel or repel from the United States people seeking asylum, with profound consequences for those asylum seekers and no benefit to public health.

The original order, issued on March 20, 2020, invoked a rarely used provision of U.S. health law — Section 265 of Title 42 of the U.S. Code — to allow the federal government, on the grounds of public health, to immediately turn away and expel people arriving at the border seeking asylum protection. 85 Fed. Reg. 17,060 (Mar. 26, 2020). Even at the time the Title 42 order was first issued, COVID-19 infections were far higher in the United States than in any other country in the Americas.[6] At the same time, other travelers, including returning U.S. citizens and residents arriving by land as well as those arriving on non-immigrant visas by plane or ship, were able to enter the United States without being tested for SARS-CoV-2, even though the latter modes of transport were explicitly listed by the Department of Health and Human Services (HHS) as

---

[6] *See*, World Health Organization, "Coronavirus disease 2019 (COVID-19) Situation Report – 61" (Mar. 20, 2020), https://apps.who.int/iris/bitstream/handle/10665/331605/nCoVsitrep21Mar2020-eng.pdf?sequence=1&isAllowed=y.

4

congregate settings with higher risk of disease transmission than land travel.[7] The initial Title 42 order was promulgated despite the reported objections of senior CDC career scientists.[8]

In fact, "[a]sylum seekers represent a small fraction of the travelers who cross the border; in the same period in which 1 million asylum seekers were expelled, nearly 100 million other travelers were admitted at U.S. land borders."[9] The Title 42 orders thus singled out asylum seekers and other migrants for exclusion based on their legal status, a form of discrimination lacking any basis in public health.[10] There is no evidence that noncitizens who lack documentation are more likely to transmit SARS-CoV-2 than are residents, citizens, or tourists entering the country. In practice, the sustained use of Title 42 has exploited public health authority as a "cover" to expel particular groups of non-citizens.[11]

Since it first went into effect, over 1.8 million people have been expelled from U.S. borders under the Title 42 orders.[12] Refugees seeking protection at the U.S. border subjected to Title 42

---

[7] U.S. Dep't of Health and Human Services & Centers for Disease Control and Prevention, "Control of Communicable Diseases; Foreign Quarantine; Suspension of Introduction of Persons into the United States from Designated Foreign Countries or Places for Public Health Purposes," 85 Fed. Reg. 16559, 16561 (Mar. 20, 2020).
[8] Jason Dearen & Garance Burke, "Pence ordered borders closed after CDC experts refused," ASSOCIATED PRESS (Oct. 3, 2020), available at https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae; Michelle Hackman, Andrew Restuccia & Stephanie Armour, "CDC Officials Objected to Order Turning Away Migrants at Border," WALL STREET JOURNAL (Oct. 3, 2020), available at https://www.wsj.com/articles/cdc-officials-objected-to-order-turning-away-migrants-at-border-11601733601; Camilo Montoya-Galvez, "Top CDC official told Congress migrant expulsion policy was not needed to contain COVID," CBS NEWS (Nov. 12, 2021), available at https://www.cbsnews.com/news/cdc-official-told-congress-migrant-expulsion-policy-not-needed-to-contain-covid/.
[9] Beckett et al., *supra* note 3.
[10] Joanna Naples-Mitchell, "There is No Public Health Rationale for a Ban on Asylum Seekers," Just Security (Apr. 20, 2020), https://www.justsecurity.org/69747/there-is-no-public-health-rationale-for-a-categorical-ban-on-asylum-seekers/; *see also* Beckett et al., *supra* note 3 ("There was — and remains — no public health evidence that singling out asylum seekers or other migrants for exclusion is effective in stemming the spread of Covid-19.").
[11] This distortion of public health authority has also proved ineffective as a means of border control. As of March 2022, the percentage of non-citizens encountered at the southern border multiple times within the prior 12 months had risen to 28 percent, compared to an average of 14 percent in FY 2014 to 2019, prior to the implementation of the Title 42 orders. *See* U.S. Customs and Border Protection, "CBP Releases March 2022 Monthly Operational Update" (Apr. 18, 2022), available at https://www.cbp.gov/newsroom/national-media-release/cbp-releases-march-2022-monthly-operational-update.
[12] U.S. Customs and Border Protection, "Nationwide Encounters," available at https://www.cbp.gov/newsroom/stats/nationwide-encounters (last accessed May 4, 2022).

have been deprived of their right to seek asylum. According to multiple reports,[13] the Title 42 order, which has also been used by the Department of Homeland Security (DHS) to shut down asylum processing at ports of entry, has pushed migrants to make repeated attempts to cross into the United States through often dangerous locations in the desert, across the Rio Grande, and by sea away from U.S. ports of entry – resulting in record numbers of deaths.[14] Asylum seekers expelled under the Title 42 order have suffered physical and verbal abuse at the hands of border officials, been detained in inhumane conditions, and separated from their families.[15] Asylum seekers have described to public health researchers having been expelled under extremely dangerous conditions.[16] Asylum seekers, including those with children, have been returned very late at night to border towns in Mexico, when they would be much less likely to reach a shelter, placing them at heightened risk of being targeted for attack by cartels.[17] The policy has resulted in at least 10,250 reports of murder, kidnapping, rape, torture and other violent attacks against migrants and asylum seekers blocked in or expelled to Mexico due to Title 42 since the current

---

[13] *See, e.g.*, Human Rights First "'Illegal and Inhumane': Biden Administration Continues Embrace of Trump Title 42 Policy as Attacks on People Seeking Refuge Mount" (Oct. 2021), https://www.humanrightsfirst.org/sites/default/files/IllegalandInhumane.pdf; "Examining Title 42 and the Need to Restore Asylum at the Border," Hearing Before the Subcomm. on Border Security, Facilitation, & Operations of the Comm. on Homeland Security(Apr. 6, 2022) (testimony of Aaron Reichlin-Melnick) available at https://www.americanimmigrationcouncil.org/sites/default/files/research/ending_title_42_and_creating_an_orderly_humanitarian_protection_system_testimony.pdf.

[14] Priscilla Alvarez, "At least 650 migrants died crossing the US-Mexico border, the most since 2014, international agency says" (Dec. 9, 2021), available at https://www.cnn.com/2021/12/09/politics/migrants-dying-crossing-us-mexico-border/index.html ("At least 650 people died attempting to cross the US-Mexico border this year, more than any other year since [the International Organization for Migration] began documenting deaths in 2014.").

[15] *See* Human Rights First, *supra* note 15; Human Rights First, "Human Rights Travesty: Biden Administration Embrace of Trump Asylum Expulsion Policy Endangers Lives, Wreaks Havoc" (Aug. 2021), https://www.humanrightsfirst.org/resource/human-rights-travesty-biden-administration-embrace-trump-asylum-expulsion-policy-endangers; Human Rights First, "Failure to Protect: Biden Administration Continues Illegal Trump Policy to Block and Expel Asylum Seekers to Danger" (Apr. 2021), https://www.humanrightsfirst.org/resource/failure-protect-biden-administration-continues-illegal-trump-policy-block-and-expel-asylum.

[16] Physicians for Human Rights, "Neither safety nor health: how title 42 expulsions harm health and violate rights" (July 28, 2021), https://phr.org/our-work/resources/neither-safety-nor-health/.

[17] *See* Human Rights First, *supra* note 15.

administration took office.[18] Human rights reporting from Human Rights First, The Haitian Bridge Alliance, and Al Otro Lado predicts exacerbated harm to asylum seekers and migrants, should the CDC be forced to continue Title 42.[19]

Plaintiffs ask the Court to grant a preliminary injunction, requesting the Court to bless their arguments that alleged harms to the States, unrelated to public health, justify overruling the CDC's decision to rescind the Title 42 order. The Court should decline to grant this injunction, and the CDC should retain its ability to rescind the Title 42 order.

## II. THE IMPLEMENTATION OF TITLE 42 CREATES ADDITIONAL PUBLIC HEALTH RISKS BY CREATING OPPORTUNITIES FOR INCREASED COVID-19 TRANSMISSION

Summary expulsions of migrants are not among the public health measures known to work to reduce the transmission of SARS-CoV-2 and, if anything, make matters worse. The execution of these expulsions under Title 42 poses public health risks, particularly in holding asylum seekers and migrants in congregate settings pending expulsion when they could have been quickly processed under Title 8.

During earlier stages of the Title 42 expulsions, after the Mexican State of Tamaulipas began refusing to accept the expulsion of families with children under the age of seven, DHS developed a practice of holding some asylum seekers and migrants in Customs and Border Protection (CBP) facilities at the border for days in crowded conditions before expelling them from

---

[18] Human Rights First, "Human Rights First Tracker of Reported Attacks During the Biden Administration Against Asylum Seekers and Migrants Who Are Stranded in and/or Expelled to Mexico," https://www.humanrightsfirst.org/sites/default/files/Attacks%20on%20Asylum%20Seekers%20Blocked%2C%20Expelled%2C%20or%20Returned%20to%20Mexico%20During%20Biden%20Administration%204.26.2022.pdf (last accessed Apr. 29, 2022).

[19] Human Rights First, Al Otro Lado, Haitian Bridge Alliance, "Extending Title 42 Would Escalate Dangers, Exacerbate Disorder, and Magnify Discrimination" (Apr. 27, 2022), https://www.humanrightsfirst.org/resource/extending-title-42-would-escalate-dangers-exacerbate-disorder-and-magnify-discrimination.

locations on the border hundreds of miles away from where they had crossed.[20] This practice increased the risk of COVID-19 spread, further demonstrating that the Title 42 order was not intended to and did not protect public health. Currently, expulsions that are being carried out by plane to Haiti and Colombia among other countries involve transferring those being expelled from various areas along the border to staging areas for expulsion flights.[21] CBP holding facilities in Laredo, Texas, for example, have been used to gather people for expulsion to Haiti, with the result that, in many cases, they are held for several days in congregate settings before being expelled—when they could have been more quickly processed under Title 8 and transferred or released to a shelter providing testing and quarantine.[22] Should the CDC be required to reverse its termination of the Title 42 order, the policy will continue to threaten public health and undermine public health measures to address the pandemic.[23]

### III. THE GOVERNMENT CAN END TITLE 42 TO PROTECT PUBLIC HEALTH, WHILE ALSO TAKING OTHER STEPS TO PROTECT THE PUBLIC FROM COVID-19

In rescinding the Title 42 order because it does not protect public health, the CDC may also choose to continue to implement other science-based public health measures, both at the U.S.-Mexico border and elsewhere, to prevent the further spread of COVID-19. Contrary to Plaintiffs' assumption, there is no inconsistency between rejecting one measure adopted in the name of COVID-19 mitigation and pursuing other proven measures. These choices can and must be made

---

[20] American Immigration Council, "A Guide to Title 42 Expulsions at the Border" (Oct. 2021), https://www.americanimmigrationcouncil.org/sites/default/files/research/title_42_expulsions_at_the_border.pdf.
[21] Witness at the Border, "ICE Air Flights, April 2022 and Last 12 Months" (May 2, 2022), https://static1.squarespace.com/static/5e221cacff87ba2d2833cf54/t/62702a304cc5fa08e7d01a40/1651518001115/ICE+Air+Apr+2022+v2THCPDF.pdf.
[22] Anna Giaritelli, "Haitian migrants arriving at border being flown to Haiti in twice-a-day flights under Biden: Sources," WASHINGTON EXAMINER (Jan. 10, 2022), available at https://www.washingtonexaminer.com/restoring-america/fairness-justice/haitian-migrants-arriving-at-border-being-flown-to-haiti-in-twice-a-day-flights-under-biden-sources
[23] Physicians for Human Rights, *supra* note 18.

according to science-based determinations of what is actually effective, determinations that can be adjusted as conditions change and the science on SAR-CoV-2 transmission and mitigation evolves. Indeed, many of the undersigned public health experts outlined and previously shared with U.S. officials science-based public health measures, such as high-quality masks, timely testing, access to vaccination, and social distancing, that would allow for the safe and effective processing of asylum seekers at the border.[24] The Title 42 orders failed to further public health and disregarded alternative measures that can protect public health while preserving access to asylum and other protection.[25]

## IV. PUBLIC HEALTH CONCERNS ABOUT SPREADING OF CURRENT AND FUTURE COVID-19 VARIANTS DEMAND A MULTIFACETED PUBLIC HEALTH RESPONSE, NOT THE DENIAL OF ASYLUM

COVID-19 variants are already present in the United States. There is no indication that variants of concern originated in persons crossing the southern border.[26] Title 42 cannot prevent the introduction of COVID-19 variants, but the United States can use other effective and multifaceted responses to protect public health. Increased transmission of SAR-CoV-2 and the emergence of new variants reinforces the need to adhere to evidence-based mitigation measures.

---

[24] *See e.g.,* "Public Health Recommendations for Processing Families, Children and Adults Seeking Asylum or Other Protection at the Border" (Dec. 2020), available at https://www.publichealth.columbia.edu/sites/default/files/public_health_recommendations_for_processing_families_children_and_adults_seeking_asylum_or_other_protection_at_the_border_dec2020_0.pdf; "Letter from Epidemiologists and Public Health Experts to CDC Director and HHS Secretary" (Sept. 1, 2021), available at https://www.publichealth.columbia.edu/node/76271; "Letter on Vaccination at the Southern Border" (Jan. 14, 2022), available at https://www.publichealth.columbia.edu/research/program-forced-migration-and-health/january-2022-letter-vaccination-southern-border.

[25] Naples-Mitchell, *supra* note 12; Lucas Guttentag & Stefano Bertozzi, "Trump Is Using the Pandemic to Flout Immigration Laws," NY TIMES (May 11, 2020), https://www.nytimes.com/2020/05/11/opinion/trump-coronavirus-immigration.html; Dr. Chris Beyrer & Yael Schacher, "Expelling Asylum Seekers is not the Answer," Refugees International (Apr. 27, 2020), https://www.refugeesinternational.org/reports/2020/4/26/expelling-asylum-seekers-is-not-the-answer-us-border-policy-in-the-time-of-covid-19.

[26] U.S. Centers for Disease Control and Prevention, "SARS-CoV-2 Variant Classifications and Definitions," available at https://www.cdc.gov/coronavirus/2019-ncov/variants/variant-classifications.html (last accessed May 4, 2022).

As epidemiologist and public health experts have previously noted that there is a "scientific consensus" that the risks posed by variants "can be mitigated through public health measures."[27] The CDC termination order lays out various mitigation efforts, including the use of now widely available rapid tests, provision of vaccinations, availability of treatments, and better understanding of how to mitigate the spread of the virus in congregate settings, to protect the public health while also restarting asylum in the United States.[28] By consistently implementing effective public health measures — including but not limited to enabling social distancing, providing appropriate personal protective equipment, and ensuring frequent testing, in addition to offering vaccination — risks to the public and asylum seekers arriving in the United States can be effectively managed.

The existence of the Omicron variant and its subvariants, and the likelihood of future variants of concern that may diminish vaccine efficacy serve as a reminder of the importance of a multilayered health response and the need for the CDC to follow evidence-based public health measures.[29] Indeed, the Omicron variant highlights that community transmission within the United States, and not introduction of the virus from Mexico, is driving the spread of COVID-19. Public health authorities need to focus on mitigation measures that are known to work. The Title 42 order is not one of them.

---

[27] "Letter from Epidemiologists and Public Health Experts to CDC Director and HHS Secretary" (Sept. 1, 2021), available at https://www.publichealth.columbia.edu/node/76271;

[28] U.S. Centers for Disease Control and Prevention, "Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists" (Apr. 1, 2022), available at https://www.cdc.gov/coronavirus/2019-ncov/cdcresponse/Final-CDC-Order-Prohibiting-Introduction-of-Persons.pdf.

[29] *See, e.g.*, Statement of Dr. Megan Coffee, Assistant Professor, Population and Family Health, Columbia University Mailman School of Public Health, "The Omicron variant has been a game changer in many ways, but it has not changed what works. The same public health measures work. We just need to use them." (Jan. 14, 2022) available at https://www.publichealth.columbia.edu/research/program-forced-migration-and-health/epidemiologists-and-public-health-experts-reiterate-urgent-call-end-title-42.

## CONCLUSION

Title 42 is not an effective public health mechanism but does harm asylum seekers by blocking them from seeking safety. Through multifaceted and science-based public health measures, the CDC can protect both public health and the rights of asylum seekers. For the foregoing reasons, the Court should deny the Plaintiff's Motion for Preliminary Injunction.

*Doctors of the World*
By and Through Ronald Waldman, MD MPH
Board President, Doctors of the World
Professor Emeritus, Milken Institute School of Public Health,
The George Washington University

*Individual Signatories*
*Institutional Affiliation for Identification Purposes Only

Joseph J. Amon, PhD MSPH
Clinical Professor and Director of the Office of Global Health
Dornsife School of Public Health,
Drexel University*

Bonnie Arzuaga, MD
Attending Pediatrician, Board Certified
Boston Children's Hospital*

Jennifer Balkus, PhD MPH
Assistant Professor and Infectious Disease Epidemiologist
Department of Epidemiology,
University of Washington School of Public Health*

Lawrence Belcher, MD
Harvard Medical School*

Chris Beyrer, MD
Desmond M. Tutu Professor
Johns Hopkins Bloomberg School of Public Health*

Juliana Bol, PhD
Assistant Professor
Columbia University, Mailman School of Public Health*

Sara Casey, DrPH MPH
Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health*

Luz Castellanos, MD
Massachusetts General Hospital*

Adriana Cohen, MD
Massachusetts General Hospital*

Megan Coffee, MD PhD
Assistant Professor
Heilbrunn Department of Population and Family Health
Columbia University, Mailman School of Public Health

Joanne Csete, PhD MPH
Adjunct Associate Professor
Columbia University Mailman School of Public Health*

Thomas J. Csordas, PhD
Distinguished Professor of Anthropology
Director, UCSD Global Health Institute
University of California, San Diego*

Fiona Danaher, MD MPH
Director, MGH Center for Immigrant Health
Massachusetts General Hospital*

Ryan Dodge, MD
Resident Physician
Massachusetts General Hospital*

Mark Eisenberg, MD
Harvard Medical School*

Wafaa El-Sadr, MD MPH MPA
University Professor, Dr. Mathilde Krim-amfAR Chair of Global Health
Columbia University, Mailman School of Public Health*

Hope Ferdowsian, MD MPH FACP FACPM
Associate Professor of Medicine, University of New Mexico School of Medicine
President/CEO, Phoenix Zones Initiative*

Paul J. Fleming, PhD MPH
Assistant Professor
University of Michigan, School of Public Health*

Linda P. Fried
Dean
Columbia University, Mailman School of Public Health*

Lynn R. Goldman, MD MS MPH
Dean
Milken Institute School of Public Health
The George Washington University*

Annekathryn Goodman, MD
Professor of Obstetrics, Gynecology, and Reproductive Biology Harvard Medical School
Massachusetts General Hospital*

Lawrence O. Gostin, JD
University Professor
Founding Linda D. & Timothy J. O'Neill Professor of Global Health Law
Faculty Director, O'Neill Institute for National & Global Health Law
Georgetown University Law School*
Director, World Health Organization Collaborating Center on Public Health Law & Human Rights*

Claire Greene, PhD MPH
Assistant Professor
Program on Forced Migration and Health
Heilbrunn Department of Population and Family Health,
Columbia University, Mailman School of Public Health*

Kim Griswold, MD MPH
Professor Emerita of Family Medicine, Psychiatry, Public Health and the Health Professions
The Jacobs School, SUNY at Buffalo*

Jill Guernsey de Zapien
Director, Border, Transborder and Binational Public Health Collaborative Research
Mel and Enid Zuckerman College of Public Health, University of Arizona*

Rohini J. Haar, MD MPH
Adjunct Professor
Division of Epidemiology and Biostatistics
School of Public Health, University of California at Berkeley*

Michele Heisler, MD MPA
Professor of Internal Medicine and Public Health
University of Michigan*

Maia Ingram, MPH
Program Director, Arizona Prevention Research Center
Mel and Enid Zuckerman College of Public Health,
University of Arizona*

Felipe A. Jain, MD
Massachusetts General Hospital and Harvard Medical School*

Radhika Jain, MD
Massachusetts General Hospital*

Monik Jiménez, SM ScD
Associate Epidemiologist
Brigham and Women's Hospital*

S. Patrick Kachur, MD MPH
Professor, Population and Family Health
Columbia University Medical Center*

Jennifer Kasper, MD MPH
Assistant Professor of Pediatrics and Global Health & Social Medicine
Harvard Medical School*

Vandana Madhavan, MD MPH
Clinical Director, Pediatric Infectious Disease
Massachusetts General Hospital*

Katherine Miller, MD
Assistant Professor of Medicine
Harvard Medical School*

Michael Nabil Khoury, MD
Emory University School of Medicine*

William D. Lopez, PhD MPH
Clinical Assistant Professor
University of Michigan*

Joseph B. McCormick, MD MS
James H. Steele Professor of Epidemiology
University of Texas, Health Science Center at Houston, School of Public Health*

Terry McGovern, JD
Harriett and Robert H. Heilbrunn Professor
Chair, Heilbrunn Department of Population and Family Health
Columbia University Mailman School of Public Health*

Katherine C. McKenzie, MD
Yale Center for Asylum Medicine*

Cecilia Menjívar, PhD
Professor
Dorothy L. Meier Chair in Social Equities
Department of Sociology
University of California, Los Angeles*

Michael O. Mensah, MD MPH
Yale School of Medicine, National Clinician Scholars Program*

Ranit Mishori, MD MHS FAAFP
Senior Medical Advisor
Physicians for Human Rights*

Rahul Nayak, MD
Massachusetts General Hospital*

Parveen Parmar, MD MPH
Associate Professor, Clinical Emergency Medicine
University of Southern California*

Anne R. Pebley, PhD
Distinguished Professor and Fred H. Bixby Chair
Fielding School of Public Health,
University of California Los Angeles*

Katherine R. Peeler, MD MA
Assistant Professor of Pediatrics
Harvard Medical School

Paulina A. Rebolledo, MD MSc
Assistant Professor of Medicine
Emory University*

Adam Richards, MD PhD MPH
Associate Professor of Global Health and Medicine
The George Washington University*

Goleen Samari, PhD MPH
Assistant Professor
Program on Forced Migration and Health
Heilbrunn Department of Population and Family Health
Columbia University, Mailman School of Public Health*

John Santelli, MD MPH
Professor, Population and Family Health and Pediatrics
Columbia University*

Jaime Sepulveda, MD DSc MPH
Executive Director, Institute for Global Health Sciences
University of California, San Francisco*

Joshua M. Sharfstein, MD
Professor of the Practice of Health Policy and Management
Johns Hopkins Bloomberg School of Public Health*

Leigh H. Simmons, MD
Massachusetts General Hospital*

Craig Spencer, MD MPH
Director of Global Health in Emergency Medicine
Columbia University, Irving Medical Center*

Steffanie Strathdee, PhD
Harold Simon Distinguished Professor, Associate Dean of Global Health Sciences
University of California, San Diego*

Til Stuermer, MD PhD MPH
Professor and Chair
Department of Epidemiology
University of North Carolina, Chapel Hill*

Monette Zard, MA
Allan Rosenfield Associate Professor of Forced Migration and Health
Columbia University, Mailman School of Public Health*

Amy Zeidan, MD
Assistant Professor of Emergency Medicine
Co-director Georgia Human Rights Clinic
Emory University, School of Medicine*

Respectfully submitted,

*/s/ Jacob K. Weixler*
Jacob K. Weixler, 36076
WEIXLER LAW LLC
P.O. Box 52197
New Orleans, LA 70152-2197
Phone: (504) 408-2180
Fax:    (504) 814-1728
jkw@weixlerlaw.com

*Counsel for Amici Doctors of the World, and certain Epidemiologists, and Public Health and Medical Experts*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all counsel of record on May 6, 2022 via the Court's CM/ECF electronic filing system.

*/s/ Jacob K. Weixler*
JACOB K. WEIXLER

17