**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| THE STATE OF ARIZONA,<br>By and through its Attorney General, Mark<br>Brnovich, et al.,<br><br>PLAINTIFFS,<br><br>v.<br><br>CENTERS FOR DISEASE CONTROL &<br>PREVENTION; et al.,<br><br>DEFENDANTS. | CIVIL ACTION NO. 6:22-cv-00885-RRS-CBW |

**PLAINTIFF STATES' REPLY IN SUPPORT OF
THEIR MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

INTRODUCTION ............................................................................................................1

I.   This Court Has Jurisdiction To Grant The States' Preliminary Injunction Request...............4

    A.   The States' Have Article III Standing.................................................................5

        1.   The Traceability Requirement Is Doubly Relaxed Here ............................5

        2.   The States' Statistical Evidence Alone Establishes Traceability................8

        3.   CDC's Contrary Arguments Lack Merit....................................................9

        4.   The States' Injuries Are Far More Traceable Here Than In *Massachusetts* and *Department of Commerce* ....................................................................11

    B.   Plaintiff States' Harms Readily Satisfy The "Not Especially Demanding" Zone of Interest Test ...........................................................................................12

    C.   CDC Does Not Have Unlimited And Unreviewable Discretion Under § 265..............14

II.  The States Are Likely To Prevail On The Merits Of Their Notice-And-Comment Claim..17

    A.   The Termination Order Failed To Establish Good Cause Exception Applies ............17

        1.   CDC Had Ample Time To Conduct Notice And Comment. Its Failure To Do So Violates Controlling Fifth Circuit Precedent Ignored By CDC. .............................17

        2.   Director Walensky's Closed Mind Does Not Constitute "Good Cause"..............19

        3.   There Are No "Pandemic" Or "Short-Term Serial Extension" Exceptions To Notice-And-Comment Requirements..........................................................19

        4.   The Existence Of Good Cause When A Rule Is Issued Does Not Create Parallel Good Cause For Repealing Or Terminating It...........................................20

        5.   CDC Failed To Explain Why It Could Extend The Termination Only Until May 23, But Not Long Enough To Take Public Comments ...........................................21

        6.   CDC's Unexplained Faith In DHS Does Not Constitute "Good Cause" .............21

    B.   The Termination Order Failed To Justify Invoking The Foreign Affairs Exception...22

        1.   CDC's Attempt To Water Down The Governing Standard Fails .........................22

        2.   CDC's Reliance On Post-Hoc Rationales And Extra-Record Evidence Contravenes Foundational Principles Of Administrative Law................................23

        3.   CDC's Post-Hoc, Extra-Record Rationale Fails In Any Event ..............................24

III. The States Are Likely To Prevail On The Merits Of Their Arbitrary-And-Capricious Claim 25

    A.   The Termination Order Is Arbitrary and Capricious........................................................25

        1.   The CDC unlawfully refused to consider State reliance interests...........................26

        2.   CDC selectively considered immigration consequences only for DHS.................28

IV.  The Remaining TRO/Preliminary Injunction Factors Support The States...........................30

V.   This Court Should Enter A Nationwide Injunction..................................................................31

CONCLUSION......................................................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Alabama Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) ...................................................................................................19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982) .........................................................................................................7

*American Radio Relay League, Inc. v. FCC,*
  524 F.3d 227 (D.C. Cir. 2008) .......................................................................................23

*American Textile Mfrs. Institute, Inc. v. Donovan,*
  452 U.S. 490 (1981) .......................................................................................................25

*Arizona v. Biden,*
  31 F.4th 469 (6th Cir. 2022) ........................................................................................8, 9

*Arizona v. United States,*
  567 U.S. 387 (2012) .......................................................................................................13

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) .........................................................................................21

*Capital Area Immigrants' Rts. Coal. v. Trump,*
  471 F. Supp. 3d 25 (D.D.C. 2020) ...........................................................................24, 25

*City of Edmonds v. Oxford House, Inc.,*
  514 U.S. 725 (1995) .......................................................................................................24

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) .........................................................................................12

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ..........................................................................................5, 12, 13

*DHS v. Regents of the Univ. of Calif.,*
  140 S. Ct. 1891 (2020) ................................................................................17, 25, 26, 30

*Ellison v. Connor,*
  153 F.3d 247 (5th Cir. 1998) .........................................................................................17

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) .......................................................................................16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) .........................................................................................................5

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) .......................................................................................................17

*Louisiana v. Becerra,*
  __ F. Supp. 3d __, 2022 WL 16571 (W.D. La. January 1, 2022) ..................................21

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ......................................................................................................2, 6

*Mach Mining, LLC v. EEOC,*
   575 U.S. 480 (2015)......................................................................................................17

*Massachusetts v. EPA,*
   549 U.S. 497 (2007).........................................................................................2, 6, 7, 13

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923)........................................................................................................7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012).................................................................................................. 3, 14

*Metro. Stevedore Co. v. Rambo,*
   515 U.S. 291 (1995)........................................................................................................7

*Michigan v. EPA,*
   576 U.S. 743 (2015)......................................................................................................25

*Motor Vehicle Mfrs. Ass'n. of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)........................................................................................................22

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015)........................................................................................................22

*Petry v. Block,*
   737 F.2d 1193 (D.C. Cir. 1984) ...................................................................................22

*Sierra Club v. EPA,*
   939 F.3d 649 (5th Cir. 2019).........................................................................................30

*Sierra Club v. U.S. Army Corps of Engineers,*
   295 F.3d 1209 (11th Cir. 2002).....................................................................................31

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) .................................................................................................. 5, 6

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021)...........................................................................................3

*Texas v. Biden,*
   20 F.4th 928 (5th Cir. 2021).................................................3, 5, 7, 8, 9, 14, 17, 28, 29, 30

*Texas v. Biden,*
   No. 21-CV-0579, __ F. Supp. 3d __ 2022 WL 658579 (N.D. Tex. Mar. 4, 2022) ................ 3, 16, 18

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020).........................................................................................17

*Texas v. United States,*
   555 F. Supp. 3d 351 (S.D. Tex. 2021) ............................................................................7

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015)...................................................................................5, 6, 7

*United States v. Johnson,*
   632 F.3d 912 (5th Cir. 2011)....................................................................................4, 19

*Western Watersheds Project v. Kraayenbrink,*
   632 F.3d 472 (9th Cir. 2011).........................................................................................26

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
139 S. Ct. 361 (2018)..............................................................................................17

*Whitman v. Am. Trucking Ass'n*,
531 U.S. 457 (2001).................................................................................................32

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980).......................................................... 24, 25, 26, 27

## STATUTES

42 U.S.C. § 265..............................................................................................17, 31, 32

42 U.S.C. § 268...........................................................................................................2

42 U.S.C. § 268(b)....................................................................................................10

5 U.S.C. § 701(a)(2)...................................................................................................4

## REGULATIONS

42 C.F.R. § 71.40................................................................................................20, 31

42 C.F.R. § 71.40(c)................................................................................................17

42 C.F.R. § 71.40(d)................................................................................................32

87 Fed. Reg. 19,949................................................................................................28

## OTHER AUTHORITIES

Dana Blanton, *Majority want Title 42 coronavirus border restrictions to remain*, Fox News (May 3, 2022)
https://fxn.ws/3P2u23U....................................................................................27

*CDC Recommendation for Masks and Travel* (May 3, 2022),
https://www.cdc.gov/media/releases/2022/s0503-covid-19-travel.html.......................15

Joseph Biden, Remarks at the White House (August 3, 2021),
https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/08/03/remarks-by-
president-biden-on-fighting-the-covid-19-pandemic/...........................................................19

*Say No to Raw Dough*, CDC, https://www.cdc.gov/foodsafety/communication/no-raw-dough.html
....................................................................................................................18

# INTRODUCTION

Defendants' opposition brief offers no persuasive basis to depart from this Court's prior conclusion that the "Plaintiff States have demonstrated a likelihood of success on the merits with respect to, at a minimum, their claim that the April 1st Termination Order was not issued in compliance with the Administrative Procedure Act," ("APA"). 4/25/22 Tr. at 5:1-4. Thankfully, CDC[1] has now dropped some of its weakest prior arguments, including purported (1) lack of final agency action, (2) lack of cognizable interest in immigration enforcement, (3) and a jurisdictional bar under 8 U.S.C. § 1252. *See* TRO Opp. (Doc. 27) 5-10. But *only some*. And those that remain continue to lack merit. Indeed, most are squarely barred by controlling precedent that is either ignored or given only paper-thin distinctions that cannot withstand scrutiny.

Defendants' *lead* argument (at 11-15) is one that only a lawyer could love. No one here contests that (1) increased migration *will cause* the States to incur financial harms such as increased health care, education, and law enforcement costs, and (2) the Title 42 Termination Order *will substantially increase* the number of migrants, from (in DHS's estimates) about 7,000 per day to as much as *18,000* per day. PI Br. (Doc. 13-1) at 10-11. Tracing the *near tripling* of crossing from Defendants' *own estimates* to the States' harms is thus painfully straightforward here. Nor does CDC even attempt to dispute that the States have established the injury-in-fact and redressability requirements for Article III standing.

Despite these uncontested premises, CDC's out-of-the-gate argument is that the States "cannot show that their asserted harms *are traceable* to the termination of the Title 42 order." Opp. (Doc. 40) at 43 (emphasis added); *accord id.* at 4, 11-15. In CDC's view, the short causal chain here is too attenuated because "[t]he downstream impacts Plaintiffs point to are indirect and incidental, and at most traceable to operations of the immigration scheme mandated by Congress." *Id.* at 4.

---

[1]  For ease of reference, "CDC," "DHS," and "Federal Defendants" are used interchangeably herein to refer to all Defendants except where context indicates otherwise.

That is preposterous. No one possessing a modicum of common sense could fail to connect the dots here. Indeed, even the Administration's *own supporters* readily understand the obvious causal connection here—which is why so many of them are running for the hills. PI Br. at 1-2. In addition, DHS has a *mandatory duty* under 42 U.S.C. § 268 to enforce CDC's Title 42 Orders, so the chain of causation between the Termination Order and increased processing of migrants into the United States under Title 8 is readily traceable by Congress *itself expressly connecting the two* by statute.

Moreover, the "operation[] of the immigration scheme" is completely irrelevant for the hundreds of thousands of "gotaways" that will circumvent Defendants' "immigration scheme" entirely simply by evading DHS apprehension. Once the Order becomes effective, DHS will predictably struggle *and fail* to catch/process even more of these greatly increased number of crossers, resulting in more gotaways. Indeed, Secretary Mayorkas has admitted that DHS has failed to apprehend approximately 200,000-400,000 "gotaways" *with Title 42 in place*. The harms from those gotaways thus flow directly from the Termination Order without *any* operation of DHS's "immigration scheme" as an intermediate attenuating step.

Remarkably, CDC advances this traceability argument even though the *ordinary* standing test requires only that the States' injuries be "*fairly traceable* to the challenged action." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up) (emphasis added). And that normal traceability test is doubly relaxed here, both due to the States asserting procedural injuries under the APA and possessing "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 518-20 (2007).

CDC's next argument is only slightly less specious. In its view, the Termination Order's "increase of noncitizens in their states [falls] outside the zone of interest protected by the statute, 42 U.S.C. § 265." Opp. at 2. But the Fifth Circuit has squarely held that additional migrants lead to the States "spend[ing] more on healthcare." *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021) *cert. granted* 142 S. Ct. 1098 (2022); *see also Texas v. Biden*, 10 F.4th 538, 548 (5th Cir. 2021) (holding standing

2

established because "at least some MPP-caused immigrants will certainly seek educational and healthcare services from the state").

Because healthcare spending and system capacity are not infinite, those increased strains on the States' systems necessarily imperil the States' ability to provide health care provided to their own lawfully-present citizens. That easily satisfies the "not … especially demanding" test, under which the "benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-25 (2012) (citation omitted). CDC also ignores the public health harms from unscreened/untested/unvaccinated crossers, including gotaways, as well as the fentanyl and other drugs that will predictably be smuggled into the U.S. undetected as DHS agents are busy processing the additional crossers. In addition, CDC's apparent premise—that *only* the federal government is legitimately interested in addressing the Covid-19 pandemic—is both contrary to, and contemptuous of, fundamental principles of federalism essential to our system of dual sovereignty.

CDC's final jurisdictional argument—that all determinations it makes under Section 265 are committed to agency discretion and thus completely unreviewable by courts—flouts controlling precedent. "By default in APA cases, [federal courts] presume reviewability." *Texas v. Biden*, 20 F.4th at 978. And while CDC may enjoy considerable discretion under § 265, it is nowhere near the unlimited and completely unreviewable discretion that CDC now arrogates to itself. For that reason, another district court has already squarely rejected this precise argument. *See Texas v. Biden*, No. 21-CV-0579, __ F. Supp. 3d __ 2022 WL 658579, at *11 (N.D. Tex. Mar. 4, 2022). This Court should too.

On the merits, CDC violated the APA first by refusing to engage in notice-and-comment rulemaking, as neither the "good cause" nor "foreign affairs" exceptions applies. The former is inapplicable because CDC had *ample time* to comply with notice-and-comment procedures. Indeed, CDC admits that termination of Title 42 has been under active consideration for *14 months* under Executive Order 14,410. That was more than enough time to conduct notice and comment, which is

the critical inquiry in the Fifth Circuit under *United States v. Johnson*, 632 F.3d 912, 929 (5th Cir. 2011)) (cleaned up)—a case that CDC ignores completely.

CDC's single-sentence foreign affairs rationale, which merely alludes to conversations with foreign governments, also failed to establish that the latter exception applies. Implicitly recognizing the Termination Order's patent deficiency on this score, CDC attempts to backfill a new rationale with a declaration outside the administration record. But this reliance on *post hoc* rationales violates core principles of administrative law and further does not satisfy the governing test in any event.

The Termination Order is also arbitrary and capricious under binding authority. CDC was *required* to consider the States' reliance interests and the burdens that would be inflicted upon them, but it *expressly refused to do so*. Its rationales—that Title 42 Orders were temporary and being challenged legally—are ones that both the Supreme Court and Fifth Circuit have squarely rejected. Similarly, CDC's refusal to consider the immigration consequences of its actions contradicts the APA, its own statutory authority, and the Termination Order itself—which considered just such consequences in delaying the effective date until May 23. CDC's refusal to employ that same authority to consider other immigration consequences (such as the resulting harms to the States) is arbitrary and capricious.

Because all of the requirements for a preliminary injunction are met here, this Court should enjoin all implementation of the Termination Order pending resolution of the merits here.

## ARGUMENT

## I.   This Court Has Jurisdiction To Grant The States' Preliminary Injunction Request

CDC advances three arguments that this Court lacks jurisdiction to hear the States' APA claims: (1) lack of Article III standing, (2) the States falling outside of § 265's zone of interest, and (3) all determinations under § 265 being "committed to agency discretion," 5 U.S.C. § 701(a)(2), and thus completely beyond any judicial review. All three contentions lack merit.

4

A.      **The States' Have Article III Standing**

To seek injunctive relief, a plaintiff "must show [(1)] that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; [(2)] it must be fairly traceable to the challenged action of the defendant; and [(3)] it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted). The first and third requirements are undisputed here: CDC does not contest (nor could it contest) that the States *will* suffer imminent harm if the Termination Order goes into effect and that an injunction against implementation of it would remedy those harms. Only the second requirement is genuinely disputed here.[2]

1.      **The Traceability Requirement Is Doubly Relaxed Here**

The ordinary Article III traceability test is not particularly demanding: a plaintiff need only show that its harms are "*fairly* traceable to the challenged action of the defendant." *Id.* (emphasis added). This normal standard is notably *less* rigorous than proximate causation. *See*, *e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). Instead, "Article III 'requires no more than *de facto* causality.'" *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (citation omitted).

But here the traceability requirement is *doubly* relaxed from the ordinary "fairly traceable"/"*de facto* causality" standard. It is first relaxed because the States are asserting "procedural right[s] to protect [their] concrete interests." *Lujan*, 504 U.S. at 572 n.7 (observing that "[t]here is this much truth to the assertion that 'procedural rights' are special"). The States can thus assert their procedural rights under the APA "'without meeting all the normal standards for redressability and immediacy.'" *Massachusetts*,

_____

[2] CDC appears at times (at 13-14) to half-heartedly recycle its argument that the States' harms are not cognizable. Not so. *See Texas v. Biden*, 20 F.4th at 990; *Texas v. United States,* 809 F.3d 134, 154 (5th Cir. 2015); *accord* TRO Reply at 7-8 (citing same cases, which go unrebutted here).

549 U.S. at 498 (quoting *Lujan*, 504 U.S. at 573 n.7).

Traceability is relaxed a second time here because States are "entitled to special solicitude" under courts' standing analysis. *Id.* at 520; *accord Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015) *aff'd by an equally divided court* 136 S. Ct. 2271 (2016) (applying *Massachusetts*'s relaxed "special solicitude" to conclude that the States' "causal connection [wa]s adequate").

Notably, this sharp relaxation as to traceability (and redressability) stands in stark contrast to "the requirement of injury in fact[, which] is a hard floor of Article III jurisdiction." *Summers*, 555 U.S. at 497. But the States' satisfaction of that "hard floor" is undisputed (and undisputable) here.

CDC never disputes that traceability requirements are relaxed because the States assert procedural injury—ignoring that consideration entirely. *See* PI Mem. at 11; *see generally* Opp. at 11-15. Nor does CDC even *argue* that its traceability arguments can prevail under that at-least-singly relaxed standard. That silent concession alone is nearly dispositive of Article III standing here.

CDC does dispute that the States are entitled to special solicitude here. But that argument squarely contravenes controlling precedent. Specifically, CDC contends (at 12) that for "quasi-sovereign interest[s]" the "State cannot assert such an injury against the United States."

Respectfully, this contention is pushing the bounds of fair argument and continues Defendants' pattern of ignoring controlling Fifth Circuit authority. *Texas v. Biden* explicitly recognizes that States *can* assert quasi-sovereign interests against the federal government, directly holding that the termination of the Migrant Protection Protocol ("MPP"), "by authorizing the presence of many previously unlawful aliens in the United States, [DHS] affected 'quasi-sovereign interests'" of the plaintiff states, thereby making them "entitled to special solicitude in the standing inquiry." *Texas v. Biden*, 20 F.4th at 969-70. Similarly, the Fifth Circuit held that because "DAPA affects the states' 'quasi-sovereign' interests" they "are entitled to 'special solicitude.'" *Texas v. United States*, 809 F.3d at 154. These are both square holdings that are controlling here.

Indeed, while CDC contends that Supreme Court decisions in 1982 and 1923 precluded the States asserting quasi-sovereign interests against the federal government, it ignores that those cases offered mere dicta that the 2007 *Massachusetts* decision decisively rejected: "Given … Massachusetts' stake in protecting its *quasi-sovereign interests,* the Commonwealth is entitled to *special solicitude* in our standing analysis." 549 U.S. at 520 (emphasis added). That more-recent holding trumps any fleeting contrary dicta in *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) and *Massachusetts v. Mellon*, 262 U.S. 447 (1923). *See, e.g., Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 300 (1995) ("Breath spent repeating dicta does not infuse it with life."). Defendants' arguments thus squarely violate *Texas v. Biden*, *Texas v. United States*, and *Massachusetts*, all of which explicitly recognize that the States *can* assert quasi-sovereign interests against the federal government to obtain "special solicitude."[3]

In establishing traceability then, the Termination Order is, like the MPP termination, "precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents." *Texas v. Biden*, 20 F.4th at 971. The States can thus rely on "big-picture evidence." *Id.* Notably, although Federal Defendants have challenged other aspects of *Texas v. Biden* in the Supreme Court, they have not even attempted to take issue with *Texas v. Biden*'s

---

[3] To be sure, *Snapp* and *Mellon* do appear to suggest that the States cannot rely on a *parens patriae* theory *alone* to establish standing. It is doubtful whether their dicta survives *Massachusetts*. *See Massachusetts*, 549 U.S. at 520 n.17 (disavowing CDC's instant reading of *Mellon* and making clear that Article III "allow[s] a State to assert its rights under federal law," including (as here) APA claims and recognizing that States may assert against the federal government "quasi-sovereign rights actually invaded or threatened" (emphasis omitted)). Following *Massachusetts*, "a long train of federal courts have applied or mirrored the Supreme Court's careful circumscription of *Mellon* to hold that a state may bring a *parens patriae* action against the federal government where it does not challenge the operation of a federal statute and it asserts a proper right." *Texas v. United States*, 555 F. Supp. 3d 351, 379 (S.D. Tex. 2021), *appeal dismissed* 2022 WL 517281 (5th Cir. 2022) (collecting cases).

But that is ultimately irrelevant here: the States are not relying on *parens patriae* standing as the sole basis for standing, but rather relying on quasi-sovereign interests to obtain "special solicitude" in analyzing whether they have Article III standing based on their other interests, such as pecuniary/proprietary harms. In truth, none of this likely matters as the States' proprietary injuries are so obviously traceable here that no special solicitude/relaxation is required (and the relaxation of traceability for procedural injuries is undisputed and unaddressed by CDC here in any event).

standing holdings, which were non-waivable (and hence fair game) in the Supreme Court. But Defendants refused to raise any standing arguments there. PI Br. at 12; TRO Reply at 3. And despite the States repeatedly raising that point here, *id.*, Defendants have never answered it—while recycling the *very same* standing arguments expressly rejected in the Fifth Circuit and then abandoned by DHS.[4]

### 2.   The States' Statistical Evidence Alone Establishes Traceability

The States readily satisfy this doubly relaxed traceability standard. Ironically, DHS itself has already supplied the requisite tracing evidence, by estimating itself (*i.e.*, tracing) the effect of the Termination Order as increasing the number of daily border crossers from 7,000 per day to as many as *18,000*. PI Br. at 10-11. That is precisely the sort of "large-scale statistics and figures" and "big-picture evidence" that is sufficient. *Texas v. Biden*, 20 F.4th at 971. Indeed, numbers rarely (if ever) come any bigger. And while the States have repeatedly made this point about statistical/big-picture evidence under *Texas v. Biden* (PI Br. at 12, TRO Reply at 3-4), Defendants have never answered it.[5]

The demonstrated ability of Federal Defendants, the White House, Members of Congress, and virtually everyone else to trace the effect of the Order to a resulting surge in crossings should tell

---

[4]  CDC also attempts (at 11) to denigrate *Texas v. Biden* as being a case solely premised on "'driver's-license-based-injury.'" But it also—just as this one—involved increased *healthcare costs*. 20 F.4th at 969 (basing standing in part on increased number of migrants requiring States to "spend[] more on healthcare"). It also involved, as here, educational costs. *Texas*, 10 F.4th at 548 ("[A]t least some MPP-caused immigrants will certainly seek educational and healthcare services from the state.").

[5]  Rather than meaningfully engaging with what controlling *Fifth* Circuit precedent provides, CDC instead (at 11-13) seeks refuge in *Sixth* Circuit precedent, *Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022). But that decision cannot overrule the Fifth Circuit's square holdings that (1) the States are entitled to special solicitude, (2) their harms are cognizable, and (3) that "downstream" harms, such as the healthcare costs, are sufficient to establish standing. CDC is welcome to rely upon that out-of-circuit decision to seek Supreme Court review of Fifth Circuit law based on that apparent circuit split, but this Court is bound by that controlling authority in the meantime.

  Moreover, the author of that opinion expressly cautioned that it "should be taken with a grain of adjudicative salt. Imperatives of speed in decisionmaking—less than a week since the last brief was filed—do not always translate into accuracy in decisionmaking." *Id.* at 483 (Sutton, J., concurring). CDC's attempt to substitute binding, unequivocal Fifth Circuit precedent with tentative out-of-circuit precedent should be rejected.

this Court everything it needs to know. Moreover, pre-Termination statistical evidence is similarly staggering. Secretary Mayorkas recently broadly agreed that the following statistics were correct from Inauguration Day to the present *with Title 42 in place*: DHS itself has directly released 836,000 aliens into the United States and there have been "somewhere between 200,000 to 400,000 gotaways." *See* 2d St. John Decl. Ex. A. And Defendants now propose to *double or triple* the rate of crossings that have produced those already-enormous statistics. Put bluntly, there is no conceivable way to reconcile these "large-scale statistics and figures" and "big picture evidence," *Texas v. Biden*, 20 F.4th at 971, with Defendants' traceability arguments. More fundamentally, if it were so difficult to trace the Termination Order to an influx of migrants, why did CDC feel compelled to give DHS nearly eight weeks precisely to prepare for such impossible-to-trace—and yet simultaneously *completely predicted/traced*—effects?

### 3.    CDC's Contrary Arguments Lack Merit

Refusing to engage with the statistics/enormous numbers at issue here, CDC attempts (at 12) to hand-wave them all off as mere "indirect, downstream costs that are traceable to *immigration* laws" assuming they are even capable of being traced "at all"—a tiny concession that CDC will not even make here. In doing so, CDC apparently believes that its Title 42 Orders have no connection to immigration enforcement whatsoever. That astonishing position fails for at least three reasons.

*First*, Congress itself has drawn the requisite causal connection between orders under § 265 and immigration effects. DHS has a mandatory statutory under § 268 "duty" to "aid in the enforcement" of the Title 42 Orders. 42 U.S.C. § 268(b) (DHS "shall … aid").

A resulting surge in processing of migrants under Title 8—where many thousands will predictably be granted asylum and/or parole into the United States—is thus not exceedingly straightforward, but also the result flows inexorably from the statutory provisions connecting CDC's orders to DHS's mandatory immigration (non-)enforcement actions. Where Congress has explicitly connected the dots from Point A to B, there is no basis for concluding such a connection is not "fairly

traceable"—particularly under a doubly relaxed standard. But remarkably, Federal Defendants never even *acknowledge* DHS's duties under § 268 in their traceability arguments (at 11-15).

*Second*, CDC's traceability arguments simply ignore gotaways. With Title 42 in place, as much as 72.6% of those crossing into the U.S. illegally never encounter DHS and thus are never processed under Title 8 removal procedures. PI Br. at 13. That percentage may rise to as much as 90%, applied to double or even triple the number of existing gotaways. *Id.* That risk is particularly acute as DHS remarkably has only arranged for a detention capacity of 18,000 people total, *see* 2d St. John Decl. Ex. B at 2—perhaps only a single day worth of crossers under the surge—and is apparently letting some of the detention capacity it secured through no-bid contracts go completely unused. *See id.* Ex. C.

These numbers of gotaways burdening the States' health care, law enforcement, and education systems are thus likely to increase enormously. Such gotaways necessarily refute CDC's traceability arguments. Those migrants that evade apprehension never encounter Defendants' "immigration scheme," and thus that scheme cannot even conceivably break the causal chain that leads to the States' injuries. Nor can the States' harms be "downstream" of a system that never actually interacts with the relevant migrants. For gotaways, the immigration system is simply not part of the stream at all. And although the States specifically raised gotaways (at 9, 13-16), Defendants tellingly have no response.

*Third,* and relatedly, CDC ignores the entirely predictable increase in successful drug smuggling that the Termination Order will occasion. *See* PI Br. at 14-15. While DHS officers are busy processing migrants, they cannot, by definition, be interdicting drugs that flow across the border. DHS, *Southwest Border Mass Irregular Migration Contingency Plan*, (Feb. 17, 2022), AZT42AR0000956-957 (calling for increasing levels of activation of resources, including expanding efforts to include other federal agencies, in response to mass migration). Such illegal drug flows are particularly harmful now, where the U.S. is already experiencing a huge increase in illegal fentanyl smuggling and numerous resulting

deaths and other health-based harms from a full-blown opioid crisis.[6] These harms too are not even conceivably the product of the operation of immigration laws. They instead are directly traceable to the Termination Order predictably overwhelming further DHS's already-overwhelmed capacity.[7]

### 4. The States' Injuries Are Far More Traceable Here Than In *Massachusetts* and *Department of Commerce*

The flaws in CDC's traceability arguments become even more apparent by comparing this case to both *Massachusetts v. EPA* and *Department of Commerce* In both cases, the Supreme Court held that a state had established Article III standing even where the causal chain was *far* more attenuated.

In *Department of Commerce*, New York based on its Article III standing on downstream costs resulting from factors that "all … turn[ed] on [the states'] expectation that reinstating a citizenship question will depress the census response rate." 139 S. Ct. at 2565. Federal Defendants objected that traceability was lacking since "such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census." *Id.*

But even though the plaintiff states' injuries were both downstream and dependent on third parties *violating the law*, the Supreme Court *unanimously* concluded that the states had Article III standing. It was sufficient "that third parties will likely react in predictable ways" and the states could thus rely upon the "predictable effect of Government action on the decisions of third parties." *Id.* at 2566.

---

[6]  *See, e.g.*, Lauren Leslie and Drew Hill, *Teen overdose deaths on the rise and fentanyl plays a big role*, WINK News (Apr. 15, 2022), https://bit.ly/3KV7Ipx (fentanyl is "to blame for the sharp rise in teen overdose deaths that nearly doubled in one year").

[7]  CDC's only response to the drug smuggling argument is to point (at 13-14) to *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015). But the lack of traceability was obvious there: Mississippi's only evidence was "that illegal immigration is costing the state money, not that DACA is costing the state money." *Id.* at 252 (emphasis omitted). Indeed, "Mississippi submitted no evidence that any DACA eligible immigrants resided in the state." *Id.* Here, by contrast, CDC does not dispute that the Termination Order *will increase* the number of migrants unlawfully present in Plaintiff States and thereby inflict injury; the agency simply seeks to shift the blame to other "downstream" immigration programs—which tellingly by definition do not interact with either drugs or gotaways at all. Nor does *Crane* address injuries resulting from increased drug smuggling attributable loss of border control with DHS predictably overwhelmed, or indeed address drug smuggling at all. *Crane* is thus inapposite.

That "predictable effect" standard is readily satisfied here. Federal Defendants do not—and could not—dispute that the "predictable effect" of the Termination Order will be massively increased numbers of migrants crossing U.S. borders. Indeed, *Defendants themselves have predicted precisely this effect.* That alone suffices under *Department of Commerce.*

Similarly, *Massachusetts* is irreconcilable with CDC's arguments here. There, Massachusetts had standing premised on EPA's non-regulation of carbon emissions in the transportation sector in unknowable ways over the course of a *century* that would allegedly affect Massachusetts's coastline in an unknowable amount and in unknowable places, in the teeth of international carbon emissions beyond the scope of any conceivable federal regulation—but *all of that uncertainty* did not preclude Article III standing. 549 U.S. at 521-26. Massachusetts's injuries were not just downstream of innumerable third parties (*e.g.*, drivers' decisions and preferences, foreign nations' decisions) but also of immense amounts of time. But Massachusetts's injuries were nonetheless traceable because "U.S. motor-vehicle emissions [would] make *meaningful contribution* to greenhouse gas concentrations." *Id.* at 525 (emphasis added). The proposition that the Termination Order would not make a "meaningful contribution" to the volume of illegal migration into Plaintiff States here is fanciful. And the impacts here are also *far* more immediate. The States' injuries are thus readily traceable under *Massachusetts.*

## B. Plaintiff States' Harms Readily Satisfy The "Not Especially Demanding" Zone of Interest Test

CDC also argues (at 15-16) that the States' "injuries [do not] fall within the zone of interests protected by Section 265." But the zone-of-interest requirement is "not ... especially demanding," with the "benefit of any doubt goes to the plaintiff." *Patchak*, 567 U.S. at 224-25 (citation omitted). Here the States need only be "*arguably* within the zone of interests to be protected or regulated by the statute.'" *Id.* at 224 (emphasis added) (citation omitted). The States easily satisfy this undemanding standard for four reasons.

*First*, CDC ignores the *healthcare costs* and strains on the States' healthcare systems that the

12

Termination Order will occasion and, in doing so, once again ignores critical and *controlling* aspects of *Texas v. Biden*. As explained above, while belittling *Texas v. Biden* as a case solely about drivers' licenses, the Fifth Circuit specifically held that as "the total number of in-State aliens increases, the States will spend more on healthcare." *Texas v. Biden*, 20 F.4th at 969; *supra* at 8 n4.

Those additional costs are simply another way of recognizing that the Termination Order will put additional burdens on the States' healthcare systems and diminish their ability to provide healthcare to their citizens that lawfully reside in their States (including treatment of communicable diseases). After all, healthcare resources are finite, and CDC never explains how the resulting burdens on healthcare systems would not impair States' ability to deliver healthcare.

The States' diminished ability to provide healthcare to their own citizens readily falls within the public-health "zone of interest" of Section 265, and CDC does not even argue otherwise.

*Second*, CDC similarly ignores the entirely predictable public-health consequences of its Termination Order. CDC, for example, tellingly *does not deny* that DHS lacks the capacity to screen/test the surge of migrants it does encounter for Covid-19 (to say nothing of the gotaways that slip through its fingers). *See* Opp. at 41 (non-denial). Similarly, while CDC touts (at 26-27) DHS's ability "to provide vaccinations to up to 6,000 migrants a day," DHS is projecting up to *18,000 migrants* may cross a day, swamping the ability to vaccinate those encountered (and again ignoring gotaways).

Thus even simply accepting CDC's arguments at face value, it is apparent that (1) the Termination Order will cause migrants to enter the U.S. that are neither tested nor vaccinated for Covid-19, thereby causing further introduction of Covid-19 into the United States and that (2) the States' healthcare systems will therefore be forced to address additional Covid-19 cases, causing precisely the sort of injury that is squarely within Section 265's zone of interest.

*Third*, CDC again ignores the entirely predictable effect of the Termination Order leading to further smuggling of drugs such as fentanyl into the United States. *Supra* at 10-11. This, in turn, will

lead to a tragic, yet entirely predictable, increase in overdose deaths and other health consequences. Such public health harms, which will undeniably fall upon the States' healthcare systems, readily fall within Section 265's public-health zone of interest.

*Fourth*, CDC is simply wrong in recycling (at 16 n.3) its contention that the States cannot "assert[] 'qausi-sovereign interest' in the health and well-being of their citizens to bring their claims within Section 265's zone of interests." Ample controlling precedent holds otherwise. *Supra* at 6-7.

It is also worth noting the arrogant and astonishing premise necessarily lurking in CDC's argument: *i.e.*, States have no legitimate interest in public health that its Order could ever conceivably invade, and thus the States simply must accept and any all § 265 regulation by CDC as infallible and unchallengeable. That premise violates the most fundamental principles of federalism, under which the Federal Government is not the sole sovereign responsible for public health and the States very much have legitimate interests in the federal actions that injure the health of their citizenry.

### C.    CDC Does Not Have Unlimited And Unreviewable Discretion Under § 265

Before turning to the merits of CDC's arguments that determinations under § 265 are committed to CDC's unreviewable discretion, it is worth nothing CDC's own unmistakable lack of confidence in it. It is very telling that CDC has declined to raise—or even hint at—such an argument in both D.D.C. and the D.C. Circuit in *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). *See*, *e.g.*, Brief for Appellants, 2021 WL 4935466 (D.C. Cir. Oct. 21, 2021) (raising no such argument). Whether that is because those courts specialize in administrative law, because that suit were filed by the Administration's ideological allies, or for some other reason, is unclear.

In contrast, CDC did make that argument in the Northern District of Texas—and lost decisively. *Texas*, 2022 WL 658579, at \*11-12. CDC acknowledges as much, albeit in a footnote (at 18 n.4). But CDC apparently has decided not to appeal the preliminary injunction entered in that opinion, and the time for it do so expired on May 3—thus demonstrating CDC's lack of faith in it, as prevailing

on that contention would necessarily mandate a complete reversal of the injunction issued. This issue thus comes to this Court having not been made in D.D.C. and the D.C. Circuit, and made, lost, and unappealed in the Northern District of Texas. This Court should thus hesitate before putting any more credence in this argument than CDC apparently does itself.

On the merits, CDC's arguments are necessarily uphill. "By default in APA cases, [federal courts] presume reviewability." *Texas v. Biden*, 20 F.4th at 978. The committed-to-agency-discretion exception is thus read "quite narrowly." *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018)). It is limited to "those rare circumstances where the relevant statute is drawn so that a court would have *no meaningful standard* against which to judge the agency's exercise of discretion." *Weyerhaeuser*, 139 S. Ct. at 370 (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (emphasis added). CDC cannot squeeze its §265 determinations into this narrow exception.

Section 265 provides just such "meaningful standards." CDC cannot regulate all diseases, but only "communicable" ones; it cannot regulate all resulting dangers, but only "serious" ones; it cannot regulate diseases wherever located, but rather only those in "in a foreign country"; any regulation must be "required in the interest of the public health," and not on some other basis. 42 U.S.C. § 265. All of these criteria provide just such meaningful standards to permit judicial review. Indeed, such standards are *substantially* more specific than the oblique "shall endeavor" language that the Supreme Court unanimously held was a "perfectly serviceable standard for judicial review" that precluded the committed-to-discretion exception in *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486, 488 (2015). Nor does the singular use of the word "deem" render the other standards provided in § 265 suddenly meaningless. *Cf. Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (holding decision committed to

agency discretion only where "deem" language was "part of a larger scheme") (cited by CDC at 17).[8]

Moreover, even if the statutory text itself failed to supply the requisite standards to evaluate CDC's exercises of discretion, the implementing regulations supply them. As the Northern District of Texas properly observed—in a ruling that CDC did not see fit to appeal—42 C.F.R. § 71.40(c) "establishes the parameters the CDC must consider" and specifically includes "a statement of five matters" that CDC "*shall* include." *Texas v. Biden*, 2022 WL 658579, at *11-12. (emphasis in original).

CDC's only response (at 18) is to denigrate those mandatory requirements as toothless, aspirational disclosure requirements serving no function other than to "inform the public of the CDC Director's" decision, "not to inform *how* the Director should exercise her discretion." Notably, CDC's concession that public disclosure is mandatory only underscores how pernicious and prejudicial CDC's evasion of notice-and-comment requirements is. But those mandatory requirements that CDC "shall" consider are plainly more than mere disclosure requirements and instead actual criteria. *Id.*

It is further worth considering the absurd consequences that would attend to accepting CDC's arguments here. CDC, for example, has long emphatically exhorted Americans never to eat raw cookie dough under any circumstances because of the (very small) risk of salmonella infection. *See Say No to Raw Dough*, CDC, https://www.cdc.gov/foodsafety/communication/no-raw-dough.html. Unbounded by the APA's requirement of reasoned decision-making that considers all relevant factors, this makes perfect sense as the predictable product of the agency's myopic focus on communicable diseases and inability to consider any other factors. That infection risk from raw cookie dough, though minute, is preventable; CDC thus unsurprisingly gives no weight to the simple enjoyment that millions of Americans quite reasonably conclude outweighs any miniscule epidemiological risk.

Under CDC's logic, however, it could ban the import of any pre-made cookie dough under

---

[8]  *Ellison v. Connor*, 153 F.3d 247 (5th Cir. 1998) is similarly inapposite as the statutory text and implementing regulation *do* provide "meaningful standard[s]." *Weyerhaeuser*, 139 S. Ct. at 370.

§ 265—and that determination would both be entirely immune from notice-and-comment requirements and *completely unreviewable* by courts. Indeed, CDC could presumably even ban the importation of eggs, lest Americans make bootleg cookie dough in contravention of CDC's commands—and that too would be *completely unreviewable*. That cannot be the law.

Nor are similar abuses hypothetical: CDC employed its discretion under the very preceding section (§ 264) to impose an eviction moratorium—which even the President judged likely unlawful[9] even as he commanded CDC to impose it (and the agency predictably and obsequiously obeyed). The Supreme Court held that action was almost certainly unlawful. *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2488 (2021) (holding that it was "difficult to imagine" that CDC's actions were lawful). Given CDC's demonstrated willingness to act lawlessly and to serve as a willing puppet to its political marionettists, the dangers from accepting CDC's arguments that its decisions under § 265 are completely immune from judicial scrutiny are manifest.

## II. The States Are Likely To Prevail On The Merits Of Their Notice-And-Comment Claim

While CDC's Order invokes both the "good cause" and "foreign affairs" exceptions to the APA's notice-and-comment requirements, its Order fails to establish that either exception applies.

### A. The Termination Order Failed To Establish Good Cause Exception Applies

CDC had ample time to conduct notice-and-comment rulemaking during the fourteen months during which it was actively considering terminating Title 42. Its willful choice not to do so violated the APA under binding Fifth Circuit authority.

#### 1. CDC Had Ample Time To Conduct Notice And Comment. Its Failure To Do So Violates Controlling Fifth Circuit Precedent Ignored By CDC.

CDC's "good cause" reasoning fails principally because the agency had ample time to comply

---

[9] President Biden specifically acknowledged that "[t]he bulk of the constitutional scholarship says that [the action was] not likely to pass constitutional muster." Joseph Biden, Remarks at the White House (August 3, 2021), https://bit.ly/39FgsmN.

with notice-and-comment procedures and simply chose not to do so. CDC never denies that under

binding Fifth Circuit precedent, the "central question is whether 'full notice-and-comment procedures

*could have been run in the time taken to issue the challenged rule.*'" PI Br. at 20 (quoting. *Johnson*, 632 F.3d at

929 (cleaned up). Indeed, CDC tellingly never cites *Johnson even once*, even though the Plaintiff States

rely heavily upon it. *See* PI Br. at 19, 20, 22; TRO Reply at 10.

CDC never denies that, under Executive Order 14,410, it had been actively considering ending

Title 42 for *fourteen months* when it issued the Termination Order. CDC argues (at 25) nonetheless that

it was not "one continuous review during that 14-month period to reach one final decision." But CDC

cites *no* statutory or precedential authority that permits it to artificially segment its analysis so as to

evade the APA. EPA, for example, has no authority to regulate power plant emissions 30 days at a

time to avoid taking public comment. And while CDC does contend (at 22) that 42 C.F.R. § 71.40

"contemplates precisely the opposite" of notice-and-comment rulemaking, it is black-letter law that a

mere regulation cannot trump statutory mandates, such as the APA's. CDC's attempt to invoke the

good cause exception thus fails under *Johnson*, and this Court can simply end its analysis there.

At its base, CDC simply never grapples with the fundamental distinction between short-term

and permanent decisions. A single 30- or 60- extension of Title 42 does not permit notice-and-

comment rulemaking. But having built up more than *two years* of hydraulic pressure with Title 42 in

place—which even Defendants acknowledge is nearly unprecedented in its challenges thereby created

for ending it—CDC could no longer treat the permanent termination of Title 42 is a mere one-off

decision with no more consequence than one of the prior short-term exceptions. Having created the

circumstances where ending Title 42 would have calamitous results, CDC was obliged to take public

comment on that calamity before inflicting it upon the American people and the States.

For similar reasons, CDC's protest (at 21) that compliance with notice-and-comment

procedures "would have needlessly extended the operative Title 42 order" rings hollow: had CDC

begun compliance within even *nine months* after Executive Order 14,410 was issued, there need not have been any delay at all (as CDC took only five months to take and respond to comments on the initial Title 42 implementation, Opp. at 22). Any potential delay here is simply and wholly the product CDC's willful defiance of the APA, not any inherent inability to comply with it on this timetable.

### 2.   Director Walensky's Closed Mind Does Not Constitute "Good Cause"

CDC also contends (at 3) that notice-and-comment procedures can be dispensed with because "the CDC Director has already determined, in her expert judgment, that a suspension of entry is no longer necessary." But the APA's central premise is that such final determinations can typically be made only *after* receiving public comment. That Director Walensky purportedly has an incurably closed mind, unsusceptible to any comments she might receive, is not "good cause" under the APA—though it is strong evidence of arbitrary and capricious decision-making. And while the States specifically raised this point in their TRO Reply (at 11), CDC continues to have no answer to it.

### 3.   There Are No "Pandemic" Or "Short-Term Serial Extension" Exceptions To Notice-And-Comment Requirements

CDC also never answers the decisions of this Court and the Fifth Circuit holding that there is no general Covid-19 exception to notice-and-comment rulemaking. Indeed, it ignores entirely both *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 611 (5th Cir. 2021) and *Louisiana v. Becerra*, __ F. Supp. 3d __, 2022 WL 16571, at *13 (W.D. La. January 1, 2022) (collecting cases); *accord* PI Br. at 22. (Nor does CDC attempt to explain HHS's refusal to appeal this Court's *Becerra* decision.)

CDC instead doubles down on its "inherent" emergency rationale these courts have rejected, relying instead (at 23) on the purportedly inherent "emergency nature of Title 42 orders." But in doing so, CDC contradicts itself: the entire premise of the Termination Order is that the Covid-19 pandemic *is no longer an emergency* that justifies the Title 42 restrictions. CDC cannot simultaneously declare that the emergency is over and then rely on the very same putative "emergency" to escape notice-and-comment requirements. But that, quite bizarrely, is what CDC is unabashedly doing here.

    **4.**    **The Existence Of Good Cause When A Rule Is Issued Does Not Create Parallel Good Cause For Repealing Or Terminating It**

More generally, CDC's defense relies largely on a false syllogism: *i.e.*, "Just as the Title 42 orders could be issued without notice and comment to address the public health emergency caused by the pandemic, so can the operative Title 42 order be rescinded without notice and comment once the emergency need for it has dissipated." Opp. at 2. But just because "good cause" exists for dispensing with notice-and-comment when a rule is issued does *not* mean that it *necessarily must exist* whenever an agency decides to repeal or terminate it. CDC tellingly cites *nothing* holding as much.

A simple example demonstrates as much. Suppose a newly enacted statute mandates that an agency issue implementing rules with 60 days. *See, e.g.*, *Petry v. Block*, 737 F.2d 1193, 1195 (D.C. Cir. 1984) (statute "directed the Secretary to promulgate implementing regulations 'not later than 60 days after the date of enactment') (alteration omitted). That tight statutory deadline can easily establish "good cause" to forego notice-and-comment rulemaking on the front end. *Id.* at 1195-97. But if the agency wishes to amend or repeal those regulations ten years down the line in circumstances without particular urgency, that initial statutory deadline hardly supplies "good cause" for the decade-hence amendment/repeal. Nor does CDC genuinely contend otherwise. Its mandatory-symmetry premise thus cannot withstand scrutiny.

CDC quotes *Perez v. Mortg. Bankers Ass'n* for the premise that "the APA 'mandates that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance.'" Opp. at 2 (quoting 575 U.S. 92, 101 (2015)). That truism is correct as far as it goes: if an agency must supply reasoned decision-making when enacting a rule, it must similarly supply such reasoning when repealing it. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n. of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983). But that principle here only means that just as CDC had to supply "good cause" to avoid notice-and-comment requirements when implementing Title 42, it similarly had to supply good cause when terminating it. It does not mean that the exact same "good cause"

necessarily must exist at termination simply because it existed at initial promulgation. But that faulty premise is the tentpole holding up virtually all of CDC's "good cause" rationale.

### 5.   CDC Failed To Explain Why It Could Extend The Termination Only Until May 23, But Not Long Enough To Take Public Comments

CDC also offers no persuasive explanation for how it could afford to delay the Termination Order until May 23 (almost eight weeks) but could not delay it long enough to comply with notice-and-comment requirements (which CDC admits (at 22) can be completed in 5 months). From the face of the Order, the May 23 date appears have been plucked from the ether. *See* Order at 29. Certainly, CDC does not provide any analysis as to whether alternative dates would have been better, which is itself an APA violation. *See*, *e.g.*, *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) ("An agency is required 'to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.'" (citation omitted)). Indeed, by all indications, DHS would also benefit enormously from the additional preparatory time, with Secretary Mayorkas apparently telling members of Congress privately that the agency is not ready for May 23, *see* TRO Reply at 11 & n.6—though he offers no equivalent candor (or a denial) to this Court.

To be sure, the Termination Order does say (at 29) that taking comment would be "contrary to the public interest and immigration laws." But CDC offers no supporting explanation; it is a naked *ipse dixit*. Nor is there any notice-and-comment exception for "immigration laws"—and DHS apparent belief that there is has repeatedly been found to violate the APA, PI Br. at 25-26.

### 6.   CDC's Unexplained Faith In DHS Does Not Constitute "Good Cause"

Finally, it appears that CDC's "good cause" rationale rests in large measure on the agency's faith in DHS's herculean abilities to manage the crisis that CDC intends to inflict on the U.S. CDC thus contends (at 27) it need not consult with States because it has already talked with "DHS—the entity best suited to advise CDC on the operational realities of resuming immigration processing."

That unexplained confidence is sorely misplaced. In the short 16 months that the Mayorkas

DHS Administration has been in power, it has broken the borders as no other administration has in the entire history of DHS—or the Republic for that matter. DHS's loss of border control is so profound that encounters are at *all-time highs, even with Title 42 in place. See* PI Mem. at App-1. Given DHS's unprecedented loss of operational border control over the border with Title 42 in place, CDC's blind confidence in the current DHS administration—which has failed more profoundly than any prior Administration—to manage the border crisis when that final safety value is intentionally removed is arbitrary and capricious.

### B.   The Termination Order Failed To Justify Invoking The Foreign Affairs Exception

CDC's single-sentence invocation of the foreign affairs exception (Order at 29) does not even conceivably satisfy the governing standard, and it does not appear that even CDC genuinely contends otherwise. CDC instead responds by quibbling with the applicable standard and attempting to supply a better-developed, post-hoc rationale to cure Termination Order's inadequacies. Both efforts fail.

### 1.   CDC's Attempt To Water Down The Governing Standard Fails

As the States have explained previously, *every single circuit*—four in all (Second, Ninth, Eleventh, and Federal Circuits)—that has considered the foreign affairs exception has adopted the same "definitely undesirable international consequences" standard for invoking it in immigration cases. PI Br. at 24. CDC makes a perfunctory, footnote-only attempt to substitute (at 28-29 n.8) that consensus standard with a lone district court decision, *Capital Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020). But not only is the Fifth Circuit more likely to adopt the consensus circuit standard, the D.D.C. standard actually appears to be *more stringent*, and CDC cannot satisfy it either.

While D.D.C. criticizes the consensus standard as "unmoored from the legislative text," it is a straightforward application of the textual canon of avoiding exceptions swallowing their attached rules. *See, e.g., City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995). The consequences standard does so by recognizing that "[t]he foreign affairs exception would become distended if

applied to INS actions generally, even though immigration matters typically implicate foreign affairs." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).

In any event, the D.D.C. standard is, if anything, *worse* for CDC. It explicitly requires that for the exception to apply, the rule must "'clearly and directly' involve activities characteristic of the conduct of international relations." *Capital Area*, 471 F. Supp. 3d at 55. But even in CDC's telling, Title 42 is *a public health* measure that is not directly part of the "conduct of international relations." And D.D.C. tellingly held that the exception was not met for a rule regarding "asylum criteria"— which Title 42 is akin to. CDC thus cannot even satisfy its preferred standard either.

## 2. CDC's Reliance On Post-Hoc Rationales And Extra-Record Evidence Contravenes Foundational Principles Of Administrative Law

Implicitly and begrudgingly acknowledging the patent insufficiency of the Order's one-sentence foreign affairs rationale, CDC attempts (at 28-31) to backfill its deficient reasoning with 3½ pages of legal reasoning in its brief and a new extra-record declaration, which CDC contends satisfies the D.D.C. standard. But CDC's thirteenth-hour attempt to cure the Order's violations of the APA violates fundamental precepts of administrative law.

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). "The *post hoc* rationalizations of the agency cannot serve as a sufficient predicate for agency action." *Id.* at 1909 (quoting *American Textile Mfrs. Institute, Inc. v. Donovan*, 452 U.S. 490, 539 (1981) (alterations omitted)). Thus, "[a]n agency must defend its actions based on the reasons it gave when it acted." *Id.*

The only reason that CDC "gave when it acted" here was a *single sentence* making reference to unspecified "ongoing discussions with Canada, Mexico, and other countries." Order at 29. That does not suffice and everything else that CDC now offers is illicit *post hoc* rationalizations.

CDC attempts (at 29 n.9) to justify its use of extra-record evidence by pointing to the Ninth

Circuit's decision in *Yassini*, 618 F.2d at 1361. But it is doubtful that the Fifth Circuit would follow that approach. The Ninth Circuit is rather notorious for inventing exceptions for extra-record evidence in APA cases—creating, for example, a blanket exception allowing "consider[ation of] evidence outside the administrative record for … ESA claim[s]." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). That exception has no real doctrinal basis and unsurprisingly has been adopted by no other circuit. It is doubtful that the Fifth Circuit, which has never adopted the ESA/*Kraayenbrink* exception, would adopt the *Yassini* one either—particularly as it conflicts with a "'foundational principle of administrative law.'" *Regents*, 140 S. Ct. at 1907. Nor is there any textual basis for creating an exception for the foreign-affairs exclusion.

But even if accepted here, the *Yassini* exception is nowhere near as broad as CDC suggests. In *Yassini*, the extra-record declaration only explained the connection between the challenged action at issue (revocation of delayed departure) and the Iranian hostage crisis—the latter of which so obviously fell within the "foreign affairs" exception as to require little further explanation. The Ninth Circuit therefore permitted submission of a declaration for the very limited purpose of explaining the connection of the challenged action at, making plain that the action "was an integral part of the President's response to the crisis." 618 F.2d at 1361.

Here, by contrast, CDC is not merely supplying an ancillary detail (such as specific connection to the acknowledged crisis) by rather spinning an entirely new *post hoc* rationale whole cloth. Even if the Fifth Circuit were to accept the *Yassini* exception, CDC cannot squeeze this much within it.

### 3.   CDC's Post-Hoc, Extra-Record Rationale Fails In Any Event

Even if CDC could freely supply a *post hoc* rationale, as its declaration and brief attempt to do, its effort here in unavailing. The Mendrala declaration tellingly is only willing to use the word "consequences" once, and the "consequences for international relations" it references are simply those inherent in all immigration policy. Mendrala Decl. (Doc. 40-1) ¶7. Allowing such consequences to

suffice would "distend[]" the exception since *all* "immigration matters typically implicate foreign affairs." *Yassini*, 618 F.2d at 1360 n.4. But the APA has no blanket exception for immigration policy.

More generally, the Mendrala speaks extensively about "engagement" with foreign countries about Title 42. But that is precisely what the States have identified as the problem: the APA generally requires federal agencies to engage with the *American public*, which cannot be evaded through "through the expedient of *talking* perfunctorily with foreign nations about the same subject." PI Br. at 25.

Equally unavailing is the Mendrala's suggestion that it would "undermine U.S. credibility with foreign partners" to "continu[e] … the Title 42 Order." Mendrala Decl. ¶7. The APA does not give foreign nations veto power over notice-and-comment requirements through mere disapproval. Respectfully, "But what will foreign elites think?" is not the all-purpose, get-out-of-public-comment-free card that the Administration believes it to be. Nor does the APA permit Defendants to evade those APA requirements by the contrivance of calling in a favor to secure such putative disapproval.

The relevant disapproval here is that the overwhelming one expressed by the *U.S. public*— currently estimated at 63% versus 27% approval.[10] The APA mandates that CDC face that music head on, rather than invoking putative foreign disapproval to side-step comments from U.S. citizens entirely. To be sure, CDC could continue the same policy *after* receiving those comments and responding adequately to them (assuming no other APA violations). But it cannot short circuit the mandatory public engagement with the U.S. public by engaging purely with foreign governments.

## III.    The States Are Likely To Prevail On The Merits Of Their Arbitrary-And-Capricious Claim

### A.    The Termination Order Is Arbitrary and Capricious.

The Government does not contend that the CDC considered financial harms or other reliance interests of the States. Opp. at 32-42. The Administrative Record contains not a scintilla of

---

[10] *See* Dana Blanton, *Majority want Title 42 coronavirus border restrictions to remain*, Fox News (May 3, 2022) https://fxn.ws/3P2u23U.

information about them. Doc. 39-2. Yet the Government openly admits that the CDC considered the non-public-health, border-security implications of its decision *as they pertain to DHS*—just not to the States or anyone else. This is arbitrary and capricious.

**1.      The CDC unlawfully refused to consider State reliance interests.**

CDC describes (at 35-36) the States' injuries as "unspecified," and speculates about what they may be. CDC's professed confusion is baffling, because the States submitted ten declarations specifying their injuries in detail. Docs. 13-3 to 13-7. These identify at least six discrete species of harm: (1) increased law enforcement costs, *see* Doc. 13-3, at 10 (Napier Decl. ¶5); *id.* at 14 (Lamb Decl. ¶¶3-7); Doc. 13-4, at 3 (Romero Decl. ¶¶4-5); (2) increased education costs, *see* Doc. 13-5, at 4 (Green Decl. ¶¶8-9); (3) increased human-trafficking harms, *see* Doc. 13-3, at 11 (Napier Decl. ¶¶ 7-8); Doc. 13-3, at 20 (Dannels Decl. ¶13); Doc. 13-6, at 1-13 (Phillips Decl. ¶¶1-36); (4) increased healthcare costs, *see* Doc. 13-3, at 37 (Trenschel Decl.¶¶ 5-8); *id.* at 40 (Trenschel Decl. ¶3 & Ex. A); Doc. 13-5, at 5 (Green Decl. ¶ 11); (5) increased criminal-justice costs, Doc. 13-3, at 47-48 (Abbotts Decl. ¶¶3-9); Doc. 13-3, at 434-35 (Okougbo Decl.¶¶ 3-4); and (6) increased costs from issuance of drivers' licenses, Doc. 13-5, at 5 (Green Decl. ¶¶12-13).

CDC gave no consideration to any of these inevitable costs and other injuries to the States. Defendants do not contend they did so, *see* Opp. at 32-42, and the Administrative Record contains no evidence that it did. *See* Doc. 39-2. The Government contends only that the CDC considered the impact of the Termination Order on "healthcare systems and resources," Opp. at 36 (quoting 87 Fed. Reg. 19,949) (cleaned up)—but even there, the CDC did not consider costs to the *States*. Instead, the Government states obliquely (at 36) that the CDC considered "a number of metrics that bear directly on the costs of health care that may be borne by state and local government entities," by citing factors that do *not* address costs and injuries from illegal immigration to the States—such as COVID-19 case rates and improvements to COVID-19 treatments. "Stating that a factor was considered … is not a

substitute for considering it." *Texas*, 20 F.4th at 993 (citation omitted).

This failure is particularly indefensible because the Government previously executed Agreements with Louisiana, Arizona, Texas, and other States specifically acknowledging that reduced border enforcement would disrupt such reliance interests. *See* Doc. 13-3, at 437-38; Doc. 13-7, at 5-6. As the Fifth Circuit held, "the Agreement *both* demonstrates DHS's prior knowledge of the States' reliance interests *and* affirmatively created reliance interests all its own." *Texas v. Biden*, 20 F.4th at 989-90. The "failure to consider those interests" was "arbitrary and capricious." *Id.*

The CDC's main contention is that it did not *have* to consider State reliance interests, because any such interests were supposedly not "legitimate." Opp. at 36. Critically, this was not a factual determination by the CDC, because Defendants admit (at 36-37) that they do not know what injuries the States face, and they did not bother to find out. Instead, the CDC made an *a priori legal* determination that *any* such reliance injuries—whatever they may be—are categorically illegitimate. *Id.*

Thus, CDC's contention that it "*weighed* those [state reliance] interests against other countervailing interests," Opp. at 33 (emphasis added), is indefensible. The CDC did not know the nature or scope of the States' interests because it considered nothing that addressed them and made no attempt to find out what they were. The CDC could not have "weighed" anything meaningfully when it had no idea what to put on one side of the scale.

CDC insists that any State reliance interests could not have been "legitimate" for two reasons: (1) Title 42 orders are inherently temporary, and (2) the CDC's authority to issue the Title 42 orders "remained contested" in (unsuccessful) lawsuits. Opp. at 36-37. The States anticipated and refuted these arguments in their opening brief, PI Br. at 28-32, and the Government offers nothing new. First, the notion that the Title 42 orders were inherently transitory and unstable does not square with the fact that they remained in effect for over two years. Second, *Regents* directly rejects these arguments. In *Regents*, the Government contended that any reliance on DACA was *per se* unreasonable because

27

(1) DACA was inherently temporary; and (2) far more than being merely "contested," DAPA (the expanded version of the program) had been *held unlawful* by the Fifth Circuit, affirmed by the Supreme Court. *Regents*, 140 S. Ct. at 1902-03, 1913. Thus, these are exactly the same arguments the Government presents here, and the Supreme Court rejected them: "[N]either the Government nor the lead dissent cites any legal authority establishing that such features automatically preclude reliance interests, and we are not aware of any." *Id.* at 1913. The CDC contends that the temporary and "contested" nature of its Title 42 orders "automatically preclude[s] reliance interests," *id.*, but after *Regents*, that argument is "astonishing[]." *Texas*, 20 F.4th at 990.

CDC argues (at 38) that *Regents* is distinguishable because "[h]ere … [the] CDC expressly considered whether any legitimate reliance interests existed and whether any reliance interests are outweighed by other factors." For the reasons discussed above, this is wrong on both points. The first point is wrong because the CDC did *not* consider whether or to what extent terminating Title 42 would disrupt state reliance interests—it concluded categorically that any such reliance interests (no matter what they were) were not "legitimate"—and the second point is wrong because the CDC could not "weigh" what it did not consider.

### 2.     CDC selectively considered immigration consequences only for DHS

Next, the Government contends that the CDC could not have considered non-public-health immigration consequences of its decision, because the CDC "may not 'rely on factors which Congress has not intended it to consider.'" Opp. at 39-40 (quoting *Sierra Club v. EPA*, 939 F.3d 649, 663 (5th Cir. 2019)) (cleaned up). This argument directly contradicts the CDC's extensive and explicit reliance on the non-public-health immigration consequences if its decision for its fellow federal agency, DHS, including most obviously the effective date of the Termination Order. Doc. 13-3, at 34-36. The Government cites nothing that would permit the CDC to consider such consequences for DHS while forbidding the CDC to consider their impact on the States.

Rather, the Government's argument is mired in self-contradiction. Opp. at 40-41. The Government argues that it must consult with DHS because there is a "statutory basis and a practical need for CDC's coordination with DHS." *Id.* at 40. But there is a "statutory basis" in the APA that *requires* the CDC to consider State interests; and an obvious "practical need" to do so, because the States "bears many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The Government argues that DHS is "the agency responsible for securing the Nation's border," and that border security is "a matter firmly within that agency's expertise." Opp. at 41 (quoting *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1222 (11th Cir. 2002)). These statements openly admit that the CDC may—indeed, must—consider the *border-security* implications of its decision. It did so with respect to the DHS, but not with respect to the States.

Likewise, the Government's argument that 42 U.S.C. § 265 forbids the CDC to consider border-security consequences is cursory and unconvincing. *See* Opp. at 40. The Government never discusses the text of the statute and instead pivots to relying on its own *regulation*—42 C.F.R. § 71.40—which is poor evidence of Congress's intent because it was promulgated by the agency, not Congress. Neither the statute nor the regulation supports the CDC's position.

The statute, 42 U.S.C. § 265, provides *in toto*:

> Whenever the Surgeon General determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the Surgeon General, in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

42 U.S.C. § 265. The statute's entire text and manifest purpose addresses controlling *immigration* and imports during times of outbreak. Nothing in the statute prohibits the CDC from taking into account the *immigration* consequences of its decisions under the statute. *See id.* Quite the contrary—in the

Government's own words, "a Title 42 order involving persons or the termination of such a Title 42 order almost always will have immigration consequences," Opp. at 40, and so it would astonishing if Congress forbade the CDC to consider such "immigration consequences" in making its decisions. And Congress did not do so. 42 U.S.C. § 265.

The CDC's attempt (at 40) to invoke a clear-statement rule here flips ordinary principles of statutory interpretation on their heads. If Congress intended to forbid the agency's consideration of the *immigration*-related consequences of a decision to restrict *immigration* in an *immigration*-focused statute, it surely "would have made that intent clear." Opp. at 40 (citing *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001)). Nothing in the statute does so.

CDC's reliance on its regulation fares no better. *See* 42 C.F.R. § 71.40(d). The regulation provides that, "when issuing any order under this section," the CDC "*shall*, as practicable under the circumstances, consult with *all* Federal departments or agencies whose interests would be impacted by the order." *Id.* (emphasis added). "All" federal agencies plainly include those with non-public-health-related "interests," *id.*, and so the regulation expressly contemplates that the CDC "shall" consider the non-public-health-related consequences of its decisions. *Id.* Likewise, the regulation states that the CDC "may … consult with any State or local authorities that he or she deems appropriate." *Id.* Again, "*any* State or local authorities" plainly include those with non-public-health-related concerns. *Id.* So the CDC's own regulation contradicts its artificially blinkered view of its authority here.

## IV.   The Remaining TRO/Preliminary Injunction Factors Support The States

Defendants' irreparable harm arguments (at 43) merely recycle their untenable traceability arguments, which fail for the reasons explained above. *Supra* § I.A.

As to the balance of harms, Defendants offer no response to the States' argument that "[t]his case is truly rare in that a preliminary injunction will *avoid* harms to all sides," PI Br. at 41—thereby essentially conceding that the balance of harms supports a preliminary injunction. And while

Defendants point to *Maryland v. King*, 567 U.S. 1301 (2012) as establishing irreparable harm to them, *Maryland* addressed an injunction of a *statute* that was unquestionably enacted properly—not a mere regulatory rule promulgated in contravention of the APA. For similar reasons, CDC's contention (at 44) that an injunction would constitute a "grave intrusion into the Executive Branch's handling of the pandemic" is specious. The States are simply insisting that Defendants comply with the APA—which has been settled law since 1946. An injunction to enforce that three-quarter-century-old law is hardly a novel and "grave intrusion" upon executive authority. But given CDC's view that its discretion is unlimited and unreviewable, *supra* Section § I.B, *any* intrusions unsurprisingly seem "grave" to it.

As to the public interest, CDC's request for deference (at 44) puts the cart before the horse. Absent compliance with the APA, no there is no valid determination to defer to. Nor does CDC offer any answer to the Fifth Circuit's holding that "there is generally no public interest in the perpetuation of unlawful agency action." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) (cleaned up). Moreover, its arrogant premise (at 44) that it is the lone "government" in this action underscores its cramped view of federalism and contempt for the States, (1) whose views it will not consider through comments and (2) whose harms and reliance interests it will not weigh in its analysis.

## V.     This Court Should Enter A Nationwide Injunction

Defendants do not dispute that if a preliminary injunction is appropriate, it should be nationwide in scope. This Court should accordingly enter a nationwide preliminary injunction.

## CONCLUSION

The States' request for a preliminary injunction should be granted.

31

Dated:   May 9, 2022

MARK BRNOVICH
  Attorney General
BRUNN ("BEAU") W. ROYSDEN III*
  Solicitor General
DREW C. ENSIGN**
  Deputy Solicitor General
JAMES K. ROGERS*
  Senior Litigation Counsel
ANTHONY R. NAPOLITANO *
  Assistant Attorney General
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
beau.roysden@azag.gov
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

STEVE MARSHALL
  Alabama Attorney General
EDMUND G. LACOUR JR.*
  Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

Respectfully submitted,
By:*/ s/  Joseph S. St. John*

ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

TREG R. TAYLOR
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
  Attorney General,
BRIAN KANE*
  Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY
GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S
OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

DAVE YOST
  Ohio Attorney General
BENJAMIN M. FLOWERS*
  Solicitor General
Office of the Ohio Attorney General
30 E. Broad St., 17th Fl.
Columbus, OH 43215
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee
ANDRÉE S. BLUMSTEIN
  Solicitor General
CLARK L. HILDABRAND*
BRANDON J. SMITH*
  Assistant Solicitors General
Office of the Tennessee Attorney General and
Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK*
  Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

PATRICK MORRISEY
  Attorney General
LINDSAY SEE*
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

\* Pro hac vice application forthcoming
\*\* Pro hac vice application granted

35