# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| STATE OF ARIZONA, *et al.*, | |
| *Plaintiffs*, | Civil Action No.: 6:22-cv-00885-RRS-CBW |
| v. | Judge: Robert R. Summerhays |
| CENTERS FOR DISEASE CONTROL & PREVENTION, *et al.,* | Magistrate Judge: Carol B. Whitehurst |
| *Defendants*. | |

## PROPOSED INTERVENORS'
## MOTION FOR LIMITED INTERVENTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................II

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    I.   Asylum at the border pre- and post-Title 42 .......................................................... 2

    II.    Proposed Intervenors ........................................................................................... 5

ARGUMENT ..................................................................................................................... 7

    I.   Proposed Intervenors meet the requirements to intervene as of right and permissively. .... 7

        A.    Proposed Intervenors are entitled to intervene as of right. ........................................... 7

        i.   Proposed Intervenors' motion is timely............................................................... 7

        ii.   Proposed Intervenors have protectable interests. ......................................................... 9

        iii.    Proposed Intervenors' ability to protect their interests may be impaired by the Court's disposition of this action. .................................................................... 11

        iv.    The existing parties may inadequately represent intervenors' interests. ................ 11

        B.    In the alternative, Proposed Intervenors have met the requirements for permissive intervention. ........................................................................................................ 14

    II.    Any preliminary injunction must be geographically limited to run only in the Plaintiff States. 15

        A.    Injunctive relief must be tailored and proportional. .................................................. 15

        B.    There is no justification for a nationwide injunction here.......................................... 19

        i.   The alleged harm to Plaintiff States does not justify nationwide relief.................... 19

        ii.   Uniformity in immigration law does not justify nationwide relief............................ 23

        iii.    The APA does not mandate nationwide relief. ...................................................... 24

    CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

*Cases*

*Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022)................................................................. 17

*Austin Indep. Sch. Dist. v. United States*, 429 U.S. 990 (1976)...................................... 16

*Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351 (5th Cir. 1997) ......................... 2

*Bibles, et al. v. City Of Irving, Tex.*, *et al.*, No. CIV.A.308-CV-1795-M, 2009 WL 2252510
    (N.D. Tex. July 28, 2009) ............................................................................................. 2

*Biden v. Texas*, No. 21-954 (U.S. filed Mar. 21, 2022), 2022 WL 876862 ........................... 18, 23

*Bonaparte v. Camden & A.R. Co.*, 3. F. Cas. 821 (C.C.D.N.J. 1830) (No. 1,617)....................... 16

*Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014)......................................................... 10, 11

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................. 16, 18

*California v. Texas*, 141 S. Ct. 2104 (2021) .................................................................. 19

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020)............................... 18

*Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018) ........................................ 24

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977) ....................................... 16, 17, 21

*DeOtte v. State*, 20 F.4th 1055 (5th Cir. 2021) ........................................................... 9, 22

*DHS v. New York*, 140 S. Ct. 599 (2020)..................................................................... 2, 24

*Doe v. Mayorkas*, 854 F. App'x 115 (9th Cir. 2021) ...................................................... 23

*Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020)...................................................... 23

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) ................................................. 16

*Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996) ............................................... 11

*Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) ............. 16

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ..................................................... 15, 24, 25

*Huisha-Huisha v. Mayorkas*, No. CV 21-100 (EGS), 2021 WL 4206688 (D.D.C. Sept. 16, 2021)
    ............................................................................................................................ 5

*Lewis v. Casey*, 518 U.S. 343 (1996).................................................................. 16, 17, 21

*Miller v. French*, 530 U.S. 327 (2000) ....................................................................... 25

*Milliken v. Bradley*, 418 U.S. 717 (1974).................................................................... 16

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)...................................... 24

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452 (5th Cir. 1984).......... 14

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................... 25

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)........................................ 10

*P.J.E.S. v. Mayorkas*, et al., No. 20- 5357 (D.C. Cir. Jan. 29, 2021) ............................... 4

*P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. Nov. 18, 2020) ..................................................... 4

*Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300 (4th Cir. 1992)........................................ 18

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) ........................................................ 7, 8, 11, 12

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) ........................................................ 8

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 338 F.R.D. 364 (W.D. Tex. 2021) ........................................................................................................................... 15

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015)................................... 1, 7, 9, 10, 11, 12, 13

*Texas v. United States*, No. 6:21-cv-00003 2021 WL 411441 (S.D. Tx. Feb. 6, 2021) .............. 15

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)........................................................................................ 2

*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ............................. 17

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)................................................................. 18

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ...................................................... 16, 18, 21

***Statutes***

5 U.S.C. 706(a)(2)........................................................................................................................... 24

8 U.S.C. 1182(d)(5) .......................................................................................................................... 3

8 U.S.C. 1225(b) ..................................................................................................................... 2, 3, 22

8 U.S.C. 1226(a) ............................................................................................................................... 3

8 U.S.C. 1229a(c)(4)......................................................................................................................... 3

Cal. Educ. Code § 68130.5 ............................................................................................................. 23

***Other Authorities***

Camilo Montoya-Galvez, *U.S. launches deportation operation to Colombia using Title 42 border rule*, CBS News (Mar. 24, 2022), https://www.cbsnews.com/news/immigration-title-42-colombia-deportations-us-mexico-border/................................................................................ 4

Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately – Ignoring Asylum Law,* ProPublica (Apr. 2, 2020), https://www.propublica.org/article/leaked-border-patrol-memo-tells-agents-to-send-migrants-back-immediately-ignoring-asylum-law ... 4

Jason Dearen and Garance Burke*, Pence ordered borders closed after CDC experts refused*, Associated Press (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae................................................... 4

Jose Luis Gonzalez and Lizbeth Diaz, *U.S. expels dozens of Haitian asylum seekers to Mexico*, Reuters (Feb. 3, 2021), https://www.reuters.com/article/us-usa-immigration-border/u-s-expels-dozens-of-haitian-asylum-seekers-to-mexico-idUSKBN2A40FM ........................................... 4

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291 (2003)......................................................................... 25

Stephanie Leutert, et al., Metering & COVID-19 (Apr. 2020),
    https://usmex.ucsd.edu/_files/MeteringCovid-19.pdf.................................................... 4

U.S. Centers for Disease Control, U.S. Department of Health and Human Services, Order
    Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable
    Communicable Disease Exists with Respect to Unaccompanied Noncitizen Children (Mar. 11,
    2022), https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren-
    update.pdf .................................................................................................................. 5

U.S. Centers for Disease Control, U.S. Department of Health and Human Services, Public Health
    determination Regarding an Exception for Unaccompanied Noncitizen Children From the
    Order Suspending the Right to Introduce Certain Persons From Countries Where a
    Quarantinable Communicable Disease Exists (July 16, 2021),
    https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf;
    NoticeUnaccompaniedChildren-update.pdf (cdc.gov). 86 Fed. Reg. 38,717 (July 22, 2021) ... 5

U.S. Dep't of Homeland Security, Fact Sheet: DHS Measures on the Border to Limit the Further
    Spread of Coronavirus (Mar. 23, 2020), https://www.dhs.gov/news/2020/10/19/fact-sheet-dhs-
    measures-border-limit-further-spread-coronavirus .................................................................. 4

U.S. Dep't of Homeland Security, Policy Guidance for Implementation of the Migrant Protection
    Protocols (Jan. 25, 2019),
    https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-
    protocols-policy-guidance.pdf .................................................................................................. 2

**_Rules_**

Fed. R. Civ. P. 24 ........................................................................................................ 7, 14

**_Regulations_**

8 C.F.R. 208.30 ................................................................................................................ 3

8 C.F.R. 235.3 .................................................................................................................. 3

85 Fed. Reg. 16,559 (March 24, 2020) ............................................................................ 3

85 Fed. Reg. 56,424 (Sep. 11, 2020) ............................................................................... 3

85 Fed. Reg. 65,806 (Oct. 16, 2020)................................................................................ 3

86 Fed. Reg. 38,717 (July 22, 2021)................................................................................ 5

## INTRODUCTION

Alicia De Los Angeles Duran Raymundo, Kevin Alexi De Leon De Leon, and Innovation Law Lab are two individuals and an organization that seek to intervene in this litigation to make a single argument: that any relief this Court orders should not run nationwide.[1] Alicia and Kevin fled violent persecution in their home countries and intend to seek asylum at the California-Mexico border. Yet they have been unable to do so for months as a result of the Title 42 order, a policy that has used public health justifications to close the southern border to people seeking asylum, thereby trapping Alicia and Kevin in Tijuana, Mexico, where they continue to fear for their safety. If permitted to enter the United States to access the asylum system, Alicia and Kevin intend to reunite with their respective families in California while their cases remain pending. Innovation Law Lab is a legal services organization that, as part of its mission, serves asylum seeking individuals along the California- and New Mexico-Mexico border. That mission has been frustrated by the Title 42 order. Law Lab has also had to divert significant resources away from its preexisting mission-driven work to respond to the Title 42 order, and will continue to have to do so for as long as it remains in effect.

Alicia, Kevin, and Innovation Law Lab (collectively, "Proposed Intervenors") each have a concrete interest in the fate of the Title 42 Termination Order and any order enjoining its implementation in California. Therefore, they easily satisfy Rule 24's requirements for intervention. *See Texas v. United States*, 805 F.3d 653, 664 (5th Cir. 2015) (reversing district court order denying immigrants' motion to intervene in states' challenge to Obama Administration immigration policy).

---

[1] Plaintiffs' counsel has stated that Plaintiffs are inclined to oppose but will take a definitive position after reviewing this motion. Defendants' counsel stated they oppose.

While Proposed Intervenors agree with Defendants' position that the Title 42 Termination Order is lawful, they seek to intervene for a distinct and limited—but crucial—purpose: to argue that, should the Court enter any injunctive relief, such relief should be geographically limited to run only in the Plaintiff States, rather than nationwide, consistent with traditional principles of equity and proportionality. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring); *DHS v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring).

Courts in this circuit have granted motions to intervene as a matter of course, particularly where, as here, the intervenors willingly submit to limitations on the scope of their involvement. *Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, 352–53 (5th Cir. 1997) (holding that reasonable conditions may be imposed upon those who intervene as of right); *Bibles, et al. v. City Of Irving, Tex., et al.*, No. CIV.A.308-CV-1795-M, 2009 WL 2252510, at *5 (N.D. Tex. July 28, 2009) (granting motion for leave to intervene limited to participation only on the issue of protecting an asserted lien interest in a potential judgment or settlement).

## BACKGROUND

### I.  Asylum at the border pre- and post-Title 42

Before the implementation of Title 42, individuals apprehended at or near the southern border who did not have proper entry documents were typically processed pursuant to Title 8 of the U.S. Code, including by being subjected to expedited removal ("ER") under Immigration and Nationality Act ("INA") § 235 or full removal proceedings under INA § 240.[2] *See* 8 U.S.C. 1225(b)(1), 1229a. Individuals subject to ER who expressed a fear of persecution or torture were

---

[2] Following the January 2019 implementation of the Migrant Protection Protocols ("MPP"), nearly 70,000 people who would have been subject to the ER and Credible Fear Interview process were instead put directly in INA § 240 proceedings and forced to wait in Mexico for the duration of their asylum proceedings. U.S. Dep't of Homeland Security, Policy Guidance for Implementation of the Migrant Protection Protocols (Jan. 25, 2019), https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf.

given a Credible Fear Interview ("CFI") to assess whether they have a significant possibility of establishing eligibility for asylum. *See* 8 U.S.C. 1225(b)(1)(A)(i). Individuals who passed the CFI were placed into full removal proceedings, where they were permitted to present their cases before an immigration judge. *See* 8 U.S.C. 1229a(c)(4); 1225(b)(1)(B)(ii); 8 C.F.R. 208.30, 235.3. Individuals who passed the CFI remained in the U.S. pending completion of removal proceedings. Some were jailed by Immigration and Customs Enforcement ("ICE"), while others were released pursuant to conditions of bond or parole. *See* 8 U.S.C. 1182(d)(5); 1226(a).

On March 20, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") and the U.S. Department of Health and Human Services ("HHS") issued an emergency Interim Final Rule that largely suspended operation of the procedures described above by invoking the authority of the Public Health Service Act. 85 Fed. Reg. 16,559 (March 24, 2020). Concurrently, the CDC Director ordered the "suspen[sion] [of] the introduction" of certain individuals who seek to enter the United States via land borders without proper entry documents or whose entry otherwise is "otherwise contrary to law" or those who seek to "unlawfully enter the United States" between ports of entry.[3] On September 11, 2020, CDC and HHS published the final rule, which took effect on October 13, 2020. 85 Fed. Reg. 56,424 (Sep. 11, 2020). The CDC issued a new order renewing the Title 42 policy after the final rule took effect.[4] 85 Fed. Reg. 65,806 (Oct. 16, 2020).

---

[3] U.S. Centers for Disease Control and Prevention, U.S. Department of Health and Human Services, Order Suspending Introduction of Certain Persons From Countries Where a Communicable Disease Exists (Mar. 20, 2020), 2-3, https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.

[4] U.S. Centers for Disease Control, U.S. Department of Health and Human Services, Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists (Oct. 13, 2020), https://www.cdc.gov/coronavirus/downloads/10.13.2020-CDC-Order-Prohibiting-Introduction-of-Persons-FINAL-ALL-CLEAR-encrypted.pdf.

U.S. Customs and Border Protection began implementing the March order by halting all processing of asylum-seeking individuals at official ports of entry. U.S. Border Patrol began expelling most Mexican, Guatemalan, Honduran, and Salvadoran families and single adults to Mexico without giving them an opportunity to seek asylum, pursuant to an agreement with the government of Mexico.[5] Individuals of other nationalities have also been expelled to Mexico pursuant to Title 42.[6] Others were expelled to their countries of origin without an opportunity to seek asylum.[7] Despite the proffered public health justifications supporting the Title 42 order, reporting has confirmed the order was initiated by the White House, which continued to advocate for it even after top CDC officials stated there was no valid public health justification for it.[8]

In the two years that Title 42 has been in effect, courts have enjoined its implementation against particularly vulnerable groups, including children and families. *See* Memorandum Opinion, *P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. Nov. 18, 2020); *P.J.E.S. v. Mayorkas*, et al., No. 20- 5357 (D.C. Cir. Jan. 29, 2021); *Huisha-Huisha v. Mayorkas*, No. CV 21-100 (EGS),

---

[5] Stephanie Leutert, et al., Metering & COVID-19 (Apr. 2020), https://usmex.ucsd.edu/_files/MeteringCovid-19.pdf; U.S. Dep't of Homeland Security, Fact Sheet: DHS Measures on the Border to Limit the Further Spread of Coronavirus (Mar. 23, 2020), https://www.dhs.gov/news/2020/10/19/fact-sheet-dhs-measures-border-limit-further-spread-coronavirus; Dara Lind, *Leaked Border Patrol Memo Tells Agents to Send Migrants Back Immediately – Ignoring Asylum Law,* ProPublica (Apr. 2, 2020), https://www.propublica.org/article/leaked-border-patrol-memo-tells-agents-to-send-migrants-back-immediately-ignoring-asylum-law.

[6] Jose Luis Gonzalez and Lizbeth Diaz, *U.S. expels dozens of Haitian asylum seekers to Mexico*, Reuters (Feb. 3, 2021), https://www.reuters.com/article/us-usa-immigration-border/u-s-expels-dozens-of-haitian-asylum-seekers-to-mexico-idUSKBN2A40FM.

[7] Camilo Montoya-Galvez, *U.S. launches deportation operation to Colombia using Title 42 border rule*, CBS News (Mar. 24, 2022), https://www.cbsnews.com/news/immigration-title-42-colombia-deportations-us-mexico-border/.

[8] Jason Dearen and Garance Burke*, Pence ordered borders closed after CDC experts refused*, Associated Press (Oct. 3, 2020), https://apnews.com/article/virus-outbreak-pandemics-public-health-new-york-health-4ef0c6c5263815a26f8aa17f6ea490ae.

2021 WL 4206688 (D.D.C. Sept. 16, 2021), *aff'd and remanded*, 27 F.4th 718 (D.C. Cir. 2022). Later CDC orders exempted unaccompanied children from the application of Title 42, 86 Fed. Reg. 38,717 (July 22, 2021), and, recently, terminated Title 42 as to unaccompanied children.[9]

On April 1, 2022, the CDC Director, in a 30-page order, announced its intention to end Title 42, effective May 23, 2022 ("Termination Order"). ECF no. 1-1 at 2-31. On April 3, 2022, three Plaintiff States including Arizona filed the present lawsuit challenging the Termination Order. ECF no. 1. On April 14, 2022, Plaintiff States amended their complaint to include 18 additional states, none of which shares a land border with Mexico, and moved for a preliminary injunction of the Termination Order. ECF nos. 10, 13. On April 21, 2022, Plaintiff States moved for a temporary restraining order ("TRO") seeking to enjoin any implementation of the Termination Order prior to the date the Termination Order was set to take effect. ECF no. 24. This Court granted that order on a nationwide basis on April 27, 2022. ECF no. 37. On May 5, 2022, Plaintiff States amended their complaint to include Texas. ECF no. 44. Arizona and Texas remain the only Plaintiff States that share a land border with Mexico.

## II.   Proposed Intervenors

Alicia De Los Angeles Duran Raymundo and Kevin Alexi De Leon De Leon currently reside in a shelter in Tijuana with their six-year-old daughter. Declaration of Alicia De Los Angeles Duran Raymundo ("Alicia Decl.") ¶¶ 3, 14; Declaration of Kevin Alexi De Leon De Leon ("Kevin

---

[9] U.S. Centers for Disease Control, U.S. Department of Health and Human Services, Public Health determination Regarding an Exception for Unaccompanied Noncitizen Children From the Order Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists (July 16, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren.pdf; U.S. Centers for Disease Control, U.S. Department of Health and Human Services, Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists with Respect to Unaccompanied Noncitizen Children (Mar. 11, 2022), https://www.cdc.gov/coronavirus/2019-ncov/more/pdf/NoticeUnaccompaniedChildren-update.pdf.

Decl.") ¶¶ 3. They fled El Salvador after gang members threatened to kill Kevin and force Alicia and their daughter to suffer the same way Kevin did when his father was brutally tortured, killed, and burned when Kevin was a child. Alicia Decl. at ¶¶ 6-9; Kevin Decl. at ¶¶ 5-6, 9-11. Since approximately January 2022, Alicia, Kevin, and their daughter have tried to present themselves to officials at ports of entry along the California-Mexico border, but they have been repeatedly told that the border is closed to people seeking asylum due to Title 42. Alicia Decl. at ¶¶ 15-18; Kevin Decl. at ¶ 14. Alicia, Kevin, and their daughter intend to seek asylum at the Tijuana-San Diego border. Alicia Decl. at ¶ 15; Kevin Decl. at ¶¶ 14-15. If allowed into the United States, they intend to reside in Rosamond, California with a family member who has legal status and is prepared to receive them. Alicia Decl. at ¶ 20; Kevin Decl. at ¶ 15.

Innovation Law Lab ("Law Lab") is a legal services organization that leverages technology, advocacy, and law to increase access to legal representation and resources for asylum-seeking individuals in different regions of the country, including California and New Mexico, in advance of its mission to leverage law, technology, and organizing to fight for immigrant and refugee justice. Declaration of Stephen Manning ("Law Lab Decl.") ¶¶ 2, 10. Title 42 has "stalled certain core aspects of [Law Lab's] mission-related programming" and "seriously undermined" its mission including by making it "much more difficult for asylum-seeking individuals to access the asylum system in the first place," which "significantly decreas[es] the number of persons in asylum proceedings who Law Lab has been able to serve." *Id.* at ¶ 14, 16. Title 42 has also caused Law Lab to divert significant resources away from its preexisting mission-driven work to attempt to consistently provide accurate information and resources to individuals who are no longer able access the asylum system as a result of the order, respond to uncertainties wrought by Title 42, and "respond to a flood of inquiries" from the communities Law Lab serves. *Id.* at ¶ 19-22.

## ARGUMENT

**I.    Proposed Intervenors meet the requirements to intervene as of right and permissively.**

Proposed Intervenors plainly meet the criteria for intervention under Fifth Circuit law. *See generally Texas*, 805 F.3d 653. Rule 24 allows nonparties to intervene either as of right or with permission. Fed. R. Civ. P. 24. "Although the movant bears the burden of establishing its right to intervene, Rule 24 is to be liberally construed." *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) (internal citations omitted). Intervention should be permitted "where no one would be hurt and greater justice could be attained." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (internal citations omitted). Proposed Intervenors satisfy the Rule 24 requirements to intervene both as of right and permissively.

### A.    Proposed Intervenors are entitled to intervene as of right.

A nonparty satisfies the requirements for intervention as of right where (1) the application is timely; (2) the Proposed Intervenors "have an interest relating to" the property or transition that is the subject of the action; (3) they are "so situated that the disposition of the action may, as a practical matter, impair or impede [their] ability to protect that interest"; and (4) their interests are inadequately represented by the existing parties to the suit. Fed. R. Civ. P. 24(a)(2); *see also Wal-Mart Stores,* 834 F.3d at 565.

#### i.    Proposed Intervenors' motion is timely.

This motion is timely. In determining whether a motion to intervene is timely, "absolute measures of timeliness should be ignored," *Sierra Club*, 18 F.3d at 1205, and, instead courts should consider four factors: (1) the length of time during which the would-be intervenor actually knew or should have known of his interest in the case before he petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties may suffer as a result of failure of the proposed intervenor to apply sooner; (3) the extent of the prejudice that the proposed intervenor may suffer if the petition is denied; and (4) any unusual circumstances militating for or against the

determination of whether the application is timely. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977). Proposed Intervenors satisfy these factors.

First, Proposed Intervenors file this motion only about two weeks after Defendants first suggested they did not intend to argue that this Court's relief should be geographically limited in their April 22 response to the Motion for a TRO, ECF no. 27, and 10 days after Defendants made that position clear in their response to the Motion for a Preliminary Injunction, ECF no. 40. Because Proposed Intervenors seek to intervene to make a limited argument about the geographic scope of injunctive relief this Court may order, they did not know that their "interests would no longer be protected by the original parties," *Sierra Club,* 18 F.3d at 1206, until Defendants filed those responses just weeks and days ago. Any earlier motion would have run the risk of being "premature" and "wast[ing] judicial resources," which "[c]ourts should discourage." *Id.*

Second, the existing parties suffer no prejudice by any alleged failure from Proposed Intervenors to apply sooner. "[P]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Id.* at 1206. As explained above, Proposed Intervenors have not delayed in filing this motion and will continue to act diligently so as not to delay the litigation. Further, they have included briefing on the geographic scope issue in this motion, in order to ensure that they cause no undue delay in this case. *See infra* Section II.

Third, Proposed Intervenors, who have a direct stake in the Termination Order and any order of this Court that runs to non-plaintiff states, will obviously be prejudiced absent intervention, as no existing party intends to pursue vigorously—or perhaps to pursue at all—their particular interest in ensuring that any injunction remains geographically limited.

ii.   **Proposed Intervenors have protectable interests.**

Proposed Intervenors have "an interest relating to the . . . transaction that is the subject of the action" under Rule 24. To satisfy this requirement, intervenors must show a "direct, substantial, legally protectable interest in the proceedings." *Texas*, 805 F.3d at 657-58. In contrast, "an interest that is concrete, personalized, and legally protectable is sufficient to support intervention." *Id.* at 658. In other words, "the inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out in a certain way." *Texas,* 805 F.3d at 657 (internal citations omitted). Intervenors need not have an interest that would give rise to standing: "an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Wal–Mart Stores, Inc.*, 834 F.3d 562, 566 (5th Cir. 2016) (cleaned up); *see also DeOtte v. State*, 20 F.4th 1055, 1068 (5th Cir. 2021).

Most important for present purposes, the Fifth Circuit has held that individuals who are the "intended beneficiaries" of a program challenged in litigation have a legally protectable interest sufficient to support intervention. *Texas*, 805 F.3d at 660; *Wal-Mart Stores, Inc.*, 834 F.3d at 566-67. *Texas* held that immigrants eligible to apply for a deferred action program that would have protected them from deportation and granted them other benefits were "intended beneficiaries" of that program and therefore entitled to intervene. *See Texas*, 805 F.3d at 660. "This is not a mere generalized interest in the implementation of [the program]; rather, the [intervenors] are the intended beneficiaries of the challenged federal policy." *Id.* Notably, the court found the intervenors' interest in receiving deferred action, employment authorization, and remaining with their United States citizen children sufficient under Rule 24 even though the program they sought to defend did not *guarantee* them any protections and benefits. *Id.*

9

Here, Proposed Intervenors Alicia and Kevin, together with their small children, intend to seek asylum at the California-Mexico border, but have been blocked by the Title 42 order. They therefore have a "concrete, personalized, and legally protectable" interest in the termination order Plaintiff States have challenged, just like the immigrants who intervened in *Texas*, 805 F.3d at 657.

Proposed intervenor Law Lab also has an interest that satisfies Rule 24. Law Lab's organizational mission is, *inter alia*, to leverage technology, advocacy, and law in order to advance migrant and refugee justice, including by serving individuals who seek asylum under Title 8 near the California and New Mexico borders with Mexico. Law Lab Decl. ¶ 2, 10. That mission has been frustrated during the period that Title 42 has barred access to asylum at the border. *Id.* at ¶ 16. In addition, Law Lab has had to divert resources to meet the needs of individuals on the Mexican side of the border who are blocked from seeking access to asylum, including by distributing accurate information about the options that such individuals have. *Id.* at ¶ 20-21. For these reasons, they too have a cognizable interest in this case, as it will determine the extent to which they can fulfill their mission and also dictate how they will expend their resources. *Cf. OCA-Greater Houston v. Texas*, 867 F.3d 604, 610-12 (5th Cir. 2017) (finding that voting rights organization satisfied injury-in-fact requirement for standing purposes where it was required to divert resources to explain challenged voter law changes to people with limited English proficiency, which frustrated and complicated its routine community outreach activities).

While Law Lab clearly satisfies Rule 24, its request should be judged by a "more lenient standard" because "the case involves a public interest question or is brought by a public interest group." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (internal quotation marks omitted).

### iii.   Proposed Intervenors' ability to protect their interests may be impaired by the Court's disposition of this action.

Once a proposed intervenor establishes an adequate interest, they must "demonstrate that disposition of that action may, as a practical matter, impair or impede [their] ability to protect that interest." *Brumfield*, 749 F.3d at 344. The impairment must be "practical," not merely "theoretical." *Id.* For example, in *Brumfield*, the Fifth Circuit held that parents of children receiving school vouchers through a program that was challenged in litigation could intervene under Rule 24 because the lawsuit's outcome might have put some parents at risk of losing vouchers or their full range of school choices. *Id.*

Here, there should be no dispute that the outcome of this case could impede Proposed Intervenors' interests. If Plaintiffs prevail and the injunction they win runs nationwide, it will impair Alicia and Kevin's access to the asylum system along the California-Mexico border, and Law Lab's interests in serving asylum-seeking individuals in that region and in New Mexico. Thus, the outcome in this case—particularly the geographic scope of any remedy this Court issues—will impair Proposed Intervenors' ability to protect their interests.

### iv.   The existing parties may inadequately represent intervenors' interests.

The proposed intervenor has the burden of demonstrating inadequate representation, but that burden is "minimal." *Sierra Club*, 18 F.3d 1202 at 1207. "[T]he applicant need not show that the representation by existing parties will be, for certain, inadequate. Instead, the Rule is satisfied if the applicant shows that the representation of [their] interest *may be* inadequate" *Texas*, 805 F.3d at 661 (cleaned up) (emphasis added). A presumption of adequate representation applies in two situations arguably relevant here. First, where the proposed intervenor has the same ultimate objective as a party to the lawsuit, then the proposed intervenor must show "adversity of interest, collusion, or nonfeasance from the existing party" to overcome the presumption *id.* at 661-62 (citing *Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996)), such as by showing that

the respective parties' interests diverge "in a manner germane to the case." *Id.* at 662. Second, when the existing party is a governmental body charged by law with representing the interest of the intervenor, the proposed intervenor must show that their respective interests in fact differ and the government will not adequately represent those of the proposed intervenor. *Id.*

Assuming those presumptions apply, at least two Fifth Circuit cases make clear that Proposed Intervenors have overcome them here. In *Texas*, the Fifth Circuit found that while both the government and the Proposed Intervenors sought to uphold the challenged deferred action program, the government's interests were in preserving "expansive … executive authority," "efficiently enforcing the immigration laws," and maintaining its relationships with the Plaintiff States, whereas the Proposed Intervenors' interests were in remaining in Texas with their children and obtaining lawful employment. *Id.* at 663. The Fifth Circuit noted those differences manifested themselves in the course of the litigation, where some of the government's defenses were in direct conflict with the Proposed Intervenors' position. *Id.* In *Sierra Club*, the Fifth Circuit found that the government's need to represent the "broad public interest" did not adequately represent the economic concerns of groups representing the timber industry. 18 F.3d 1202 at 1208 (reversing district court order denying timber purchasers' association's motion to intervene as of right).

Those cases dictate the result here. Even assuming that Defendants and Proposed Intervenors have the same interests in some respects, there is also an evident "adversity of interest[s]" between Defendants and Proposed Intervenors which suffices to overcome any presumption that the government will adequately represent Proposed Intervenors' interests. *Texas*, 805 F.3d at 661-62. Whereas Defendants champion expedited removal processing pursuant to Title 8 for its "greater deterrent effect than expelling a migrant to Mexico under Title 42," ECF no. 27 at 6, Proposed Intervenors Alicia and Kevin seek processing under Title 8 for a *very* different

reason: to vindicate their asylum claims and join their families in California. As in *Texas*, Defendants' interests in preventing Plaintiff States from imposing on the federal government's authority to enforce immigration laws—here their desire to "improv[e] DHS's deterrent capabilities," ECF no. 27 at 13-15, 22, and dictate public health policy, *id.* at 19—stand in sharp contrast to Proposed Intervenors' interest in obtaining humanitarian protection. Indeed, until the Termination Order, it was *Defendants'* implementation of the Title 42 order that blocked Proposed Intervenors' access to asylum.[10] Here, as in *Texas,* the "lack of unity in all objectives, combined with real and legitimate additional or contrary arguments" is sufficient for Proposed Intervenors to meet this requirement of Rule 24. 805 F.3d at 663.

The second presumption also does not apply, for similar reasons. The differing objectives and adversity of interests between Proposed intervenors and Defendants overcomes any presumption that the government will adequately represent Proposed Intervenors' interests. *Texas*, 805 F.3d at 662-63. Defendants are not "charged by law" with representing the Proposed Intervenors; Defendants represent the interests of the federal government, which, as discussed, diverge from those of Proposed Intervenors. And even if the presumption does apply, Proposed Intervenors have overcome it for the same reasons they overcome the first: their interests are in accessing the asylum system, whereas Defendants' interests are in enforcing laws that seek to deter and deport people like them.

---

[10] Although the Court need not decide the question, it is clear that the first presumption does not apply, as Proposed Intervenors do not share "the same ultimate objective" as Defendants. *Texas*, 805 F.3d at 661. Whereas Defendants oppose Plaintiff States' motions for injunctive relief *everywhere*, ECF nos. 27, 40, Proposed Intervenors seek only to argue that, if injunctive relief does issue, its geographic scope be limited to the Plaintiff States, *see infra* Section II. That critical difference has already manifested itself in this litigation: Defendants have declined to advance any argument about the geographic scope of the injunction in their responsive briefing to date. *See* ECF nos. 27; 40. That fact alone makes clear that Proposed Intervenors have distinct interests sufficient to satisfy Rule 24's distinct interest requirement.

Proposed Intervenors have thus met their "minimal" burden of establishing inadequate representation by the existing parties.

**B.   In the alternative, Proposed Intervenors have met the requirements for permissive intervention.**

On a timely motion, courts may permit a non-party to intervene where the proposed intervenor has a "claim or defense that shares with the main action a common question of law or fact" and the intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (3); *see, e.g., League of United Latin Am. Citizens v. Clements*, 884 F.2d 185, 189 n.2 (5th Cir. 1989). Additionally, in determining whether to permit intervention, courts should consider, among other factors, adequate representation from other parties and whether the proposed intervenor will "significantly contribute to full development of the underlying factual issues in the suit." *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 472 (5th Cir. 1984); *see also League of United Latin Am. Citizens*, 884 F.2d at 189.

Proposed Intervenors easily satisfy these standards. For the reasons described above, Proposed Intervenors' motion is timely. The common question of law or fact is obvious: Proposed Intervenors present questions about the appropriate breadth of any injunctive relief this Court orders. Those questions are necessarily a subset of the questions at issue in the main action in this case, through which Plaintiff States seek preliminary and permanent injunctive relief nationwide to enjoin the Termination Order, ECF no. 1, and its implementation before its effective date, ECF no. 24. And Proposed Intervenors' arguments plainly arise from the same set of facts as the claims of the existing parties: Defendants' termination of the Title 42 expulsion order. Thus, Proposed Intervenors meet the first requirement of permissive intervention.

Moreover, intervention will not unduly delay or prejudice the existing parties' rights for the same reasons Proposed Intervenors' motion is timely. *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 338 F.R.D. 364, 372 (W.D. Tex. 2021) ("The analysis as to whether the intervention will cause undue delay or prejudice is essentially the same as the timeliness analysis."). *See supra* Section I(A)(i).

A recent decision in this Circuit—in a case remarkably similar to this one—provides further support for Proposed Intervenors' position. In a lawsuit brought by Texas challenging the federal government's moratorium on removals, the Southern District of Texas granted a request to intervene much like this one. The court found that groups representing immigrants satisfied Rule 24 in a procedural posture very similar to this one: after issuance of a TRO but before decision on a preliminary injunction motion. *Texas v. United States*, No. 6:21-cv-00003 2021 WL 411441 at *2 (S.D. Tx. Feb. 6, 2021). That court found the request timely, and also that the claims and defenses of all parties, including proposed interveners, arose from the same set of facts and considerations. *Id.* It also found no undue prejudice or delay, and that the federal government's interests were "chiefly institutional and political,") whereas Proposed Intervenors were concerned "exclusively with the welfare of individuals directly affected" by the pause. *Id.* at *2-4. This Court should find the same.

## II.    Any preliminary injunction must be geographically limited to run only in the Plaintiff States.

In order to ensure they do not cause undue delay, Proposed Intervenors present here the primary arguments they would make if permitted to intervene regarding the scope of any relief this Court may order in response to Plaintiff States' preliminary injunction motion.

### A.  Injunctive relief must be tailored and proportional.

In issuing injunctive relief, federal courts must adhere to certain "requirements" enshrined over "several hundred years of history." *Hecht Co.* v. *Bowles*, 321 U.S. 321, 329 (1944); *see also*

*eBay Inc.* v. *MercExchange, LLC*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) (Although district courts are afforded some discretion in how they shape equitable remedies, "[d]iscretion is not whim." (citation omitted)). Indeed, although "equity is flexible," that flexibility is "confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarrollo S.A.* v. *Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). These principles require injunctive relief to be carefully tailored to the particular circumstances of a case, rather than dispensed reflexively and broadly. As Justice Baldwin recognized nearly two centuries ago, injunctions are "the strong arm of equity." *Bonaparte* v. *Camden & A.R. Co.*, 3. F. Cas. 821, 827 (C.C.D.N.J. 1830) (No. 1,617). There is no exercise of the equitable power "more delicate," nor "which requires greater caution, deliberation, and sound discretion," than issuing injunctive relief. *Id.*; *see also Weinberger* v. *Romero-Barcelo*, 456 U.S. 305*, 312 (1982). Thus, injunctions must be tailored to take account of case-specific factors. *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979).

Such tailoring requires taking a clear-eyed look at the precise nature of the injury that gave rise to the suit and modulating relief accordingly. *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). Where the injury to the prevailing party is slight, equitable relief should typically be correspondingly modest. *Milliken* v. *Bradley*, 418 U.S. 717, 738 (1974) (in "any equity case, the nature of the violation determines the scope of the remedy"); *see also Dayton Bd. of Educ.* v. *Brinkman*, 433 U.S. 406, 420 (1977) (same); *Austin Indep. Sch. Dist.* v. *United States*, 429 U.S. 990, 992 (1976) (Powell, J., concurring) (faulting the Court of Appeals for ordering a degree of injunctive relief "far exceeding in scope any identifiable violations"). To apply this principle of proportionality, courts fashioning injunctive relief must weigh the harm suffered by the plaintiff against the burdens of imposing injunctive relief on the defendant and the public at large, including persons— and states—not before the court. *eBay*, 547 U.S. at 391; *Weinberger*, 456 U.S. at 312.

16

Courts must also consider the viability of narrower alternatives. In *Trump* v. *International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (per curiam), for example, the Supreme Court trimmed an injunction that swept "much further" than what would have been necessary to redress the injuries of the plaintiffs and others "similarly situated." *Id.* at 2087-88. Likewise, in *Dayton*, the Supreme Court faulted the lower court because "instead of tailoring a remedy commensurate to the three specific violations, the Court of Appeals imposed a systemwide remedy going beyond their scope." 433 U.S. at 417. And, in *Lewis,* the Supreme Court struck down a sweeping injunction because the "violation ha[d] not been shown to be systemwide, and granting a remedy beyond what was necessary to provide relief to [plaintiffs] was therefore improper." 518 U.S. at 360.[11]

As Judge Sutton of the Sixth Circuit recently explained when staying a nationwide injunction entered on behalf of several states challenging federal immigration policy, "[a]t a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government. Even if it turns out that the three States in this case are entitled to relief, it is difficult to see why an injunction applicable only to them would not do the trick." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022).

To be clear, Proposed Intervenors do not contend that nationwide injunctions are never appropriate. But the normal mechanism for entering them should be through a class action certified under Rule 23. Rule 23's robust statutory scheme provides explicit mechanisms to protect nonparties. To "justify a departure from" the "usual rule that litigation is conducted by and on

---

[11] *See also New York* v. *DHS*, 969 F.3d 42, 87-88 (2d Cir. 2020) (limiting geographic scope of injunction against Trump Administration's public charge rule to three plaintiff states); *Innovation Law Lab* v. *Wolf*, 951 F.3d 986, 990 (9th Cir. 2020) (limiting geographic scope of injunction against Trump Administration's Migration Protection Protocols to Ninth Circuit); *Texas* v. *United States*, 14 F.4th 332, 341 (5th Cir. 2021) (partially staying injunction against Biden Administration's enforcement priorities, citing its nationwide scope), *vacated*, 24 F.4th 407 (5th Cir. 2021) (mem.), *appeal dismissed*, 2022 WL 517281 (5th Cir. Feb. 11, 2022).

behalf of the individual named parties only," Rule 23 requires that class representatives "*possess the same interest* and suffer the same injury as the class members." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348-49 (2011) (cleaned up) (emphasis added). In other words, the named plaintiffs must be "appropriate representatives of the class whose claims they wish to litigate." *Id.*[12]

Here, it appears highly unlikely (to put it mildly) that all 50 states would have agreed to let the Plaintiff States represent them in a nationwide class action under Rule 23. *Cf.* Brief of Illinois, *et al*. as *Amici Curiae, Biden v. Texas*, No. 21-954 (U.S. filed Mar. 21, 2022), 2022 WL 876862 (amicus brief filed by 17 states, including California, opposing suit by other states seeking to enjoin termination of MPP). Where, as here, the parties seek to proceed without the statutory safeguards that Rule 23 imposes, courts must take all the more care to weigh nonparty interests in evaluating the "public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312. Indeed, even in cases where all the requirements of Rule 23 are in place, the Supreme Court has cautioned that courts "should take care to ensure that nationwide relief is indeed appropriate in the case before it." *Califano*, 442 U.S. at 702.

---

[12] Similarly, when organizations or associations with members living throughout the country seek nationwide injunctions, the relevant equities in crafting injunctive relief are more akin to those present in class actions, and less like those raised here, because the organizations' structure can serve as an analog to Rule 23's representativeness requirement. See, e.g., *Richmond Tenants Org., Inc.* v. *Kemp*, 956 F.2d 1300, 1302, 1309 (4th Cir. 1992) (rejecting challenge to nationwide injunction in non-class action case brought by, *inter alia*, a national association of tenants' organizations, finding "[t]he injunction issued by the district court was appropriately tailored to prevent irreparable injury to plaintiffs[.]"); *Casa de Maryland, Inc.* v. *Wolf*, 486 F. Supp. 3d 928, 941, 972 (D. Md. 2020) (granting injunctive relief to all members of plaintiff organizations found to have associational standing on behalf of their members, including a national organization with thousands of members across the United States).

### B.  There is no justification for a nationwide injunction here.

A nationwide injunction would be entirely out of proportion with the showing of harm in support of Plaintiff States' argument for a preliminary injunction, and is not justified by the alleged general need for "uniform" immigration policy or the APA's remedial scheme.

#### i.        The alleged harm to Plaintiff States does not justify nationwide relief.

The Plaintiff States' briefing to date in support of their request for a nationwide injunction relies on injuries stemming from the increased cost of providing public services including "law enforcement, education, and health care spending" to immigrants who would come within their states as a result of the Termination Order. ECF no. 13-1 at 46. Plaintiff States also make additional allegations of harm to support their claim to standing, which they could conceivably point to to support the request for nationwide injunctive relief. None of the evidence on which they rely comes close to supporting that request.

First, Plaintiff States argue at length that "changes in federal immigration policy cause increased illegal immigration into their states and that illegal immigration causes increased costs to the states for law enforcement and social services," ECF no. 13-1 at 18. But they cite nothing explaining how those harms will result specifically *from the Termination Order*, much less how they will result from migrants who first enter California or New Mexico as a result of the Termination Order and only later enter Plaintiff states. That omission is fatal, as they must show harms "directly traceable" to the challenged policy even to establish standing, let alone to obtain nationwide relief. *Cf. California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (holding that plaintiff states failed to establish standing where they "failed to show how this injury is directly traceable to any actual or possible unlawful Government conduct[.]").

The evidence on which Plaintiff States rely further illustrates these defects. For example, Plaintiff States' discussion of costs associated with "[c]riminal [noncitizens]" and the "illegal drug

19

trade," ECF no. 13-1 at 20, does not trace those costs to the Termination Order, let alone its implementation in non-Plaintiff states like California and New Mexico. In other words, even if Plaintiff States suffer injury from costs associated with unauthorized immigration, including unlawfully present individuals who engage in the drug trade or commit other crimes, nothing in the record shows those costs result from individuals who would have otherwise been expelled under the Title 42 order but were instead released into the United States as a result of implementation of the Termination Order in California or New Mexico.

Indeed, many of the harms Plaintiff States allege are obviously not traceable to the Termination Order. Plaintiff States' evidence regarding "human trafficking," EFC no. 13-1 at 16, describes individuals coming here by passing through traffic lanes at ports of entry, ECF no. 13-6 at 4-5, through "loopholes in the U.S. H-2B Visa system," and by relying on individuals who have "overstayed their visas." ECF no. 13-4 at 12-13. All of those avenues exist regardless of Title 42. They do not show that allowing individuals to seek asylum at the border (in any state, let alone non-Plaintiff States) could result in more human trafficking. Indeed, the *only example* cited in the record of a case involving trafficking from a non-Plaintiff state occurred in December 2020, *when the Title 42 order was in effect*. It proves the opposite of Plaintiff States' claims: that Title 42 *failed to prevent* human trafficking. ECF no. 13-6 at 10.

The other evidence on which Plaintiff States rely also does not show harm traceable to Title 42, let alone in non-Plaintiff states. For example, Plaintiff States' assertion that "the Biden Administration predicts that, after Termination Order, 18,000 [migrants] could illegally cross the border per day," ECF no. 13-1 at 19, misstates the evidence, which is from an article stating "the Department of Homeland Security has enlisted Federal Emergency Management Administration (FEMA) officials to help prepare for as many as 18,000 migrants per day," ECF no. 13-2 at 25.

That projected figure does not specify the manner of entry such individuals might seek. Indeed, like Potential Intervenors here, it likely includes individuals who intend to present themselves at a port of entry to seek asylum. Alicia Decl. ¶ 15; Kevin Decl. ¶ 14. The extrapolation regarding the number of "gotaways" that could result is pure conjecture, but more importantly is also not traceable to Title 42: people seeking to evade authorities can do so whether or not the order is in place. Similarly, Plaintiff States' assertion that "Yuma Regional Medical Center ("YRMC") in Arizona was forced to provide $546,050 in unreimbursed medical care for unauthorized [immigrants]," ECF no. 13-1 at 21, refers to costs associated with providing services to individuals "while in ICE custody," ECF no. 13-2 at 4, not individuals who could enter undetected as a result of the termination of the Title 42 order.

To be clear, Proposed Intervenors do not argue here that Plaintiff States' allegations of harm fail to establish standing to bring this challenge. Rather, they note the defects in this evidence to show that even *if* it suffices to enjoin the Termination Order in *Plaintiff* states, basic equitable principles of remedial proportionality illustrate that this alleged injury does not come close to justifying a *nationwide* injunction. *See Dayton*, 433 U.S. at 420; *Lewis*, 518 U.S. at 361. Plaintiff States have offered no evidence to support the speculative supposition that people paroled into *other*, *non-Plaintiff* states who would otherwise have been expelled under Title 42 will travel to Plaintiff States and, once there, impose harms on those states. Nothing in the record thus far indicates there would be *any* such persons, let alone enough to justify a nationwide injunction.

The absence of such evidence is particularly striking given the severe harm that nationwide relief imposes on thousands of individual non-parties who will never impose any burden on the Plaintiff States. *Weinberger*, 456 U.S. at 312 (equity requires balancing non-party interests). The Title 42 order that Plaintiff States seek to keep in place bars access to asylum for people who, like

21

the Individual Intervenors, have *no intention of leaving California* prior to their cases being

resolved. *See* Alicia Decl. ¶ 20; Kevin Decl. ¶ 15. Indeed, it bars access to asylum even to those

whom the federal government would otherwise *keep detained* for the duration of their cases. *See*

*Texas v. Biden*, 20 F.4th 928, 995-96 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *cert. granted*, 142

S. Ct. 1098 (2022) (explaining DHS detains some applicants for admission pursuant to 8 U.S.C.

1225(b)), or who may be forced to wait in Mexico until the immigration courts decide their cases.

*See id*. Nationwide relief bars those individuals from accessing the asylum system, even though

they will never do anything that harms the Plaintiff States.

    As these examples illustrate, there is an obvious difference between enjoining the

Termination Order in Arizona and Texas (the only Plaintiff States situated along the border), and

enjoining it *everywhere else* on the Southern border. Where individuals enter the United States

through Arizona or Texas and use services there, the alleged economic harm to *those* states would

be directly traceable to the challenged federal policy. But any harm arising from individuals

entering through *other* states occurs only if those individuals later *move* to Arizona or Texas and

then use public services. Even if there were support in the record for the existence of *some* such

harm (which at present there is not), it would be far too attenuated, under basic equitable principles

of tailoring and proportionality, to justify relief beyond the Plaintiff States' borders, particularly

given the obvious countervailing harms the injunction would cause to non-parties in other states.

    Moreover, ordering nationwide relief for Plaintiff States without ever considering the

countervailing interests of other states would effectively permit a handful of states to set

nationwide immigration policy at the expense of those that did not participate in these proceedings.

Plaintiff States' economic interests are no more compelling than other states' countervailing

interests in, for example, expanding their tax bases and labor forces by welcoming paroled

noncitizens, or their interest in vindicating their residents' desire to be reunited with noncitizen family members who would otherwise be subject to Title 42. *See* Brief of Illinois, *et al*., No. 21-954 (noting the "wide range of benefits" to states arising from the federal government's decision to parole asylum seekers into the country, including "access to safe living conditions to family reunification."). To give just one example, Plaintiff States' stated economic interests in not expending costs associated with "educat[ing] [undocumented] children," ECF no. 13-1 at 21, runs directly counter to California's interest, which is to do just the opposite by funding extended educational opportunities for undocumented students in its state. *See* Cal. Educ. Code § 68130.5 (state law allowing qualifying undocumented students to pay in-state tuition at state community colleges and universities). Issuing a nationwide injunction would improperly privilege the Plaintiff States' interests, while disregarding core structural principles of interstate equality.

### ii.     Uniformity in immigration law does not justify nationwide relief.

The Plaintiff States also request nationwide relief due to the need for uniformity in immigration law, but that does not suffice to support a nationwide injunction in this case. Despite Plaintiff States' passing suggestion that immigration law must necessarily be uniform, ECF no. 13-1 at 47, splits in the lower courts and across regions routinely result in non-uniform immigration policies. For example, in the context of MPP, a comparable border policy concerning asylum, from January 2020 to July 2021, a class-wide preliminary injunction entered in the Southern District of California required CBP to provide access to counsel to people in MPP *nonrefoulement* interviews. However, that order was not binding outside California, and the government did not implement it elsewhere. *See Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *Doe v. Mayorkas*, 854 F. App'x 115 (9th Cir. 2021). Similar examples of limited injunctions abound. Since 2018, a class-wide preliminary injunction entered in the District of Columbia has required arriving asylum seekers found to have a credible fear of persecution to be considered for parole under a previously

issued parole directive, and has prohibited ICE from detaining them absent an individualized determination on flight risk or danger. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018). But it applies only to people in ICE custody in the jurisdiction of the Detroit, El Paso, Los Angeles, Newark, and Philadelphia field offices. *Id.* at 325. As is true in those cases, it remains eminently practicable here to limit the scope of the injunction to apply in only some geographic areas.

While policy uniformity is a valid factor informing the scope of injunctive relief, it is but one of many that courts should consider in fashioning tailored relief. Otherwise, every case involving federal immigration policy (and in many other areas of federal policy as well) would require nationwide relief, regardless of the extent of injury. That is not our system. *See DHS v. New York*, 140 S. Ct. at 600 (Gorsuch, J. concurring) ("The traditional system of … courts issuing interlocutory relief limited to the parties at hand" "encourages multiple judges … and circuits to weigh in only after careful deliberation, a process that permits the airing of competing views[.]").

### iii.   The APA does not mandate nationwide relief.

That this case involves a claim under the Administrative Procedure Act ("APA") does not necessarily require nationwide relief. Neither the Supreme Court nor the Fifth Circuit has ever held that the phrase "shall . . . hold unlawful and set aside" in 5 U.S.C. 706(a)(2) mandates district courts to issue nationwide injunctions against the federal government in every case. Nor should it. In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court explained that "no recourse to the additional and extraordinary relief of an injunction" was warranted for an APA violation where *"partial* or complete vacatur" was possible. *See* 561 U.S. 139, 165-66 (2010) (emphasis added).

Moreover, the APA does not displace traditional principles of equitable remedial discretion to *require* nationwide injunctions whenever a court finds agency action unlawful. *Hecht* confronted an analogous situation in which a lower court interpreted the Emergency Price Control Act to require an injunction once a violation was found. 321 U.S. at 321-22, 326. Emphasizing

24

that "equity practice with a background of several hundred years of history" was distinguished by "[f]lexibility rather than rigidity," the Court declined to adopt the view that under all circumstances in which a violation is found, the court must issue an injunction, holding that "if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made." *Id.* at 329. More recently, the Supreme Court recognized it "should not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary." *Miller* v. *French*, 530 U.S. 327, 340 (2000) (citations omitted); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009).

The plain text of Section 706's grant of authority to "set aside" an order says nothing about whether a court's ruling should govern the federal government's conduct as to nonparties. And nothing in the legislative background of the APA's enactment suggests the APA's "set aside" language requires mandatory nationwide injunctions in all APA cases. *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 313-14 (2003). Without a clear command to the contrary, this Court retains equitable authority to order a remedy that is appropriately tailored to the needs of this case; it is not required to issue a nationwide injunction simply because Plaintiff States present a claim under the APA.

For these reasons, any injunctive relief should run only in the Plaintiff States.

## CONCLUSION

This Court should grant Proposed Intervenors' Motion for Limited Intervention.

*/s/ Monika Y. Langarica* (T.A.)
Monika Y. Langarica*
CA Bar No. 308518
Ahilan Arulanantham*
CA Bar No. 237841
Talia Inlender*
CA Bar No. 253796
**Center for Immigration Law and Policy**
**UCLA School of Law**

25

Box 951476
Los Angeles, CA 90095
(310) 983-3345
langarica@law.ucla.edu


*/s/ Matthew S. Vogel*
Matthew S. Vogel+
LA Bar No. 35363
Sirine Shebaya*
DC Bar No. 1019748
Joseph Meyers*++
CA Bar No. 325183
**National Immigration Project of the National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
matt@nipnlg.org

\* *Motions to appear* pro hac vice *forthcoming*
+ Not admitted in DC; working remotely from and admitted in Louisiana only
++Not admitted in DC; working remotely from and admitted in California only