UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| STATE OF ARIZONA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> CENTERS FOR DISEASE CONTROL & PREVENTION, *et al.*, <br><br> *Defendants*. | Civil Action No.: 6:22-cv-00885-RRS-CBW <br><br> Judge: Robert R. Summerhays <br> Magistrate Judge: Carol B. Whitehurst |

**DECLARATION OF STEPHEN MANNING
IN SUPPORT OF PROPOSED INTERVENORS'
MOTION FOR LIMITED INTERVENTION**

## DECLARATION OF STEPHEN MANNING

I, Stephen W. Manning, declare as follows:

I have personal knowledge of the facts set forth below and, if called to testify, I could and would do so competently.

1. I am an attorney licensed to practice in the State of Oregon and am a member in good standing of the bars of the United States District Court for the District of Oregon, the United States Court of Appeals for the Ninth Circuit, and the Supreme Court of the United States. I am a member of the American Immigration Lawyers Association ("AILA"), a former member of the Board of Governors of AILA, and a former Chair of the Oregon Chapter of AILA. I am over 18 and have personal knowledge of the facts described herein.

2. I am the Executive Director of Innovation Law Lab ("Law Lab"), a nonprofit in Oregon that I founded to defend and improve the legal rights of immigrants and refugees in the United States. Law Lab's mission is to leverage law, technology, and organizing to fight for immigrant and refugee justice. As part of that mission, Law Lab aims to increase access to legal representation and legal resources for asylum-seeking individuals from Central America and other parts of the world, the majority of whom arrive in the United States at the southern border.

3. In my role at Law Lab, I have designed and led multiple efforts that seek to provide effective legal representation and assistance to asylum-seeking individuals. For example, I led the organizing of the Artesia Pro Bono Project in 2014 and the Dilley Pro Bono Project in 2015-2016, both of which are detention-based projects that provided universal representation to detained families in rapid removal proceedings. I designed the model for the Southeast Immigrant Freedom Initiative, an initiative of the Southern Poverty Law Center in collaboration with Law Lab, to provide representation to adult noncitizens detained at immigration facilities in the Southeastern

1

United States in 2017. I also designed and directed the pro bono representation project called the Centers of Excellence, which have provided support to noncitizens and their pro bono attorneys including legal, technical, and strategic assistance in the preparation and presentation of claims.

4. In Oregon, I direct Equity Corps of Oregon, colloquially known as ECO, which is a universal representation project that provides legal representation to asylum-seeking individuals in removal proceedings, many of whom first sought asylum at the southern Border.

5. To support the provision of legal representation to asylum seekers, under my direction, more than one hundred pro bono lawyers have been trained on asylum and removal defense. These are lawyers from large, medium, and small firms, solo practices, and in-house counsel.

6. The Artesia Pro Bono Project provided representation to more than 700 women and children who were detained at the Artesia Family Residential Center in Artesia, New Mexico, including representation during their credible and reasonable fear screenings, applications for release, and merits adjudication on immigration relief. The Artesia Pro Bono Project lasted six months and ended when the detention center in Artesia was closed in December 2014.

7. The Dilley Pro Bono Project, which continues to operate at the South Texas Family Residential Center, has represented more than 70,000 noncitizens during proceedings since its inception in 2015.

8. In 2015, I was awarded the AILA Founder Award as a person who had the most substantial impact on the field of immigration law or policy in relation to the Artesia Pro Bono Project and the Dilley Pro Bono Project. In 2017, I was named the most innovative lawyer in North America by *Financial Times* for my work in creating these immigrant and refugee representation detention-based projects.

*Law Lab's Mission-Driven Programming*

9. Since its founding, Law Lab has engaged in extensive program activity to further its mission of ensuring access to the asylum system. For example, in 2018, Law Lab mobilized around the civil detention of 123 asylum-seeking immigrant men at the Federal Correctional Institution Sheridan, Oregon ("FCI Sheridan"). Law Lab provided pro bono legal representation to every person in the Sheridan cohort who requested our representation. In collaboration with almost 200 legal advocates and community members, Law Lab represented 80 men from 11 different countries. Every individual represented by Law Lab was found to have a credible fear of persecution or torture. For most individuals, this outcome led to the conclusion of expedited removal proceedings, the initiation of immigration judge § 240 proceedings (i.e., full removal proceedings), and eligibility for release from detention. All but three of our 80 clients were released from FCI Sheridan on bond or parole.

10. In furtherance of Law Lab's mission-driven endeavor to increase access to legal representation and legal resources for asylum-seekers, the organization also created the Anticarceral Legal Organizing (AcLO) program to provide supports to asylum-seeking individuals in Mexico who seek to enter or who have recently entered through the US-Mexico border. In California and New Mexico, two of the states where AcLO operates, the federal government subjects many asylum seekers to detention. Law Lab's AcLO program is designed so that attorneys and advocates who are unable to physically enter a detention center because of its remoteness can support asylum-seeking individuals by providing services using technology-based, cloud systems.

11. For example, Law Lab manages a clearinghouse to support the representation of asylum-seekers subject to detention in three New Mexico ICE detention centers: Otero County Processing Center, Cibola County Correctional Center, and Torrance County Detention Facility.

3

In support of our mission to support asylum-seeking individuals, AcLO conducts in-person legal visits to interview individuals for legal representation, develops and provides pro se materials to asylum-seeking individuals, manages referrals to other partner organizations, and provides direct legal representation to some individuals.

12.     Likewise, in California, in furtherance of its mission, Law Lab is a founding partner of the Imperial Liberation Collaborative (ILC), through which Law Lab provides legal representation and advocacy to asylum seekers who are detained in the Imperial Regional Detention Facility (IRDF) in Calexico, California. In collaboration with partner organizations of ILC, Law Lab provides mission-related work including legal orientation, consultation, pro se support, and legal representation in immigration court and before U.S. Immigration and Customs Enforcement.

13.     Through these and other mechanisms, Law Lab invested substantial resources in developing systems to support asylum seekers who sought entry into California and New Mexico prior to the implementation of the Title 42 expulsion order. For example, Law Lab invested resources to design and implement, in collaboration with other partner organizations, workshops for asylum-seeking individuals who lived in or were transiting through Tijuana and greater Baja California, Mexico, to support them in properly accessing the asylum system at the San Ysidro port of entry. Law Lab also assisted partner organizations to create and implement systems to track cases that had received legal assistance through the legal workshop with the goal of providing the follow-up assistance that individuals need to gain access the U.S. asylum system.

*Frustration of Law Lab's Mission*

14.     Since the implementation of the Title 42 expulsion order, Law Lab's core mission and function have been frustrated on multiple levels. While Law Lab has historically redirected its

services and diverted resources to find new ways to serve asylum-seeking individuals in their efforts to gain access to the asylum system in the U.S. when faced with roadblocks of various kinds, the wholesale blockade of the asylum system imposed by the Title 42 order has stalled certain core aspects of our mission-related programming. The Title 42 order has seriously undermined our organizational mission of leveraging advocacy, technology and the law to fight for immigrant and refugee justice.

15. Title 42 has frustrated Law Lab's ability to provide access to legal resources to asylum-seeking individuals in Tijuana and Baja California who are fleeing persecution and harm, as it has significantly undermined the utility of Law Lab's program conducting workshops and distributing pro se materials that promote safe and fair access to the asylum system.

16. The Title 42 order has also frustrated Law Lab's clearinghouse programs, including massive collaborative representation projects with partner organizations in California, New Mexico, and elsewhere. Those programs provide access to counsel and pro se support services for asylum seekers. Because the Title 42 order makes it much more difficult for asylum-seeking individuals to access the asylum system in the first place, it directly threatens Law Lab's ability to provide this core set of services. The Title 42 order has significantly decreased the number of persons in asylum proceedings who Law Lab has been able to serve, thereby frustrating Law Lab's ability to fulfill its mission.

17. The Title 42 order also undermines Law Lab's mission because far fewer pro bono attorneys are able to provide representation to asylum seekers stranded in Mexico, as opposed to those detained (or released) in the United States. Most of the pro bono attorneys within Law Lab's existing network do not have the time, skill, or capacity to engage in representation for individuals living in Mexican shelters or refugee camps. In this way, Title 42 undermines Law Lab's mission

5

and one of Law Lab's core functions: engaging and supporting pro bono attorneys to provide direct representation to asylum-seeking individuals.

*Diversion of Law Lab's Resources*

18. Apart from the various ways in which the Title 42 order has frustrated Law Lab's mission, responding to the order has required and will continue to require Law Lab to divert its limited resources from core service objectives. The attorneys and staff who manage Law Lab's projects have had to shift their organizational focus, time, and other resources to providing legal orientation and pro se assistance in a completely new context that has resulted in geographical, logistical, and financial challenges to the organization, and has shifted focus away from critical, ongoing matters and clients served by existing projects. This diversion of Law Lab's resources, which has been necessary to counter the frustration of its mission and meet the needs of individuals denied access to the asylum system by Title 42, diminishes the organization's ability to support existing programs that seek to facilitate access to asylum.

19. For example, Law Lab's mission-driven work to create accountability within the asylum system has been significantly hindered by the Title 42 order. Law Lab has long been engaged in research and policy advocacy centered around improving due process and access to justice in the asylum system. Title 42 has forced us to turn our attention away from that research, and the development of new resources based on it, in order to continue to respond to the impacts of Title 42 on our existing programs and clients.

20. Law Lab's work with the California Welcoming Task Force presents a prime example of such diversion. Law Lab is a lead member of the California Welcoming Task Force, a binational coalition dedicated to re-envisioning how the U.S. can welcome people seeking asylum safely and expeditiously at our border. As part of its work with the Task Force, Law Lab and its

partners developed educational materials and other resources to provide asylum-seeking individuals with information about current border policies that impact their access to the U.S. asylum system. As the Title 42 policy and its various exemptions have varied over time, Law Lab and the Task Force have expended significant resources to combat misinformation among asylum-seeking individuals in Mexico – both rumors from uninformed individuals and disinformation from entities that have sought to take advantage of vulnerable migrants by spreading and capitalizing on false rumors that they can help them enter the United States despite Title 42. Through its work in the Task Force's communication sub-group, Law Lab has diverted resources to develop visual and audio materials to combat this misinformation and to advocate with Biden administration officials about ending Title 42 and more clearly communicating its current state to individuals seeking asylum. If Title 42's termination does not take effect due to litigation, this reversal in policy would compel Law Lab and the Task Force to continue diverting resources to combat another prime opportunity for misinformation and exploitation of asylum-seeking individuals on the border.

21. Law Lab's efforts to develop materials to inform asylum seekers of their rights in the asylum process have been especially challenging in light of the unprecedented circumstances surrounding the Title 42 expulsion order itself. For example, it is unclear under what circumstances individuals who have been subject to the Title 42 order may have an opportunity to present their asylum claims to Department of Homeland Security officials and immigration courts, whether they may benefit from access to counsel to try to present their asylum claims, and how any such access would occur in practice. This uncertainty significantly undermines the ability of Law Lab to provide effective representation and accurate information to asylum-seeking individuals. The only way to eliminate the uncertainty wrought by the order is to terminate the order itself.

22. In addition to everything mentioned above, the Title 42 order has required Law Lab to respond to a flood of inquiries and community uncertainty from the immigrant communities we serve regarding the unprecedented changes to asylum policy the order has created.

23. In sum, the Title 42 order has had and continues to have significant negative effects on Law Lab's existing mission-driven programs. Those harms are very difficult, and in some cases impossible, to remediate. In addition, the Title 42 order has prevented Law Lab from developing new programs and resulted in the repeated and substantial diversion of its limited resources.

I hereby declare under the penalty of perjury pursuant to the laws of the United States that the above is true and correct to the best of my knowledge.

EXECUTED this 9th day of May, 2022.

_____
Stephen W. Manning, OSB #013373