# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

**STATE OF LOUISIANA ET AL.,**

  *Plaintiffs,*         **Case No. 6.22-cv-00885-RRS-CBW**

**v.**

**CENTERS FOR DISEASE CONTROL &
PREVENTION, ET AL.,**

  *Defendants*.

**BRIEF OF CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
AND THE IMMIGRATION AND DEPORTATION DEFENSE CLINIC AS
*AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION[1]**

          WILLIAM QUIGLEY (La. Bar No. 7769)
          Professor of Law
          Loyola University College of Law
          7214 St. Charles Avenue
          New Orleans, LA. 70118
          Telephone: (504)710-3074
          Facsimile: (504)861-5440
          Email: quigley77@gmail.com
          *Admitted to Practice in W.D. La.*

---

[1] The parties have consented to the filing of this brief. *See* Unopposed Motion for Leave To File Brief As *Amicus Curiae* by Center For Human Rights and Constitutional Law and The University of San Francisco School of Law's Immigration and Deportation Defense Clinic In Opposition to Plaintiffs' Motion for Preliminary Injunction. No party's counsel authored this brief in whole or in part, and no person or entity other than *amici* made a monetary contribution intended to fund the preparation or submission of this brief. Cf. Fed. R. App. Proc. 29(a)(4)(E).

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
PETER A. SCHEY (Cal. Bar No. 58232)*
TAYLOR KOEHLER (Mn. Bar No. 0402207)*
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Facsimile: (213) 386-9484
Email: pschey@centerforhumanrights.org
        taylor@centerforhumanrights.org
*pro hac vice applications forthcoming

USF SCHOOL OF LAW IMMIGRATION CLINIC
BILL ONG HING (CAL. BAR NO. 61513)*
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu
*pro hac vice application forthcoming

/ / /

# TABLE OF CONTENTS

Page

I. INTEREST OF THE AMICI PARTIES .................................................................................. 1

II. BACKGROUND ................................................................................................................ 2

III. ARGUMENT .................................................................................................................... 3

    a. THE PUBLIC INTEREST FAVORS THE TERMINTION OF THE TITLE 42 POLICY BECAUSE EXISTING IMMIGRATION LAWS ARE BETTER SUITED TO ADDRESSING MIGRATION AT THE SOUTHERN BORDER. ...................................... 4

IV. CONCLUSION ............................................................................................................... 10

/ / /

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Sepulvado v. Jindal,* 729 F.3d 413 (5th Cir. 2013) .......................................................................... 4
*Texas v. United States*, 328 F. Supp. 3d 662 (S.D. Tex. 2018) ....................................................... 4

### Statutes

8 U.S.C. § 1225(b)(1)(A)(ii) ............................................................................................................ 9
8 U.S.C. §1182(a)(9) ....................................................................................................................... 6
INA § 235(b)(1) .......................................................................................................................... 8, 9

### Other Authorities

*A Guide to Title 42 Expulsions,* American Immigration Council (Oct. 15, 2021) .......................... 7
Hillel R. Smith, Congressional Research Service, *Expedited Removal of Aliens: An Introduction*
    (Mar. 25, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11357 ............................. 8, 9
Migration Policy Institute, "Controversial U.S. Title 42 Expulsions Policy is Coming to an End,
    Bringing New Border Challenges" (Mar. 31, 2022),
    https://www.migrationpolicy.org/article/title-42-expulsions-policy ......................................... 7
*The Opposite of Orderly and Humane: Use of Title 42 Spurs Disorder and Undermines Security*,
    Human Rights First (Feb. 2022), *available at*
    https://www.humanrightsfirst.org/sites/default/files/Title42SpursDisorderUnderminesSecurity.
    pdf .............................................................................................................................................. 5
U.S. Customs and Border Protection, "CBP Releases January 2022 Monthly Operational
    Update," (Feb. 18, 2022), https://www.cbp.gov/newsroom/national-media-release/cbp-
    releases-january-2022-monthly-operational-update#. ............................................................... 8
U.S. Dep't of Homeland Security, *Homeland Threat Assessment* 21 (Oct. 2020),
    https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-
    assessment.pdf ........................................................................................................................... 6
U.S. Gov't Accountability Office, *Border Security: CBP's Response to COVID-19* (June 2021) 5

/ / /

## I.     INTEREST OF THE AMICI PARTIES

The Center for Human Rights and Constitutional Law ("CHRCL") (www.centerforhumanrights.org) is a non-profit, public interest legal foundation dedicated to furthering and protecting the civil, constitutional, and human rights of immigrants and refugees, among others. Since its incorporation in 1980, CHRCL has provided a wide range of legal services to vulnerable individuals, including immigrants and refugees, and technical support and trainings to legal aid attorneys in the areas of immigration and constitutional law. CHRCL is invested in ensuring that agencies of the federal Government implement policies that are consistent with federal laws, including the Administrative and Procedures Act ("APA"), the Immigration and Nationality Act. ("INA") and the U.S. Constitution. To that end, CHRCL has successfully undertaken numerous class action cases challenging policies and practices of federal works to advance and protect the constitutional and statutory rights of individuals seeking asylum and legal status in the United States. In addition to providing direct legal services, CHRCL has litigated to protect immigrants' rights to access asylum and other relief under U.S. law and has appeared as *amici* in cases like this one that impact its organizational mission and ability to serve clients.

The Immigration and Deportation Defense Clinic (https://www.usfca.edu/law/professional-skills/law-clinics/immigration-deportation)

1

represents unaccompanied immigrant children and families who are in removal proceedings. The majority of clients are seeking asylum and come from Central America and Mexico. Under the supervision of the director and supervising attorney, students represent clients in various phases of immigration proceedings, including those subject to expedited removal. Through their work, students learn how to be ethical and successful immigration attorneys in a nonprofit setting. Implementation of Title 42 has prevented and continues to prevent immigrants from having access to the legal services that it is the Immigration and Deportation Defense Clinic's primary mission to provide.

## II. BACKGROUND

On April 1, 2022, the Centers for Disease Control and Prevention ("CDC") issued a Public Health Determination and Order ending migrant expulsions under the Title 42 Order and setting an implementation date of May 23, 2022 (hereinafter "Termination Order"). Public Health Determination and Order Regarding the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists (Apr. 1, 2022), Compl., Ex. A, ECF No. 1-1, at 29.

In issuing this Termination Order, CDC Director Rochelle Walensky determined that the "suspension of the introduction of covered noncitizens [migrants subject to the Title 42 Policy] is no longer required in the interest of public health." *Id*. at 5.

Plaintiffs seek to enjoin the Termination Order in full, believing continued enforcement of the Title 42 Policy necessary for migration control at the southern border in order to prevent an unprecedented influx of undocumented migrants. Compl., ECF No. 1, at 1-12. Although Plaintiffs recognize that the Title 42 Policy was formally implemented under a public health code as a specific response to the COVID-19 public-health emergency, they argue that its continued implementation is justified by the threat of a "wave of illegal migration and drug trafficking" which will "overwhelm the Southern border." *Id*. at 8. In seeking a Preliminary Injunction, Plaintiffs argue that they will be irreparably harmed if the Department of Homeland Security ("DHS") uses existing immigration procedures outlined in the Immigration and Nationality Act ("INA") to manage undocumented migration at the southern border, instead of the Title 42 Policy. *See* Pls. Mem. Supp. Mot. Prelim. Inj., ECF. No. 13-1, at 40-41. As *amici* will discuss *infra*, this is simply not the case.

### III. ARGUMENT

In considering a motion for a preliminary injunction, this Court must consider whether Plaintiffs have shown "(1) a substantial likelihood of success on the merits (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) the grant of an injunction will not disserve the public interest." *Sepulvado v. Jindal,* 729 F.3d 413, 417 (5th Cir. 2013).

The public interest "should be given considerable weight" in a preliminary injunction analysis, and "[i]f no public interest supports granting preliminary relief, such relief should ordinarily be denied." *Texas v. United States*, 328 F. Supp. 3d 662, 740-41 (S.D. Tex. 2018). This *amicus* brief addresses the preliminary injunction factor relating to the public interest. It is clear in this case that the public interest strongly favors Defendants' termination of the Title 42 Policy and thus the denial of Plaintiffs' requested preliminary injunction.

    a. **THE PUBLIC INTEREST FAVORS THE TERMINTION OF THE TITLE 42 POLICY BECAUSE EXISTING IMMIGRATION LAWS ARE BETTER SUITED TO ADDRESSING MIGRATION AT THE SOUTHERN BORDER.**

As Plaintiffs emphasize in their Complaint, they are concerned with the number of undocumented migrants crossing the southern border and fear the country's border policies "devolving into an unmitigated chaos and catastrophe" if the Title 42 Policy is terminated. *See* Complaint, ECF No. 1, at 1. Yet, the Title 42 Policy has continuously failed to achieve its tacit goal of preventing undocumented migration, let alone its stated public-health purposes, but has instead made the southern border more insecure.

In 2021, the U.S. Government Accountability Office released a report entitled *Border Security: CBP's Response to COVID-19*, and not unsurprisingly to *amici*, the report concluded that the Title 42 Policy had "negatively affected enforcement" at the

southern border, as the expedited expulsions under the Title 42 Policy prevented border patrol agents from collecting critical intelligence from migrants, particularly concerning smuggling and other illegal conduct. *See* U.S. Gov't Accountability Office, *Border Security: CBP's Response to COVID-19* (June 2021)

The minimal "in-the-field" processing of migrants under Title 42 prevents border agents from conducting formal and thorough interviews with apprehended migrants during which important law enforcement information may be gathered. *Id*. at 40. This is of particular concern as Mexican cartels, which present a serious threat to U.S. security, are "increasingly fighting to exercise even greater control over border regions." *The Opposite of Orderly and Humane: Use of Title 42 Spurs Disorder and Undermines Security*, Human Rights First (Feb. 2022), *available at* https://www.humanrightsfirst.org/sites/default/files/Title42SpursDisorderUndermines Security.pdf.

A 2020 U.S. Department of Homeland Security threat assessment affirms this conclusion with its finding that "among [transnational criminal organizations], Mexico-based cartels pose the greatest threat to the [U.S.] because of their ability to control territory – including along the U.S. Southwest Border – and co-opt parts of government, particularly at a state and local level." U.S. Dep't of Homeland Security, *Homeland Threat Assessment* 21 (Oct. 2020), https://www.dhs.gov/sites/default/files/publications/2020_10_06_homeland-threat-

assessment.pdf. Moreover, these cartels treat vulnerable migrants like commodities, reaping profits as they smuggle them across the southern border.

The Title 42 Policy also weakens the border security system by encouraging recidivism. Unlike the INA, Title 42 does not subject migrants who have been removed to long-term consequences, such as a bar on future immigration benefits. For example, the INA makes permanently inadmissible certain migrants previously removed under the Title 8. *See* 8 U.S.C. §1182(a)(9). Since Title 42 is a public health law with public-health related purposes, removal under it does not carry the usual penalties for repeat entries found in the INA. As a result, recidivism is encouraged, with migrants expelled under Title 42, particularly single adults who have little reason not to attempt repeat crossings of the southern border.

While the number of encounters at the border has been consistently increasing, with nearly twice as many border apprehensions in Fiscal Year 2021 than in Fiscal Year 2019, the number of individual migrants attempting to enter the U.S. without inspection is not as high as the numbers may suggest. Encounter numbers refer only to apprehension events, not individuals, so "a single person trying to cross the border can be caught, expelled, and then repeat the attempt multiple times, each of which would count as a new expulsion." Migration Policy Institute, "Controversial U.S. Title 42 Expulsions Policy is Coming to an End, Bringing New Border Challenges" (Mar. 31, 2022), https://www.migrationpolicy.org/article/title-42-expulsions-policy. This is

exactly what has been happening at the southern border under the Title 42 Policy. An analysis of Customs and Border Protection estimates by the American Immigration Society suggest that the number of unique apprehensions was likely only 24% higher in 2021 than in 2019. *See A Guide to Title 42 Expulsions,* American Immigration Council (Oct. 15, 2021), *available at* https://www.americanimmigrationcouncil.org/sites/default/files/research/title_42_expulsions_at_the_border.pdf.

Using data from CBP and DHS, The Migration Policy Institute reported: "From April through September 2020, 47% of all single adults encountered by Border Control had been encountered in the previous 12 months – *more than double the pre-Title 42 rate of 23% from 2014 through March 2020*." See MIGRATION POLICY INSTITUTE, "Controversial U.S. Title 42 Expulsions Policy is Coming to an End, Bringing New Border Challenges" (Mar. 31, 2022) (emphasis added), https://www.migrationpolicy.org/article/title-42-expulsions-policy.

U.S. Customs and Border Protection ("CBP") clearly acknowledges that its encounter statistics "overstate the number of unique individuals arriving at the border." U.S. Customs and Border Protection, "CBP Releases January 2022 Monthly Operational Update," (Feb. 18, 2022), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2022-monthly-operational-update#.

Thus, the Title 42 Policy is ultimately inefficient as a border enforcement tool as it encourages migrants who have been expelled to repeatedly attempt crossings, creating additional work for border control agents and further taxing the U.S.'s migration control system.

Neither the Plaintiffs nor the border states need the Title 42 Policy to manage migration at the southern border. In the absence of the Title 42 Policy, adult migrants would be rapidly processed and removed under Title 8 of the U.S. Code, the traditional means of dealing with undocumented migrants apprehended at the border prior to the COVID-19 pandemic. Title 8 provides for a streamlined detention and "expedited removal" process for migrants who enter the U.S. without inspection. *See* INA § 235(b)(1).

Migrants subject to expedited removal can be summarily removed "without further hearing or review" if they are determined by DHS to be "inadmissible either because they (1) lack valid entry documents, or (2) tried to procure their admission into the United States through fraud or misrepresentation." Hillel R. Smith, Congressional Research Service, *Expedited Removal of Aliens: An Introduction* (Mar. 25, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11357. Expedited removal is typically applied to "(1) arriving aliens (defined by regulation as aliens arriving at U.S. ports of entry); (2) aliens who entered the United States by sea without being admitted or paroled into the United States, and who have been in the country less than

two years; and (3) aliens apprehended within 100 miles of the U.S. border within 14 days of entering the country, and who have not been admitted or paroled." *Id.*

Moreover, the fear that migrants awaiting an order of expedited removal under Title 8 will simply be released into the U.S is unfounded. INA § 235(b)(1) requires the detention of undocumented migrants placed in expedited removal or going through a credible fear determination for an asylum claim. Thus, when undocumented migrants are apprehended at the border, they are placed into and almost all remain in immigration detention.

Title 8 does permit apprehended migrants a limited right to seek asylum protection. 8 U.S.C. § 1225(b)(1)(A)(ii). However, apprehended single adult migrants are detained pending a credible fear interview and if any asylum officer or Immigration Judge determines that the migrant does not possess a credible or reasonable fear of return, then the undocumented migrant is ordered removed without further review. 8 U.S.C. §1225(b)(1)(B)(iii)(I). Individuals who are found to have a credible or reasonable fear of persecution may still be detained while further review of their asylum case is pending. 8 U.S.C. § 1225(b)(1)(B)(ii).

The streamlined nature of expedited removal statutes under Title 8 allows for the detention and rapid removal of migrants who entered without inspection and do not possess a statutory right to remain in the U.S. This appears to be precisely the result Plaintiffs desire. The southern states and the public have an interest in having

migration along the southern border effectively and efficiently managed, and also hopefully have an interest in ensuring that migrants actually eligible for relief under statutes enacted by Congress have access to such relief. The latter number is obviously small compared to the numbers of migrants apprehended entering without inspection. Neither the southern states nor the public have an interest in having migration along the southern border controlled by a Title 42 mandate that encourages recidivism while also preventing migrants eligible for relief under statures enacted by Congress – including, for example, derivative U.S. citizens (8 U.S.C. § 1431), victims of trafficking (8 U.S.C. § 1101(a)(15)(T)), and abused, abandoned, or neglected minors (8 U.S.C. § 1101(a)(27)(J)) – to establish their possible eligibility for relief from summary removal.

### IV.     CONCLUSION

Plaintiffs' request that this Court enjoin Defendants implementation of the Order terminating the Title 42 Policy disserves the public interest. The termination of the Title 42 Policy not only protects the rights of a small number of migrants who may avoid removal if the Government applies Title 8 procedures at the border, but also

allows for undocumented migration to be better and more effectively managed at the southern border than it has been since Title 42's implementation.[2]

Dated: May 11, 2022          Respectfully Submitted,

*/s/ William Quigley*
WILLIAM QUIGLEY (La Bar No. 7769)
Professor of Law
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA. 70118
Telephone: (504)710-3074
Facsimile: (504)861-5440
Email: quigley77@gmail.com
*Admitted to Practice in W.D. La.*

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
PETER A. SCHEY (Cal. Bar No. 58232)
TAYLOR KOEHLER (Mn. Bar No. 0402207)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: pschey@centerforhumanrights.org
    taylor@centerforhumanrights.org
**pro hac vice applications forthcoming*

USF SCHOOL OF LAW IMMIGRATION CLINIC
BILL ONG HING (CAL. BAR NO. 61513)
2130 Fulton Street
San Francisco, CA 94117-1080
Telephone: (415) 422-4475
Email: bhing@usfca.edu
**pro hac vice application forthcoming*

---

[2] Final note: The *amici* do not support every aspect of the Government's Title 8 expedited removal powers but nevertheless believe enforcement of those powers exceed the Title 42 powers in managing the border and discouraging recidivism.

11

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2022, a true and correct copy of the foregoing document was filed electronically through the Court's CM/ECF system, and will be served on counsel for all parties by operation of the Court's electronic filing system.

*/s/ William Quigley*
WILLIAM QUIGLEY (La Bar No. 7769)