# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

|  |  |
|---|---|
| STATE OF ARIZONA, *et al.*,<br><br><br>        *Plaintiffs*,<br><br>    v.<br><br>CENTERS FOR DISEASE CONTROL & PREVENTION, *et al.,*<br><br>        *Defendants.* | Civil Action No.: 6:22-cv-00885-RRS-CBW<br><br><br>Judge: Robert R. Summerhays<br>Magistrate Judge: Carol B. Whitehurst |

## BRIEF FOR *AMICI CURIAE* ALICIA DE LOS ANGELES DURAN RAYMUNDO, KEVIN ALEXI DE LEON DE LEON, AND INNOVATION LAW LAB

Monika Y. Langarica*, CA Bar No. 308518
Ahilan Arulanantham*, CA Bar No. 237841
Talia Inlender*, CA Bar No. 253796
Center for Immigration Law and Policy
UCLA School of Law
Box 951476
Los Angeles, CA 90095
(310) 983-3345
langarica@law.ucla.edu

Matthew S. Vogel+, LA Bar No. 35363
Sirine Shebaya*, DC Bar No. 1019748
Victoria F. Neilson*++, NY Bar No. 2689792
Joseph Meyers*+++, CA Bar No. 325183
National Immigration Project
of the National Lawyers Guild (NIPNLG)
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(202) 656-4788
matt@nipnlg.org
*Counsel for Amici Curiae*

* Admitted *pro hac vice*
+ Not admitted in DC; working remotely from and admitted in LA only
++Not admitted in DC; working remotely from and admitted in NY only
+++ Not admitted in DC; working remotely from and admitted in CA only

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTERESTS OF AMICI CURIAE.................................................................................. 1

INTRODUCTION ........................................................................................................... 3

    I.    Any preliminary injunction must be geographically limited to run only in the Plaintiff States. ........................................................................................................................... 4

    II.    There is no justification for a nationwide injunction here. ............................... 7

        A.    The alleged harm to Plaintiff States does not justify nationwide relief.................... 7

        B.    Uniformity in immigration law does not justify a nationwide injunction. ............ 12

        C.    The APA does not mandate nationwide relief. ....................................................... 14

CONCLUSION.............................................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

*Arizona v. Biden*, 31 F.4th 469 (6th Cir. 2022) ............................................................ 6

*Austin Indep. Sch. Dist. v. United States*, 429 U.S. 990 (1976) .................................... 5

*Biden v. Texas*, No. 21-954 (U.S. filed Mar. 21, 2022), 2022 WL 876862 ................. 6, 11

*Bonaparte v. Camden & A.R. Co.*, 3. F. Cas. 821 (C.C.D.N.J. 1830) (No. 1,617) ....................... 4

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................. 4, 7

*California v. Texas*, 141 S. Ct. 2104 (2021) ................................................................ 8

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) .............................. 6

*Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018) ......................................... 12

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977) ........................................... 5, 10

*DHS v. New York*, 140 S. Ct. 599 (2020) ................................................................. 3, 13

*Doe v. Mayorkas*, 854 F. App'x 115 (9th Cir. 2021) ..................................................... 12

*Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020) .................................................... 12

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) .............................................. 4, 5

*Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) ............... 4

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) .............................................................. 4, 15

*Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020) ........................................ 15

*Innovation Law Lab v. Wolf*, 951 F.3d 986 (9th Cir. 2020) .......................................... 15

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ............................................................ 13

*Lewis v. Casey*, 518 U.S. 343 (1996) ................................................................. 4, 5, 10

*Miller v. French*, 530 U.S. 327 (2000) ..................................................................... 15

*Milliken v. Bradley*, 418 U.S. 717 (1974) ................................................................... 5

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ....................................... 14

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................... 15

*Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300 (4th Cir. 1992) .......................... 6

*Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021) ........................................................... 13

*Texas v. Biden*, 20 F.4th 928, 995-96 (5th Cir. 2021) .................................................. 10

*Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021) ................................................ 13

*Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021) ............................................. 5

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................. 13, 14

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ................................................................... 3

*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ...................... 5

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................................................................. 6

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .................................................. 4, 5, 7, 10

**STATUTES**

42 U.S.C. 265 ........................................................................................................................ 12

42 U.S.C. 268 ........................................................................................................................ 12

5 U.S.C. 706(a)(2) .................................................................................................................. 14

8 U.S.C. 1225(b) .................................................................................................................... 10

Cal. Educ. Code § 68130.5 .................................................................................................... 12

**OTHER AUTHORITIES**

Kate Morrissey, *Ukrainians only: Racial disparities in U.S. border policies grow more obvious*,
San Diego Union Tribune (Mar. 19, 2022),
https://www.sandiegouniontribune.com/news/immigration/story/2022-03-19/ukrainians-
border-title-42. ...................................................................................................... 14

Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in
Administrative Law*, 53 Duke L.J. 291 (2003) ......................................................... 15

**REGULATIONS**

85 Fed. Reg. 65,806 (Oct. 16, 2020) ...................................................................................... 12

## INTERESTS OF AMICI CURIAE

Alicia De Los Angeles Duran Raymundo, Kevin Alexi De Leon De Leon, and Innovation Law Lab are two individuals and an organization who sought to intervene in this litigation to argue that any relief this Court orders should not run nationwide. ECF No. 62. This Court denied their motion to intervene, but permitted them to make their arguments as *amici*, as they now do here.[1]

Alicia, Kevin, and their six-year-old daughter fled violent persecution in their home countries and intend to seek asylum at the California-Mexico border. Yet they have been unable to do so for months as a result of the Title 42 order, a policy that has used public health justifications to close the southern border to people seeking asylum. Because of the Title 42 order, Alicia and Kevin's family remains in limbo in Tijuana, Mexico, where they continue to fear for their safety. If permitted to enter the United States to access the asylum system, they intend to reunite with their respective families in California while their cases remain pending.[2]

Innovation Law Lab is a legal services organization that, as part of its mission, serves asylum seeking individuals along the New Mexico- and California-Mexico border. That mission has been frustrated by the Title 42 order. Law Lab has had to divert significant resources away from its preexisting mission-driven work to respond to the Title 42 order, and will continue to have to do so for as long as it remains in effect. For these reasons, and for those discussed in their

---

[1] The parties, as well as this Court, have consented to the filing of this *amicus* brief. *Amici* respectfully continue to object to the Court's denial of their Motion for Limited Intervention, and believe they should be entitled to present the arguments advanced herein as intervenors for the reasons stated in that Motion.

[2] As counsel for *amici* prepared to file this brief, they learned that Alicia and Kevin's family is scheduled for Title 8 processing pursuant to Defendants' Title 42 humanitarian exceptions process. As of this time, Alicia's and Kevin's interest as *amici* remains unchanged as their family has suffered profound harm while in Mexico as a result of the Title 42 order. Even if they are admitted in the coming days, they would remain deeply interested as the close friends of many people in Tijuana who remain unable to access the asylum system.

previously filed Motion for Limited Intervention and reflected in supportive exhibits, ECF Nos. 62, 62-1, 62-2, 62-3, Alicia, Kevin, and Innovation Law Lab have a profound interest in the outcome of this case—particularly in the geographic scope of any injunction this Court enters.

**INTRODUCTION**

While *amici curiae* agree with Defendants' position that the Title 42 Termination Order is lawful, they submit this *amicus* brief for one limited—but crucial—purpose: to argue that, should the Court enter any injunctive relief, such relief should be geographically limited to run only in the Plaintiff States, rather than nationwide, consistent with traditional principles of equity and proportionality. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring); *DHS v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring).

Application of those principles counsels against nationwide relief in this case.

*First*, the attenuated harm Plaintiff States allege in support of their motion for preliminary injunction fails to justify nationwide relief because it is not traceable to the Title 42 Termination Order. It is certainly not traceable to individuals who would have otherwise been expelled under the Title 42 order but will instead enter the United States through non-Plaintiff states, then relocate to Plaintiff States after arrival, and then impose the alleged injuries on Plaintiff States once there. Not a shred of record evidence supports this hypothetical harm, let alone enough to justify a nationwide injunction given the extensive, direct harm such an order would impose on non-parties.

In the absence of evidence of direct harm, Plaintiff States recite a litany of consequences that flow from immigration in general (or perhaps unauthorized immigration). But they cite no evidence demonstrating that those harms would be more likely to occur after the Title 42 Termination Order takes effect. Nothing in the record proves the Title 42 order has decreased unauthorized immigration, or that the Termination Order will increase it.

*Second*, the need for uniformity in immigration policy does not, without more, justify nationwide relief in this case. The Title 42 order derives its authority from public health law, not immigration law. Moreover, under Fifth Circuit law, the need for immigration policy uniformity is but one factor to consider when fashioning relief. That factor warrants very little weight here,

given that the Title 42 order is itself characterized by dis-uniformity, as the federal government has always implemented it differently on different sections of the border.

*Third*, the APA does not require a nationwide injunction, as it does not displace traditional principles of equitable remedial discretion, which here counsel against a nationwide injunction.

Thus, any injunction this Court orders should be limited to run only within the geographic boundaries of the States that brought this case.

## ARGUMENT

I. **Any preliminary injunction must be geographically limited to run only in the Plaintiff States.**

In issuing injunctive relief, federal courts must adhere to certain "requirements" enshrined over "several hundred years of history." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) (Although district courts are afforded some discretion in how they shape equitable remedies, "[d]iscretion is not whim." (citation omitted)). Indeed, although "equity is flexible," that flexibility is "confined within the broad boundaries of traditional equitable relief." *Grupo Mexicano de Desarollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999). These principles require injunctive relief to be carefully tailored to the particular circumstances of a case, rather than dispensed reflexively and broadly. As Justice Baldwin recognized nearly two centuries ago, injunctions are "the strong arm of equity." *Bonaparte v. Camden & A.R. Co.*, 3. F. Cas. 821, 827 (C.C.D.N.J. 1830) (No. 1,617). There is no exercise of the equitable power "more delicate," nor "which requires greater caution, deliberation, and sound discretion," than issuing injunctive relief. *Id.*; *see also Weinberger* v. *Romero-Barcelo*, 456 U.S. 305, 312 (1982). Thus, injunctions must be tailored to take account of case-specific factors. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Such tailoring requires taking a clear-eyed look at the precise nature of the injury that gave rise to the suit and modulating relief accordingly. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Where

4

the injury to the prevailing party is slight, equitable relief should typically be correspondingly modest. *Milliken* v. *Bradley*, 418 U.S. 717, 738 (1974) (in "any equity case, the nature of the violation determines the scope of the remedy"); *see also Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) (same); *Austin Indep. Sch. Dist. v. United States*, 429 U.S. 990, 992 (1976) (Powell, J., concurring) (faulting the Court of Appeals for ordering a degree of injunctive relief "far exceeding in scope any identifiable violations"). To apply this principle of proportionality, courts fashioning injunctive relief must weigh the harm suffered by the plaintiff against the burdens of imposing injunctive relief on the defendant and the public at large, including persons— and states—not before the court. *eBay*, 547 U.S. at 391; *Weinberger*, 456 U.S. at 312.

Courts must also consider the viability of narrower alternatives. In *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (per curiam), for example, the Supreme Court trimmed an injunction that swept "much further" than what would have been necessary to redress the injuries of the plaintiffs and others "similarly situated." *Id.* at 2087-88. Likewise, in *Dayton*, the Supreme Court faulted the lower court because "instead of tailoring a remedy commensurate to the three specific violations, the Court of Appeals imposed a systemwide remedy going beyond their scope." 433 U.S. at 417. And, in *Lewis,* the Supreme Court struck down a sweeping injunction because the "violation ha[d] not been shown to be systemwide, and granting a remedy beyond what was necessary to provide relief to [plaintiffs] was therefore improper." 518 U.S. at 360.[3]

---

[3] *See also New York v. DHS*, 969 F.3d 42, 87-88 (2d Cir. 2020) (limiting geographic scope of injunction against Trump Administration's public charge rule to three plaintiff states); *Innovation Law Lab v. Wolf*, 951 F.3d 986, 990 (9th Cir. 2020) (limiting geographic scope of injunction against Trump Administration's Migrant Protection Protocols to Ninth Circuit); *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021) (partially staying injunction against Biden Administration's enforcement priorities, citing its nationwide scope), *vacated*, 24 F.4th 407 (5th Cir. 2021) (mem.), *appeal dismissed*, 2022 WL 517281 (5th Cir. Feb. 11, 2022).

As Judge Sutton of the Sixth Circuit recently explained when staying a nationwide injunction entered on behalf of several states challenging federal immigration policy, "[a]t a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government. Even if it turns out that the three States in this case are entitled to relief, it is difficult to see why an injunction applicable only to them would not do the trick." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022).

To be clear, *amici* do not contend that nationwide injunctions are never appropriate. But the normal mechanism for entering them should be through a class action certified under Rule 23. Rule 23's robust statutory scheme provides explicit mechanisms to protect nonparties. To "justify a departure from" the "usual rule that litigation is conducted by and on behalf of the individual named parties only," Rule 23 requires that class representatives "*possess the same interest* and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (cleaned up) (emphasis added). In other words, the named plaintiffs must be "appropriate representatives of the class whose claims they wish to litigate." *Id.*[4]

Here, it appears highly unlikely (to put it mildly) that all 50 states would have agreed to let the Plaintiff States represent them in a nationwide class action under Rule 23. *Cf.* Brief of Illinois, *et al.* as *Amici Curiae, Biden v. Texas*, No. 21-954 (U.S. filed Mar. 21, 2022), 2022 WL 876862

---

[4] Similarly, when organizations or associations with members living throughout the country seek nationwide injunctions, the relevant equities in crafting injunctive relief are more akin to those present in class actions, and less like those raised here, because the organizations' structure can serve as an analog to Rule 23's representativeness requirement. *See, e.g.*, *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1302, 1309 (4th Cir. 1992) (rejecting challenge to nationwide injunction in non-class action case brought by, *inter alia*, a national association of tenants' organizations, finding "[t]he injunction issued by the district court was appropriately tailored to prevent irreparable injury to plaintiffs[.]"); *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 941, 972 (D. Md. 2020) (granting injunctive relief to all members of plaintiff organizations found to have associational standing on behalf of their members, including a national organization with thousands of members across the United States).

(*amicus* brief filed by 17 states, including California and New Mexico, opposing suit by other states seeking to enjoin termination of MPP). Indeed, contrary to Plaintiff States' mischaracterization, it is Plaintiff States—not *amici*—who have purported to represent the interests of non-Plaintiff states by asking this Court to issue a ruling that would bind them all. *See* ECF No. 74 at 7. Instead, *amici* urge that where the parties here seek to proceed without the statutory safeguards that Rule 23 imposes, this Court must take all the more care to weigh nonparty interests in evaluating the "public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312. Indeed, even in cases where all the requirements of Rule 23 are in place, the Supreme Court has cautioned that courts "should take care to ensure that nationwide relief is indeed appropriate in the case before it." *Califano*, 442 U.S. at 702.

## II.     There is no justification for a nationwide injunction here.

A nationwide injunction would be entirely out of proportion with the showing of harm in support of Plaintiff States' argument for a preliminary injunction and is not justified by the alleged general need for "uniform" immigration policy or the APA's remedial scheme.

### A.   The alleged harm to Plaintiff States does not justify nationwide relief.

The Plaintiff States' briefing to date in support of their request for a nationwide injunction relies on injuries stemming from the increased cost of providing public services including "law enforcement, education, and health care spending" to immigrants who would come within their states as a result of the Termination Order. ECF No. 13-1 at 46. Plaintiff States also make additional allegations of harm to support their claim to standing, which they could conceivably point to in support of their request for a nationwide injunction. None of the evidence on which they rely comes close to justifying such broad relief.

Plaintiff States argue at length that "changes in federal immigration policy cause increased illegal immigration into their states and that illegal immigration causes increased costs to the states

for law enforcement and social services," ECF No. 13-1 at 18. But they cite nothing explaining how those harms will result specifically *from the Termination Order*, much less how they will result from migrants who first enter California or New Mexico as a result of the Termination Order and only later, if ever, enter Plaintiff states. That omission is fatal, as they must show harms "directly traceable" to the challenged policy even to establish standing, let alone to obtain nationwide relief. *Cf. California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (holding that plaintiff states failed to establish standing where they "failed to show how this injury is directly traceable to any actual or possible unlawful Government conduct[.]").

The evidence on which Plaintiff States rely further illustrates these defects. For example, Plaintiff States' discussion of costs associated with "[c]riminal [noncitizens]" and the "illegal drug trade," ECF No. 13-1 at 20, does not trace those costs to the Termination Order, let alone its implementation in non-Plaintiff states like California and New Mexico. In other words, even taking at face value the argument that Plaintiff States suffer injury from costs associated with unauthorized immigration, including unlawfully present individuals who engage in the drug trade or commit other crimes, nothing in the record shows those costs result from individuals who would have otherwise been expelled under the Title 42 order but instead entered into the United States as a result of implementation of the Termination Order in California or New Mexico.

Indeed, many of the harms Plaintiff States allege are obviously not traceable to the Termination Order. Plaintiff States' evidence regarding "human trafficking," EFC No. 13-1 at 16, describes individuals coming here by passing through traffic lanes at ports of entry, ECF No. 13-6 at 4-5, through "loopholes in the U.S. H-2B Visa system," and by relying on individuals who have "overstayed their visas." ECF No. 13-4 at 12-13. All of those avenues exist regardless of Title 42. The evidence does not show that allowing individuals to seek asylum at the border (in any

state, let alone non-Plaintiff States) could result in more human trafficking. Indeed, the *only example* cited in the record of a case involving trafficking from a non-Plaintiff state occurred in December 2020, *when the Title 42 order was in effect*. It proves the opposite of Plaintiff States' claims: that Title 42 *failed to prevent* human trafficking. ECF No. 13-6 at 10.

The other evidence on which Plaintiff States rely also does not show harm traceable to Title 42, let alone in non-Plaintiff states. For example, Plaintiff States' assertion that "the Biden Administration predicts that, after Termination Order, 18,000 [migrants] could illegally cross the border per day," ECF No. 13-1 at 19, misstates the evidence, which is from an article stating that "the Department of Homeland Security has enlisted Federal Emergency Management Administration (FEMA) officials to help prepare for as many as 18,000 migrants per day," ECF No. 13-2 at 25. That projected figure does not specify the manner of entry such individuals might seek. Indeed, like *amici* here, it almost certainly includes individuals who intend to present themselves at a port of entry to seek asylum. ECF No. 62-2, Declaration of Alicia De Los Angeles Duran Raymundo ("Alicia Decl.") ¶ 15; ECF No. 62-1, Declaration of Kevin Alexi De Leon De Leon ("Kevin Decl.") ¶ 14. The extrapolation from this projected figure regarding the number of "gotaways" that could result is pure conjecture, but more importantly is also not traceable to Title 42: people seeking to evade authorities can do so whether or not the Title 42 order is in place. Similarly, Plaintiff States' assertion that "Yuma Regional Medical Center ("YRMC") in Arizona was forced to provide $546,050 in unreimbursed medical care for unauthorized [immigrants]," ECF No. 13-1 at 21, refers to costs associated with providing services to individuals "while in ICE custody," ECF No. 13-2 at 4, not individuals who could enter undetected or be paroled into the United States as a result of the termination of the Title 42 order.

To be clear, *amici* do not argue here that Plaintiff States' allegations of harm fail to establish standing to bring this challenge. Rather, they argue that even *if* that evidence suffices to warrant enjoining the Termination Order in *Plaintiff* States, it does not come close to showing an injury sufficient to warrant a nationwide injunction under basic equitable principles of remedial proportionality. *See Dayton*, 433 U.S. at 420; *Lewis*, 518 U.S. at 361. Plaintiff States have offered no evidence to support their speculation that people paroled into *other*, *non-Plaintiff* states who would otherwise have been expelled under Title 42 will travel to Plaintiff States and, once there, impose harms on those states. Nothing in the record thus far indicates there would be *any* such persons, let alone enough to justify a nationwide injunction.

The absence of such evidence is particularly striking given the severe harm that nationwide relief imposes on thousands of individual non-parties who will never impose any burden on the Plaintiff States. *See Weinberger*, 456 U.S. at 312 (equity requires balancing non-party interests). The Title 42 order that Plaintiff States seek to keep in place bars access to asylum for people who, like *amici*, have *no intention of leaving California* prior to their cases being resolved, much less travelling to Plaintiff States. *See* Alicia Decl. ¶ 20; Kevin Decl. ¶ 15. Indeed, it bars access to asylum even to those whom the federal government would otherwise *keep detained* for the duration of their cases. *See Texas v. Biden*, 20 F.4th 928, 995-96 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *cert. granted*, 142 S. Ct. 1098 (2022) (explaining DHS detains some applicants for admission pursuant to 8 U.S.C. 1225(b)), or who may be forced to wait in Mexico until the immigration courts decide their cases. *See id*. Nationwide relief bars those individuals from accessing the asylum system, even though they will never do anything that harms the Plaintiff States.

As these examples illustrate, there is an obvious difference between enjoining the Termination Order in Arizona and Texas (the only Plaintiff States situated along the Southern border), and enjoining it *everywhere else* on the Southern border. Where individuals enter the United States through Arizona or Texas and use services there, the alleged economic harm to *those* states would be directly traceable to the challenged federal policy. But any harm arising from individuals entering through *other* states occurs only if those individuals later *move* to Arizona or Texas and then use public services. Even if there were support in the record for the existence of *some* such harm (which at present there is not), it would be far too attenuated, under basic equitable principles of tailoring and proportionality, to justify relief beyond the Plaintiff States' borders, particularly given the obvious countervailing harms the injunction would cause to non-parties in other states.

Moreover, ordering nationwide relief for Plaintiff States without ever considering the countervailing interests of other states would effectively permit a handful of states to set nationwide immigration policy at the expense of those that did not participate in these proceedings. Plaintiff States' economic interests are no more compelling than other states' countervailing interests in, for example, expanding their tax bases and labor forces by welcoming paroled noncitizens, or their interest in vindicating their residents' desire to be reunited with noncitizen family members who would otherwise be subject to Title 42. *See* Brief of Illinois, *et al.*, No. 21-954 (noting the "wide range of benefits" to states arising from the federal government's decision to parole asylum seekers into the country, including "access to safe living conditions to family reunification."). To give just one example, Plaintiff States' stated economic interests in not expending costs associated with "educat[ing] [undocumented] children," ECF No. 13-1 at 21, runs directly counter to California's interest, which is to do just the opposite by funding extended

educational opportunities for undocumented students in its state. *See* Cal. Educ. Code § 68130.5 (state law allowing qualifying undocumented students to pay in-state tuition at state community colleges and universities). Issuing a nationwide injunction would improperly privilege the Plaintiff States' interests, while disregarding core structural principles of interstate equality.

### B.   Uniformity in immigration law does not justify a nationwide injunction.

The Plaintiff States also request nationwide relief due to the need for uniformity in immigration law, but that does not suffice to support a nationwide injunction in this case. As a threshold matter, the Title 42 order derives from the Public Health Services Act, 42 U.S.C. 265, 268, its authority to suspend the introduction of certain individuals due the "danger of the introduction of COVID-19 into the United States." 85 Fed. Reg. 65,806 (Oct. 16, 2020). The Title 42 order is therefore public health measure, not an immigration law or policy.

Moreover, despite Plaintiff States' suggestion that immigration law must necessarily be uniform, ECF No. 13-1 at 47, splits in the lower courts and across regions routinely result in non-uniform immigration policies. For example, in the context of the so-called Migrant Protection Protocols, a comparable border policy related to asylum, from January 2020 to July 2021, a class-wide preliminary injunction entered in the Southern District of California required CBP to provide access to counsel to people in MPP *nonrefoulement* interviews. However, that order was not binding outside California, and the government did not implement it elsewhere. *See Doe v. Wolf*, 432 F. Supp. 3d 1200 (S.D. Cal. 2020); *Doe v. Mayorkas*, 854 F. App'x 115 (9th Cir. 2021). Similar examples of limited injunctions abound. Since 2018, a class-wide preliminary injunction entered in the District of Columbia has required arriving asylum seekers found to have a credible fear of persecution to be considered for parole under a previously issued parole directive, and has prohibited ICE from detaining them absent an individualized determination on flight risk or danger. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 323 (D.D.C. 2018). But it applies only to people

in ICE custody in the jurisdiction of the Detroit, El Paso, Los Angeles, Newark, and Philadelphia field offices. *Id.* at 325. As is true in those cases, it remains eminently practicable here to limit the scope of the injunction to apply in only some geographic areas.[5]

While immigration policy uniformity is a valid factor informing the scope of injunctive relief, it is but one of many that courts should consider in fashioning tailored relief. Plaintiff States' argument that Fifth Circuit caselaw *requires* nationwide relief is without merit. ECF No. 74 at 2. The Fifth Circuit has stated that proper relief in immigration related cases "*includes* nationwide injunctions," *Texas v. Biden*, 554 F. Supp. 3d 818, 857 (N.D. Tex. 2021) (emphasis added), and that "[i]t is not beyond the power of a court *in appropriate circumstances*, to issue nationwide injunctions," *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (emphasis added). But it hardly follows (as Plaintiff States appear to argue) that virtually every case involving nationwide federal immigration law (which is to say, all immigration law) would require nationwide relief, regardless of the extent of redressable injury. That is not our system. *See DHS v. New York*, 140 S. Ct. at 600 (Gorsuch, J. concurring) ("The traditional system of … courts issuing interlocutory relief limited to the parties at hand" "encourages multiple judges … and circuits to weigh in only after careful deliberation, a process that permits the airing of competing views[.]").

---

[5] There are *many* other examples of circuit splits that, for years, resulted in different rules governing important aspects of immigration law. For nearly ten years, circuits were split on whether a grant of Temporary Protected Status ("TPS") constitutes an "admission" for purposes of eligibility for adjustment of status, an issue of profound importance to several hundred thousand people and the orderly administration of the immigration laws. *See Sanchez v. Mayorkas*, 141 S. Ct. 1809, 1812 & n.3 (2021). In 2021, the Supreme Court resolved the split and held that a grant of TPS does not constitute an admission. *Id.* at 1815. *See also Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) (partially resolving a more than five-year-old circuit split on whether thousands of individuals detained in ICE custody for prolonged periods could pursue release from detention before an immigration judge).

While the Fifth Circuit approved entry of a nationwide injunction in *Texas*, 809 F.3d. 134, it relied upon the need for uniformity in the implementation of the deferred action program at issue, which was characterized by standardized eligibility criteria and would have conferred uniform federal benefits upon successful applicants across the country, *id.* at 147-49. On the other hand, Title 42, like other border policies, has been characterized by dis-uniform implementation since its inception. As the record evidence already shows, Title 42 applies differently at some ports of entry than others, and to some nationalities and not others.[6] The alleged need for uniformity is plainly insufficient to justify nationwide relief with respect to a policy that is already implemented differently across the border and over time.

### C.   The APA does not mandate nationwide relief.

That this case involves a claim under the Administrative Procedure Act ("APA") does not require nationwide relief. Neither the Supreme Court nor the Fifth Circuit has ever held that the phrase "shall . . . hold unlawful and set aside" in 5 U.S.C. 706(a)(2) mandates district courts to issue nationwide injunctions against the federal government in every case. Nor should it. In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court explained that "no recourse to the additional and extraordinary relief of an injunction" was warranted for an APA violation where *"partial* or complete vacatur" was possible. *See* 561 U.S. 139, 165-66 (2010) (emphasis added).

Moreover, the APA does not displace traditional principles of equitable remedial discretion to *require* nationwide injunctions whenever a court finds agency action unlawful. *Hecht* confronted an analogous situation in which a lower court interpreted the Emergency Price Control

---

[6] *See, e.g.,* ECF No. 65 at 5-6 (listing only six ports of entry at which different numbers of individuals have been excepted from Title 42 pursuant to the NGO-supported humanitarian exception process); *see also* Kate Morrissey, *Ukrainians only: Racial disparities in U.S. border policies grow more obvious*, San Diego Union Tribune (Mar. 19, 2022), https://www.sandiegouniontribune.com/news/immigration/story/2022-03-19/ukrainians-border-title-42.

Act to require an injunction once a violation was found. 321 U.S. at 321-22, 326. Emphasizing that "equity practice with a background of several hundred years of history" was distinguished by "[f]lexibility rather than rigidity," the Court declined to adopt the view that under all circumstances in which a violation is found, the court must issue an injunction, holding that "if Congress had intended to make such a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made." *Id.* at 329. More recently, the Supreme Court recognized it "should not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary." *Miller v. French*, 530 U.S. 327, 340 (2000) (citations omitted); *see also Nken v. Holder*, 556 U.S. 418, 433 (2009).

The plain text of Section 706's grant of authority to "set aside" an order says nothing about whether a court's ruling should govern the federal government's conduct as to nonparties. And nothing in the legislative background of the APA's enactment suggests the APA's "set aside" language requires mandatory nationwide injunctions in all APA cases. *See* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 313-14 (2003).

Plaintiff States' misplaced reliance on *Innovation Law Lab v. Wolf,* 951 F.3d 1073, 1094 (9th Cir. 2020) to support their argument that the APA requires nationwide relief ignores not only the record in that case—in which Innovation Law Lab demonstrated harm arising from locations outside the Ninth Circuit—but also the fact that the Ninth Circuit limited the injunction "insofar as it operate[d] outside of the geographical boundaries of the Ninth Circuit," recognizing that "the proper scope of injunctions against agency action is a matter of intense and active controversy." *Innovation Law Lab v. Wolf*, 951 F.3d 986, 990 (9th Cir. 2020). Although the injunction did not fully redress its harms, Innovation Law Lab acceded to the ruling by declining to appeal. Without

a "clear[] command" to the contrary, *Miller*, 530 U.S. at 340, this Court retains equitable authority to order a remedy that is appropriately tailored to the needs of this case; it is not required to issue a nationwide injunction simply because Plaintiff States present a claim under the APA.

## CONCLUSION

For the foregoing reasons, this Court should limit the geographic scope of any injunction it orders to apply only in the Plaintiff States.


Respectfully submitted,


*/s/ Monika Y. Langarica*                                    Dated: May 18, 2022
Monika Y. Langarica*
CA Bar No. 308518
Ahilan Arulanantham*
CA Bar No. 237841
Talia Inlender*
CA Bar No. 253796
**Center for Immigration Law and Policy**
**UCLA School of Law**
Box 951476
Los Angeles, CA 90095
(310) 983-3345
langarica@law.ucla.edu


*/s/ Matthew S. Vogel*
Matthew S. Vogel+
LA Bar No. 35363
Sirine Shebaya*
DC Bar No. 1019748
Victoria F. Neilson*++
NY Bar No. 2689792
Joseph Meyers*+++
CA Bar No. 325183
**National Immigration Project**
**of the National Lawyers Guild (NIPNLG)**
2201 Wisconsin Ave NW, Suite 200
Washington, DC 20007
(504) 264-3613

matt@nipnlg.org

\* Admitted *pro hac vice*
+ Not admitted in DC; working remotely from and admitted in Louisiana only
++ Not admitted in DC; working remotely from and admitted in New York only
+++ Not admitted in DC; working remotely from and admitted in California only