# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

**STATE OF LOUISIANA ET AL**                    **CASE NO.  6:22-CV-00885**

**VERSUS**                                      **JUDGE ROBERT R. SUMMERHAYS**

**CENTERS FOR DISEASE CONTROL &**               **MAGISTRATE JUDGE CAROL B.**
**  PREVENTION, ET AL**                         **WHITEHURST**

## MEMORANDUM RULING

Twenty-four states (the "Plaintiff States") brought the present action seeking to enjoin the Centers for Disease Control ("CDC") from terminating the COVID-related restrictions on immigration enacted by the CDC pursuant to its authority under Section 265 of Title 42. They contend that the CDC's decision to terminate its Title 42 rules violates the Administrative Procedure Act ("APA"). They contend that the CDC failed to consider the effects of a Title 42 termination on immigration enforcement and the states. The instant matter before the Court is the Plaintiff States' Motion for Preliminary Injunction [ECF No. 13]. The Court held a hearing on the parties' legal arguments on May 13, 2022. The parties did not request an evidentiary hearing, but instead rely on the evidence previously filed into the record. The Court has considered the record, the parties' arguments, and rules as follows.

## I.
### FINDINGS OF FACT

A. **The CDC's Title 42 Orders**.

1.  The Public Health Services Act, 42 U.S.C. § 265 (referred to as "Title 42"), empowers the CDC to enter appropriate regulations limiting immigration to combat the spread of serious communicable diseases:

1

> Whenever the [Director of the CDC] determines that by reason of the existence of any communicable disease in a foreign country there is serious danger of the introduction of such disease into the United States, and that this danger is so increased by the introduction of persons or property from such country that a suspension of the right to introduce such persons and property is required in the interest of the public health, the [Director of the CDC], in accordance with regulations approved by the President, shall have the power to prohibit, in whole or in part, the introduction of persons and property from such countries or places as he shall designate in order to avert such danger, and for such period of time as he may deem necessary for such purpose.

2.   On March 20, 2020, in response to the COVID-19 pandemic, the U.S. Department of Health & Human Services ("HHS") issued an Interim Final Rule ("IFR") amending the applicable regulations to create "an efficient regulatory mechanism to suspend the introduction of persons" to prevent COVID-19 spread into the U.S.[1] In doing so, the CDC invoked the good cause exception to the APA, citing "the national emergency caused by COVID-19."[2] However, the CDC expressly invited "comment on all aspects of this interim final rule, including its likely costs and benefits and the impacts that it is likely to have on the public health[.]"[3]

3.   After receiving 218 comments during the 30-day comment window that closed April 24, 2020, the CDC published a final rule September 11, 2020. That rule "establishe[d] final regulations under which the [CDC] may suspend ... the introduction of persons into the United States for such period of time as the Director may deem necessary to avert the serious danger of the introduction of a quarantinable communicable disease into the United States."[4] This Final Rule became effective October 13, 2020 (CDC's collective policies of excluding aliens are hereinafter referred to as the "Title 42 Orders.")

---

[1] 85 Fed. Reg. 16,562.
[2] *Id.* at 16,565.
[3] *Id.*
[4] 85 Fed. Reg. 56,424, 56,424, 56,448 (Sep. 11, 2020) (codified at 42 C.F.R. § 71.40).

4.   Concurrently with the March 2020 IFR, the CDC Director issued an order suspending the introduction into the United States of all "persons traveling from Canada or Mexico," except for "U.S. citizens, lawful permanent residents, and their spouses and children," and other limited exceptions[5] (the "March 2020 Order").

5.   The March 2020 Order provided that it would expire after 30 days unless renewed.[6] In May, the 30-day renewal requirement was abandoned and instead replaced with a mandatory review of the policy's continued necessity every 30 days.[7] In other words, the order would no longer automatically expire.

6.   When the Final Rule became effective, CDC issued a new order, the "October 2020 Order."[8] The October 2020 Order was "substantially the same as" prior orders, was subject to 30-day periodic reviews, and was to remain in force until CDC had "publish[ed] a notice in the Federal Register terminating this Order and its Extensions."[9]

7.   On July 19, 2021, CDC issued a new order excepting unaccompanied children (the "July 2021 Order").[10] The CDC subsequently suspended the October 2020 Order and incorporated by reference the July 2021 Order excepting unaccompanied children (the "August 2021 Order").[11] That order stated that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both."[12]

---

[5] 85 Fed. Reg. 17,060 (Mar. 26, 2020).
[6] It was renewed in April and May of 2020. *See* 85 Fed. Reg. 22,424, 22,427 (Apr. 22, 2020); 85 Fed. Reg. 31,503 (May 26, 2020).
[7] 85 Fed. Reg. 31,504.
[8] 85 Fed. Reg. 65,806, 65,807, 65,810, 65,812 (Oct. 16, 2020).
[9] *Id.*
[10] 86 Fed. Reg. 38,717 (July 22, 2021).
[11] 86 Fed. Reg. 42,828 (Aug. 5, 2021).
[12] 86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021).

**B.  The Exceptions to the CDC's Title 42 Orders.**

8.   The August 2021 Order, like the prior Title 42 Orders, includes an exception for
"[p]ersons whom customs officers determine, with approval from a supervisor, should be
excepted from this Order based on the totality of the circumstances, including consideration of
significant law enforcement, officer and public safety, humanitarian, and public health
interests. DHS will consult with CDC regarding the standards for such exceptions to help
ensure consistency with current CDC guidance and public health recommendations."[13]

9.   According to Blas Nuñez-Neto, the Acting Assistant Secretary for Border and
Immigration Policy at the Department of Homeland Security, the exception cited above has
been used throughout the course of the pandemic in order to apply the normal Title 8
immigration enforcement procedures, rather than the Title 42 Order to certain situations.[14]

10. As to the individuals processed as exceptions from the Title 42 Orders during the
first quarter of 2022, "655 out of 745 (88%) single adults from Northern Triangle countries
who have been processed for expedited removal in the first quarter of this fiscal year have
already been removed or are in the process of being removed. Seventy-two percent (537 out of
745) of single adults from the Northern Triangle processed for expedited removal in the first
quarter of 2022 did not claim a fear and were subject to removal directly from CBP custody;
another 16% (118 people) claimed fear of torture or prosecution, were detained by ICE as they
went through the credible fear interview process, and were found not to have a credible fear
and subject to removal. Just 90 out of 745 (12%) were referred for full removal proceedings
under Section 1229a of Title 8 of the U.S. Code."[15]

---

[13] *Id.*
[14] Declaration of Blas Nuñez-Neto, ¶ 6, Exhibit A to ECF No. 27.
[15] *Id.* at ¶ 18.

4

## C. **The CDC's Termination Order.**

11. On February 2, 2021, President Biden signed Executive Order 14010, in which he ordered that "[t]he Secretary of HHS and the Director of CDC, in consultation with [DHS], shall promptly review and determine whether termination, rescission, or modification of the [Title 42 orders] is necessary and appropriate."[16]

12. On March 11, 2022, CDC issued a new order (the "March 2022 Order") superseding the August 2021 Order.[17] The March 2022 Order apparently was issued in response to litigation in Texas challenging Defendants' practice of not applying Title 42 to unaccompanied alien children ("UAC").[18] The March 2022 Order found that suspending entry of UACs was "not necessary to protect U.S. citizens."[19]

13. On April 1, 2022, CDC Director Walensky issued the Order Under Sections 362 & 365 of the Public Health Service Act[20] ("Termination Order"). The Termination Order claimed that it was "not a rule subject to notice and comment under the Administrative Procedure Act."[21] It did so on two stated bases: the "good cause" and "foreign affairs" exceptions of 5 U.S.C. §§ 553(a)(1) and (b)(3)(B).[22]

14. With regard to the "good cause" exception, the Termination Order states that:

> This Termination, like the preceding Orders issued under this authority, is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Termination. Given the extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes

---

[16] 86 Fed. Reg. 8,267 (Feb. 5, 2021).
[17] 87 Fed. Reg. 15,243 (Mar. 17, 2022).
[18] *See Texas v. Biden*, 21-cv-00579 (N.D. Tex.).
[19] 87 Fed. Reg. 15,245.
[20] 87 Fed. Reg. 19,941 (Apr. 6, 2022).
[21] 87 Fed. Reg. 19,941 (Apr. 6, 2022).
[22] *Id.*

under Title 8, and the statutory and regulatory requirement that an CDC order under the authority last no longer than necessary to protect public health, it would be impracticable and contrary to the public interest and immigration laws that apply in the absence of an order under 42 U.S.C. § 265 to delay the effective date of this termination beyond May 23, 2022 for the reasons outlined herein. As explained, DHS requires time to institute operational plans to implement this order, including COVID-19 mitigation measures, and begin regular immigration processing pursuant to Title 8. In light of the August Order's significant disruption of ordinary immigration processing and DHS's need for time to implement an orderly and safe termination of the order, there is good cause not to delay issuing this termination or to delay the termination of this order past May 23, 2022.[23]

15. As to the foreign affairs exception, the Termination Order states only that "this Order concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders and therefore directly 'involve[s] . . . a . . . foreign affairs function of the United States;' thus, notice and comment are not required."[24]

16. The Termination Order states that the CDC's decision to issue the Order is based on its determination that "although the implementation of the CDC Orders to reduce the numbers of noncitizens held in congregate settings in POEs and Border Patrol stations has been part of the layered COVID-19 mitigation strategy used over the past two years, less burdensome measures are now available to mitigate the introduction, transmission, and spread of COVID-19 resulting from the entry of covered noncitizens."[25]

17. The implementation date of the Termination Order is May 23, 2022. The purpose of this delay is to "give DHS time to implement additional COVID-19 mitigation measures."[26]

---

[23] *Id.*
[24] *Id.* (footnote omitted).
[25] *Id.*
[26] *Id.*

**D.  The Plaintiff States File Suit.**

18. On April 3, 2022, the states of Arizona, Louisiana and Missouri filed a Complaint for declaratory and injunctive relief against the Centers for Disease Control & Prevention, Rochelle Walensky, U.S. Department of Health & Human Services, Xavier Becerra, U.S. Department of Homeland Security, Alejandro Mayorkas, U.S. Customs & Border Protection, Christopher Magnus, U.S. Immigration & Customs Enforcement, Tae Johnson, U.S. Citizenship & Immigration Services, Ur Jaddou, U.S. Border Patrol, Raul Ortiz, U.S. Department of Justice, Merrick Garland, Executive Office of Immigration, David Neal, Joseph R. Biden, Jr.,[27] and the United States of America ("Defendants"). [28]

19. On April 14, 2022, a First Amended Complaint[29] was filed to include an additional eighteen (18) states.[30]

20. On May 5, 2022, a Second Amended Complaint[31] was filed to include an additional three (3) states.[32] The States of Arizona, Louisiana, Missouri, and the twenty-one (21) additional states added to the case are referred to collectively as the "Plaintiff States."

21. The Plaintiff States seek to enjoin the implementation of the Termination Order issued by Defendants.

22. On April 14, 2022, the Plaintiff States filed a Motion for Preliminary Injunction.[33]

---

[27] All individuals are sued in their official capacities.
[28] ECF No. 1.
[29] ECF No. 10.
[30] The First Amended Complaint was filed by the States of Arizona, Louisiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, Tennessee, Utah, West Virginia and Wyoming.
[31] ECF No. 44.
[32] The Second Amended Complaint added North Dakota, Texas, and Virginia as plaintiffs.
[33] ECF No. 13.

23. On April 21, 2022, the Plaintiff States filed a Motion for Temporary Restraining Order.[34]

24. The Court issued a Temporary Restraining Order[35] ("TRO") on April 27, 2022, designed to maintain the status quo and prohibit the Defendants from beginning to implement the Termination Order prior to its stated implementation date of May 23, 2022.

25. On May 11, 2022, the Court entered an Order[36] which extended the TRO until the earlier of (1) this Court's decision on the Motion for Preliminary Injunction, or (2) May 23, 2022.

**E.  Impact of the Termination Order on Immigration.**[37]

26. The Plaintiff States contend that the Termination Order will result in a surge of border crossings, and that this surge will result in an increase in illegal immigrants residing in the states.[38] They also contend that the transition back to immigration enforcement under Title 8 will result in an increase in immigration "parolees" in the Plaintiff States.[39]

27. The Termination Order states that "CDC recognizes that the Termination of the August Order will lead to an increase in the number of noncitizens being processed in DHS facilities which could result in overcrowding in congregate settings. Moreover, DHS projects, based on available intelligence as well as seasonal migration patterns, an increase in encounters in the coming months, which could lead to further crowding in DHS facilities."[40]

---

[34] ECF No. 24.

[35] ECF No. 37.

[36] ECF No. 60.

[37] The evidentiary requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure are more relaxed than the evidentiary standards required to prevail at a trial on the merits. An application for a preliminary injunction may be supported by affidavits and evidence that is otherwise inadmissible at a trial on the merits. 11A Wright & Miller. Fed. Prac. & Proc. § 2949 at 237-38 (3d ed. 2013).

[38] ECF No. 13-1 at 9-10.

[39] ECF No. 1 at 39.

[40] *Id.*

28. The Plaintiff States also point to reports that DHS estimates that "border crossings" will increase from approximately 7,000 crossings per day to approximately 18,000 crossings per day after the Termination Order goes into effect.[41]

29. According to media sources cited by the Plaintiff States and uncontested by Defendants, DHS "intelligence estimates that perhaps 25,000 migrants already are waiting in Mexican shelters just south of the border for Title 42 to end."[42] Further intelligence indicates that the number of aliens in northern Mexico waiting to cross illegally into the United States is "[b]etween 30,000 to 60,000."[43]

30. The Plaintiff States contend that DHS's own data indicates that many immigrants crossing the border will evade capture. The record includes DHS estimates that "there have been more than 300,000 known 'gotaways'—migrants who were not apprehended or turned themselves in and who got past agents—since fiscal year 2022 began on October 1st."[44] In addition, the record includes a report that former Border Patrol Chief Rodney Scott stated that "there had been approximately 400,000 gotaways in the entirety of FY 2021."[45]

31. In sum, the record supports the Plaintiff States' position that the Termination Order will result in increased border crossings and that, based on the government's estimates, the increase may be as high as three-fold.

**F. The CDC's Acknowledgement of the Impact of Its Orders On Local Communities and Healthcare.**

32. The record also indicates that, in issuing its prior Title 42 orders, the CDC acknowledged the impact of migration on border communities: "[T]he flow of migration

---

[41] Declaration of James K. Rogers, ¶ 2, Exhibit 5, Exhibit A to ECF No. 13.
[42] *Id.* at Exhibit 3.
[43] *Id.* at Exhibit 4.
[44] Rogers Decl. Ex. 1.
[45] *Id.*

directly impacts not only border communities and regions, but also destination communities *and healthcare resources of both.*"[46]

33. The CDC has also acknowledged the impact of its orders on DHS's operations and the health of DHS personnel. The CDC's October 2020 Order states that the CDC's prior Title 42 Orders had "reduced the risk of COVID-19 transmission … and thereby reduced risks to DHS personnel and the U.S. health care system."[47] The CDC further stated that its Title 42 orders had "significantly reduced the population of covered aliens in congregate settings in [points of entry] and Border Patrol stations, thereby reducing the risk of COVID-19 transmission for DHS personnel and others within these facilities."[48]

**G. Impact of an Increase in Illegal Immigration on Arizona.**

34. The State of Arizona alleges that the lifting of the Title 42 Orders will cause an increase in immigrants coming into the state and will result in increased law enforcement and healthcare costs.[49]

35. According to Mark Napier, Chief of Staff for the Cochise County Sheriff's Office in Cochise County, Arizona, for the period from July 2020 to January 2021, only 27.6% of undocumented persons crossing the southern border were apprehended by DHS personnel.[50] Further, from "January through September 2020 there were 181 sets of human remains recovered in the border region of Arizona's desert. Each of these recoveries results in the tremendous expenditure of law enforcement resources."[51] Mr. Napier further indicated that "[m]igrants abandoned by transnational criminal organizations trafficking in humans on the

---

[46] 86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021) (emphasis added).
[47] 85 Fed. Reg. 65,806, 65,810 (Oct. 16, 2020).
[48] *Id.*
[49] Declaration of Anthony Napolitano, Assistant Attorney General for the Arizona Attorney General's Office, Exhibit B to ECF No. 13.
[50] Declaration of Mark D. Napier, ¶ 4, Exhibit 1 to Napolitano Declaration, Exhibit B to ECF No. 13.
[51] *Id.* at ¶ 5.

10

north side of the border frequently call local law enforcement in distress…. These often led to significant expenditures of county and Border Patrol resources to affect rescue in the hope of preventing additional migrant deaths."[52]

36. According to Mark Lamb, the Sheriff of Pinal County, Arizona, the Pinal County Sherriff's Office "has recorded a surge in the number of pursuits of suspected unauthorized aliens" since the beginning of 2021.[53] The cost of such pursuits "represents a roughly 71% increase in [personnel] costs over ... the same time period last year."[54] When "pursuits result in arrests, the Pinal County Sheriff's Office incurs the cost of incarcerating the individual….an additional cost of $1,750 per booking on average."[55] According to the opinion of Sheriff Lamb, "the increase in incidents, and therefore increase in costs, ... is at least in part directly related to announced changes in federal border enforcement and alien removal policies."[56]

37. Mark Dannels, the Sheriff of Cochise County, Arizona, submitted a declaration stating that "[i]ndividuals illegally crossing through [the border] cut trails, trample plant life, and leave behind litter and potentially hazardous waste including soiled clothing and excrement."[57] Further, he states that, since October 2021, Cochise County has experienced "an increase in costs related to pursuits and apprehensions of illegal immigrants and the costs of property damage and other crimes in our community."[58]

38. According to Robert J. Trenschel, President and CEO of Yuma Regional Medical Center ("YRMC"), "[f]rom January through June 2019, … an estimated 1,293 adult patients

---

[52] *Id.* at ¶ 6.
[53] Declaration of Mark Lamb, ¶ 4, Exhibit 2 to Napolitano Declaration, Exhibit B to ECF No. 13.
[54] *Id.* at ¶ 6.
[55] *Id.* at ¶ 7.
[56] *Id.* at ¶ 8.
[57] Declaration of Mark Dannels, ¶ 7, Exhibit 3 to Napolitano Declaration, Exhibit B to ECF No. 13.
[58] *Id.* at ¶ 4.

were brought to YRMC while in ICE custody"[59] and that "[t]he estimated cost of [their] care in that six-month period was $810,433,"[60] but that only $264,383 was reimbursed, "leaving a $546,050 unreimbursed gap for that six-month period alone."[61] "These cost estimates also do not include the substantial care expenses for the multiple mothers who delivered babies at YRMC while under ICE custody during that timeframe."[62]

39. According to Shaka Okougbo, DC Operations Manager for the Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR"), "[t]he cost to ADCRR and the State of Arizona from persons being placed in community supervision per person is $4,163.60 per year. (2019)"[63]

40. In sum, the record supports Arizona's position that an increase in border crossings as a result of the Termination Order will increase the state's costs for healthcare reimbursements. Defendants did not dispute the facts supporting this finding.

## H. Impact of an Increase in Illegal Immigration on Missouri.

41. According to Maddie Green, Assistant Attorney General for Missouri, "Missouri spent an average of $10,654 per student in school year 2019-2020 regardless of immigration status,"[64] and further that "[a] 2018 study shows that an estimated 3,000 illegal alien school-aged children were enrolled in Missouri schools."[65] "Missouri expended $361,702 in emergency medical care costs for treatment of ineligible aliens during Fiscal Year 2020."[66] In addition, "Missouri's Department of Revenue ("DOR") uses the Systemic Alien Verification

---

[59] Declaration of Robert J. Trenschel, CO, MPH, FACHE, ¶ 5, Exhibit 4 to Napolitano Declaration, Exhibit B to ECF No. 13.
[60] *Id.* at ¶ 6.
[61] *Id.* at ¶ 7.
[62] *Id.* at ¶ 8.
[63] Declaration of Shaka Okougbo, ¶ 4, Exhibit 6 to Napolitano Declaration, Exhibit B to ECF No. 13.
[64] Declaration of Maddie M. Green, ¶ 8, Exhibit D to ECF No. 13.
[65] *Id.* at ¶ 9.
[66] *Id.* at ¶ 11.

of Entitlements ("SAVE") system to verify unlawful individuals' lawful immigration status at a cost of $0.80 for the initial inquiry and $0.50 for any additional inquiries. In state fiscal year 2020, DOR paid $30,114.11 for SAVE inquiries."[67] "Statistically, for every 1,000 aliens who remain unlawfully in the United States, 56 end up residing in Missouri."[68]

42. According to Allison Phillips, the co-founder of The Human Trafficking Training Center and the former Director for the Anti-Human Trafficking Task Force for the Missouri Attorney General's Office, "there is a relationship between the prevalence of human trafficking in the United States and activity on the US-Mexico border. Immigration policies as they relate to the management of the southern border of the United States are a contributing factor to overall rates of human trafficking in the United States."[69]

43. In sum, the record supports Missouri's position that an increase in border crossings as a result of the Termination Order will increase the state's costs for healthcare reimbursements, the provision of educational services, and the administration of its driver's license program. Defendants did not dispute the facts supporting these findings.

## I. **Impact of an Increase in Illegal Immigration on Louisiana.**

44. According to Tommy Romero, Iberia Parish Sheriff, [m]igrants coming from the border are sometimes transporting drugs into or across Louisiana, including in or through Iberia Parish. In the past 24 months, the Iberia Parish Sheriff's Office has confiscated drugs suspected to have been moved from the border into Louisiana, including but not limited to marijuana, fentanyl, methamphetamine, and heroin. This criminal activity requires substantial law enforcement resources to apprehend, detain, prosecute, and incarcerate the individual

---

[67] *Id.* at ¶ 12.
[68] *Id.* at ¶ 10, citing Pew Research Center, U.S. unauthorized immigrant population estimates by state, 2016 (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorizedimmigrants-by-state/.
[69] Declaration of Alison Phillips, ¶ 18, Exhibit E to ECF No. 13.

involved."[70] Sheriff Romero opined that "a pause or significant decrease in ICE removals will incentivize undocumented immigration. This will most certainly encourage an increase in the number of migrants who attempt to illegally cross the border into the United States and, in turn, into Louisiana."[71]

**J. Unverified Allegations.**[72]

45. Arizona alleges that it has "approximately 275,000 to 365,000 immigrants living in the State that are not lawfully in the United States; about 54% of them do not have health insurance; about 32% of them have incomes below the poverty level; and they cost Arizona taxpayers more than $1.7 billion a year."[73]

46. Louisiana alleges that it has "approximately 70,000 to 78,000 aliens living in the State that are not lawfully in the United States; more than 70% of them do not have health insurance; about 34% of them have incomes below the poverty level; and they cost Louisiana taxpayers more than $362 million a year."[74]

47. Missouri alleges that "approximately 56 out of every 1,000 unlawful aliens who enter the United States end up residing in Missouri. These unlawful aliens impose pocketbook injuries on Missouri in the form of education, healthcare, and criminal-justice costs. These

---

[70] Declaration of Tommy Romero, ¶ 4, Exhibit C to ECF No. 13.

[71] *Id.* at ¶ 5.

[72] The Plaintiff States also point to allegations in their Complaint to support relief. For purposes of a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, unverified allegations are not sufficient, standing alone, to support relief. While the evidentiary standards for a preliminary injunction are relaxed, relief can be based on pleadings alone only if the pleadings are verified. *See* 11A Wright & Miller, Federal Practice and Procedure § 2949 (3d ed. 2013). Accordingly, the Court will not consider these unverified allegations in determining whether the Plaintiff States have satisfied the requirements for a preliminary injunction under Rule 65.

[73] Second Amended Complaint, ECF No. 44, ¶ 121, citing various studies including Unauthorized Immigrant Population Profiles, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized-immigrant-population; U.S. unauthorized immigrant population estimates by state, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state; The Fiscal Burden of Illegal Immigration, Federation for American Immigration Reform (2017), https://fairus.org/sites/default/;files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf

[74] *Id.* at ¶ 125.

pocketbook injuries are irreparable because Missouri has no plausible recourse to recoup them."[75]

48. Alabama alleges that it has "approximately 55,000 to 73,000 illegal aliens living in the State; about 68% of them are uninsured; about 34% of them have incomes below the poverty line; and they cost Alabama taxpayers more than $324.9 million a year."[76]

49. Alaska alleges that it has "approximately 5,000 to 11,260 illegal aliens living in the State; they cost Alaska taxpayers more than $72 million a year."[77]

50. Arkansas alleges that it has "approximately 58,000 to 79,000 illegal aliens living in the State; about 63% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Arkansas taxpayers more than $339.5 million a year."[78]

51. Florida alleges that it has "approximately 772,000 to 957,000 illegal aliens living in the State; about 61% of them are uninsured; about 28% of them have incomes below the poverty line; and they cost Florida taxpayers more than $4.7 billion a year."[79]

52. Georgia alleges that it has "approximately 339,000 to 422,000 aliens living unlawfully in the State; about 70% of them are uninsured; about 36% of them have incomes below the poverty level; and they cost Georgia taxpayers more than $1.8 billion a year."[80]

53. Idaho alleges that it has "approximately 29,000 to 51,000 illegal aliens living in the State; about 60% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost Idaho taxpayers more than $225.4 million a year."[81]

---

[75] *Id.* at ¶ 127.
[76] *Id.* at ¶ 133.
[77] *Id.* at ¶ 135.
[78] *Id.* at ¶ 137.
[79] *Id.* at ¶ 139.
[80] *Id.* at ¶ 142
[81] *Id.* at ¶ 145.

54. Kansas alleges that it has "approximately 69,000 to 85,000 illegal aliens living in the State; about 64% of them are uninsured; about 25% of them have incomes below the poverty line; and they cost Kansas taxpayers more than $377 million a year."[82]

55. Kentucky alleges that it has "approximately 35,000 to 56,000 illegal aliens living in the State; about 60% of them are uninsured; about 37% of them have incomes below the poverty level; and they cost Kentucky taxpayers more than $261 million a year."[83]

56. Mississippi alleges that it has "approximately 20,000 to 28,150 illegal aliens living in the State; about 75% of them are uninsured; about 49% of them have incomes below the poverty level; and they cost Mississippi taxpayers more than $117 million a year."[84]

57. Montana alleges that it has "approximately 3,000 to 6,000 illegal aliens living in the State, and they cost Montana taxpayers more than $27 million a year."[85]

58. Nebraska alleges that it has "approximately 42,000 to 60,000 illegal aliens living in the State; about 56% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Nebraska taxpayers more than $233.1 million a year."[86]

59. North Dakota alleges that it has "approximately 5,000 to 6,000 illegal aliens living in the State, and they cost North Dakota taxpayers more than $27.4 million a year."[87]

60. Ohio alleges that "Ohio, according to a 2019 estimate, has almost 90,000 illegal migrants living in the State. According to the same estimate, half of this population is uninsured, two-thirds live below 200 percent of the poverty level, and 92 percent of school aged children attend school. Ohio is required to pay the cost of emergency medical services

---

[82] *Id.* at ¶ 147.
[83] *Id.* at ¶ 149.
[84] *Id.* at ¶ 151.
[85] *Id.* at ¶ 153.
[86] *Id.* at ¶ 155.
[87] *Id.* at ¶ 157.

for uninsured immigrants who otherwise qualify for Medicaid, through the Emergency Medicaid program."[88]

61. Oklahoma alleges that it has "approximately 90,000 to 107,000 illegal aliens living in the State; about 68% of them are uninsured; about 27% of them have incomes below the poverty line; and they cost Oklahoma taxpayers more than $467 million a year."[89]

62. South Carolina alleges that it has "approximately 88,000 to 98,000 illegal aliens living in the State; about 69% of them are uninsured; about 33% of them have incomes below the poverty line; and they cost South Carolina taxpayers more than $471 million a year."[90]

63. Tennessee alleges that it has "approximately 128,000 to 135,000 illegal aliens living in the State; about 73% of them are uninsured; about 30% of them have incomes below the poverty line; and they cost Tennessee taxpayers more than $593 million a year."[91]

64. Texas alleges that "Texas law subsidizes driver's licenses, including for noncitizens," and that by "increasing the number of aliens who can secure subsidized licenses, the Defendants impose significant financial harm on Texas."[92] Texas also alleges that it "spends significant amounts of money providing services to illegal aliens. Those services include education services and healthcare, as well as many other social services broadly available in Texas"[93] and that it "funds multiple healthcare programs that cover illegal aliens."[94] Texas further alleges that it spends tens of millions of dollars annually on programs

---

[88] *Id.* at ¶ 158.
[89] *Id.* at ¶ 161.
[90] *Id.* at ¶ 163.
[91] *Id.* at ¶ 165.
[92] *Id.* at ¶ 167.
[93] *Id.* at ¶ 168.
[94] *Id.* at ¶ 169.

which provide services to illegal aliens, including the Emergency Medicaid program, the Texas Family Violence Program, and the Texas Children's Health Insurance Program.[95]

65. Utah alleges that it has "approximately 89,000 to 113,000 illegal aliens living in the State; about 61% of them are uninsured; about 23% of them have incomes below the poverty line; and they cost Utah taxpayers more than $521 million a year."[96]

66. Virginia alleges that it has "approximately 251,000 to 337,800 illegal aliens living in the State; about 68% of them are uninsured; about 21% of them have incomes below the poverty line; and they cost Virginia taxpayers nearly $1.7 billion a year."[97]

67. West Virginia alleges that it has "approximately 4,000 to 6,000 illegal aliens living in the State, and they cost West Virginia taxpayers more than $26.3 million a year."[98]

68. Wyoming alleges that it has "approximately 5,000 to 7,000 illegal aliens living in the State, and they cost Wyoming taxpayers more than $26.1 million a year."[99]

# II.
## INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy.[100] A preliminary injunction is intended to preserve the status quo to "protect [the] plaintiff from irreparable injury and preserve the court's power to render a meaningful decision after a trial on the merits."[101] A preliminary injunction requires proof of four elements: (1) a substantial threat of irreparable injury; (2) a substantial likelihood of success on the merits; (3) that the threatened injury if the injunction is

---

[95] *Id.* at ¶ 170.
[96] *Id.* at ¶ 175.
[97] *Id.* at ¶ 177.
[98] *Id.* at ¶ 179.
[99] *Id.* at ¶ 181.
[100] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).
[101] 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2947 (3d ed.)

denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest.[102] The movant must "clearly carr[y] the burden of persuasion on all four requirements."[103] With respect to the proof supporting each element, the Federal Rules of Evidence do not apply in preliminary injunction hearings and "in practice affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(e) [for summary judgment], and that hearsay evidence also may be considered."[104]

## III.
## JURISDICTIONAL ARGUMENTS

### A. **Standing**.

Defendants argue that the Plaintiff States do not have standing to bring their claims. Jurisdiction under Article III of the Constitution requires the presence of a "case or controversy" among the parties to a federal lawsuit.[105] Standing is one aspect of this case-or-controversy requirement.[106] Standing identifies "those disputes which are appropriately resolved through the judicial process,"[107] and "serves to prevent the judicial process from being used to usurp the powers of the political branches."[108] Courts have adopted various "prudential" standing doctrines but Article III standing requires, at a minimum, that the plaintiff show (1) an "injury in fact," (2) "traceability"—in other words, a "causal connection between the injury and the conduct complained of," and (3) "redressability"—a showing that the injury will likely "be redressed by a

---

[102] *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016).
[103] *Id.*
[104] 11A Wright & Miller, Fed. Prac. & Proc. § 2949 (3d ed. 2013).
[105] U.S. Const. amend. III, § 2; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 1549 (2016).
[106] *Spokeo, Inc.*, 136 S. Ct. at 1549 ("[T]he doctrine of standing derives from [Article III's] case-or-controversy requirement....")
[107] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[108] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

favorable decision"[109] The injury-in-fact requirement ensures that the plaintiff has a "personal stake in the outcome of the controversy."[110] The plaintiff's injury must be "concrete, particularized, and actual or imminent ...."[111] Traceability requires that the plaintiff's injury be "fairly traceable to the defendant's allegedly unlawful conduct,"[112] while "redressability" requires a showing that the plaintiff's injury is likely to be redressed by the relief requested in the complaint.[113] The Plaintiff States must ultimately prove standing by a preponderance of the evidence to obtain final relief on the merits of their claims.[114] At the preliminary injunction stage, however, "the movant must clearly show only that each element of standing is likely to obtain in the case at hand."[115] In other words, the Plaintiff States must show a substantial likelihood that they will be able to prove standing by a preponderance of the evidence at a trial on the merits. Only one party with standing is required to establish Article III jurisdiction.[116] Accordingly, only one of the Plaintiff States need establish standing for the Court to grant relief.

Here, the Plaintiff States base "injury in fact" on the effect of the Termination Order on border crossings and the resulting cost incurred by the states for medical services, education, and law enforcement. Specifically, they contend that the Termination Order will increase daily border crossings from approximately 7,000 to almost 18,000 crossings.[117] The Defendants do not directly challenge "redressability," but focus instead on whether the Plaintiff States have demonstrated a "cognizable" injury and "traceability." Accordingly, the Court will address whether the Plaintiff States have satisfied the "cognizable injury" and traceability requirements for Article III standing.

---

[109] *Lujan*, 504 U.S. at 560–561.
[110] *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal quotation marks omitted).
[111] *Clapper*, 568 U.S. at 409 (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).
[112] *Allen v. Wright*, 468 U.S. 737, 751 (1984).
[113] *Id.*
[114] *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021).
[115] *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).
[116] *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).
[117] ECF No. 13, Exhibit A.

### 1.   Are the Plaintiff States Entitled to "Special Solicitude"?

The Court first addresses whether the Plaintiff States are entitled to "special solicitude" in assessing whether they satisfy the requirements for Article III standing. In *Massachusetts v. EPA*,[118] Massachusetts challenged the Environmental Protection Agency's decision not to regulate greenhouse-gas emissions from new motor vehicles on the grounds, *inter alia*, that increased greenhouse-gas emissions contribute to global warming and the erosion of the state's coastal areas.[119] The Supreme Court held that Massachusetts was entitled to "special solicitude" in assessing whether it satisfied the requirements for Article III standing.[120] This special solicitude doctrine relaxes the showing required for a state to establish standing.[121] The Supreme Court further reasoned that the states have surrendered "certain sovereign prerogatives" to the Federal Government.[122] With respect to greenhouse-gas emissions, those "sovereign prerogatives are now lodged in the Federal Government, and Congress has ordered EPA to protect Massachusetts (among others) by prescribing standards applicable" to air pollution that may "reasonably be anticipated to endanger public health or welfare."[123] A state may trigger "special solicitude" in the standing analysis if it shows (1) that it has "a procedural right to challenge the action in question,"[124] and (2) "the challenged action must affect one of the State's quasi-sovereign interest."[125] For the Supreme Court, Massachusetts' "quasi-sovereign" interest was the

---

[118] 549 U.S. 497, 526 (2007).
[119] *Id.*
[120] *Id.*
[121] *Id.* at 518 ("It is of considerable relevance that the party seeking review here is a sovereign State and not…a private individual" given that "states are not normal litigants for purposes of invoking federal jurisdiction.")
[122] 549 U.S. at 519.
[123] *Id.*
[124] *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021).
[125] *Id.* (quoting  42 U.S.C. § 7521(a)(1)).

preservation of its coastal lands through environmental regulation, which it could not protect through police powers that had been surrendered to the Federal Government.[126]

In *Texas v. United States*,[127] the Fifth Circuit addressed the special solicitude doctrine in the immigration context in a challenge by over twenty-five (25) states to the Deferred Action for Parents of Americans ("DAPA" Program). There, the Fifth Circuit concluded that the states met the first requirement for the special solicitude doctrine because they were challenging a procedural right under the APA. With respect to the second prong of the "special solicitude" doctrine, the court concluded that DAPA affected a "quasi-sovereign" interest of the plaintiff states in that case. The court observed that, like the environmental regulation at issue in *Massachusetts v. EPA*, the plaintiff states had "surrendered some of their sovereign prerogatives over immigration."[128] The State of Texas argued that, because state law required it to issue driver's licenses to some aliens and to subsidize those licenses, the changes in immigration status caused by DAPA would cause Texas to incur increased expenses as far as driver's licenses.[129] According to the Fifth Circuit, this would impose "substantial pressure on [the plaintiff states] to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses."[130] The court concluded that DAPA affected the plaintiff states' "quasi-sovereign" interests because the Federal Government's regulation of immigration requires them to "now rely on the Federal Government to protect their interests."[131]

---

[126] *Id.*
[127] 809 F.3d 134 (5th Cir. 2015).
[128] *Id.* at 153.
[129] *Id.*
[130] *Id.*
[131] *Id.* at 154.

Here, the Plaintiff States rely on *Texas v. United States*[132] and the Fifth Circuit's more recent decision in *Texas v. Biden*.[133] In *Texas v. Biden*, the plaintiffs challenged DHS's decision to terminate its Migrant Protection Protocols ("MPP"). Relying on its earlier decision in *Texas v. United States*, the circuit court in *Texas v. Biden* found that the plaintiff states in that case were exercising a procedural right under the APA to challenge DHS's suspension of MPP, and that the suspension of MPP would impact the states' "quasi-sovereign" interest by creating pressure on Texas to amend its driver's license laws and increasing the cost of issuing licenses.[134]

Here, the Plaintiff States have satisfied the first requirement for "special solicitude" standing because they are exercising a procedural right by challenging the CDC's Termination Order under the APA. Specifically, they challenge the CDC's failure to follow the APA's notice-and-comment requirements for issuing the Termination Order, and, as a result, they argue that they were unable to comment on the proposed termination. They also contend that the CDC's termination decision was arbitrary and capricious under the APA. The fact that the Plaintiff States are exercising their procedural rights under the APA alone relaxes the showing needed to establish the requirements of "redressability" and "immediacy."[135] It also satisfies the first requirement for "special solicitude" in the standing analysis.

With respect to the second prong of "special solicitude" standing, the Plaintiff States contend that the Termination Order affects their "quasi-sovereign" interests. Specifically, they argue that the Termination Order will result in a surge of border crossings that will impact law enforcement, their provision of educational services, and the healthcare systems in their states. As

---

[132] 809 F.3d 134 (5th Cir. 2015).
[133] 20 F.4th 928.
[134] 20 F.4th at 970.
[135] *Summers v. Earth Island Institute*, 555 U.S. 488, 496 (2009) ("a person who has been accorded a procedural right to protect his concrete interest can assert that right without meeting all the normal standards for redressability and immediacy.") Quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 660 (1992)) (Emphasis omitted).

Defendants correctly observe, the Plaintiff States do not rely on the same "quasi-sovereign" interests cited by the Fifth Circuit in *Texas v. Biden* or *Texas v. United States*—specifically, that the agency action at issue in those cases would pressure Texas to change its laws on issuing driver's licenses. However, "special solicitude" standing is not limited to the specific quasi-sovereign interest cited *Texas v. Biden* or *Texas v. United States*. *Massachusetts v. EPA*, for example, did not involve agency action that pressured the state to change its laws. Rather, the enforcement (or lack of enforcement) of federal environmental statutes affected Massachusetts' sovereign interest in its territory.

Here, the Plaintiff States claim quasi-sovereign interests in the health and welfare of their citizens in light of the pandemic, and in the administration of their healthcare and educational systems. Defendants, however, argue that the Sixth Circuit's recent decision in *Arizona v. Biden* precludes the Plaintiff States from relying on healthcare and education costs as a basis for "special solicitude" standing.[136] In *Arizona v. Biden*, the states of Arizona, Montana, and Ohio challenged a DHS memorandum outlining its immigration enforcement priorities and policies. As here, the plaintiffs in *Arizona v. Biden* challenged the agency's action under the APA and argued that the new enforcement guidance would result in "downstream cost to the states in the form of additional crime and public-welfare costs."[137] Specifically, they argued that they would incur "additional costs to pay for medical and educational services and additional law-enforcement burdens...."[138] The Sixth Circuit panel in *Arizona v. Biden* ruled that the plaintiffs were not entitled to "special solicitude" standing because the "indirect fiscal burdens" cited by the plaintiffs did not amount to the "quasi-sovereign" injuries that would satisfy the requirements for "special solicitude" standing.

---

[136] 31 F.4th 469, 2022 WL 1090176 (6th Cir. 2022).
[137] *Id.* at *2.
[138] *Id.*

Defendants' reliance on *Arizona v. Biden* is misplaced for at least two reasons. First, the agency action at issue in *Arizona v. Biden* was fundamentally different from the CDC's decision to terminate its Title 42 orders and allow DHS to resume operations under Title 8. *Arizona v. Biden* involved a change by DHS in its agency guidance to individual immigration officers. The plaintiffs there argued that implementation of this guidance would result in a "decrease in removals."[139] This alleged decrease in removals would then create the "indirect downstream costs" alleged by the plaintiffs.[140] According to the Sixth Circuit, it was purely "speculative whether and how the Guidance's prioritization of the apprehension and the removal of the non-citizens in the [plaintiff states] would injure each of them."[141] This link between the new enforcement guidance and the alleged decrease in removals was speculative because the impact of the enforcement guidance would necessarily turn on the exercise of prosecutorial discretion by individual immigration enforcement officers.[142] Standing alone, the new guidance imposed no requirements and commanded no action. In short, according to the court, the plaintiffs "did not connect the dots between the decrease in removals and the Guidance's challenged prioritization."[143] Here, in contrast, the impact of the Termination Order is not based on prosecutorial discretion or the actions of individual immigration officers. Rather, like the challenge to the termination of MPP in *Texas v. Biden*, the Plaintiff States challenge the termination of an entire immigration enforcement regime enacted under Section 265 of Title 42.

Second, *Arizona v. Biden* is inconsistent with the Fifth Circuit's holding in *Texas v. Biden* to the extent that the Sixth Circuit held that an increase in the states' healthcare reimbursement

---

[139] *Id.* at *3.
[140] *Id.*
[141] *Id.* at *2.
[142] *Id.* at 3.
[143] *Id.*

costs is not a sufficient basis for standing. In *Texas v. Biden*, the Fifth Circuit noted that the plaintiffs subsidized healthcare—and, indeed, were required by law to do so—and that an increase in these costs resulting from immigration was a sufficient basis for standing.[144] In that case, the district court found that the increase in immigration "releases" and "parolees" as a result of MPP would increase the states' healthcare costs because "both Texas and Missouri subsidize heath care for immigrants, regardless of immigration status."[145] The court further observed that "federal law affirmatively requires the states to make some of those expenditures."[146] The Fifth Circuit concluded that the district court's findings in this regard were not clearly erroneous and that the findings on healthcare supported the plaintiffs' standing to sue.[147]

In sum, the Plaintiff States have demonstrated that the Termination Order will affect their "quasi-sovereign" interests based on its impact on their healthcare systems and their interest in the health and welfare of their citizens. As the circuit expressly recognized in *Texas v. United States*, the Plaintiff States have surrendered their control over immigration and, under Title 42, the CDC has the authority to limit immigration in order to protect the citizens of the Plaintiff States from communicable diseases, such as COVID-19.[148] Accordingly, the Court concludes that the Plaintiff States are entitled to "special solicitude" as far as satisfying the requirements for standing.

## 2. Will the Plaintiff States Suffer a Cognizable Injury?

Defendants next argue that the Plaintiff States have not identified a "legally cognizable injury" as grounds for Article III standing.[149] The Plaintiff States assert that the predicted increase in immigration following the Termination Order will cause increased costs to the states as far as

---

[144] 20 F.4th at 969-70.
[145] *Id.*
[146] *Id.*
[147] *Id.* at 970 ("It follows that Texas has been actually injured—or at the least, that it faces imminent injury without the district court's injunction. *Likewise* with health care costs.") (emphasis added.)
[148] 809 F.3d at 153.
[149] ECF No. 40 at 13-14.

education expenses and healthcare costs.[150] The Plaintiff States also contend that the expected increase in border crossings will strain state law enforcement resources due to an increase in crime.[151] The Plaintiff States further argue that they are required by law to provide education and healthcare services to immigrants regardless of immigration status and that an increase in border crossings will increase these expenditures.[152]

Citing the Sixth Circuit's decision in *Arizona v. Biden*, Defendants argue that education, healthcare, and law enforcement expenditures are merely "indirect, downstream costs" and are not legally cognizable injuries for purposes of Article III standing. The flaw in this argument is that, as explained previously, it runs counter to binding Fifth Circuit precedent in *Texas v. Biden*. Defendants, however, argue that *Texas v. Biden* is distinguishable because the Fifth Circuit based standing on state expenditures for driver's licenses and that the termination of MPP created pressure on Texas to change its driver's license laws.[153] Defendants' argument ignores the district court's findings and conclusions in *Texas v. Biden* that the plaintiffs in that case had stated a "legally cognizable" injury based on "increased healthcare cost, education cost, and enforcement and correctional costs...."[154] In affirming the district court, the Fifth Circuit ruled that the district court's findings were not clearly erroneous and that, apart from expenditures on Texas' driver's license program, increased healthcare expenditures are a legally cognizable injury.[155]

Defendants also cite the Fifth Circuit's decision in *Crane v. Johnson*.[156] In *Crane*, the court rejected a challenge to the government's Deferred Action for Childhood Arrivals ("DACA")

---

[150] ECF No. 13-1 at 13-15.
[151] *Id.*
[152] *Id.*
[153] 20 F.4th at 969-70.
[154] *Texas v. Biden*, 554 F. Supp. 3d 818 (N.D. Tex. 2021).
[155] *Texas v. Biden*, 20 F.4th at 969-70. ("It follows that Texas has been actually injured—or at least it faces eminent injury without the district court's injunction. *Likewise with healthcare costs.*") (emphasis added)
[156] 783 F.3d 244 (5th Cir. 2015).

program. Mississippi argued that, as here, the "beneficiaries of DACA who remain in the state will cost the state money in education, healthcare, enforcement, and lost tax revenue."[157] There, the court ruled that Mississippi's "alleged fiscal injury was purely speculative because there was no concrete evidence that Mississippi's costs had increased or will increase as a result of DACA."[158] However, as noted by the  Fifth Circuit in *Texas v. Biden*, Mississippi's sole evidence of injury was a nine-year old study "conducted by the state estimating the "net of fiscal burden of illegal immigration as a whole" at twenty-five million dollars per year.[159] The *Crane* court concluded that this data on illegal immigration *as a whole* failed to show that the fiscal burden to the state would be similarly affected by DACA.[160]

Here, as in *Texas v. Biden*, the Plaintiff States have come forward with evidence that the Termination Order is likely to result in a significant increase in border crossings, that this increase will impact their healthcare systems, and that they will incur higher costs for healthcare reimbursements.  Accordingly, the present case is distinguishable from *Crane* for the same reasons that the Fifth Circuit found that *Texas v. Biden* was disguisable from *Crane.* Applying the holding of *Texas v. Biden* here, the Plaintiff States have shown a legally cognizable injury at least with respect to healthcare costs and the Plaintiff States' legal obligation to subsidize healthcare for illegal immigrants.

### 3.  Are the Plaintiff States' Injuries Fairly "Traceable" to the Challenged Agency Action?

Defendants next argue that, even if Plaintiff States can show a legally cognizable injury, they cannot trace that injury to the Termination Order. "Traceability" for Article III standing must

---

[157] *Id.* at 249.
[158] *Id.* at 251.
[159] *Texas v. Biden*, 20 F.4th at 971 (citing *Crane*, 783 F.3d at 249).
[160] *Crane*, 783 F.3d at 251.

be satisfied by evidence that the plaintiff's injury is "connect[ed] with the conduct about which he complains."[161] In other words, Article III standing "requires a causal connection between the plaintiff's injury and the defendant's challenged conduct."[162] That causation showing, however, is not the more demanding requirement for showing "proximate cause."[163] Rather, an indirect causal relationship is sufficient provided that "there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant."[164] Here, the Plaintiff States rely on evidence that the Termination Order will increase border crossings, and that this increase will result in additional expenditures with respect to law enforcement, as well as health and education services.

The Court first addresses the question of law enforcement expenditures and the strain caused by increased border crossings on state law enforcement and corrections. The Court concludes that the record does not support traceability with respect to these harms. The record includes anecdotal evidence of the impact of illegal immigration on law enforcement as well as drug crimes.[165] Here, the increase in daily border crossings predicted by the government as a result of the Termination Order may lead to some of the criminal activity cited by the Plaintiff States. That link—that increased border crossings will equate to an increase in crime—is not supported by the anecdotal evidence in the record. Nor does the record support a link between the termination of Title 42 and an increase in drug or human trafficking. Any such link is tenuous and speculative based on the current record. Again, the Plaintiff States may be able to "connect the dots" and

---

[161] *Glen v. American Airlines, Inc.*, 7 F.4th 331, 335 (5th Cir. 2021) (*quoting Trump v. Hawaii*, ___ U.S. ___, 138 S. Ct. 2392, 2416 (2018).

[162] *Inclusive Communities Project, Inc. v. Department of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019).

[163] *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (Tracing an injury for purpose of Article III standing is not the same as establishing "proximate" cause).

[164] *Vermont Agency of Natural Resources v. U.S. Ex Rel. Stevens*, 529 U.S. 765, 771 (2000).

[165] *See, e.g.*, 13-1 at 13-14 (Arguing that increased border crossing would lead to "increased drug trafficking" and law enforcement costs related to the apprehension of "dangerous criminal aliens").

establish such a link at a trial on the merits based on admissible evidence. But they have not done so based on the current record.

The Plaintiff States' reliance on increased expenditures for healthcare and educational services presents a different case. The record supports the Plaintiff States' argument that the Termination Order will cause a significant increase in border crossings—a possible three-fold increase according to the government's own predictions—and that this increase in border crossings will increase the fiscal burden of providing required healthcare and educational services for those immigrants. In *Texas v. Biden*, the Fifth Circuit addressed traceability with respect to an increase in immigration "parolees" as a result of the termination of MPP.[166] The court assessed this increase and its effect on Texas' driver's license expenditures.[167] Because Texas law allows immigration parolees in Texas to apply for and receive driver's licenses, the court concluded that the termination of MPP (and the resulting increase in immigration parolees) would increase Texas' cost to administer that program.[168] The court also concluded that the plaintiffs could base standing on the impact to healthcare.

Healthcare reimbursements, however, are not limited to immigration parolees. The Plaintiff States contend that an increase in border crossing by immigrants (regardless of status) will result in increased healthcare costs. This link is supported by the record because it is likely that—just as parolees in Texas were likely to apply for driver's licenses according to the circuit in *Texas v. Biden*—immigrants entering the country illegally after the effective date of the Termination Order will likely require the healthcare and educational services provided by the Plaintiff States at some point.[169] Courts have held that traceability for purposes of standing may

---

[166] 20 F.4th at 970.
[167] *Id.*
[168] *Id.*
[169] *See, e.g.*, Trenschel Dec., ECF No. 13.

be based "on the predictable effect of Government action on the decisions of third parties."[170] Here, the Plaintiff States can similarly rely on the predicted effect of the Termination Order on border crossings, and that an increase in border crossings on the scale estimated by the government will likely impact their healthcare and educational expenditures. The Court concludes, therefore, that the record supports the traceability requirement for standing.

* * *

In sum, the Plaintiff States will ultimately have to establish standing by a preponderance of the evidence in order to receive final relief on the merits of their claims at trial. At the current stage, however, for purposes of a preliminary injunction, the Plaintiff States have shown a substantial likelihood of establishing Article III standing.

### B.  Zone of Interests.

The Defendants argue that, even if the Plaintiff States can establish Article III standing, their alleged injuries fall outside the "zone of interests" of the relevant statute. Whether a plaintiff comes within the "zone of interests" of a statute requires a court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."[171] The doctrine "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."[172] Even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls

---

[170] *Texas v. Biden*, 20 F. 4th at 973 (quoting *Department of Commerce v. New York*, ___ U.S. ___, 139 S. Ct. 2551, 2566 (2019)).
[171] *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).
[172] *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."[173]

Defendants contend that the injuries alleged by the Plaintiff States fall outside Title 42's "zone of interests."[174] They argue that the Plaintiff States' injuries would result solely from the government's enforcement operations under Title 8 after the effective date of the Termination Order and not on account of Title 42.[175] Defendants argue that, in contrast to Title 8, Title 42 pertains solely to the health effects of communicable diseases—COVID-19 in the present case.[176] This argument is unpersuasive for at least two reasons. First, the Plaintiff States point to the fact that they have legitimate interests in the health and welfare of their citizens as well as the impact of the pandemic on their citizens. They argue that decisions by the federal government with respect to immigration, especially when those decisions are based on the prevention of communicable diseases under Title 42, directly impact the states' interest in the health and welfare of their citizens and the protection of their citizens during a pandemic. The Court agrees. Courts have recognized that "states have standing to file suit to protect the health and welfare of their citizens."[177] Indeed, the CDC expressly recognized in its prior orders that "the flow of migration directly impacts not only border communities and regions, but also destination communities and healthcare resources of both."[178]

Second, Defendants' argument that Title 42 is solely a public health measure is not entirely accurate. Title 42 is certainly a public health measure. But, as Defendants acknowledge, it protects

---

[173] *Air Courier Conf. of Am. v. Postal Workers Union, AFL-CIO*, 498 U.S. 517, 523-24 (1991) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990)); *see also Bennett v. Spear*, 520 U.S. 154, 175–76 (1997).
[174] ECF No. 40 at 15-16.
[175] *Id.*
[176] *Id.*
[177] *Texas v. United States*, 86 F. Supp. 3d 591, 631 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015) (citing *Massachusetts v. EPA*).
[178] 86 Fed. Reg. 42,828, 42,835 (Aug. 5, 2021).

public health *by regulating immigration*.[179] Indeed, the Termination Order expressly discusses the possible immigration-related consequence of terminating the CDC's prior Title 42 Orders.[180] Accordingly, even though the CDC's decision to terminate its prior Title 42 Orders was grounded on public health considerations, it necessarily has consequences as far as immigration. The Plaintiff States argue that the immigration-related consequences of the Termination Order will impact them in the form of increased costs for healthcare reimbursements and educational services. The Court concludes that the record supports this link.

In sum, as recognized by the Fifth Circuit in *Texas v. Biden*, the zone-of-interest inquiry is "not especially demanding," and the Plaintiff States do not have to point to "any indication of congressional purpose to benefit the states" to satisfy the zone-of-interest test.[181] Here, the Court concludes that the Plaintiff States fall within Title 42's "zone of interests." The statute regulates immigration (albeit for public health reasons), and the termination of rules issued pursuant to that statute impact the Plaintiff States' interests in the health and welfare of their citizens, as well as state expenditures for healthcare and education.

C.     **Reviewability**

Defendants argue that the CDC's decision to terminate its prior Title 42 orders is not subject to judicial review. According to Defendants, this decision "is committed to the CDC's discretion by law."[182] Defendants are correct that the APA precludes judicial review of agency actions when those actions are "committed to agency discretion by law."[183] There is also, however, a "strong" and "well-settled" presumption in favor of judicial review under the APA.[184] An agency

---

[179] ECF No. 40 at 40 ("a Title 42…or the termination of such a Title 42 order almost always will have immigration consequences…").
[180] ECF No. 1-1 at 28.
[181] 20 F.4th at 975 (quoting *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).
[182] ECF No. 40 at 16.
[183] 5 U.S.C. § 701(a)(2).
[184] *See Texas v. Biden*, 20 F.4th at 976.

can overcome that presumption by showing that (1) the relevant statute precludes review, or (2) that the agency action is committed to agency discretion by law.[185] The text of Title 42 does grant the CDC discretion in adopting rules that regulate immigration to prevent the spread of communicable diseases. But that discretion is not unbounded. As the Plaintiff States point out, the "committed to agency discretion" exception is narrow, and is limited to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standing against which to judge the agency's exercise of discretion."[186] Here, Title 42 provides such "meaningful standards." Specifically, Title 42 limits the CDC's authority to regulating "communicable" diseases and, more importantly, requires the CDC to exercise that discretion only when "required in the interest of public health."[187] In sum, as in *Texas v. Biden*, the Court concludes that Defendants have not overcome the presumption of reviewability under the APA.

## IV.
## SUBSTANTIAL LIKELIHOOD OF SUCCESS

Because the Plaintiff States have satisfied the jurisdictional requirements for bringing this case—they have Article III standing, they fall within the "zone of interests" of Title 42, and the CDC's actions are reviewable—the Court now turns to whether the states have demonstrated a substantial likelihood of success on the merits of their claims. The Plaintiff States assert that the Termination Order violates the APA's notice-and-comment requirements and that the order is arbitrary and capricious.

---

[185] *Id.*
[186] *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993).
[187] ECF No. 51-1 at 15.

### A. **APA's Rule-Making Requirements**.

When an agency issues a "rule,"[188] the APA generally requires the agency to provide

"notice of [the] proposed rulemaking," "give interested persons an opportunity to" submit

comments, and "consider and respond to significant comments."[189] However, "[n]ot all 'rules'

must be issued through the notice-and-comment process."[190] For example, the APA exempts a rule

from undergoing notice-and-comment rulemaking when "the agency for good cause finds … that

notice and public procedure thereon are impracticable … or contrary to the public interest."[191] It

also exempts a rule that "involve[s] a … foreign affairs function of the United States."[192]

Defendants assert that both exceptions apply.

The APA's requirement that a rule undergo the notice-and-comment process is not a mere

technicality. The Supreme Court has stated that the notice-and-comment provisions "were

designed to assure fairness and mature consideration of rules of general application."[193] As

explained by the Fifth Circuit,

> These provisions afford an opportunity for "the agency promulgating the rule to
> educate itself before establishing rules and procedures which have a substantial
> impact on those regulated." *Texaco, Inc. v. FPC*, 412 F.2d 740, 744 (3rd Cir. 1969).
> Congress realized that an agency's judgment would be only as good as the
> information upon which it drew. It prescribed these procedures to ensure that the
> broadest base of information would be provided to the agency by those most
> interested and perhaps best informed on the subject of the rulemaking at hand. *See
> Shell Oil v. FEA*, 574 F.2d 512, 516 (Temp.Emer.Ct.App.1978)."[194]

Given the importance of these policy considerations, "it is well established that the 'good cause'

exception to notice-and-comment should be 'read narrowly in order to avoid providing agencies

---

[188] A "rule" means, inter alia, "an agency statement of general or particular applicability and future effect" that is "designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).
[189] *Perez v. Mortgage Bankers Assn,* 575 U.S. 92, 96 (2015) (quoting 5 U.S.C. § 553(b), (c)).
[190] *Id.* at 96–97.
[191] 5 U.S.C. § 553(b)(B).
[192] 5 U.S.C. § 553(a)(1).
[193] *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969).
[194] *Brown Exp., Inc. v. U.S.*, 607 F.2d 695, 701 (5th Cir. 1979).

with an 'escape clause' from the requirements Congress prescribed.'"[195] In fact, all of the "various exceptions … will be narrowly construed and only reluctantly countenanced" by federal courts.[196]

As a preliminary matter, certain statements in Defendants' opposition brief and the administrative record suggest that the CDC did not consider the Termination Order to be a "rule" subject to the APA's notice-and-comment rulemaking process.[197] Defendants, however, do not appear to advance this argument here. In any event, the Termination Order qualifies as a "rule" that is subject to the notice-and-comment process absent the "good cause" and "foreign affairs" exceptions invoked by Defendants. The Termination Order provides that the CDC's prior orders restricting immigration under Title 42 will terminate and that normal immigration enforcement operations will resume under Title 8. The Termination Order is thus "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy …."[198] The Termination Order is not "a matter[] relating to agency management or personnel,"[199] nor is it merely an interpretive rule, a general statement of policy, or a rule of agency organization, procedure, or practice.[200] Since the Termination Order is a rule that would ordinarily be subject to the APA's notice-and-comment requirement, the Court now addresses whether the Termination Order falls within one of the exceptions to this process. If it does not, the CDC's action violates the APA.

---

[195] *United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) (quoting *United States v. Garner*, 767 F.2d 104, 120 (5th Cir. 1985)).

[196] *Id.* at 1045 n.88 (quoting *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980)); *see also Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (good-cause exception is not an "escape claus[e]" to be "arbitrarily utilized at the agency's whim").

[197] ECF No. 40 at 6; ECF No. 1-1 at 29 (Termination Order) ("This termination, like the preceding Orders issued under this authority, *is not a rule subject to notice and comment* under the [APA].") (emphasis added). While arguing that the Termination Order is not a "rule" within the meaning of the APA, the CDC also notes in the Termination Order that "the Office of Information and Regulatory affairs has determined that this is a major rule as defined by Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act."

[198] 5 U.S.C. § 551(4).

[199] 5 U.S.C. § 553(a)(2).

[200] *Id.* at § 553(b)(3)(A).

### B. __Good Cause.__

Defendants argue that the Termination Order was exempt from the notice-and-comment process under the "good cause" exception. A federal court's "review of [an] agency's legal conclusion of good cause is *de novo*."[201] Here, the Court's review of the CDC's "good cause" determination is limited to the "basis articulated by the agency itself," and the agency's rationale must be articulated "at the time of the rulemaking."[202] "Post hoc explanations ... are simply an inadequate basis for the exercise of substantive review of an administrative decision."[203] The CDC's Termination Order provides the following rationale for the "good cause" exception to the APA's notice-and-comment requirement:

> This Termination, like the preceding Orders issued under this authority, is not a rule subject to notice and comment under the Administrative Procedure Act (APA). Even if it were, notice and comment are not required because there is good cause to dispense with prior public notice and the opportunity to comment on this Termination. Given the extraordinary nature of an order under Section 265, the resultant restrictions on application for asylum and other immigration processes under Title 8, and the statutory and regulatory requirement that an CDC order under the authority last no longer than necessary to protect public health, it would be impracticable and contrary to the public interest and immigration laws that apply in the absence of an order under 42 U.S.C. § 265 to delay the effective date of this termination beyond May 23, 2022 for the reasons outlined herein. As explained, DHS requires time to institute operational plans to implement this order, including COVID-19 mitigation measures, and begin regular immigration processing pursuant to Title 8. In light of the August Order's significant disruption of ordinary immigration processing and DHS's need for time to implement an orderly and safe termination of the order, there is good cause not to delay issuing this termination or to delay the termination of this order past May 23, 2022.[204]

The Court must therefore consider whether the reasons stated satisfy the requirement of "good cause." As stated above, the "good cause" exception in 5 U.S.C. § 553 is read narrowly in order to avoid providing agencies with an escape clause from the APA notice-and-comment

---

[201] *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014).
[202] *Johnson*, 632 F.3d at 928 (quoting *United States v. Garner*, 767 F.2d 104, 117 (5th Cir. 1985)).
[203] *Id.*
[204] 87 Fed. Reg. 19,941 (Apr. 6, 2022).

requirements.[205] The circumstances justifying reliance on this exception are "indeed rare."[206] The "good cause" exception was described by one court as "meticulous and demanding," "narrowly construed," "reluctantly countenanced," and evoked only in "emergency situations."[207] Based upon this stringent standard, the "good cause" exception is rarely upheld.[208]

The CDC's rationale for invoking the "good cause" exception is flawed for at least four reasons. First, the CDC's rationale suggests that the CDC had insufficient time to undergo the APA's notice-and-comment process—in other words that the need to terminate the orders was so urgent that it could not hew to the requirements of the APA. This rationale ignores the fact that the CDC was ordered to consider the need to continue its Title 42 orders by Executive Order over fourteen (14) months prior to issuing the Termination Order.[209] As the Plaintiff States point out, this fourteen-month period provided the CDC with ample time to review its Title 42 orders and, upon deciding that they should be terminated, to undergo the normal notice-and-comment process mandated by the APA.

Second, the CDC's stated rationale for the "good cause" exception is internally inconsistent. While the CDC refers to the need for swift action given "the extraordinary nature of an order under Section 265 [of Title 42]," the CDC also states that "DHS requires time to institute operational plans to implement this order…"[210] This rationale recognizes that a Title 42 termination will impact DHS's immigration enforcement operations and that DHS will need to "institute operational plans" to prepare for a termination.[211] In this respect, the CDC's rationale actually supports subjecting the rule to the notice-and-comment process because such a process

---

[205] *United States v. Johnson*, 632 F.3d 912 (5th Cir. 2011).
[206] *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981).
[207] *Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702 (D.C. Cir. 2014).
[208] *See Louisiana v. Becerra*, 2022 WL 16571 (W.D. La. 1/1/22) (collecting cases).
[209] 86 Fed. Reg. 8,267 (Feb. 5, 2021).
[210] 87 Fed. Reg.19,941.
[211] *Id.*

would provide the CDC with the opportunity to "educate itself" before adopting a rule that will have a substantial impact on DHS's immigration enforcement operations and the Plaintiff States.

Third, the CDC's stated rationale is overbroad in that it would apply to all rules issued under Title 42 regardless of the circumstances. Specifically, the CDC states that the "good cause" exception applies to the Termination Order because the COVID-related orders issued under Title 42 are "extraordinary." Given that Section 265 of Title 42 essentially allows the CDC to supplant normal immigration operations under Title 8, any order issued under Section 265 of Title 42 is arguably "extraordinary," and, hence, exempt from the APA's notice-and-comment rulemaking process. Nothing in Section 265 of Title 42 indicates that Congress intended to exempt any and all actions under that provision from the normal rulemaking process. Indeed, the extraordinary nature of the CDC's Title 42 orders argue against a wholesale exemption of actions under Title 42 from the normal rulemaking process.

Fourth, the CDC's stated rationale appears to rely on the same rationale used to implement the original Title 42 orders issued near the onset of the COVID-19 pandemic. The Plaintiff States argue that the rationale for the "good cause" exemption based on circumstances that may have existed near the beginning of the pandemic does not apply now, when the CDC is determining whether to resume normal operations given the current state of the pandemic.[212] An agency's response to a dangerous and largely unknown contagious disease may justify emergency action that dispenses with the normal rulemaking process.[213] The same emergency conditions do not exist—or at least the CDC has not explained how such emergency conditions exist—with respect to *terminating* its COVID-related orders based on improving conditions and allowing DHS to resume normal operations under Title 8. Simply put, the CDC has not explained how the present

---

[212] ECF No. 13 at 21-22.
[213] *Chambless Enter., LLC v. Redfield*, 508 F.Supp.3d 101, 119 (W.D. La. 2020)

circumstances prevented the CDC from issuing the Termination Order through the required notice and comment process under the APA.

Accordingly, the Court concludes that the Termination Order is not exempt from the APA's notice-and-comment process based on the "good cause" exception.

### C.   Foreign Relations Exception.

Defendants next seek to invoke the foreign affairs exception to the notice-and-comment requirement, arguing that the order involves "a military or foreign affairs function of the United States."[214]  As with other exceptions to the notice-and-comment requirements, the foreign affairs exception "must be narrowly construed."[215]  The parties here propose two different tests for when the foreign affairs exception should apply based on a circuit split.[216]  Plaintiff States argue that the Court should apply the foreign affairs exception only where "the public rulemaking provisions [will] provoke definitely undesirable consequences."[217]  Under this test, the exception would apply only "where the international consequence is obvious or the Government has explained the need for immediate implementation of a final rule."[218]  In contrast, Defendants argue that this test "is unmoored from the legislative text"[219] and that the appropriate test for this exception is whether the action "relates directly to, and has clear consequences for, foreign affairs."[220]  In *City of New York*, which discusses this second test, the Second Circuit also noted that where a matter does not "clearly and directly involve a foreign affairs function," the court should conduct a case-by-case

---

[214] 5 U.S.C. §553(a)(1).
[215] *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (quoting *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)).
[216] The Fifth Circuit has no case law providing a clear definition of when the foreign affairs exception should apply.
[217] *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 776 (9th Cir. 2018) (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980)).
[218] *East Bay*, 932 F.3d at 776.
[219] *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F.Supp.3d 25, 53 (D.D.C. 2020)
[220] *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010).

analysis determining whether "definitely undesirable international consequences" would result.[221] This need for a case-by-case analysis was especially important regarding issues of immigration because "it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law."[222]

Ultimately, the Court finds that the foreign affairs exception would not apply to the Termination Order regardless of which test is used. In seeking to invoke the foreign affairs exception, the Termination Order includes only one sentence and states that it "concerns ongoing discussions with Canada, Mexico, and other countries regarding immigration and how best to control COVID-19 transmission over shared borders."[223] Defendants have now submitted two declarations to expand upon the foreign affairs implications of the Termination Order. However, as the Supreme Court has cautioned, it is a "foundational principle of administrative law" that judicial review of agency action is limited to "the grounds that the agency invoked when it took the action."[224] Accordingly, the declarations submitted by Defendants must be "viewed only as impermissible post hoc rationalizations and thus are not properly before us."[225] The Court is limited to the reasons stated in the Termination Order to determine whether the foreign affairs exception applies. The cursory information included in the Termination Order is simply insufficient to satisfy the requirements of either of the proposed tests.

**D.  Arbitrary and Capricious**.

The Plaintiff States also argue that the Termination Order is arbitrary and capricious. They assert that the Termination Order is arbitrary and capricious based upon CDC's failure to consider

---

[221] *Id.* at 202 (quotations omitted).
[222] *Id.*
[223] 87 Fed. Reg. 19941-01, 2022 WL 1016059 (Apr. 06, 2022).
[224] *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1907 (2020), citing *Michigan v. EPA*, 576 U.S. 743, 758, 135 S. Ct. 2699 (2015).
[225] *Id.* at 1909.

(1) the financial harms to the states and other reliance interests; and (2) the immigration consequences of the Termination Order.

The arbitrary and capricious standard under the APA is "narrow and highly deferential."[226] In reviewing an agency's explanation, a court is to consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[227] The "court's task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision."[228] The Supreme Court has stated that "[n]ormally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[229] Further, "a court is not to substitute its judgment for that of the agency," and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."[230]

Because the Plaintiff States have established a substantial likelihood of success on the merits of their APA notice-and-comment claim, they have satisfied the first requirement for a preliminary injunction; the Court need not, at this time, address the Plaintiff States' arbitrary and capricious claim before addressing the remaining requirements for injunctive relief. The Court, however, will briefly address several of the questions raised by the Plaintiff States as to whether the CDC's actions are arbitrary and capricious. The Plaintiff States contend that the Termination Order is arbitrary and capricious because the CDC failed to "consider financial harms to the states

---

[226] *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021).
[227] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
[228] *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022).
[229] *State Farm*, 463 U.S. at 43.
[230] *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys. Inc.*, 419 U.S. 281, 286 (1974))

in terminating its prior COVID-19 orders under Title 42."[231] The Plaintiff States also argue that the CDC failed to consider the immigration consequences of its order.[232] Based on the Court's review of the Termination Order and the administrative record, it appears that CDC did review some aspects of the immigration impact of resuming normal operations under Title 42 as well as how that transition might impact local communities within the Plaintiff States. Defendants also argue in their opposition brief that the CDC considered how the Termination Order would impact the reliance interests of the states.[233] The problem with this argument is that the CDC did not have the benefit of additional information and input with respect to the reliance interests claimed by Plaintiff States because it did not promulgate the Termination Notice through the APA's required notice-and-comment process.

Furthermore, it does not appear from the record that the CDC considered alternatives to a blanket order that simply terminates its prior Title 42 orders. *Texas v. Biden* illustrates this point. There, DHS considered the possibility of either retaining MPP or simply terminating MPP and elected to terminate MPP. The Fifth Circuit observed that DHS's decision was arbitrary and capricious because "DHS was required to consider not just the binary decision to keep or reject MPP, but also 'the alternatives that [were] within the ambit of' MPP."[234] Here, Title 42 does not cabin the CDC's options under the statute to a binary decision to either keep or terminate its Title 42 COVID-related orders. Consideration of the alternatives may ultimately lead the CDC to determine that a termination of its Title 42 orders is the correct course. However, the CDC must, consistent with *Texas v. Biden*, consider the alternatives.

---

[231] ECF NO. 13-1 at 27-28.
[232] *Id.* at 33-34.
[233] ECF No. 40 at 35-38.
[234] 20 F.4th at 992.

43

In sum, the Court finds that the Plaintiff States have established a substantial likelihood of success based on the CDC's failure to comply with the rulemaking requirements of the APA. This finding is sufficient to satisfy the first requirement for injunctive relief. Accordingly, the Court will not, at this time, make a finding as to whether the CDC's action was arbitrary and capricious.

## V.
## THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

### A. Immediate and Irreparable Harm.

Defendants next argue that the Plaintiff States have not shown that they will be immediately and irreparably injured if the Termination Order goes into effect. To obtain injunctive relief, the Plaintiff States must establish "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."[235] Evidence of "speculative injury" is not sufficient; there must be more than an unfounded fear on the part of the applicant."[236] The Court concludes that the Plaintiff States have met this burden. The record reflects that—based on the government's own predictions—that the Termination Order will result in an increase in daily border crossings and that this increase could be as large as a three-fold increase to 18,000 daily border crossings. Moreover, the CDC's own Termination Order acknowledges that the order "will lead to an increase in a number of non-citizens being processed in DHS facilities which could result in overcrowding in congregate settings."[237] The record also includes evidence supporting the Plaintiff States' position that such an increase in border crossings will increase their costs for healthcare reimbursements and education services. These costs are not

---

[235] *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir., 1986).
[236] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir., 2011).
[237] ECF No. 10-1 at 27.

recoverable.[238] The Plaintiff States thus satisfy the irreparable harm requirement for a preliminary injunction.

### B. Balance of Harms.

Defendants next argue that consideration of the "balance of harms" weighs against a preliminary injunction. Specifically, they argue that an injunction "would unduly interfere with the judgment of the Nation's chief public health expert that a Title 42 order is no longer warranted giving the public health circumstances."[239] They argue that an injunction would "require the Executive Branch to adopt an extraordinarily restrictive public health order, despite the Executive Branch's considered judgment that the order is no longer warranted."[240] Defendants' argument is correct to the extent that the CDC's Title 42 Orders indisputably impact the operation of the immigration system under Title 8. This argument, however, is just one side of the "balance of harms" that the Court must consider. The Plaintiff States have demonstrated harm that will result from the Termination Order and that, despite the impact of the order on the states, they were not able to protect their interest by participating in the notice-and-comment process mandated by the APA. On the other hand, the impact of the CDC's Title 42 Orders on immigration are ameliorated by certain exceptions and "safety valves" in those orders. The CDC's Title 42 Orders grant DHS discretion to except non-citizens from the impact of the orders on a case-by-case basis.[241] These exceptions can be triggered by "consideration of significant law enforcement, officer and public safety, humanitarian and public health interests."[242] Defendants concede that these exceptions have

---

[238] *Texas v. Biden*, 20 F.4th at 1002 (The same costs to the plaintiffs that supported standing also constitute irreputable injury not adequately remedied by damages" because "they will be unable to recover those additional cost from the Federal Government.").
[239] ECF NO. 40 at 43.
[240] *Id.* at 44.
[241] ECF No. 24-1.
[242] ECF No. 27-1 at ¶ 3.

been employed throughout the period that the CDC's Title 42 Orders have been in place.[243] Considering the record as a whole, the Court concludes that the balance of harms weighs in favor of issuing a preliminary injunction.

### C. The Public Interest.

Finally, the Court concludes that injunctive relief would serve the public interest. Defendants' brief argument with respect to this element merely repeats the same arguments they make with respect to standing, reviewability, and the balance of harms. Given the impact of the Termination Order on the Plaintiff States and their showing that the CDC did not comply with the APA, the Court concludes that the public interest would be served by a preliminary injunction preventing the termination of the CDC's Title 42 Orders.

# VI.
## SCOPE OF INJUNCTIVE RELIEF

The final matter that the Court must address is the scope of injunctive relief. The Plaintiff States argue that they are entitled to a preliminary injunction that has nation-wide effect. As recognized by the court in *Texas v. United States*,[244] an injunction limited just to the Plaintiff States "would detract from the integrated scheme of regulation created by Congress and there is a substantially likelihood that a geographically-limited injunction would be ineffective because [immigrants] would be free to move among states."[245] The Defendants do not appear to contest the entry of a nation-wide preliminary injunction assuming that the Court finds that the Plaintiff States have satisfied all of the requirements for injunctive relief. However, in an Amicus Brief filed on behalf of two asylum applicants in Mexico, these asylum applicants argue for an injunction that is

---

[243] ECF No. 27 at 11-12.
[244] 809 F.3d at 188.
[245] ECF No. 74 at 2.

limited in scope to the territories of the twenty-four Plaintiff States.[246] The Court agrees with the Plaintiff States that a nation-wide injunction is necessary for complete relief given the ability of immigrants crossing the border to move freely from one state to another.[247] A preliminary injunction limited to the Plaintiff States will likely do nothing more than shift border crossings from the Plaintiff States to states not covered by the preliminary injunction. The Court also notes that the Termination Order outlines the significant operational issues posed by an order that requires DHS to resume immigration operations under Title 8.[248] A piecemeal preliminary injunction would only further complicate DHS's operations. Accordingly, a nation-wide injunction would provide the Plaintiff States with complete relief as well as promoting uniformity in immigration enforcement.

## VII.
### CONCLUSION

For the reasons stated above, the Court finds that the Plaintiff States have satisfied each of the requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. Accordingly, the court **GRANTS** the Plaintiff States' Motion for a Preliminary Injunction.

THUS DONE in Chambers on this 20th day of May, 2022.

ROBERT R. SUMMERHAYS
UNITED STATES DISTRICT JUDGE

---

[246] ECF No. 88.
[247] *Texas v. United States*, 809 F.3d at 188.
[248] ECF No. 1-1 at 28.