**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

THE STATE OF ARIZONA,
By and through its Attorney General, Mark
Brnovich, et al.,

                              PLAINTIFFS,

v.                                              CIVIL ACTION NO. 6:22-cv-00885-RRS-
                                                CBW

CENTERS FOR DISEASE CONTROL &
PREVENTION; et al.,

                              DEFENDANTS.

**PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
ORDER TO SHOW CAUSE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

GOVERNING LAW ........................................................................................................ 6

ARGUMENT ................................................................................................................. 8

    I.    DEFENDANTS APPEAR TO BE VIOLATING THIS COURT'S PRELIMINARY INJUNCTION ........ 8

        A.   Defendants Appear to Have Ended the Title 42 Policy for Citizens of Haiti ........... 9

            1.   Defendants' Own Reports And Data Strongly Suggest That DHS Has *De Facto* Terminated Title 42 Vis-à-vis Haiti ........................................................ 9

            2.   Defendants' Explanations To Date Are Unpersuasive ..................................... 13

        B.   Defendants Appear to Be Using Humanitarian Exceptions to Circumvent Or Violate This Court's Preliminary Injunction .......................................................... 18

            1.   The Data From DHS's Reports Suggests That DHS May Be Attempting To Circumvent This Court's Injunction .......................................................... 18

            2.   DHS's Repeated Attestations That They Have "Made No Material Changes To Its Policy on Application the Title 42 Process" Appear Dubious. ......................................................................................................... 19

            3.   Defendants' Explanations To Date Are Unpersuasive ..................................... 21

    II.   THIS COURT SHOULD ISSUE AN ORDER TO SHOW CAUSE ............................................. 23

CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*American Airlines, Inc. v. Allied Pilots Ass'n*,
228 F.3d 574 (5th Cir. 2000) ................................................................................. 7, 8

*Chao v. Transocean Offshore, Inc.*,
276 F.3d 725 (5th Cir. 2002) ................................................................................. 7

*F.D.I.C. v. LeGrand*,
43 F.3d 163 (5th Cir. 1995) ................................................................................. 7

*Hornbeck Offshore Servs., LLC v. Salazar*,
713 F.3d 787 (5th Cir. 2013) ................................................................................. 6

*Martin v. Trinity Indus., Inc.*,
959 F.2d 45 (5th Cir. 1992) ................................................................................. 7

*Norman Bridge Drug Co. v. Banner*,
529 F.2d 822 (5th Cir. 1976) ................................................................................. 7

*Oaks of Mid City Resident Council v. Sebelius*,
723 F.3d 581 (5th Cir. 2013) ................................................................................. 7

*Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*,
799 F.3d 437 (5th Cir. 2015) ................................................................................. 7

*Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*,
2015 WL 13768849 (5th Cir. Oct. 22, 2015)......................................................... 7

*Test Masters Educ. Servs., Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005) ................................................................................. 8

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947)......................................................................................... 7, 8

*United States v. Woodberry*,
405 F. App'x. 840 (5th Cir 2010) ....................................................................... 7

*Waffenschmidt v. MacKay*,
763 F.2d 711 (5th Cir. 1985) ............................................................................... 6

## OTHER AUTHORITIES

https://www.cbp.gov/newsroom/stats/nationwide-encounters .................................... 12

Julia Ainsley, *Biden admin to step up deportation of Haitians to address migrant surge,
documents say*, NBC NEWS, Sept. 17, 2022
https://www.nbcnews.com/politics/immigration/biden-admin-step-deportation-haitians-
address-migrant-surge-documents-say-n1279449 ................................................. 17

Julia Ainsley, *DHS reviewing agency failures that led to surprise surge of Haitian migrants
at Texas border*, NBC NEWS, Oct. 7, 2021

https://www.nbcnews.com/politics/immigration/u-s-knew-july-thousands-haitians-were-prepping-journey-u-n1280924 ................................................................................................... 18

Julia Ainsley, *Number of Haitians deported plunged in June as more are allowed to seek asylum*, NBC NEWS, July 7, 2022
https://www.nbcnews.com/politics/immigration/number-haitians-deported-plunged-june-are-allowed-seek-asylum-rcna36974 ...................................................................................... 14

Miroff, Nick, and Sachetti, Maria, *New Biden rules for ICE point to fewer arrests and deportations, and a more restrained agency*, Washington Post (Feb. 7, 2021) ...................... 13

**INTRODUCTION**

On May 20, 2022, this Court granted Plaintiff States' motion for a preliminary injunction against Defendants' attempt to "terminat[e] the COVID-related restrictions on immigration enacted by the CDC pursuant to its authority under Section 265 of Title 42" (the "Title 42 Policy"). Doc. 90 at 1. This Court issued a clear and unambiguous order enjoining Defendants "from enforcing the April 1, 2022 Order Under Sections 362 & 365 of the Public Health. Service Act anywhere within the United States" and requiring that "DHS shall file monthly reports providing ... any material changes to policy regarding DHS's application of the Title 42 process." Doc. 91 at 1-2.

Defendants' recent reports raise very troubling questions as to whether DHS has complied with this Court's preliminary injunction, however. In particular, DHS's own reports strongly suggest that the agency has partially implemented the Termination Order as if this Court's preliminary injunction was written in vanishing ink and the Termination Order instead took effect as planned on May 23, 2022.

In particular, Defendants appear to have *de facto* terminated the Title 42 Policy vis-à-vis citizens of Haiti. In June 2022—*i.e.*, right after the Termination Order would have taken effect without the preliminary injunction—the number of Haitian citizens subject to Title 42 suddenly dropped *more than 99%*. Moreover, while the number of Haitians subject to Title 42 and Title 8 previously used to move in tandem, *see* Chart 3 *infra* at 10, the correlation became permanently broken in June. Instead, Title 42 applications became locked at low numbers accounting for less than 1% of total encounters. *Id.*

Statistically speaking, DHS's data is indistinguishable from this Court granting a preliminary injunction as to other nations but exempting Haiti. But this Court did no such thing.

1

And June was no aberration: Defendants' July, August, and September reports also reflect reductions of over 99% in expulsions for individuals from Haiti from May 2022 numbers. The respective numbers are as follows:



Defendants' reports filed in this Court also raise substantial questions about the accuracy and completeness of representations made to this Court. Defendants' report for June 2022—the same month that expulsions of Haitians declined 99%—affirmatively represented that DHS "has made no material changes in its policy on application of the Title 42 process." Doc. 151 at 6. Chart 1 above alone demonstrates visually the implausibility of that statement. Similarly, Defendants' report for May 2022 reported "one material change" regarding "application of Title 42 orders to family units" in response to a court order. Doc. 147 at 6-7. DHS thus affirmatively represented that it made no material changes with respect to Haiti that could have produced the 99% drop.

Defendants' subsequent reports then become even fishier. The report for July 2022 also swore to this Court that DHS "has made no material changes to its policy on application of the

Title 42 process." Doc. 154 at 6. But this time that "no material changes" attestation is caveated with a footnote that "given a significant increase in the number of individuals who have presented themselves with situations that warrant humanitarian exceptions … DHS *began on July 13, 2022* to gradually increase the number of humanitarian exceptions it applies." Doc. 154 at 6 n.1 (emphasis added).

In Defendants' report for August 2022—after the States pressed Defendants on these concerning developments, *see* Ex. A at 8-11—Defendants suddenly changed their tune. That August report contradicted Defendants' prior assertions, but did so by putative "clarification." Specifically, in that report "Defendants *clarif[ied]* that after the temporary restraining order was superseded by the preliminary injunction, DHS increased the number of humanitarian exceptions beginning on June 4, as reflected in Defendants' data report for the month of June." Doc. 155 at 6 n.1 (emphasis added).

That is of course no "clarification" but rather a direct contradiction, all without any explanation of why Defendants prior representations to this Court were apparently false. As a result, the States have pressed Defendants' counsel to explain this, but have not received a satisfactory explanation. *See* Ex. A at 2, 4.

Thus, even if the sudden 99% decrease in relevant expulsions did not itself violate the preliminary injunction, Defendants' repeated attestations to this Court that they have made "no material changes" to Title 42 implementation appear to be in sharp—and perhaps irreconcilable— tension with the numbers supplied in those reports. And those doubts are further compounded by Defendants' sudden "clarification" that their June and July reports were in fact false: both swore that the putative change as occurred on July 13, rather than the true June 4 date that DHS's August report belatedly disclosed. *Compare* Doc. 151 at 5 n.1 (June report listing date of July 13, 2022 as

start of increased grants of humanitarian exceptions), Doc. 154 at 6 n.1 (July report listing same) *with* Doc. 155 at 6 n.1 (August report listing date for start of increased humanitarian exceptions as June 4).

It further appears that DHS may be employing the humanitarian exception to circumvent—and perhaps violate—this Court's injunction. All of Defendants' reports attest that there has been "no material change" in policy vis-à-vis the exception, but rather only a change in factual circumstances: *i.e.*, "a significant increase in the number of individuals who have presented themselves with situations that warrant humanitarian exceptions." Doc. 151 at 5 n.1; *accord* Doc. 154 at 6 n.1; Doc. 155 at 6. n.1.

This makes little sense on its face: if there merely were a rise in people satisfying the *same legal standards*, DHS should not be able to put a precise date on that change—and then backdate it to a different specific date. Instead, the reason that DHS can precisely date these changes is presumably because the agency has in fact made material changes to the *legal standard* for humanitarian exception itself with specific effective dates or how the agency was applying it—and did so on June 4 and July 13, 2022. Moreover, the numbers in DHS's reports disclose a sudden and sustained increase in the number of humanitarian exceptions being granted.

The upshot is that this approach is functionally equivalent to partially terminating Title 42—which would of course violate this Court's injunction if adopted formally. Defendants' conduct appears tantamount to the same thing.

A quick review of the number of humanitarian exceptions being granted belies Defendants' repeated attestations that they have made "no material changes" in the Title 42 Policy implementation:



DHS is not entitled to any benefit of the doubt here. DHS is, after all, the same agency that illegally and secretly began implementing the Termination Order *more than a month* before its effective date—all while the States' motion for a preliminary injunction motion was pending, and with the States having agreed with DOJ to a schedule that would permit briefing and decision *before* the Termination Order was supposed to go into effect. The secret implementation was leaked to the press and the States responded by seeking such a temporary restraining order, which this Court granted, *see* Docs. 37 and 60.

Given these concerning developments and the obvious inconsistencies in Defendants' reports—including their own "clarification," which actually reflects a glaring contradiction with two prior reports—Plaintiffs respectfully request that the Court order the Defendants to show cause as to why they should not be held in contempt or other appropriate remedial measures be entered either for (1) violating this Court's preliminary injunction and/or (2) falsely attesting that "no material changes" had been made to implementation of the Title 42 Policy.

In addition, this Court should enter an order providing or requiring that:

1) Defendants explain in detail all policy changes, both written and unwritten, that may have contributed to these drastic changes in how Title 42 is applied to citizens of Haiti and the increased granting of humanitarian exceptions;

2) Defendants produce all documents and communications related to these policy changes;

3) Defendants produce any internal planning documents or communications that might be the "internal planning document" about processing of citizens Haiti that was referred to in press reports;

4) Defendants produce numbers broken down by nationality of all grants of humanitarian exceptions to the Title 42 Policy;

5) Either the Assistant Secretary for Border and Immigration Policy or the Secretary of Homeland Security to attest to the veracity and completeness of all future reports under penalty of perjury declaration; and

6) Plaintiffs be permitted to take up to five depositions relating to these matters of DHS officials.

**GOVERNING LAW**

"Courts possess the inherent authority to enforce their own injunctive decrees." *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985). The availability of the federal courts' power to punish for contempt promotes "the due and orderly administration of justice and safeguards the court's authority." *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (cleaned up). A district court's issuance of a contempt order is reviewed for abuse of discretion and its factual findings are reviewed under a clearly erroneous standard. *Martin v.*

*Trinity Indus., Inc.*, 959 F.2d 45, 46–47 (5th Cir. 1992). "A party may be held in civil contempt of an injunction order if there is clear and convincing evidence that: (1) the injunction was in effect at the time of the allegedly contemptuous conduct, (2) the injunction neither vaguely nor ambiguously required the party to perform or abstain from certain conduct, and (3) the party failed to comply with the injunction's requirements." *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs., Inc.*, 799 F.3d 437, 454 (5th Cir. 2015), *on reh'g*, 2015 WL 13768849 (5th Cir. Oct. 22, 2015) (citing *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013)).

If the facts establish that a defendant did not comply with a court order, "the burden shifts to the [defendant] to rebut this conclusion, demonstrate an inability to comply, or present other relevant defenses." *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995). "Good faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002); *United States v. Woodberry*, 405 F. App'x 840, 843-44 (5th Cir 2010).

If a party fails to meet its burden, then "[j]udicial sanctions ..., may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574 (5th Cir. 2000) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947))*; see also Norman Bridge Drug Co. v. Banner,* 529 F.2d 822, 827 (5th Cir. 1976) ("Coercive civil contempt is intended to make the recalcitrant party comply. Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of his adversary's non-compliance.").

"Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*,

428 F.3d 559, 582 (5th Cir. 2005) (citing *American Airlines, Inc.,* 228 F.3d at 585). When fashioning such sanctions, courts should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United Mine Workers of Am.*, 330 U.S. at 304.

## ARGUMENT

### I.    DEFENDANTS APPEAR TO BE VIOLATING THIS COURT'S PRELIMINARY INJUNCTION

Defendants appear to have violated this Court's preliminary injunction order in the following three ways as previewed above.

*First*, Defendants appear to have ended the Title 42 Policy vis-à-vis Haiti. Indeed, a formal decision to end Title 42 with respect to Haitians would produce data virtually indistinguishable from that what Defendants have reported. The numbers observed from June 2022 on—all in the teens and twenties, down from a prior level of about 1,900—are now so low that they may be nothing more than mere erroneous applications of a *de facto* partial termination policy or data entry errors.

Defendants' explanations for the anomalous statistical patterns for Haitians are implausible. They might conceivably explain a more modest decrease, but cannot explain the cliff that the relevant numbers went over precisely as Title 42 was set to expire—an expiration that this Court *enjoined*.

*Second*, Defendants' reports that they did not make any relevant material changes to their application of the Title 42 Policy are implausible, self-contradictory, undermined by Defendants' post-dated "clarifications," and nearly impossible to reconcile with the numbers that Defendants reported. Defendants have consistently disclaimed material changes, but the numbers they are reporting vis-à-vis citizens of Haiti bely their claims. Additionally, Defendants' recent footnote "clarification" in their August report about humanitarian exceptions only came after Plaintiffs

called attention to the significant increase in numbers, and appears merely to be an effort to backfill an explanation (and is a weak attempt at that, as the footnote offers little in the way of actual substantive explanation).

*Third*, Defendants are massively increasing the number of humanitarian exceptions in a manner that is indistinguishable numerically from partial termination of the Title 42 Policy. DHS's drastic increase in the granting of such exceptions does not appear to be the result of changed circumstances, but instead appears to be caused by a change in the qualitative standards that DHS uses to determine whether to grant exceptions.

### A. Defendants Appear to Have Ended the Title 42 Policy for Citizens of Haiti

#### 1. Defendants' Own Reports And Data Strongly Suggest That DHS Has *De Facto* Terminated Title 42 Vis-à-vis Haiti

In May 2022, Customs and Border Protection ("CBP") used Title 42 to expel 1,928 Haitians who had crossed the border without authorization. Doc 147 at 4 and 6. Then, in June 2022, Border Patrol ("BP") expelled *only 7* Haitians under Title 42. Doc. 151 at 3. These numbers have remained similarly low ever since: it was only 18 and 6 Title 42 applications in July and August, respectively. Doc. 154 at 4 and Doc 155 at 4. At the same time, there has been a corresponding increase in the number of Haitians processed under Title 8 and granted humanitarian exceptions[1] at U.S. Ports of Entry ("POEs") by CBP's Office of Field Operations ("OFO"). That number in May was 1,044. Doc. 147 at 2. In June, it increased by 53%, to 1,601. Doc 151 at 2. In July, it increased by 99%, to 2,653. Doc. 154 at 2. In August, it increased yet again by 13%, to 2,989. Doc. 155 at 2. In September, it remained nearly unchanged, at 2,897. Doc 159 at 3. Comparing May (the last month before planned cancelation of Title 42) to August and September,

---

[1] It appears that migrants are generally processed under Title 8 at ports of entry only after they have been granted humanitarian exceptions, thereby allowing them to enter the United States.

the number of Haitians apparently receiving humanitarian exemptions each month has nearly tripled.

Plaintiff States recognize that migrant flows across the border will be subject to normal ebbs and flows based on a variety of factors including seasonal climate, Mexican government policy, and conditions in aliens' home countries. Yet, the statistics for Haitians stand out as unique: the Title 42 numbers for no other nationality have collapsed so completely or so quickly. Notwithstanding this radical statistical shift, Defendants have *repeatedly* attested in their monthly reports to this Court that they have *not* made any material changes to their application of the Title 42 process related to Haitians. *See* Doc. 147 at 6; Doc. 151 at 6; Doc. 154 at 6; Doc 155 at 6; and Doc. 159 at 7.

Using data from CPB's website, which goes back further than Defendants' reports in this case back to January 2021, the trend becomes even clearer:



Source: https://www.cbp.gov/newsroom/stats/nationwide-encounters[2]

Put simply, in the last 12 months, the number of Title 42 expulsions was never under 400 until the would-be May 23 effective date of the Termination Order, and now consistently is under 70 for the last four months after that effective date—notwithstanding this Court's preliminary injunction. Similarly, the continually high numbers of Title 8 processings makes clear that Title 42 processings have not dropped enormously because DHS is no longer encountering migrants

---

[2]  This data does not align perfectly with DHS's reports as these numbers are not limited to just single adults at the southwestern border. Because of small data discrepancies between the DHS reports and the CBP website (which includes data for both OFO and CBP under both Title 8 and Title 42), which likely reflects modest post-report corrections, the States have reproduced charts directly generated from CBP website in the appendix. Such charts can be generated at https://www.cbp.gov/newsroom/stats/nationwide-encounters. The data underlying this chart and Chart 4 can be found at Reproduced Tables 1 and 2 in the appendix.

from Haiti. Instead, DHS has apparently shifted processing of migrants from what previously had a been a mix of Title 8 and Title 42 to using Title 8 almost exclusively (*i.e.*, in greater than 99% of cases).

The next chart, demonstrating relative percentages of Title 8 vs. Title 42 processing for Haitian nationals makes this day-and-night shift obvious:



Source: https://www.cbp.gov/newsroom/stats/nationwide-encounters

Chart 4 is indistinguishable from what would have been expected if this Court had *denied* the States' request for injunctive relief. That near-100% overlap with the alternative scenario where the Termination Order had gone into effect and was not enjoined is powerful evidence that DHS may not be complying with this Court's preliminary injunction. Indeed, if DHS were in complete and outright contempt of this Court's injunction, the chart would look *just like this*.

It is also notably that these relative percentages *used* to fluctuate, varying with circumstances. Now they are somehow *locked* at 99-percent-plus processing under Title 8. It is unclear how exactly DHS has effectuated this result; but the observed effects are unmistakable and apparently impervious to any changes in circumstances over the last four months.

Nor would this be the first time that DHS created illegal, country-specific exceptions to its policies. Notably, DHS previously halted deportation "flight[s] to majority-Black countries [that] had been scheduled during Black History Month," including Haiti. Miroff, Nick, and Sachetti, Maria, *New Biden rules for ICE point to fewer arrests and deportations, and a more restrained agency*, Washington Post (Feb. 7, 2021). And the States here obtained a temporary restraining order here after DHS secretly and illegally began implementing the Termination Order before its effective date—but primarily or purely only for Northern Triangle countries. *See* Doc. 24-1 at 2-3. DHS appears to lack any compunction about playing favorites between nationalities of migrants, and apparently to do so on little more than political whim.

DHS has thus already demonstrated its willingness to effectuate illegal country-specific policies *in this very case with the same Title 42 policy.*

### 2. Defendants' Explanations To Date Are Unpersuasive

Plaintiff States have corresponded with counsel for Defendants regarding this issue and others relating to Defendants' compliance with the injunction and their reports. Although Defendants offered some putative rationales for the radical drop in Title 42 expulsions, those explanations are unpersuasive, if not outright incredible.

On August 22, 2022, Plaintiffs emailed Defendants' counsel and requested an explanation for the mysterious change in the number of Haitians being processed under Title 42, as well as for the explosion in grants of humanitarian exemptions. *See* Ex. A at 8-11. Plaintiffs' decision to request an explanation was prompted not only by the radical shift in numbers in Defendants'

reports, but also by a press report that DHS had ceased all removal flights to Haiti on June 3, and that "according to an internal [DHS] planning document," "[t]he number of Haitians deported by U.S. Immigration and Customs Enforcement fell dramatically in June as the Biden administration has allowed more to enter the country through legal ports of entry to seek asylum."[3]

Defendants responded to Plaintiffs' email on August 25 and claimed that "[t]here has ... been an increase in exception requests (which are often assisted by NGOs) from Haitians as well as a concomitant increase in the number of Haitians being granted humanitarian exceptions. But again, that increase is *not* because of any change in DHS policy." Ex. A at 6. The email, however, did not clarify what role NGOs might be playing in the processing of Haitians or whether DHS had been coordinating with such NGOs to effectuate intentionally just such an outcome.

According to Defendants, the change in statistics for Haitians is explained by "a marked decrease in the number of Haitians seeking to unlawfully cross the border between ports of entry (POEs)" and that "DHS believes this is due in significant part to USBP's robust enforcement of Title 42 (including DHS's use of Title 42 expulsion flights) as to noncitizens crossing between POEs, including Haitians." Ex. A at 6. Defendants claimed that the "increase [in Haitians at POEs] is *not* because of any change in DHS policy as to Haitians.  There are no nationality-based preferences for Haitians or for any other nationalities." *Id.*

After the States again asked Defendants about the continued trend of expulsions of Haitians remaining at levels less than 1% of May 2022 numbers, Defendants reiterated on October 21 their contention that "DHS believes this is due in significant part to U.S. Border Patrol's robust enforcement of Title 42 (including DHS's use of Title 42 expulsion flights)." Ex. A at 1.

---

[3] Julia Ainsley, *Number of Haitians deported plunged in June as more are allowed to seek asylum*, NBC News, July 7, 2022  https://www.nbcnews.com/politics/immigration/number-haitians-deported-plunged-june-are-allowed-seek-asylum-rcna36974

***"Robust Enforcement."*** Defendants' "robust enforcement" theory makes little sense, and certainly cannot account for the *sudden and enormous* decrease that occurred in June 2022. There is no reason to believe that Haitian migrants suddenly became aware of DHS's putative "robust enforcement" in June 2022, but were unaware of it before that time.

Moreover, if Haitian migrants were responding previously to DHS's "robust enforcement of Title 42," why did numbers remain at the *severely depressed* levels for the following months? Beginning in June 2022, DHS's enforcement of Title 42 was not even conceivably "robust"—it effectively was *non-existent*, being down more than 99% and with Title 8 being applied roughly *100 times more often* than Title 42 for migrants arriving from Haiti. Under DHS's theory that "robust" enforcement caused a massive decline in Title 24 expulsions, shouldn't the near-complete absence of enforcement since June 1, 2022 have caused a rebound in migrants being apprehended and processed under Title 42? That is particularly true as DHS recently pointed to the agency's "use of Title 42 expulsion flights"—but those flights have effectively ended and yet there has been no rebound.

Similarly, DHS's "robust enforcement" rationale fails to explain why Haitians *uniquely* among all nationalities perceived DHS enforcement as being "robust" while nearly all other nationalities failed to do so—for whom the corresponding numbers and trends of Title 42 applications show nothing of the radical and abrupt changes as those for Haiti. *See* Charts 5-6. The enormous divergence between Haitians and other nationalities renders Defendants' explanations incomplete at best.





Chart 5: Title 42 Applications by Country and Month
Haiti and Northern Triangle Countries
(From DHS Reports to this Court)
14000
12000
10000
8000
6000
4000
2000
0
11758
11671
10259
8693
8595
7671
8340
7910
7241
6756
4168
3994
3854
3225
2990
1933
14
19
13
22
May 22
June 22
July 22
August 22
September 22
Number of Title 42 Explusions Haiti
Number of Title 42 Explusions El Salvador
Number of Title 42 Explusions Guatemala
Number of Title 42 Explusions Honduras

Chart 6: Title 42 Expulsions By Country
as Precentage of May 2022 Expulsons
(From DHS's Reports to this Court)
120.0%
100.0%
80.0%
60.0%
40.0%
20.0%
0.0%
108.7%
103.1%
94.4%
88.1%
100.0%
99.3%
95.8%
92.5%
87.3%
86.0%
77.4%
73.9%
78.1%
68.0%
0.7%
1.0%
0.7%
1.1%
May 22
June 22
July 22
August 22
September 22
Haiti
El Salvador
Guatemala
Honduras
Mexico

The radical drop in Title 42 applications to Haitians compared to other nations with historically significant numbers of Title 42 expulsions—which have relatively stability and nothing approaching a sudden 99% drop—renders DHS's explanations to date unpersuasive. These sweeping deviations could easily by explained by a change in DHS policy, but cannot be reasonably be explained by DHS's proffered rationales to date. Indeed, Defendants' counsel themselves have noted that "with respect to single adults from Northern Triangle countries, the percentage of individuals expelled under Title 42 vs. Title 8 has remained relatively consistent." Ex. A. at 2. But as Chart 4 indicates, the same is very much *not* the case for migrants from Haiti. DHS likely knows why, but to date has not been forthcoming about the true reasons.

***Ports of Entry.*** Defendants' October 21 email also argued that the change in numbers is due to Haitians "instead of seeking to cross the border *between* ports of entry, Haitians are now seeking to enter the United States through ports of entry." Ex. A at 1.

That might be descriptively true, but it hardly establishes causation. Indeed, it is highly suggestive that DHS may have *caused* the shift: the data is fully consistent with the proposition that DHS effectively terminated Title 42 for Haitians (but no other nationalities) at ports of entry— which is why Haitians (and not other nationalities) suddenly stopped crossing the border between ports of entry and began presenting themselves almost exclusively at such ports where they could reasonably expect that they would *not* be subject to Title 42. DHS's explanations to date do nothing to discount this very possibility.[4]

---

[4] It appears that DHS may be taking affirmative steps to ensure that Haitian migrants present at particular ports of entry. NBC News has reported that "ICE will also begin 'lateral flights,' in which Haitian migrants will be flown to other sectors of the U.S. border for processing, in order to alleviate overcrowding in Del Rio, according to another document." Julia Ainsley, *Biden admin to step up deportation of Haitians to address migrant surge, documents say*, NBC NEWS, Sept. 17, 2022 https://www.nbcnews.com/politics/immigration/biden-admin-step-deportation-haitians-address-migrant-surge-documents-say-n1279449.

Policy vis-à-vis migrants from Haiti also appears to be something of a political football within the Administration: Two DHS "officials said that the debate over starting deportations before the migrant surge in Del Rio, Texas, was a political battle between progressives and others at DHS and that the progressives won, delaying deportation flights."

***Planning Document Obtained By NBC News.***

In response to Plaintiffs' query about the planning document regarding Title 42 implementation for Haiti specifically obtained by NBC News and reported by it on July 7 (*supra* at 12-13 & n.3), Defendants claimed that "DHS found no such internal planning document. While there are internal deliberative emails discussing Haitians, none sets forth any DHS (or Administration) policy about Haitians (or any other nationalities)." Ex. A at 5.

Perhaps NBC News misunderstood or mischaracterized what it obtained. Perhaps Defendants are playing legalistic games about what constitutes a "policy." But whatever NBC News obtained, Defendants apparently have no intention of turning it over voluntarily. Only an order from this Court will pry that document loose from DHS's hands if it exists. This Court should issue one.

**B.      Defendants Appear to Be Using Humanitarian Exceptions to Circumvent Or Violate This Court's Preliminary Injunction**

**1.      The Data From DHS's Reports Suggests That DHS May Be Attempting To Circumvent This Court's Injunction**

Defendants' grant of humanitarian exceptions has exhibited a remarkable pattern that is numerically equivalent to a partial and ever-escalating termination of Title 42—which this Court enjoined. CBP applied humanitarian exemptions to 8,247 aliens in May and to 8,792 aliens in June for all nationalities. Doc 147 at 6 and Doc 151 at 5. (Defendants' monthly reports do not break out humanitarian exemptions by nationality). In July, however, humanitarian exemptions suddenly jumped by 31.6%, to 11,574. Doc. 154 at 6. They similarly increased again in August, by another 37%, to 15,906. Doc 155 at 6. They decreased slightly in September, to 13,221, but remained far above (60%) the May 2022 numbers, which was the last pre-preliminary injunction month. Doc.

---

Julia Ainsley, *DHS reviewing agency failures that led to surprise surge of Haitian migrants at Texas border*, NBC NEWS, Oct. 7, 2021   https://www.nbcnews.com/politics/immigration/u-s-knew-july-thousands-haitians-were-prepping-journey-u-n1280924.

159 at 7. Comparing May (the last month before planned cancelation of Title 42) to August, the change in humanitarian exemptions reflects an astounding 93% increase. *See* Chart 2, *supra* at 5.

Notably, by significantly expanding the number of humanitarian exemptions being granted, Defendants could effectively implement a partial and phased implementation of the Termination Order. Indeed, a partial phased implementation that was intentionally designed to circumvent this Court's preliminary injunction would look almost indistinguishable numerically from what Defendants are effectively doing to date.

Such a partial implementation of the Termination Order would squarely violate this Court's preliminary injunction. Doc. 91 at 1-2. And Defendants' recent expansions of the humanitarian exceptions appear tantamount to such a partial implementation. The States' concerns on this front are further heightened by the fact that, as explained next, DHS appears to have made changes to its policies that it simultaneously both (1) denies making and (2) is apparently able to date with clockwork precision (except for when it has to correct those precise dates with alternative specific dates).

### 2. DHS's Repeated Attestations That They Have "Made No Material Changes To Its Policy on Application the Title 42 Process" Appear Dubious.

In each of its reports to this Court, Defendants have either declared that they have "made no material changes to its policy on application of the Title 42 process," Docs. 151 at 6, 154 at 6, 155 at 6, 159 at 6/PageID 4133, or reported a material change unrelated to humanitarian exception policy, *see* Doc. 147 at 6-7. Defendants have thus repeatedly certified to this Court that they have not made *any* relevant material changes to Title 42 policy, including how the Title 42 humanitarian exception is being applied.

The rapidly increasing numbers of humanitarian exceptions—which just happens to coincide with when the Termination Order would have gone into effect—alone make these

certifications problematic. But Defendants' repeated statements elsewhere in their reports raise even more significant questions about DHS's compliance with this Court's injunctions.

Defendants claimed in their July 15, 2022 report (containing numbers about the month of June) that "[g]iven a significant increase in the number of individuals who have presented themselves with situations that warrant humanitarian exceptions pursuant to the terms of the CDC's Title 42 public health orders, DHS has, beginning July 13, 2022, begun to gradually increase the number of humanitarian exceptions it applies, subject to operational constraints." Doc. 151 at 5 n.1. Defendants made the same claim in their August 16, 2022 report (containing numbers about the month of July).

In their September 16, 2022 report, however, Defendants started spinning a different tale, backdating the change to June: "Defendants clarify that after the temporary restraining order was superseded by the preliminary injunction, DHS increased the number of humanitarian exceptions beginning on June 4, as reflected in Defendants' data report for the month of June. See ECF No. 151 at 5–6 (showing 8,792 exceptions, as compared to 8,247 in the month of May). The more significant increase occurred beginning in mid-July as noted above and reflected in Defendants' data report for the month of July. *See* Doc. 154 at 3 (showing 11,574 exceptions). As the number of individuals who have presented themselves with situations that warrant humanitarian exceptions continued to increase, DHS has further increased the number of humanitarian exceptions, subject to operational constraints." Doc. 155 at 6 n.1.

There is a glaring omission in all of these explanations—Defendants never explain what changed on June 4, and then what changed again on July 13. If the change was merely caused by an "significant increase in the number of individuals who have presented themselves with situations that warrant humanitarian exceptions," then how can Defendants so precisely peg the

change to so specific a date? Defendants' footnotes raise more questions than they answer, and strongly suggest that DHS made policy changes to loosen its standards for granting such exceptions, and that these policy changes happened on June 4, and then again on July 13.

### 3.     Defendants' Explanations To Date Are Unpersuasive

In response the State's inquiries, DHS has explained the increases in the number of humanitarian exceptions being granted was due to "a significant increase in the number of individuals whose circumstances warrant such exceptions." Ex. A at 1. No explanation of what change in circumstances there might have been. Even stranger, DHS offers little explanation of how it was able to date *precisely* when the purported changes in circumstances occurred (July 23)—and then had to backdate that change to another specific date (June 4). *Supra* at 2-3.[5]

The timing of the purported change in exogenous circumstances is also deeply suspicious: being a mere 12 days after the Termination Order was set to take effect and 15 days after this Court's preliminary injunction issued and the previous TRO (which explicitly prevented such changes). Such timing hardly precludes this precisely-dated change—which was only belated revealed three months later in a "clarification" that rendered a prior statement to this Court necessarily false, *see* Doc. 155 at 6 n.1—from being an attempt to circumvent this Court's preliminary injunction.

---

[5] Defendants' contentions that these dates are merely ones in which "DHS has made incremental increases to its case processing volumes to account for the increase in the number of people who warrant exceptions" and on which DHS "made these gradual increases" (Ex. A. at 2) make little sense. As an initial matter, "incremental increases" and "gradual increases" are the antithesis of sudden punctuated changes that can be dated with precision—which is the case here under DHS's own telling. Moreover, the number of grants has remained at an elevated rate ever since, underscoring that DHS has likely either change the *standard* being applied or how it is being applied in a manner that amounts to the same thing. And DHS's changes to dilute the stringency of the humanitarian exception appears to have occurred on those June 4 and July 13 dates.

At a minimum, DHS should be required to explain whether it has made any *de jure* or *de facto* changes to the humanitarian-exception standard or how it applies it.

Even Defendants' own characterizations sound more like changes in *policy* rather than circumstances: for example, DHS explained that it "*DHS began* on July 13, 2022 to gradually increase the number of humanitarian exceptions it applies." Doc. 155 at 6 n.1 (emphasis added). Even in DHS's own telling, that change is one that *DHS made*, not when circumstances changed. But if *DHS* made material policy changes, its repeated certifications to this Court are obviously problematic.

Defendants' counsel have not yet offered a satisfactory explanation for (1) how DHS is able to date putative changes in circumstances so precisely to single dates and (2) how DHS came to make the false representation to this Court that the change only occurred on July 13, rather than June 4, *compare* Doc. 155 at 6 n.1 *with* Doc. 154 at 6 n.1.

The States concerns are heightened by Defendants' explicit acknowledgment that, unlike the temporary restraining order, Defendants believe that "the preliminary injunction does not prevent DHS from increasing the number of humanitarian exceptions in order to respond to changed circumstances, as it has done and reported to you and the Court." Ex. A. at 2.

That explanation is problematic for three reasons. *First*, if the increase were due to a desire to implement the Termination Order, rather than responding to changed circumstances, that attempted circumvention *would* violate the preliminary injunction. And Defendants' explanations to date hardly preclude that possibility. *Second*, DHS's specific dates are *far* more consistent with *changed policies*, rather than changed circumstances. *Third*, DHS has *repeatedly* certified to this Court that it "has made no material changes in its policy on application of the Title 42 process." Even if changing their humanitarian-exception policies did not alone violate the preliminary injunction, falsely representing to this Court that they have made no material changes to those policies in reports mandated by the preliminary injunction very much *would* violate that injunction.

*       *       *

The upshot is that Defendants reports appear to indicate that DHS has changed its humanitarian-exception policies on June 4 and July 23 in a manner that both (1) violates DHS's repeated attestations that it has made no material changes in its Title 42 policies and (2) may be an attempt to circumvent this Court's preliminary injunction by effectively implementing a partial termination of Title 42 through substantially increased grants  of the humanitarian exceptions. Defendants' explanations in email correspondence do not provide satisfactory answers to the States' concerns on this front. The States therefore respectfully require a more detailed accounting of what DHS is in fact doing.

## II.    THIS COURT SHOULD ISSUE AN ORDER TO SHOW CAUSE

Defendants' ongoing failures to properly apply the Title 42 Policy cause Plaintiffs to suffer ongoing, irreparable injury. Defendants' continued apparent potential violations of the injunction therefore reasonably demand a response from this Court. Considering this Court's broad discretion to fashion a remedy that will prompt Defendants' compliance, Plaintiffs request both that this Court issue an order to show cause and granting the other relief sought by Plaintiffs (*supra* at 5-6) so that they can further examine Defendants' injunction compliance.

Plaintiffs are not demanding that Defendants account for every fluctuation in their numbers. Plaintiffs recognize that there will always be modest fluctuations in Defendants' Title 42 statistics attributable to seasonal fluctuations, natural ebbs and flows, or to the vagaries of the human condition. However, none of that could come close to explaining to the changes that have occurred vis-à-vis Haitians. Combined with press reports stating that DHS had made special provision for the treatment of Haitians, it is distinctly unlikely that such an extraordinary departure can be accounted for by the weak explanations that Defendants have proffered so far. When the statistics so strongly suggest that Defendants may be engaging in an outright violation of this

23

Court's injunction, then this Court and the Plaintiff States are entitled either to (1) a satisfactory explanation for how Defendants' conduct comports with this Court's preliminary injunction and (2) appropriate relief if no such explanation exists.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court enter an order directing Defendants to show cause why they should not be held in contempt and grant the other appropriate relief sought by the States. *Supra* at 5-6.

Dated:   November 1, 2022

MARK BRNOVICH
  Attorney General
DREW C. ENSIGN*
  Deputy Solicitor General
JAMES K. ROGERS*
  Senior Litigation Counsel
ANTHONY R. NAPOLITANO *
  Assistant Attorney General
OFFICE OF THE ARIZONA ATTORNEY
GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

Respectfully submitted,

By: */s/ Joseph S. St. John*
ELIZABETH B. MURRILL (La #20685)
  Solicitor General
J. SCOTT ST. JOHN (La #36682)
  Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
  Attorney General
D. JOHN SAUER *
  Solicitor General
OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

24

STEVE MARSHALL
  Alabama Attorney General
EDMUND G. LACOUR JR.*
  Solicitor General
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

LESLIE RUTLEDGE
  Arkansas Attorney General
NICHOLAS J. BRONNI*
  Solicitor General
DYLAN L. JACOBS*
  Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
  Attorney General of Georgia
STEPHEN J. PETRANY*
  Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

TREG R. TAYLOR
  Attorney General of Alaska
CORI M. MILLS*
  Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
  Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

ASHLEY MOODY
  Attorney General
JAMES H. PERCIVAL*
  Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
  Attorney General
BRIAN KANE*
  Chief Deputy Attorney General
OFFICE OF THE IDAHO ATTORNEY
GENERAL
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DEREK SCHMIDT
  Attorney General
DWIGHT R. CARSWELL*
  Deputy Solicitor General
OFFICE OF THE KANSAS ATTORNEY
GENERAL
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA
ATTORNEY GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

DANIEL CAMERON
  Attorney General of Kentucky
MARC MANLEY*
  Associate Attorney General
KENTUCKY OFFICE OF THE
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
  Attorney General of Mississippi
JUSTIN L. MATHENY*
  Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

DREW H. WRIGLEY
  Attorney General
MATTHEW SAGSVEEN*
  Solicitor General
OFFICE OF THE NORTH DAKOTA
ATTORNEY GENERAL
500 N. 9th St.
Bismarck, ND 58501-4509
masagsve@nd.gov

*Counsel for Plaintiff State of North Dakota*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

JONATHAN SKRMETTI
  Attorney General and Reporter of Tennessee
ANDRÉE S. BLUMSTEIN
  Solicitor General
CLARK L. HILDABRAND*
BRANDON J. SMITH*
  Assistant Solicitors General
OFFICE OF THE TENNESSEE ATTORNEY GENERAL AND REPORTER
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

JASON S. MIYARES
  Attorney General
ANDREW N. FERGUSON*
  Solicitor General
LUCAS W.E. CROSLOW*
  Deputy Solicitor General
OFFICE OF THE VIRGINIA ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-7704
AFerguson@oag.state.va.us

*Counsel for Plaintiff State of Virginia*

DAVE YOST
  Ohio Attorney General
BENJAMIN M. FLOWERS*
  Solicitor General
OFFICE OF THE OHIO ATTORNEY GENERAL
30 E. Broad St., 17th Fl.
Columbus, OH 43215
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

KEN PAXTON
  Attorney General of Texas
AARON F. REITZ*
  Deputy Attorney General for Legal Strategy
LEIF A. OLSON*
  Special Counsel
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Aaron.Reitz@oag.texas.gov
Leif.Olson@oag.texas.gov

*Counsel for Plaintiff State of Texas*

PATRICK MORRISEY
  Attorney General
LINDSAY SEE*
  Solicitor General
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

* Pro hac vice application granted or forthcoming

SEAN D. REYES
  Utah Attorney General
MELISSA HOLYOAK*
  Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

BRIDGET HILL
  Attorney General of Wyoming
RYAN SCHELHAAS*
  Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY
GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

**APPENDIX**: Tables Generated From CBP's Website

**Reproduced Table 1: All Applications of Title 42 for Haitian Nationals**



**Reproduced Table 2: All Applications of Title 8 for Haitian Nationals**



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 602 | 793 | 3,884 | 2,161 | 1,137 | 2,042 | 4,653 | 7,334 | 4,152 | 5,459 | 6,808 | 5,213 | **44,238** |

App-2

**Reproduced Table 3: All Applications of Title 42 by CBP for Haitian Nationals**



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | FY | Component | Area of Responsibility |
|---|---|---|---|
| Nationwide | 2022 | U.S. Border Patrol | All |

| Demographic | Citizenship | Title of Authority | State |
|---|---|---|---|
| All | HAITI | Title 42 | All |

FY   ▨ 2022                                    **Reset Filters**

**FY Nationwide Encounters by Month**

|  | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 574 | 451 | 3,449 | 1,663 | 854 | 497 | 1,181 | 3,415 | 11 | 44 | 21 | 20 | 12,180 |

App-3

**Reproduced Table 4: All Applications of Title 8 by CBP for Haitian Nationals**



**Reproduced Table 5: All Applications of Title 42 by OFO for Haitian Nationals**



**Reproduced Table 6: All Applications of Title 8 by OFO for Haitian Nationals**



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 87 | 55 | 102 | 155 | 217 | 316 | 1,340 | 2,819 | 3,953 | 5,077 | 6,418 | 5,027 | 25,566 |

App-6

**Reproduced Table 7: All Applications of Title 42 by CBP for Haitian Nationals That Are Single Adults at the Southwestern Border (same category of data reported in Defendants' Reports)**



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 219 | 192 | 1,544 | 507 | 286 | 183 | 379 | 2,061 | 11 | 27 | 16 | 18 | **5,443** |

**Reproduced Table 8: All Applications of Title 8 by CBP for Haitian Nationals That Are Single Adults at the Southwestern Border (same category of data reported in Defendants' Reports)**



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 78 | 150 | 964 | 563 | 314 | 588 | 891 | 1,101 | 70 | 140 | 73 | 98 | **5,030** |

**Reproduced Table 9: All Applications of Title 42 by OFO for Haitian Nationals That Are Single Adults at the Southwestern Border (same category of data reported in Defendants' Reports)**



**Reproduced Table 10: All Applications of Title 8 by CBP for Haitian Nationals That Are Single Adults at the Southwestern Border (same category of data reported in Defendants' Reports)**

