IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| STATE OF LOUISIANA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:22-CV-00885-RRS-CBW |
| | ) | |
| CENTERS FOR DISEASE CONTROL & PREVENTION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR AN ORDER TO SHOW CAUSE**

**Table of Contents**

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................3

    A.    The Court's Preliminary Injunction ...............................................................3

    B.    Defendants' Compliance with the Preliminary Injunction ............................4

    C.    DHS's Tracking of Its Enforcement of Title 42 .........................................6

    D.    DHS's Discretion to Grant Humanitarian Exceptions ..................................6

    E.    Defendants' Attempts to Address Plaintiffs' Concerns and Plaintiffs' Motion for an Order to Show Cause ......................................................................7

STANDARD OF REVIEW .......................................................................................................8

ARGUMENT ............................................................................................................................9

    I.    Defendants Have Not Ended the Title 42 Policy for Haitians ......................9

    II.    Defendants Are Not Using Humanitarian Exceptions to Effectuate the Termination Order ...................................................................................15

    III.    The Court Should Deny Plaintiffs' Requested Discovery and Other Remedial Measures .................................................................................17

CONCLUSION ........................................................................................................................19

## Table of Authorities

**Cases**

*In re Cheney*,
    544 F.3d 311 (D.C. Cir. 2008) ............................................................................................... 19

*In re FDIC*,
    58 F.3d 1055 (5th Cir. 1995) ................................................................................................ 19

*In re Stone*,
    986 F.2d 898 (5th Cir. 1993) ................................................................................................ 19

*Morgan v. United States*,
    304 U.S 1 (1938) ................................................................................................................... 19

*Petroleos Mexicanos v. Crawford Enters.*,
    826 F.2d 392 (5th Cir. 1987) .................................................................................................. 9

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ............................................................................................. 9, 14

*Travelhost, Inc. v. Blandford*,
    68 F.3d 958 (5th Cir. 1995) ..................................................................................................... 8

*Walker v. NCNB Nat'l Bank of Fla.*,
    810 F. Supp. 11 (D.D.C. 1993) ............................................................................................. 19

**Other Auhorities**

86 Fed. Reg. 42,828 (Aug. 5, 2021) ..................................................................................... 5, 6, 15

87 Fed. Reg. 19,941 (Apr. 6, 2022) .............................................................................................. 3

## INTRODUCTION

Plaintiffs moved for an order to show cause why Defendants should not be held in contempt for violating this Court's preliminary injunction, which enjoined Defendants from implementing the April 1, 2021 order of the Centers for Disease Control and Prevention ("CDC") terminating CDC's prior Title 42 orders. This Court should deny Plaintiffs' motion because it is based on two erroneous assumptions: (1) that Defendants have stopped enforcing Title 42 against Haitian migrants, and (2) that Defendants are using Title 42's humanitarian exception to circumvent the Court's injunction. As explained below and in the attached Declaration of the Acting Assistant Secretary for Border and Immigration Policy, Department of Homeland Security ("DHS"), DHS continues to enforce Title 42 against Haitian migrants in the same manner as it does migrants of any other nationality. While DHS has granted more humanitarian exceptions from Title 42 in recent months, that is in response to an increase in the number of migrants whose circumstances warrant such exceptions.

Plaintiffs' assertion that there is a 99% decrease in Title 42 enforcement against Haitians is misleading. It appears that they derive that number from data provided in DHS's monthly reports from two DHS entities—the Office of Field Operations and U.S. Border Patrol—without considering the key denominator, the number of Haitians encountered after they have unlawfully crossed between ports of entry into the United States. The drop in the number of Haitians subject to Title 42 expulsions is due to the fact that Haitians have largely stopped crossing the border unlawfully—not a change in DHS's enforcement policies.

There has been a dramatic shift in the migration pattern for Haitian migrants. Instead of attempting to illegally cross the border and risk being expelled to Haiti (as Mexico does not accept Title 42 expulsions of Haitians), Haitian migrants have been waiting in shelters in Mexico near ports of entry in the hope of being granted humanitarian exceptions under Title 42. As shown by the government's reports, the number of encounters of Haitian migrants between ports of entries dropped significantly in June 2022. In May 2022, more than 3,000 single adults from Haiti were encountered by U.S. Border Patrol after illegally crossing the border between ports of entry into the United States. But since that time, there have been no more than 165 such encounters in a single month. This

marked decline led to a correspondingly low number of Title 42 expulsions reported by U.S Border Patrol.

Meanwhile, the Office of Field Operations' data does not include the large number of migrants who are prevented from entering the United States due to DHS's enforcement of Title 42.  The Office of Field Operations, which operates ports of entry, enforces Title 42 by preventing migrants from crossing the international boundary line into the United States in the first place.  Because such migrants never enter the United States, they are not processed or recorded as Title 42 "expulsions."  The only Title 42 expulsions that are recorded are the few migrants who manage to evade Title 42 enforcement at the international boundary line, are processed while in the United States, and then expelled.  The Office of Field Operations' data does include those migrants who are processed under immigration laws in Title 8 of the U.S. Code, after having been excepted from Title 42 for humanitarian or other approved reasons.  Thus, while only those granted the humanitarian exception and processed under Title 8 are reflected in the Office of Field Operations' data, the hundreds if not thousands of other Haitian nationals who are prevented from entering United States because of Title 42 are not reflected in the data.  Plaintiffs' use this data to assess DHS's Title 42 enforcement efforts is thus inappropriate.

Nor is DHS's increased grant of humanitarian exceptions in recent months an attempt to circumvent the preliminary injunction.  CDC's Title 42 orders have always authorized DHS to grant exceptions to the application of Title 42 for humanitarian or other reasons, and the preliminary injunction does not purport to limit that authority.  Indeed, the Court has said that it did not "inten[d] to limit or prevent" DHS's exercise of discretion to grant humanitarian, law enforcement, or other exceptions "authorized by the [Title 42] orders" prior to the issuance of the Termination Order.  4/25/22 TRO Hr'g Tr. at 10:15–23, ECF No. 36.  DHS exercised its discretion to grant more humanitarian exceptions because there is an increase in the number of migrants warranting such exceptions.

Plaintiffs make much of DHS's clarification as to the precise timing of when DHS first increased the number of humanitarian exceptions.  Although the preliminary injunction requires DHS to provide only the total number of humanitarian exceptions in a given month, for the sake of

transparency, DHS included in its monthly report for June the additional information that it began increasing the number of such exceptions on July 13, 2022.  Upon discovering that there had also been a more modest increase beginning on June 4, 2022, Defendants provided that information as well in its report for August.  Because DHS was able to provide the precise dates for such increases, Plaintiffs surmise that DHS must have made "material changes to the *legal standard* for humanitarian exception itself," Pls.' Mot. for Order to Show Cause ("Mot.") 4 (emphasis in original), and yet failed to report them as required by the preliminary injunction.  But DHS has made no such change; it merely has set a maximum number of humanitarian exceptions officers and agents of the Customs and Border Protection generally could grant daily and has incrementally increased those maximum numbers on specific dates, based on its the processing capacity, in response to an increase in the number of migrants whose circumstances warrant such exceptions.  There was no policy change to report.  Nor was DHS's clarification material.  While Defendants regret the initial error, at all times DHS has provided accurate numbers of total humanitarian exceptions in its monthly reports.

In short, an order to show cause is not warranted, and this Court deny Plaintiffs' motion as well as their request for discovery.

## BACKGROUND

### A.     The Court's Preliminary Injunction

On April 1, 2022, CDC issued an order terminating its prior Title 42 public health orders, which suspend certain noncitizens' entry into the United States to prevent the spread of COVID-19. 87 Fed. Reg. 19,941 (Apr. 6, 2022) (Termination Order).  On April 3, 2022, Plaintiffs brought this suit to challenge the Termination Order for failing to meet the Administrative Procedure Act's notice-and-comment requirements and as arbitrary and capricious agency action.  ECF No. 1.  Plaintiffs thereafter moved for a preliminary injunction seeking to enjoin the enforcement of the Termination Order, which had an effective date of May 23, 2022.  ECF No. 13.  On May 20, 2022, the Court granted Plaintiffs' motion and issued a nationwide preliminary injunction.  ECF Nos. 90, 91.

The preliminary injunction enjoined Defendants "from enforcing the April 1, 2022 Order Under Sections 362 & 365 of the Public Health Service Act anywhere within the United States."  ECF

No. 91 at 2.  The Court further ordered DHS to "file monthly reports providing (i) the number of single adults processed under Title 42 and Title 8 by country, (ii) the number of recidivist border crossers for whom DHS has applied expedited removal, (iii) the number of migrants that have been excepted from Title 42 under the NGO-supported humanitarian exception process, and (iv) any material changes to policy regarding DHS's application of the Title 42 process."  *Id.*

**B.     Defendants' Compliance with the Preliminary Injunction**

Defendants have complied with the Court's preliminary injunction.  As explained below and in the attached Declaration of Blas Nuñez-Neto, Acting Assistant Secretary for Border and Immigration Policy, dated November 10, 2022, DHS has not implemented the Termination Order. Fourth Nuñez-Neto Decl. ¶¶ 3, 8.  DHS continues to expel tens of thousands of noncitizens each month under the authority of CDC's operative August 2021 Title 42 Order.  *See* ECF Nos. 151, 154, 155, 159.  In total, since the Court's preliminary injunction, DHS has expelled, among others, over 278,000 single adults under CDC's Title 42 authority.  *See id.*  DHS has also complied with the Court's requirement that it file monthly data reports regarding its application the Title 42 Order.  *See id.*  Those reports have specified the numbers of single adults processed under Title 42 and Title 8, respectively, broken down by country.  *Id.*  They have also specified the number of recidivist border crossers for whom DHS has applied expedited removal and the number of migrants that have been excepted from Title 42 under the NGO-supported humanitarian exception process.  *Id.*

Defendants' data reports show that the overall Title 42 expulsion rate for single adults from all nationalities has remained at around 50% since the preliminary injunction.  ECF Nos. 151, 154, 155, 159 (showing monthly expulsion rates ranging from 42% to 56%).  Moreover, DHS has been consistent in its application of Title 42.  For example, a key metric that the parties have used to assess DHS's application of Title 42 has been the percentage of single adults from the Northern Triangle countries of El Salvador, Guatemala, and Honduras who have been expelled under Title 42 by U.S.

Border Patrol.[1]  That percentage has remained relatively consistent since the Court entered the preliminary injunction.  In June 2022, U.S. Border Patrol expelled, under Title 42, 92.3% of single adults traveling from Northern Triangle countries.  ECF No. 151.  It expelled 92.1% of such adults in July 2022, ECF No. 154, 91.8% of such adults in August 2022, ECF No. 155, and 92.7% of such adults in September 2022, ECF No. 159.  U.S. Border Patrol's application of Title 42 as to single adults from Mexico has also been consistent, with the expulsion rates ranging from 90.2% (in July) to 91.7% (in September).  ECF Nos. 151, 154, 155, 159.

DHS's ability to enforce Title 42, however, depends largely on the cooperation of foreign governments; DHS may expel a noncitizen under Title 42 only if either (i) the Government of Mexico agrees to accept the relevant nationality and demographic or (ii) the individual's country of origin agrees to accept Title 42 expulsions.  *See* 86 Fed. Reg. 42,828, 42,836 (August 2021 Order); Fourth Nuñez-Neto Decl. ¶ 4; First Nuñez-Neto Decl. ¶ 9, ECF No. 27-1.  Until recently, the Government of Mexico generally accepted Title 42 expulsions of only Mexicans and certain Northern Triangle nationalities, which is why the data reflects that the vast majority of expulsions were citizens of Mexico or Northern Triangle countries.  Fourth Nuñez-Neto Decl. ¶ 5 .

For nationals of many countries, however—such as Cuba and (until recently) Venezuela— neither the Government of Mexico nor the country of origin has agreed to accept Title 42 expulsions. Fourth Nuñez-Neto Decl. ¶ 5.  As a result, the vast majority of migrants from these countries must be processed under Title 8.  For example, in August 2022, U.S. Border Patrol encountered 18,102 Venezuelan single adults who crossed the border between ports of entry illegally, and the vast majority (17,666) were processed under Title 8.  ECF No. 155.  In September, the number of encounters increased to 24,808, with 24,745 processed under Title 8.  ECF No. 159.  In October 2022, the Government of Mexico agreed to accept the expulsion of Venezuelan nationals for the first time, and since then, DHS has expelled Venezuelans pursuant to Title 42.  Fourth Nuñez-Neto Decl. ¶ 8.

---

[1] *See, e.g.*, TRO at 3, ECF No. 37 (using the percentage of single adults traveling from Northern Triangle Countries who have been expelled under Title 42 as a "historical benchmark").

### C.   DHS's Tracking of Its Enforcement of Title 42

Although DHS has continued to enforce Title 42, the data submitted in its monthly reports does not reflect the full scale of such enforcement.  Specifically, DHS's data is derived from U.S. Customs and Border Protection ("CBP") statistics, which include data from U.S. Border Patrol ("USBP") and the Office of Field Operations ("OFO").  *See, e.g.*, ECF No. 159 (reporting USBP and OFO data broken down by Title 8 and Title 42, and by country).  Although both entities enforce Title 42, they track their data differently.  USBP engages migrants after they have crossed the border into the United States, and all encounters are included in USBP's data under either Title 42 or Title 8.  Fourth Nuñez-Neto Decl. ¶ 18.  By contrast, the vast majority of individuals processed by OFO and included in OFO's data are those who are being processed under Title 8 after having been granted an exception from Title 42.  *Id.* ¶¶ 19–20.  This is so because OFO, which manages operations at ports of entry, enforces Title 42 by preventing covered noncitizens from crossing the international boundary line into ports of entry in the United States.  *Id.*  Because those migrants never enter the United States, they are not recorded in OFO's data.  *Id.*  OFO does encounter a small number of individuals who manage to evade Title 42 enforcement at the international boundary line, and those encounters are included in OFO's data.  *Id.* ¶ 19.  But these numbers are small given that the primary mechanism for enforcing Title 42 at the ports of entry is OFO's enforcement at the international boundary line.  *Id.*  The vast majority of the individuals reflected in OFO's data are those who are processed under Title 8.

### D.   DHS's Discretion to Grant Humanitarian Exceptions

CDC's Title 42 Orders have always authorized DHS to except from Title 42 "persons whom customs officers determine, with approval from a supervisor, should be excepted from [Title 42] based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests."  *See, e.g.*, 86 Fed. Reg. at 42,841 (Aug. 2021 Order).  The Court's preliminary injunction does not limit DHS's authority in that regard.  *See* ECF Nos. 90, 91.  To the contrary, the Court has stated that it did not intend to limit or prevent DHS's exercise of discretion to grant exceptions.  *See* 4/25/22 TRO Hr'g Tr. at 10:15–23, ECF No. 36

("[T]here are certain bases for exceptions.  You cited the humanitarian exception.  There's also the law enforcement exception.  These are discretionary decisions that were made prior to April 1st and it is not my intent to limit or prevent that because they were authorized by the prior orders.").

Consistent with the preliminary injunction, CBP officers and agents have continued to grant humanitarian exceptions where warranted.  As part of the humanitarian-exception process, DHS coordinates with non-governmental organizations (NGOs) to provide a safer and more orderly mechanism for particularly vulnerable noncitizens, including families, to apply for exceptions to Title 42.  Fourth Nuñez-Neto Decl. ¶ 11.  Partner NGOs facilitate the process by referring names and biographic information of vulnerable individuals to CBP for consideration.  *Id.*  Those partner NGOs will then work with DHS to schedule a specific time and port of entry for those who may warrant a humanitarian exception.  *Id.*  DHS, however, retains sole discretion to determine whether an exception is warranted when the individual presents himself or herself at the port of entry.  *Id.*

Since the issuance of the preliminary injunction, DHS has not made any material changes to its policy on how it applies humanitarian exceptions to Title 42.  Fourth Nuñez-Neto Decl. ¶ 12.  DHS has set the maximum number of humanitarian exceptions CBP officers and agents generally may grant daily, and since the preliminary injunction, DHS has from time to time increased those maximum numbers, as permitted by operational capacity, to respond to an increase in the number of particularly vulnerable noncitizens whose circumstances warrant an exception.  *Id.* Specifically, it did so on June 4, July 13, September 7, and October 19.  *Id.*; *see also* ECF No. 151 n.1; ECF No. 154 n.1; ECF No. 155 n.1.

**E.**  **Defendants' Attempts to Address Plaintiffs' Concerns and Plaintiffs' Motion for an Order to Show Cause**

Since Defendants filed their first data report in this case on May 4, 2022, Plaintiffs have at times requested explanations from Defendants, which Defendants have readily provided.  On May 9, 2022, Plaintiffs asked why it appeared that the Office of Field Operations had "effectively terminated" Title 42.  *See* Ex. 1.  Defendants explained that, as noted above, the OFO data does not capture applications of Title 42 to the hundreds or thousands individuals covered by the Title 42 Order who

are prevented from crossing the border into the United States; OFO data reflects mainly individuals processed under Title 8 after having been granted a humanitarian exception from Title 42.  *Id.* Plaintiffs also asked why Title 42 enforcement rates varied by country, and Defendants explained that this was primarily due to the fact that DHS may expel an individual under Title 42 only if either the Government of Mexico or the individual's country of origin agrees to accept him or her.  *Id.*

On August 22, 2022, Plaintiffs asked whether DHS has stopped enforcing Title 42 as to Haitians because there appeared to be a significant decrease in Title 42 expulsions of Haitians.  *See* Mot. Ex. A at 6–11.  Defendants explained that DHS had not, and that the perceived decrease was due to a significant drop in the number of Haitians attempting to cross the border between ports of entry illegally and the manner in which USBP and OFO are able to track their enforcement of Title 42, as explained above.  *Id.*  On October 20, 2022, Plaintiffs repeated the same question about Haitians and further asked for an explanation of the increases in the number of humanitarian exceptions granted by DHS.  *Id.* at 1–5.  Defendants reiterated their explanation about Haitians and also explained that DHS had made no material policy changes as to how it applies the humanitarian exception; rather, the increases were due to a significant increase in the number of individuals warranting such exceptions.  *Id.*

Plaintiffs thereafter filed this instant motion for an order to show cause why Defendants should not be held in contempt.  ECF No. 160.  Conspicuously absent from Plaintiffs' description of Defendants' explanations is the critical fact that the OFO data Plaintiffs used to calculate the supposed drop in Title 42 enforcement against Haitians does not reflect the number of Haitians prevented from entering ports of entry due to OFO's application of Title 42.  Plaintiffs further request that the Court order discovery into alleged policy changes and depositions of unnamed DHS officials.  *Id.* Defendants now oppose Plaintiffs' motion.

## STANDARD OF REVIEW

A party moving for a contempt order must demonstrate that the respondent "violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."  *Travelhost, Inc. v. Blandford*, 68 F.3d 958,

961 (5th Cir. 1995). If the Court were to issue an order to show cause, Plaintiffs would "bear[] the burden of establishing by clear and convincing evidence . . . that [Defendants] failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987). To meet the clear-and-convincing standard, "[t]he evidence must be so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005).

As explained below, Plaintiffs cannot establish even a *prima facie* case that Defendants have violated the preliminary injunction. Accordingly, the Court should deny Plaintiffs' motion for an order to show cause and for discovery.

## ARGUMENT

Plaintiffs contend that Defendants appear to be violating the preliminary injunction in two ways. First, Plaintiffs allege that Defendants "appear to have ended the Title 42 Policy for citizens of Haiti." Mot. 9–18. Second, Plaintiffs allege that Defendants "appear to be using humanitarian exceptions to circumvent" the Court's preliminary injunction. Mot. 18–23. Neither contention has merit.

## I.      Defendants Have Not Ended the Title 42 Policy for Haitians

Defendants have not ended the Title 42 Policy for Haitians. Fourth Nuñez-Neto Decl. ¶ 13. DHS continues to apply Title 42 to Haitians in the same manner that it applies Title 42 to every other nationality. *Id.*

Plaintiffs note that the total number of Haitians expelled under Title 42 has decreased in recent months according to Defendants' monthly reports. Mot. 2. By Plaintiffs' calculation, the drop is as much as 99% since June, the timing of which Plaintiffs attribute to the effective date of the Termination Order had it not been enjoined by the Court. *Id.* at 1–2. But the drop in the number of expulsions is not because DHS has made any changes to the manner it applies Title 42 to Haitians. Fourth Nuñez-Neto Decl. ¶ 17. Rather, it is due largely to a significant change in the migration pattern of Haitians. *Id.* ¶ 15. Before June 2022, most Haitians encountered by CBP had illegally crossed the border *between* ports of entry into the United States. *See, e.g.*, ECF No. 147 at 2, 4 (reflecting 3,110

9

Haitian single adult encounters between ports of entry in May 2022 versus 1,049 single adults processed at ports of entry that same month).  DHS processed such individuals under Title 42, typically by returning them to Haiti via expulsion flights.  Fourth Nuñez-Neto Decl. ¶ 14.  Those Haitians who were expelled under Title 42 were recorded in DHS's monthly data reports because U.S. Border Patrol tracks such data.  *Id.* ¶ 18; *see also, e.g.*, ECF No. 147 at 4 (showing in May that U.S. Border Patrol processed 1,928 Haitian single adults under Title 42 and 1,182 Haitian single adults under Title 8).

Beginning around June 2022, however, the vast majority of Haitian migrants stopped attempting to illegally enter the United States between ports of entry.  Fourth Nuñez-Neto Decl. ¶ 14. For example, in June 2022, U.S. Border Patrol encountered only 79 Haitian single adults attempting to cross between ports of entry, down 98% from May 2022 level.  ECF No. 151 at 3.  Similarly, in July 2022, U.S. Border Patrol encountered only 165 Haitian single adults.  ECF No. 154 at 4.  The numbers have remained low for August (89 single adults) and September (116 single adults).  ECF Nos. 155, 159.  The chart below shows the steep decline in the number of Haitian single adults encountered between ports of entry by U.S. Border Patrol:



In recent months, it appears that instead of seeking to cross the border illegally and risk being expelled back to Haiti, Haitians have been traveling to shelters near ports of entry on the Mexican side

of the border, where they apply for, and wait to learn whether they will be considered for a humanitarian exception.  Fourth Nuñez-Neto Decl. ¶¶ 14–15.  This dramatic shift in the migration pattern of Haitians is significant because unlike Haitians who attempt to cross the border between ports of entry, Haitians who gather outside ports of entry in Mexico are not tracked by DHS.  *Id.* ¶¶ 19–20.  This is so even though it is Title 42 that is effectively preventing such Haitians from entering the United States; but for Title 42, they would enter ports of entry to seek asylum or other immigration protections.  *Id.*

As noted above, an individual seeking entry at a port of entry will generally be reflected in DHS's monthly data only if DHS has already granted that individual a humanitarian (or other) Title 42 exception, in which case that individual will necessarily be processed under Title 8.  *Id.*  This explains why individuals processed by DHS's Office of Field Operations are generally reported as being processed under Title 8.  It also explains why the data reflects a decrease in the number of expulsions of Haitians—despite the fact that CDC's Title 42 Order suspending the right to enter the United States remains in full effect for Haitians and all other nationalities.  Fourth Nuñez-Neto Decl. ¶¶ 19–20.  DHS obviously cannot expel those Haitians who are sheltering in Mexico.[2]

Defendants explained this to Plaintiffs twice—in emails dated August 25 and October 21.  *See* Mot. Ex. A.  Nonetheless, Plaintiffs suggest that DHS has violated the preliminary injunction because it may have had some role in "caus[ing] the shift" in the migration pattern.  *Id.*  Mot. 17.  But even if

---

[2] There is also no basis for Plaintiffs' suggestion that DHS has "demonstrated its willingness to effectuate illegal country-specific policies."  Mot. 13.  To support that claim, Plaintiffs cite an article from February 2021—more than a year before this lawsuit was filed—stating that U.S. Immigration and Customs Enforcement (which enforces immigration laws in the interior of the United States, not the border) had halted a single Title 8 deportation flight (not a Title 42 expulsion flight) to Africa to provide individuals more time to pursue Title 8 humanitarian claims in immigration courts.  *Id.* (citing Nick Miroff & Maria Sacchetti, *New Biden Rules for ICE Point to Fewer Arrests and Deportations, and a More Restrained Agency*, Wash. Post (Feb. 7, 2021)).  Plaintiffs do not explain why the halting of this one flight would have been "illegal," let alone how this establishes a DHS practice that is in any way relevant to this lawsuit.  Nor is there any basis for Plaintiffs' suggestion that DHS "illegally began implementing the Termination Order before its effective date . . . primarily or purely only for Northern Triangle countries," Mot. 13.  *See, e.g.*, ECF Nos. 27, 27-1 (explaining that DHS had continued to prioritize Title 42 expulsion flights to Northern Triangle countries).

DHS had caused such a shift due to its enforcement of Title 42 between ports of entry and its grant of humanitarian exceptions at ports of entry when warranted, that by no means would establish that Defendants had violated the preliminary injunction.  Indeed, from a law enforcement perspective and given the need to conserve scarce resources, the safer and more orderly processing of migrants at ports of entry is preferable to trying to capture and detain individuals after they have surreptitiously crossed the border into the United States.  Fourth Nuñez-Neto Decl. ¶¶ 16, 23.  More importantly, DHS has continued to enforce the Title 42 Order and has not implemented the Termination Order in any way as to Haitians or any other nationality.

DHS believes that the migration shift is due to multiple factors, including an expansion of expulsion flights to Haiti and increased capacity for processing humanitarian exceptions.  *Id.* ¶¶ 14– 15.  Indeed, the risk of being expelled back to Haiti could be a significant deterrent considering the journey the Haitian migrants might have had to undertake to reach the southern border.  *See id.* ¶¶ 5, 14–15.  Additionally, DHS does not control how NGOs identify vulnerable individuals for referral into the exception process.  *Id.* ¶ 17.  It may be the case that NGOs are referring more Haitians for humanitarian exceptions, but that does not mean that DHS has changed its policy on granting humanitarians to Haitians or any other nationality.  *Id.*  Plaintiffs contend that these explanations are "unpersuasive," Mot. 17, but each of their criticisms misses the mark.

***DHS's Enforcement Efforts***.  Plaintiffs first contend that DHS's enforcement of Title 42 between ports of entry "cannot account for the sudden and enormous decrease that occurred in June 2022."  Mot. 15.  They also question why the shift in the migration pattern persisted past June 2022, when Plaintiffs allege that DHS's enforcement of Title 42 became "non-existent."  *Id.*  But, again, DHS never stopped enforcing Title 42 between ports of entry.  Haitian migrants would likely have known the significant risk of being expelled back to Haiti, which is why, as a general mater, they appear to have stopped trying to cross between ports of entry.  *See, e.g.*, Rosa Flores, *Dreams of Safety, Health Care, Jobs: Why Thousands of Migrants Are waiting in Mexico – And Thousands More Arrive Each Week*, CNN (Sept. 1, 2022), https://perma.cc/89EJ-R85V (discussing migrants' use of social media platforms to share information).

Plaintiffs also question why Haitian migrants "uniquely" shifted their migration pattern.  Mot. 15.  Plaintiffs note that, unlike for Haitians, there has not been a drop in Title 42 expulsions for citizens of Mexico and Northern Triangle countries.  Mot. 16.  But the reason is that unlike Haitians, who are expelled to Haiti via expulsion flights, Mexican citizens can be expelled to Mexico.  Fourth Nuñez-Neto Decl. ¶ 5.  The same is true for most nationals of Northern Triangle countries, as Mexico accepts such expulsions.  *Id.*  And because a Title 42 expulsion carries no immigration consequences, such individuals may simply attempt to cross the border again.  *See, e.g.*, First Nuñez-Neto Decl. ¶ 11, ECF No. 27-1.  Thus, DHS's enforcement efforts between ports of entry may serve as a stronger deterrent to Haitians than to Mexicans or nationals of Northern Triangle countries, who are often returned to Mexico rather than expelled to their home countries via expulsion flights.  Fourth Nuñez-Neto Decl. ¶¶ 5, 15–16.

*Ports of Entry*.  Plaintiffs contend that Defendants' data reports are "fully consistent with the proposition that DHS effectively terminated Title 42 for Haitians (but no other nationalities) at ports of entry," which they suggest explains "why Haitians (and not other nationalities) suddenly stopped crossing the border between ports of entry."  Mot. 17.  But as already explained above, the vast majority of migrants entering the United States through ports of entry (as opposed to those encountered between ports of entry) are processed under Title 8 because they have been granted an exception under Title 42, whereas those prevented from entering the ports of entry in the first place are not included in DHS's data, as the Office of Field Operations simply cannot track such individuals. For example, in September, DHS processed 131 Armenians at ports of entry, all of whom were processed under Title 8 after being excepted from Title 42.  ECF No. 159 at 2.  That same month, DHS processed 66 Belarusians at ports of entry, all of whom were likewise processed under Title 8 after being excepted from Title 42.  *Id.*  Other examples include:

| Citizenship | Title 42 | Title 8 | Total |
|---|---|---|---|
| El Salvador | 10 | 199 | 209 |
| Guatemala | 21 | 125 | 146 |
| Honduras | 16 | 582 | 598 |
| Kyrgyzstan | 0 | 73 | 73 |
| Russia | 2 | 827 | 829 |
| Tajikistan | 0 | 32 | 32 |

Far from suggesting some special treatment for Haitians, Defendants' data reports demonstrate that DHS has been enforcing Title 42 in the same manner regardless of nationality.

**Planning Document Referenced by NBC News**.  Plaintiffs also seek to support their allegation that DHS has stopped enforcing Title 42 as to Haitians by citing an alleged "internal planning document" obtained by NBC News that purportedly supports the proposition.  Mot. 18; *id.* at 14 (citing Julia Ainsley, *Number of Haitians Deported Plunged in June as More Are Allowed to Seek Asylum*, NBC News (July 7, 2022)).  But DHS searched for, and did not find, any such internal planning document.  Fourth Nuñez-Neto Decl. ¶ 16.  As Defendants have explained to Plaintiffs, DHS found internal deliberative emails discussing Haitians, but none fits the description or sets forth any policy about Haitians (or any other nationalities).  *Id.*.

\*       \*       \*

As the foregoing shows, DHS has not stopped enforcing Title 42 as to Haitians.  The purported "evidence" that Plaintiffs cite in support of their claim consists of trends in data that are attributable to a shift in the migration pattern, not any implementation of the Termination Order.  This "evidence" does not warrant entering an order to show cause and falls far short of the "clear, direct and weighty and convincing" evidence necessary to support a finding of contempt.  *Test Masters*, 428 F.3d at 582.

## II.    Defendants Are Not Using Humanitarian Exceptions to Effectuate the Termination Order

There is likewise no support for Plaintiffs' contention that DHS is "using humanitarian exceptions to circumvent or violate this Court's preliminary injunction." Mot. 18. CDC's Title 42 orders have always authorized DHS to grant exceptions on a case-by-case basis, based on the totality of the circumstances, including for humanitarian reasons. 86 Fed. Reg. at 42,841 (Aug. 2021 Order). And the Court has made clear that it did not "inten[d] to limit or prevent" the grant of humanitarian or other exceptions because they "were authorized by the [Title 42] orders" "prior to April 1st." 4/25/22 TRO Hr'g Tr. at 10:15–23, ECF No. 36.

Plaintiffs contend that the increase in the number of humanitarian exceptions granted in recent months suggests that DHS is implementing the Termination Order in violation of the preliminary injunction. Mot. 18–23. That is not so. The preliminary injunction does not prevent or limit DHS's discretion to grant humanitarian exceptions. While DHS has granted more humanitarian exceptions in recent months, that has been due to a significant increase in the number of individuals whose circumstances warrant such exceptions. Fourth Nuñez-Neto Decl. ¶ 12.

Unable to identify any provision of the preliminary injunction that prohibits DHS's exercise of discretion to grant humanitarian exceptions, Plaintiffs turn their focus to DHS's statements in its monthly data reports that it has "made no material changes to its policy on [its] application of the Title 42 process." Mot. 19–21. Plaintiffs argue that these statements "appear dubious" in light of the increasing number of humanitarian exceptions, *id.* at 19–20, surmising that DHS must have "made material changes to the legal standard for humanitarian exception." *Id.* at 4; *see also id.* at 21 (suggesting that DHS must have "loosen[ed] its standards). But Plaintiffs ignore the logical alternative explanation that the number of humanitarian exceptions has increased because the number of people warranting such exceptions has increased. Fourth Nuñez-Neto Decl. ¶ 12. DHS has made no material change to the "legal standard" it applies for the humanitarian exception. *Id.*

Plaintiffs are also wrong to suggest that DHS's ability to "put a precise date on" its increases suggests that it has "made material changes to the legal standard" for humanitarian exceptions. Mot. 4, 20–21. As explained above, those dates correspond to dates when DHS increased the maximum

15

number of humanitarian exceptions that generally could be granted by CBP officers and agents at ports of entry daily based on processing capacity.  Fourth Nuñez-Neto Decl. ¶¶ 12.  And the increases in the maximums were made in response to increases in the number of individuals whose circumstances warrant humanitarian exceptions.  *Id.*  The increases are consistent with DHS's past practice of applying humanitarian exceptions where warranted, as permitted by CDC's Title 42 Order and the Court's preliminary injunction.  *Id.* ¶¶ 9–12.  DHS's monthly reports have thus accurately stated that DHS has made no material changes to its policy on its application of the Title 42 process.

In any event, as Plaintiffs acknowledge, DHS disclosed when it first began increasing the number of humanitarian exception in its monthly report—which corresponded to the date of the increase in the maximum number of individuals who could be granted exceptions—and also disclosed when there were subsequent incremental increases, which again are pegged to the dates of the increases in the maximum numbers.  ECF No. 151 at 5 n.1; ECF No. 154 at 6 n.1; ECF No. 155 at 6 n.1.  DHS did so well *before* Plaintiffs ever raised the issue with Defendants.  *See* Mot. 3 (incorrectly suggesting that Defendants "suddenly changed their tune" only "after" Plaintiffs raised the issue).  In their monthly report for June 2022 (filed on July 15), Defendants disclosed that "[g]iven a significant increase in the number of individuals who have presented themselves with situations that warrant humanitarian exceptions . . . , DHS has, beginning July 13, 2022, begun to gradually increase the number of humanitarian exceptions it applies, subject to operational constraints."  ECF No. 151 at 5 n.1.  DHS included this information again in its report for July 2022, filed on August 16.  ECF No. 154 at n.1.  It was not until August 22 that Plaintiffs contacted Defendants about the data, and even then, Plaintiffs focused solely on the reduction of expulsions of Haitians under Title 42, not the general increase in humanitarian exceptions.  *See* Mot. Ex. A. at 8–11.

Contrary to Plaintiffs' assertion, Defendants did not "start[] spinning a different tale" in their August 2022 report.  Mot. 20.  That report included a clarification as to when DHS first began increasing the number of humanitarian exceptions.  Defendants had initially provided the July 13, 2022 date—which corresponded to an increase in the maximum number of humanitarian exceptions CBP officers and agents generally could grant daily—in its report for June (filed on July 15), but later,

16

upon learning that there was a more modest increase in the maximum on June 4, Defendants clarified that information.  This clarification had nothing to do with Plaintiffs contacting Defendants about the number of Haitians processed under Title 42.  Far from "undermin[ing]" Defendants' representations, Mot. 8, Defendants' clarification, as well as disclosure of the increases, show that Defendants have been transparent with Plaintiffs and the Court.   And, in any event, Defendants have accurately reported the precise number of humanitarian exceptions granted each month as required by the preliminary injunction, so Plaintiffs cannot possibly show that they have suffered any harm as a result of any alleged failure to characterize any increase as a "material change" in the legal standard of the Title 42 humanitarian exception.

Nor is there anything "suspicious" about the timing of the increases.  Mot. 21.  DHS increased the numbers at the times that it did in response to an observed increase in the number of individuals whose circumstances warrant humanitarian exceptions and when permitted by operational capacity. Fourth Nuñez-Neto Decl. ¶¶ 12.  The fact that the increases took place after the Court issued the preliminary injunction does not mean that it was an attempt to "circumvent" the injunction.  Mot. 21.

### III.   The Court Should Deny Plaintiffs' Requested Discovery and Other Remedial Measures

In addition to seeking an order directing Defendants to explain why they should not be held in contempt, Plaintiffs also request a broad range of other relief.  *See* ECF No. 160-3 (listing six requests for information or deposition).  For the reasons explained below, the Court should decline Plaintiffs' request.

#### *Requests (i)–(ii):  Discovery into alleged policy changes*

The Court should not issue the requested order to require Defendants to (i) "file a report with this Court explaining in detail all policy changes . . . that may have contributed" to the increased number of Haitians processed under Title 8 and the increased number of humanitarian exceptions, and (ii) produce to Plaintiffs "all documents and communications" related to any such policy changes. ECF No. 160-3 at 1.  As explained above and in the attached Declaration of the Acting Assistant Secretary for Border and Immigration Policy, DHS has made no such policy changes, and has not

changed how it applies Title 42 to Haitians.  Fourth Nuñez-Neto Decl. ¶¶ 12–13.  The declaration also explains DHS's reasons for increasing the number of humanitarian exceptions.  *Id.* ¶ 12.  The declaration thus serves the same purpose as Plaintiffs' requested report.  And ordering written discovery into "all documents and communications related to [the alleged] policy changes" would serve no purpose because, as explained, there have been no such policy changes.

### *Request (iii)*:  *Alleged Internal Planning Document*

The Court should likewise decline Plaintiffs' request that the Court order Defendants to produce to Plaintiffs "any internal planning documents or communications that might be the 'internal planning document' about processing of citizens of Haiti that was referred to in press reports."  ECF No. 160-3.  As discussed above, DHS has already searched for, and did not find, any such document.  Fourth Nuñez-Neto Decl. ¶¶ 16.

### *Request (iv)*:  *Data on Humanitarian Exceptions Broken Down By Nationality*

Plaintiffs also request that Defendants produce to produce to Plaintiffs "numbers broken down by nationality of all grants of humanitarian exceptions to the Title 42 Policy."  ECF No. 160-3 at 2.  As noted in the attached Nuñez-Neto Declaration, DHS will voluntarily provide Plaintiffs with the requested information for the period from May through October 22, the last month for which DHS has fully settled and verified data.  DHS will provide the data as soon as operationally feasible, but no later than November 16.  There is thus no reason to order Defendants to produce data that is has voluntarily agreed to provide.

### *Request (v)*:  *Attestation for Future Monthly Reports*

Plaintiffs further request that "[e]ither the Assistant Secretary for Border and Immigration Policy or the Secretary of Homeland Secretary" be required to "attest to the veracity and completeness of all future reports under penalty of perjury."  ECF No. 160-3 at 2.  In the interest of cooperation, Acting Assistant Secretary Nuñez-Neto will attest to the veracity and completeness of DHS's future monthly data reports.  Fourth Nuñez-Neto Decl. ¶¶ 25.

***Request (vi):  Depositions of "Up to Five" DHS Officials***

Finally, Plaintiffs seek to depose up to five DHS officials.  ECF No. 160-3 at 2.  The Court should decline Plaintiffs' request because Plaintiffs offer no legitimate reasons as to why such depositions are necessary.  *See* Mot. 6.  Acting Assistant Secretary Nuñez-Neto has already provided a detailed declaration addressing each of Plaintiffs' contentions, and Defendants are voluntarily agreeing to two of Plaintiffs' demands.  Plaintiffs are not entitled to discovery simply to assuage unjustified concerns that the government is not complying with the preliminary injunction.

To the extent Plaintiffs seek depositions of high-ranking DHS officials, they would have to demonstrate "exceptional circumstances" justifying such a request,  *In re FDIC*, 58 F.3d 1055, 1062 (5th Cir. 1995); *see also Morgan v. United States*, 304 U.S 1, 18 (1938), which they have not done.  The Fifth Circuit has made clear that "it will be the rarest of cases . . . in which exceptional circumstances can be shown where the testimony is available from an alternate witness." *In re FDIC*, 58 F.3d at 1062; *see also, e.g.*, *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) ("The duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere.").  This is because of the longstanding recognition that "[h]igh ranking government officials have greater duties and time constraints than other witnesses."  *In re FDIC*, 58 F.3d at 1060. "[S]ubjecting officials to interrogation about how they reached particular decisions would impair that decision-making process by making officials less willing to explore and discuss all available options." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also In re Stone*, 986 F.2d 898, 904 (5th Cir. 1993) ("High-ranking officials of cabinet agencies could never do their jobs if they could be subpoenaed for every case involving their agency.").

Plaintiffs have not even attempted to show the requisite "exceptional circumstances" or that this is the "rarest of cases" where such testimony might be warranted.  *In re FDIC*, 58 F.3d at 1060, 1062.  Indeed, they have not demonstrated why any deposition is appropriate.  Accordingly, the Court should deny Plaintiffs' request to take five depositions of DHS officials.

## CONCLUSION

The Court should deny Plaintiffs' motion for an order to show cause.

Date:  November 10, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Civil Division

JEAN LIN
Special Litigation Counsel (NY #4074530)

/s/ John Robinson
JOHN ROBINSON (DC #1044072)
Trial Attorneys
1100 L St. N.W.
Washington, DC 20530
U.S. Department of Justice, Civil Division
Federal Program Branch
(202) 514-3716
Jean.lin@doj.gov
John.j.robinson@usdoj.gov

Attorneys for Defendants