IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| THE STATE OF ARIZONA, By and through its Attorney General, Mark Brnovich, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CENTERS FOR DISEASE CONTROL & PREVENTION; et al., <br><br> Defendants. | CIVIL ACTION NO. 6:22-cv-00885-RRS-CBW |

**FOURTH DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the Acting Assistant Secretary for Border and Immigration Policy at the Department of Homeland Security (DHS) as of October 1, 2021. My permanent role is Chief Operating Officer at U.S. Customs and Border Protection (CBP), which I began on March 5, 2021. Since August 24, 2021, I have been concurrently serving as the Vice Chair for the Secretary of Homeland Security's Southwest Border Taskforce. I also previously served as an Advisor to CBP Commissioner Gil Kerlikowske from January 12, 2015 to January 16, 2017.

2. I am familiar with the series of orders issued by the Centers for Disease Control and Prevention (CDC) invoking its authority under the Public Health Service Act, 42 U.S.C. § 265, including the currently operative order issued in August 2021. I am also familiar with the

1

CDC's April 1, 2022 Order terminating its Title 42 orders, *see Public Health Determination and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists*, 87 Fed. Reg. 19,941 (Apr. 6, 2022), which I understand was enjoined by this Court.

I.   **Background Information**

3.   DHS continues to assist in the implementation of the CDC's Title 42 Order at the southwest border, as required by this Court's ruling. Since March 2020, when the CDC's first Title 42 public health Order was issued, DHS has, consistent with the requirements of that Order, expelled covered noncitizens that are encountered between ports of entry and denied entry to covered noncitizens who present at ports of entry (POE). Under the currently operative Title 42 Order, single adults and family units encountered at the land border between POE are subject to expulsion unless they cannot be expelled or they are excepted from the Order. Single adults and family units who attempt to enter at a POE can be denied entry at the international boundary line under the Order. Unaccompanied children are excepted from the currently operative Title 42 Order.

4.   As I have described in previous declarations in this case, noncitizens encountered at the southwest border (SWB) between POE can only be expelled pursuant to the Title 42 Order if the Government of Mexico (GOM), the noncitizen's home country, or some other third country agrees to receive them. Not all countries of origin agree to accept the return of their nationals pursuant to the Title 42 Order—and those that do sometimes impose requirements that make returns difficult, if not impossible, to operationalize. In addition, the GOM has placed certain nationality- and demographic-specific restrictions on the individuals that they will accept for return under the Title 42 Order.

5.      Over the past two years, DHS has reached agreements with a number of foreign governments to accept the return of their nationals under the Title 42 Order—including Guatemala, Honduras, Haiti, Colombia, Brazil, Ecuador, and Peru.  Many of these countries, however, impose restrictions on how Title 42 flights can be operated—including testing requirements, manifest submission deadlines, and limitations on authorized flights per week—that effectively limit the number of expulsion flights.  Other key countries in our hemisphere, including Venezuela and Cuba, do not allow the return of individuals pursuant to the Title 42 Order.  Meanwhile, Mexico has, until recently, generally only allowed the return of its own citizens as well as citizens of El Salvador, Guatemala, and Honduras pursuant to the Title 42 Order.

6.      Within these limitations, DHS continues to expel all noncitizens covered by the Title 42 Order that can be expelled, subject to applicable humanitarian and other protections.  Over the past fiscal year (FY), DHS has expelled 887,080 individuals to Mexico and 216,879 individuals to third countries, including a total of 10,479 to Haiti.

7.      DHS implements the CDC Order differently depending on whether the noncitizen has crossed the border between ports of entry or seeks to enter the United States at a port of entry.  Individuals encountered between ports of entry have already physically entered the United States unlawfully and are thus subject to expulsion after U.S. Customs and Border Protection (CBP) processes them.  At ports of entry, by contrast, covered individuals may be prevented from entering the United States at the international boundary line by DHS personnel.  Therefore, covered noncitizens who seek to enter the United States at a POE, and are not allowed to enter under Title 42, are not "encountered," "processed," or "expelled."  As a result, DHS does not keep records on the numbers of individuals who are stopped at the international boundary line and not allowed to enter at a POE.

8. On April 1, 2022, the CDC issued an Order terminating the application of the Title 42 public health Order, with an effective date of May 23, 2022. This Court issued a preliminary injunction, enjoining DHS from enforcing the April 1 termination order on May 20, 2022. DHS has been abiding by the Court's preliminary injunction by continuing to enforce Title 42 at the land border, including by working to increase the nationalities that can be expelled under the Title 42 Order. On October 12, 2022, the Government of Mexico agreed to accept the expulsion of Venezuelan nationals for the first time.

9. Every CDC Title 42 Order—from the first March 2020 Order through the currently operative August 2022 Order—has authorized CBP officers and agents to except individuals from its application, on a case-by-case basis, based on the totality of circumstances, including considerations of humanitarian, law enforcement and public safety. Those excepted from the CDC Order are instead processed under Title 8 of the U.S. Code; they are inspected for admissibility and removability, which could include referral to U.S. Immigration and Customs Enforcement (ICE) for removal and/or for immigration removal proceedings.

10. Pursuant to the terms of the Title 42 Order, CBP officers and agents have—since the beginning of its application—granted exceptions for humanitarian and other reasons, on a case-by-case basis, to individuals and families that would otherwise be subject to the Order. Over the past two years, DHS has streamlined the process to provide a safe and orderly mechanism for certain covered individuals who are in Mexico to seek exceptions. This process was created in consultation with the Department of State (DOS), CDC, and international and non-governmental organizations (NGOs) who help support the exception process.

11. The exception process is designed to allow particularly vulnerable migrants, including family units, to present themselves at a port of entry, be considered for an exception for

4

humanitarian and other reasons, and be processed pursuant to Title 8 immigration authorities as a result. NGOs operating along the border refer the names and biographic information of vulnerable individuals to CBP for consideration. These NGOs also work with CBP to schedule a specific time and port of entry for those individuals who may be granted exceptions to present themselves. CBP, however, retains the sole discretionary authority to determine, on a case-case basis, whether an exception is warranted, and if so, whether the individual is admissible to the United States or subject to removal under Title 8. Importantly, these case-by-case determinations are made regardless of nationality.

12. On April 21, 2022—prior to the issuance of the preliminary injunction—CBP had already begun increasing its capacity to process noncitizens potentially amenable for exceptions to Title 42. Over time, and in response to an increased number of migrants whose circumstances warrant exceptions for humanitarian and other reasons, CBP has gradually increased the overall number of exceptions processed across the SWB, consistent with the capacity to safely process these individuals at ports of entry. In light of these considerations, and consistent with operational capacity, DHS increased the maximum number of individuals who could be granted exceptions at POEs on June 4, July 13, September 7, and October 19. Importantly, DHS has not made any material changes to its policy on how it applies humanitarian exceptions to Title 42.

## II. Haiti

*Shift in Irregular Migration Trends of Haitian Nationals*

13. Plaintiffs allege that DHS has effectively ceased applying the Title 42 Order to nationals of Haiti, citing data that shows a decrease in expulsions of Haitian nationals. However, nothing could be further from the truth. DHS consistently enforces CDC's Title 42 public health Order in expelling covered noncitizens able to be returned to Mexico or the respective country of origin, including with respect to Haitians.

14. In fact, these enforcement efforts, in conjunction with an increased capacity for processing exceptions from Title 42 at POEs, has resulted in a dramatic decrease in unlawful entries (and thus Title 42 expulsions) of Haitian nationals since June 2022. From January to May 2022, CBP encountered 19,117 Haitian nationals seeking to enter unlawfully between POEs along our southwest border, numbers that sharply increased from 1,903 in March, to 4,462 in April, to 7,762 in May. From May to June, U.S. Border Patrol (USBP) total encounters of Haitian nationals between ports of entry dropped significantly—from 7,762 to 145, a 98 percent reduction—and have remained at low levels since. This was the result of multiple factors, including an expansion of expulsion flights to Haiti and increased capacity for processing humanitarian exceptions, that provided a safe and orderly process for vulnerable individuals to enter the United States without crossing unlawfully between ports of entry.

15. In sum, enforcement of the Title 42 Order on Haitian nationals at the land border between POEs, combined with an orderly process to except particularly vulnerable Haitian migrants from the Title 42 Order at the POEs, has resulted in a change to migratory patterns. Instead of seeking to cross the border unlawfully between ports of entry, the vast majority of Haitians are waiting in Mexico and seeking enter the United States lawfully through ports of entry.

*DHS's Policy on Humanitarian Exceptions Remains the Same*

16. DHS policy continues to focus on deterring unlawful migration between ports of entry and providing mechanisms that channel migratory flows into safe and orderly pathways, including by encouraging migrants to present lawfully at ports of entry. Importantly, DHS does not exclude or prioritize any nationality, including Haitians, as it advances these policy goals. While the plaintiffs have referenced an "internal planning document" about the processing of

Haitian nationals, DHS searched for, and did not find, any such internal planning document. There are only internal deliberative emails discussing Haitian migration patterns.

17.     DHS also does not control how NGOs identify vulnerable individuals for referral into the exception process. Any increase with respect to Haitians is due to the demographics of the vulnerable individuals that NGOs encounter and refer for exception; it is not due to any change in DHS policy on granting humanitarian exceptions, including to Haitians.

*DHS Data on Haitian Encounters*

18.     DHS's reports reflect data from two distinct CBP operational components, the Office of Field Operations (OFO) and USBP. The two components engage with migrants differently and thus enforce the Title 42 Order in different ways. USBP primarily engages migrants who have crossed the border between ports and entry and are encountered and processed in the United States. These encounters are recorded, including the number of Title 42 expulsions from those encounters. As described above, these numbers have dropped significantly because significantly fewer Haitians are crossing unlawfully between ports of entry.

19.     OFO primarily engages with migrants at ports of entry along the land border, as well as at airports and seaports. At land ports of entry, the primary way that OFO enforces the Title 42 Order is by preventing individuals from crossing the international boundary line into the United States. Because these individuals never enter the United States, they are not processed, as they would be if they were physically in the United States. Because these individuals are not processed by CBP, the interaction is not recorded. In other words, covered noncitizens who are prevented from crossing the international boundary line into the United States pursuant to Title 42 are not included in OFO's data. A small number who evade Title 42 enforcement at the international boundary line, and are subsequently expelled after being processed while in the

7

United States, are recorded as Title 42 expulsions. However, these numbers are small given that the primary mechanism for enforcing Title 42 at the ports of entry is OFO's enforcement at the intentional boundary line.

20. As a result, OFO's data primarily reports those, including Haitians, who fall within a humanitarian exception to Title 42 and are processed under Title 8. Thus, the numbers reported by OFO primarily include those processed under Title 8, not Title 42—in fact, anything to the contrary would raise questions about why more individuals were not being stopped at the international boundary line under Title 42. Any suggestion that the numbers presented indicate a failure to enforce the Title 42 Order is based on a misinterpretation of the data, and the facts.

### III. Conclusion

21. DHS continues to comply with the preliminary injunction requiring continued enforcement of the CDC Title 42 public health Order and has been consistent in its application of granting humanitarian exceptions to that order.

22. The continued enforcement of Title 42 between POEs, combined with a safe and orderly process for granting exceptions to Title 42 at the POEs on a case-by-case basis, has dramatically reduced encounters of Haitians between POEs and incentivized migrants to wait for a safer and more orderly process to enter the United States.

23. If the court were to restrict DHS's ability to process such humanitarian exceptions, vulnerable individuals may, instead of pursuing an orderly and established means to present at a designated POE, seek to enter unlawfully between ports of entry. That is, migrants—including Haitians—that are currently waiting in Mexico in the hopes of being processed for exceptions could be incentivized to enter unlawfully between POEs, rather than crossing in a safe and orderly process at the POEs. The net result of the "relief" that plaintiffs are requesting actually risks creating a perverse incentive that would increase unlawful activity between ports of entry.

24. I further understand Plaintiffs have requested numbers broken down by nationality of all grants of humanitarian exceptions to the Title 42 policy. In the interest of cooperation, DHS is working to provide the requested information from May 2022 to October 2022, which is the last month for which DHS has fully settled and verified data. The data will be provided as soon as operationally feasible, but no later than November 16, 2022.

25. Further, I agree to attest to the veracity and completeness of DHS's future monthly data reports filed pursuant to the Preliminary Injunction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on this 10 day of November, 2022.

_____

Blas Nuñez-Neto
Acting Assistant Secretary for Border and Immigration Policy
Department of Homeland Security