| | |
|---|---|
| **From:** | Robinson, John J. (CIV) |
| **Sent:** | Wednesday, May 11, 2022 9:57 AM |
| **To:** | Ensign, Drew; Murrill, Elizabeth; 'John.Sauer@ago.mo.gov'; St. John, Joseph; Roysden, Beau |
| **Cc:** | Lin, Jean (CIV); Kossak, Jonathan (CIV); DeMott, Joseph (CIV) |
| **Subject:** | RE: Arizona v. CDC - First data report |

Drew,

Thanks again for your email. We've conferred with DHS and can provide the further context below, which we hope addresses your concerns. We would be happy to discuss further if you have questions.

**OFO vs. USBP data**

As you note, the report reflects data from two distinct CBP components—the Office of Field Operations (OFO) and U.S. Border Patrol (USBP). The two components engage with migrants differently and so enforce Title 42 in different ways.

OFO primarily engages with migrants at ports of entry along the land border, as well as at airports and seaports. The primary way that OFO enforces Title 42 is by preventing individuals from crossing the "limit line" into the United States. Because these individuals never enter the United States, they are not processed the way they would be if they crossed into the United States. As a result, none of OFO's Title 42 enforcement at the limit line is recorded or reflected in our encounter data. Accordingly, individuals that OFO prevents from crossing the limit line into the U.S. pursuant to Title 42 are not included in the data.

OFO does encounter some individuals who have crossed the limit line into the U.S., and these individuals are included in the data we provided. These individuals break down into two categories: (1) those excepted from Title 42, for humanitarian or other reasons, pursuant to the terms of the CDC Order, and (2) those who evade the Title 42 restrictions at the limit line and are encountered by OFO after having crossed the limit line (primarily individuals in personal vehicles). Individuals excepted from Title 42 do cross the limit line, are recorded as "encounters," and are *all* processed pursuant to Title 8. As a result, the large majority of OFO "encounters" are processed via Title 8, and this has always been the case. (We are advised that since April 2020, approximately two-thirds of OFO recorded encounters have been processed under Title 8). As to the latter, the small number of individuals who evade the restrictions at the limit line, and are encountered by OFO after having crossed the limit line, are processed, when possible, for expulsion under Title 42, and these expulsions are reflected in the data.

USBP, by contrast, primarily engages migrants encountered in the United States, between ports of entry. Unlike with OFO, all of these USBP encounters are recorded. As a result, as noted, there has always been a significant differential between the percentage of Title 42 vs. Title 8 encounters for OFO vs. USBP.

**Country-specific data**

You also asked why the Title 42 vs. Title 8 percentage varies by country. This is primarily due to the fact, for those encountered or apprehended on the Southwest land border, DHS may expel an individual under Title 42 only if either (i) the Government of Mexico agrees to accept the relevant nationality and demographic or (ii) the individual's country of origin agrees to accept Title 42 expulsions via flight. *See generally* 86 Fed. Reg. 42,828, 42,836 (Aug. 5, 2021); First Nuñez-Neto Decl. ¶ 9, ECF No. 27-1. The Government of Mexico has generally allowed Title 42 expulsions of only Mexicans and certain Northern Triangle nationalities, with limited exceptions, which explains the higher Title 42 percentage for Northern Triangle countries. Many of the countries you identified are (1) countries whose citizens Mexico will not accept via expulsion, and (2) countries that have refused to accept Title 42 flight expulsions at all. For those

countries that do accept Title 42 expulsions, some impose other restrictions as a precondition for accepting such expulsions that make it operationally infeasible or difficult to return individuals under Title 42. Such restrictions include caps on the number and/or frequency of flights, COVID-19 testing requirements, and requiring DHS to submit passenger manifests several days in advance of a flight. This further limits DHS's ability to apply Title 42 to many nationalities.

This also explains why CBP's Title 8 processing for all countries was 43% of the total encountered. As you know, the 5% benchmark was only for single adults from Northern Triangle countries, for whom the Government of Mexico has generally agreed to accept Title 42 expulsions with limited exceptions.

**General limitations**

We also want to emphasize again that because of the way that DHS's operational data systems work, it can take several days—and up to two weeks—for the data to settle and become fully reliable. For example, in addition to the issues we've previously flagged, Title 42 expulsion flights generally take place no sooner than 3-4 days after the initial encounter, so those expulsions are almost certainly undercounted in the reporting. Again, we would be happy to discuss if you have further questions.

Best,
John

**John Robinson**
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-8489


**From:** Robinson, John J. (CIV)
**Sent:** Tuesday, May 10, 2022 8:05 PM
**To:** 'Ensign, Drew' <Drew.Ensign@azag.gov>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; 'John.Sauer@ago.mo.gov' <John.Sauer@ago.mo.gov>; St. John, Joseph <StJohnJ@ag.louisiana.gov>; Roysden, Beau <Beau.Roysden@azag.gov>
**Cc:** Lin, Jean (CIV) <Jean.Lin@usdoj.gov>; Kossak, Jonathan (CIV) <Jonathan.Kossak@usdoj.gov>; DeMott, Joseph (CIV) <Joseph.DeMott@usdoj.gov>
**Subject:** RE: Arizona v. CDC - First data report

Hi Drew,

As an update, we expect to be able to get back to you on this either later this evening or first thing tomorrow.

Best,
John

**From:** Ensign, Drew <Drew.Ensign@azag.gov>
**Sent:** Monday, May 9, 2022 2:00 PM
**To:** Robinson, John J. (CIV) <John.J.Robinson@usdoj.gov>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; 'John.Sauer@ago.mo.gov' <John.Sauer@ago.mo.gov>; St. John, Joseph <StJohnJ@ag.louisiana.gov>; Roysden, Beau <Beau.Roysden@azag.gov>
**Cc:** Lin, Jean (CIV) <Jean.Lin@usdoj.gov>; Kossak, Jonathan (CIV) <Jonathan.Kossak@usdoj.gov>; DeMott, Joseph (CIV)

<Joseph.DeMott@usdoj.gov>
**Subject:** [EXTERNAL] Re: Arizona v. CDC - First data report

Thanks, John. We appreciate that.

One other country I inadvertently left off my prior email was Nicaragua, immigrants from which appear to be being processed under Title 8 roughly 97% of the time by CPB (1,867/1,926). The difference between Nicaragua and neighboring Honduras, which has 9.2% processing under Title 8 (95/1,030) is particularly striking and without obvious explanation to us.

Drew

---

**From:** Robinson, John J. (CIV) <John.J.Robinson@usdoj.gov>
**Sent:** Monday, May 9, 2022 10:28 AM
**To:** Ensign, Drew; Murrill, Elizabeth; 'John.Sauer@ago.mo.gov'; St. John, Joseph; Roysden, Beau
**Cc:** Lin, Jean (CIV); Kossak, Jonathan (CIV); DeMott, Joseph (CIV)
**Subject:** RE: Arizona v. CDC - First data report

Hi Drew,

Thanks for your email. We are conferring with DHS on your questions and will get back to you as soon as we can.

Best,
John

**John Robinson**
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (202) 616-8489

---

**From:** Ensign, Drew <Drew.Ensign@azag.gov>
**Sent:** Monday, May 9, 2022 1:10 PM
**To:** Robinson, John J. (CIV) <John.J.Robinson@usdoj.gov>; Murrill, Elizabeth <MurrillE@ag.louisiana.gov>; 'John.Sauer@ago.mo.gov' <John.Sauer@ago.mo.gov>; St. John, Joseph <StJohnJ@ag.louisiana.gov>; Roysden, Beau <Beau.Roysden@azag.gov>
**Cc:** Lin, Jean (CIV) <Jean.Lin@usdoj.gov>; Kossak, Jonathan (CIV) <Jonathan.Kossak@usdoj.gov>; DeMott, Joseph (CIV) <Joseph.DeMott@usdoj.gov>
**Subject:** [EXTERNAL] Re: Arizona v. CDC - First data report

Thanks, John. Some of these numbers are a bit puzzling. We wanted to reach out to see if DOJ/DHS could provide some context before we would potentially trouble the Court.

At least for the Office of Field Operations ("OFO") it appears that Title 42 is effectively terminated already. It appears that more than 3/4 of migrants processed by OFO are under Title 8 (1,013 out of 1,308). For some countries, the percentage processed under Title 8 is at or near 100% (e.g., Armenia is 31/32, Haiti is 181/181,

Honduras is 116/117). Is there some explanation that DHS can provide that would provide some indication either that (1) the vast majority of these Title 8 processings are recidivists who fall under the exception that the parties agreed to or (2) some other factor(s) is at work here, other than early implementation of the Title 42 Termination Order?

The numbers appear better for CPB, but are still potentially alarming. It appears that the rate of processing under Title 8 was about 43% (10,500 out of 24,445). That obviously is above the prior benchmark of 5%. How much of that is the recidivist exception we have agreed to and how much of that is within the exceptions of Title 42 Order themselves?

The country-specific data is also a bit odd, and difficult to understand in the abstract. It does appear that for the Northern Triangle countries, the rate of processing under Title 8 is about 5.7% (188/3,327), in line with historical benchmarks. But for many other countries, it appears that Title 42 is essentially over entirely. Leaving aside countries with fewer that 100 migrants processed (who may have small number bias), it appears that migrants from *every* country save Mexico is essentially being processed largely or entirely under Title 8.

Countries for which Title 42 appears abolished in all but name include Brazil (128/129 under Title 8), Ecuador (163/166), Georgia (142/142), Haiti (340/352), India (295/295), Peru (472/472), Turkey (246/246) and Venezuala (602/603). The story appears a bit more mixed with Cuba or Colombia, although Title 8 processings clearly predominate: 3,934/4,197 for Cuba and 978/1,101 for Colombia.

Candidly, it appears that DHS might be treating the TRO as if it only applies to Northern Triangle countries and no others. While that was the focus of our TRO motion, the terms of the actual TRO are not so limited. *See, e.g.*, TRO at 2. Instead, it bars *any* "implementat[ation] of the Termination Order, including increases ... in processing of migrants from Northern Triangle Countries." *Id.*

We understand that this data is complex and much could be lurking behind the surface numbers. Could you please provide any context that DHS wishes to supply **by tomorrow COB**?

Sincerely,
Drew