# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| THE STATE OF ARIZONA, By and through its Attorney General, Mark Brnovich, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CENTERS FOR DISEASE CONTROL & PREVENTION; et al., <br><br> Defendants. | Civil Action No. 6:22-cv-00885-RRS-CBW |

**PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR MOTION FOR ORDER TO SHOW CAUSE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ................................................................................................................................. 1

ARGUMENT ......................................................................................................................................... 2

    I.    Defendants' *De Facto* Termination Of Title 42 Vis-à-vis Haiti—A Change That It Effectively Admits To Causing—Warrants Issuance Of An Order To Show Cause ............. 2

        A.    DHS Effectively Admits To Causing The Change At Issue ............................................... 2

        B.    The Change DHS Admits To Causing Constitutes Contempt ........................................... 2

        C.    Defendants' Alternative Explanations For The Observed Partial Termination Are Unpersuasive And Belied By DHS's Effective Admissions .................................................. 4

            1.    Defendants' Responses To DHS's Past Race-Based Or Nationality-Based Discriminations Support The Need For An Order To Show Cause ......................... 5

    II.    Defendants' Abuse Of Their Authority Under The Humanitarian Exception And Misleading Reports Warrants An Order To Show Cause ............................................................. 7

        A.    DHS Admit To Changing Policy By Increasing the Limits of Humanitarian Exceptions Its Officers May Issue Per Day .......................................................................... 8

        B.    The Nunez-Neto Declaration Reveals Another Violation Of The Preliminary Injunction ................................................................................................................................. 8

        C.    DHS's Use Of Humanitarian Exceptions To Implement The Termination Order Violates The Preliminary Injunction ..................................................................................... 9

    III.    Discovery Is Warranted To Investigate Defendants' Unlawful Actions ............................... 10

CONCLUSION .................................................................................................................................... 10

# TABLE OF AUTHORITIES

**CASES**

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
 228 F.3d 574 (5th Cir. 2000) ................................................................................................ 2, 3

*Aspira of New York v. Bd. of Educ. of City of New York*,
 423 F.Supp. 647 (S.D.N.Y. 1976) ............................................................................................ 3

*Department of Commerce v. New York*,
 139 S. Ct. 2551 (2019) .............................................................................................................. 5

*Hoffmann-La Roche Inc. v. Schwegmann Bros. Giant Super Markets*,
 122 F. Supp. 781 (E.D. La. 1954) ............................................................................................ 3

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
 774 F.3d 935 (9th Cir. 2014) .................................................................................................... 3

*Interstate Circuit v. United States*,
 306 U.S. 208 (1939) .............................................................................................................. 1, 2

*League of United Latin Am. Citizens v. Perry*,
 548 U.S. 399 (2006) .................................................................................................................. 5

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
 583 F. Supp. 115 (W.D. La. 1984) .......................................................................................... 3

*North Alamo Water Supply Corp. v. City of San Juan*,
 90 F.3d 910 (5th Cir.1996) ...................................................................................................... 3

*United States v. Christie Indus., Inc.*,
 465 F.2d 1002 (3d Cir. 1972) .................................................................................................. 3

*Youakim v. McDonald*,
 71 F.3d 1274 (7th Cir. 1995) ................................................................................................... 3

**OTHER AUTHORITIES**

Nick Miroff and Maria Sacchetti, *New Biden Rules for ICE Point to Fewer Arrests and Deportations, and a More Restrained Agency*, Wash. Post (Feb. 7, 2021) ............................................................. 8

**INTRODUCTION**

There is no dispute that there has been an objectively measurable and statistically significant change in the use of Title 42 vis-à-vis Haitians. Although padded with protests and diversions, DHS's response is a conspicuous non-denial that it is responsible for that change. Indeed, DHS expressly admits (at 3) that it permitted increased numbers of humanitarian exceptions. DHS also explicitly acknowledges (at 11) that the States have accused it of "causing the shift" at issue (*i.e.*, the de facto termination of Title 42 as to Haiti)—and then *does not deny that it did precisely that*. Instead, DHS immediately transitions to "[b]ut *even if DHS had caused such a shift* … that by no means would establish that Defendants had violated the preliminary injunction." Opp. at 11-12 (emphasis added). That "but even if" is *not* a denial.

The clear implication is that DHS had a large—if not overwhelming—hand in the enormous change that occurred in the application of Title 42 to Haitians. That change notably transpired *exactly* as the Termination Order was set to go into effect. Rather than deny its role, DHS implausibly blames other factors. But none of those factors account for (1) why the change was *enormous* rather than modest, (2) why it occurred so *abruptly*—not as part of a broader trend but as a sudden rupture, (3) did so at the *exact moment* when the Termination Order was otherwise set to go into effect, and (4) why it only occurred for Haitian citizens and not citizens of other similarly situated countries. The numbers at issue reflect such an abrupt, dramatic change that they look numerically *indistinguishable* from partial implementation of the Termination Order as to Haitians. And even looking past DHS's implicit admission, DHS's other rationales are unpersuasive.

As the Supreme Court rightly observed long ago, "The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. . . . Silence then becomes evidence of the most convincing character." *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939). So it is here. DHS's palpable evasions warrant issuance of an order to show cause.

1

## ARGUMENT

I. **Defendants'** *De Facto* **Termination Of Title 42 Vis-à-vis Haiti—A Change That It Effectively Admits To Causing—Warrants Issuance Of An Order To Show Cause**

Defendants' response all-but admits that DHS caused the change at issue here: *i.e.*, the *de facto* termination of Title 42 as to Haiti. *Supra* at 1. Defendants' remaining rationales—which elide their effective admission that *they*, and not conjectural factors, caused this change—are wholly unpersuasive in establishing Defendants' good-faith compliance with this Court's injunction.

    A. **DHS Effectively Admits To Causing The Change At Issue**

Defendants all but admit they caused the *enormous* drop in Title 42 applications vis-à-vis citizens of Haiti. *Supra* at 1. DHS acknowledges the States have accused it of "causing the shift" at issue and then tellingly refuses to deny that it did just that. Opp. at 11-12. That is tantamount to an admission—and *at least* sufficient basis for an order to show cause requiring DHS to account for exactly what actions it took. If DHS did *not* cause this shift at issue, there would be no conceivable reason to conceal that fact. DHS's refusal to elucidate its actions is "evidence of the most convincing character" that it has, fact, caused the shift. *Interstate Circuit*, 306 U.S. at 226.

    B. **The Change DHS Admits To Causing Constitutes Contempt**

DHS alternatively appears (at 11-12) to argue that even if its actions are substantively equivalent to contempt, "that by no means would establish that Defendants had violated the preliminary injunction" because DHS has affixed different labels to its actions implementing the Termination Order (*e.g.*, intentionally causing a shift in migration that effectively terminates Title 42 for one nationality). In essence, DHS contends it may take actions in clear violation of the spirit of the injunction so long as the agency is creative about the terminology it employs.

That is not the law. "The district court need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). An order need "not choreograph every step,

2

leap, turn, and bow of the transition ballet," so long as "it specifies the end results expected and allows the parties the flexibility to accomplish those results." *Id.* (quoting *North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 917 (5th Cir.1996)). Thus, a party violates an injunction if it "ha[s] not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'" *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 583 F. Supp. 115, 120 (W.D. La. 1984).[1]

This Court entered its preliminary injunction "to preserve the status quo to protect the plaintiff[s] from irreparable injury and preserve the court's power to render a meaningful decision after a trial on the merits.'" (Doc. 90 at 18) (cleaned up). And the Court did so to "provide the Plaintiff States with complete relief as well as promoting uniformity in immigration enforcement." (*Id.* at 47.)

DHS's actions violate the purpose, spirit of, and likely letter of, the injunction for two reasons: 1) they do not "preserve the status quo," and 2) they do not "promot[e] uniformity in immigration enforcement." *First*, because DHS's changes are tantamount to a *de facto* termination of Title 42 as to Haitians, the status quo is not preserved. Before this Court entered its Preliminary Injunction, thousands of times a month, Defendants were using Title 42 to refuse Haitian citizens entry into the United States. Defendants' change—which decreased those numbers by at least *two* orders of magnitude—caused an objectively measurable and statistically significant change to the status quo, and well before this case has been conclusively adjudicated on the merits.

*Second*, Defendants' change has only resulted in a significant change for Haitian citizens and not for similarly situated citizens of other countries, thereby discriminating against those other

---

[1] *See also Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014) ("In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded."); *Youakim v. McDonald*, 71 F.3d 1274, 1283 (7th Cir. 1995) (a party's conduct may "violate an injunction if it threatens the spirit if not the literal language of the earlier order"); *Hoffmann-La Roche Inc. v. Schwegmann Bros. Giant Super Markets*, 122 F. Supp. 781, 787 (E.D. La. 1954), aff'd, 221 F.2d 326 (5th Cir. 1955) (same). An injunction cannot "be avoided on merely technical grounds" so long as its "thrust" gives litigants "fair warning of the acts that it forbids." *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972).

nationalities. Defendants' change has thus led to extreme *dis*uniformity in immigration enforcement.

### C. Defendants' Alternative Explanations For The Observed Partial Termination Are Unpersuasive And Belied By DHS's Effective Admissions

DHS's violations of this Court's injunction are underscored by the agency's inability to account for the *wild* differential between Haiti and the other nations accounting for most Title 42 removals. To recap, Chart 1 in the appendix shows the differential based on removals as a percentage of May 2022 numbers. Against this backdrop, DHS offers a sole, speculative explanation for the *enormous* differential between these countries: "the reason is that unlike Haitians, who are expelled to Haiti via expulsion flights, Mexican citizens can be expelled to Mexico. The same is true for most nationals of Northern Triangle countries, as Mexico accepts such expulsions." Opp. at 13.

This is nonsensical for two reasons. *First*, the fact that Haitians are removed to their home country—*just like those from Mexico*—does not explain the wild differential between Haitians and Mexicans. In this respect, citizens of Mexico and Haiti are *exactly the same*: where Title 42 applies, they are removed to their home country. But while the theoretical (but actually abolished) potential for expulsions back to Haiti did not prevent a 99-percent-plus reduction in Title 42 applications for Haitians, the numbers for citizens of Mexico never declined more than 32% from May 2021 numbers.

*Second*, even for citizens from Northern Triangle countries—who are *not* removed to their home countries but rather a third country (Mexico)—their numbers too show remarkable stability. They never declined more than 30% from May 2022 numbers.

The upshot is that for all relevant countries—*save Haiti*—it does not matter whether removals under Title 42 were to the migrants' home countries or to a third country. For all such nationalities, removals remained near May 2022 levels, and *never* declined more than 32% from those May levels. DHS's contention that Haitians being deported to their home country accounts for this *enormous* discrepancy cannot withstand scrutiny. Nor could it even conceivably account for the sudden May-June 2022 sea-change. There is *no* reason to believe the potential for removal to Haiti only became a

sudden issue for Haitians in June 2022. And why exactly at that time—except for that is when Defendants *wanted* the Termination Order to take effect?

Put simply, for the countries that account for the *vast majority* of Title 42 removals in May 2022, there was remarkably little change *except for one country*: Haiti. Whether removals were to their home country or some third country did not matter—their patterns showed remarkable stability. The sole outlier was Haiti. That outlying performance began at the exact moment when DHS *wanted* Title 42 to end. DHS does not even bother to deny causing that drop off, almost assuredly because it did. Accepting the proposition that such sudden and enormous changes—remarkably limited to just *one* nationality—occurred *exactly* when this Court's injunction took effect has nothing to do with DHS's actions would require this Court to "'to exhibit a naiveté from which ordinary citizens are free.'" *Department of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted).

1. **Defendants' Responses To DHS's Past Race-Based Or Nationality-Based Discriminations Support The Need For An Order To Show Cause**

DHS's past willingness to engage in country-specific and race-based policy-making militates in favor of a conclusion that DHS is up to it again here.

***DHS Black-History Month Moratorium On Removals.*** DHS tellingly does *not* deny that it intentionally halted at least one deportation flight in February 2021 for the *sole reason* that it was Black History Month. *See* Opp. at 11 n.2. It nonetheless contends that there is no basis for concluding that this admitted race-based decision-making was "'illegal.'" *Id.*

But such crude racial classification is the quintessential sort of race-based decision-making that the Equal Protection Clause forbids. "It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part). But far from having any apparent aversion to such sordidness, DHS was an eager perpetrator of it. There is no conceivable way that a February-only exclusion of removals would ever satisfy strict scrutiny, particularly given the crudeness of the classifications here in which a black Brazilian would be removed

5

in February but a white South African would not. Such wildly arbitrary race-based classifications by government actors are as sordid—and unconstitutional—as they come.

But even if DHS's actions somehow comported with the Equal Protection Clause, they would still flagrantly violate the APA. Refusing to deport migrants from "majority-Black countries" in February alone—but then freely deporting those migrants the remaining *11 months of the year*—is prototypical arbitrary-and-capricious decision-making. Migrants' fates should not turn on such wildly capricious and illegal distinctions as whether it is February or not. And Defendants' unabashed willingness to defend such crude, race-based discrimination is disgraceful.

Ultimately, DHS's attempted defense of their February-only prohibition on exclusions is not merely unpersuasive but also inadvertently supporting of the States' arguments here. DHS's inability to understand how clumsy, explicit, race-based decision-making predicated on the happenstance of the particular calendar month could even possible be "illegal" is powerfully (if inadvertently) revealing.

Finally, it is worth noting that DHS's contention (at 11 n.2) that the Washington Post article involved only a "single Title 8 deportation flight" is unavailing. What the article reported was that activists demanded a halt of a deportation "flight to majority-Black countries had been scheduled during Black History Month" and DHS acceded "[w]ithin hours… stopping the deportations." Nick Miroff and Maria Sacchetti, *New Biden Rules for ICE Point to Fewer Arrests and Deportations, and a More Restrained Agency*, Wash. Post (Feb. 7, 2021). While the decision at issue might have been a single flight, there is no indication that DHS did not halt other (or all) such flights in February, and DHS does not deny that it did. Indeed, given the *obsequious and immediate* manner in which DHS caved to the pressure to end *all* such February removals, there is strong reason to believe otherwise.

DHS's demonstrably incomplete response here underscores the appropriateness of an order to show case. Moreover, this Court should include in its order a requirement that DHS explain whether it was indeed just a "single flight," or whether DHS misleadingly suggested otherwise.

6

***Circumstances Leading To The TRO In this Case.*** The States discovered that DHS had surreptitiously and illegally began implementing the Termination Order as to the Northern Triangle Countries. (Doc. 24 at 2; Doc 33 at 1.) And they obtained a TRO on that basis. (Doc. 37 at 1-2.)

Apparently tone deaf (and perhaps worse) to this Court's order, DHS now contends (at 11 n.2) that there is no "basis for Plaintiffs' suggestion that DHS 'illegally began implementing the Termination Order before its effective date primarily or purely only for Northern Triangle countries." Opp. at 11 n.2 (cleaned up) (quoting Mot. at 13).

The "basis" for that suggestion—which DHS still fails to acknowledge or internalize—is all the evidence that the States submitted in support of their request for a *TRO, which culminated in this Court granting that request.* (Doc. 24; Doc 33; Doc. 37.) DHS might disagree with that conclusion that it did not appeal, but its suggestion that it was utterly without "basis" is specious.

## II. Defendants' Abuse Of Their Authority Under The Humanitarian Exception And Misleading Reports Warrants An Order To Show Cause

Before this Court entered its Preliminary Injunction, Defendants granted a modest number of humanitarian exceptions per month, and this Court's Order implicitly allows such exceptions to continue. (Doc. 91 at 2). However, this Court also explained that the purpose of the Preliminary Injunction is "to preserve the status quo to protect the plaintiff[s] from irreparable injury and preserve the court's power to render a meaningful decision after a trial on the merits.'" (Doc. 90 at 18) (cleaned up). And when this Court ordered Defendants to produce monthly reports about the operation of Title 42, it specifically required Defendants to report "any material changes to policy regarding DHS's application of the Title 42 process." (Doc. 91 at 2.)

But, contrary to this Court's Orders and Plaintiff States' reasonable expectations, Defendants appear to have used the humanitarian exception process to make material changes to the Title 42 process in a way that subverts the status quo. Indeed, the change *de facto* implements the Termination Order. Even worse, Defendants have not been forthcoming about what they were doing.

7

### A. DHS Admit To Changing Policy By Increasing the Limits of Humanitarian Exceptions Its Officers May Issue Per Day

In their Response, Defendants admitted (at 3) for the first time that DHS imposes a maximum number of humanitarian exceptions that "officers and agents of the Customs and Border Protection generally could grant daily." And even more astoundingly, Defendants only *now* admit (at 3) that DHS has "increased those maximum numbers on specific dates." *Id.* DHS, however, has failed to disclose what those limits used to be, or how high they have now climbed.

And even though DHS now admits that it had a specific policy that limits how many humanitarian exceptions an officer or agent may grant, and even though DHS now admits that it has changed that policy to increase the maximum allowable ceiling, DHS tries to claim with a straight face that "[t]here was no policy change to report" to this Court. (Doc. 162 at 3.)

Defendants' rationalization appears to be that a rule capping the daily number of humanitarian exceptions that officers may grant at a specific number does not qualify as a "policy" and that when it increases—apparently by a *substantial* and *ever-growing* amount—the maximum number of daily humanitarian exceptions that its officers may grant, that this does not constitute a "material change." But that is not a defensible reading of either those terms or this Court's injunction. An explicit cap on the number of exceptions that can be granted is inarguably a "policy," and significant changes to it are manifestly "material changes in policy." DHS's willingness to play these meritless semantic games exemplifies the need for an order to show cause here.

### B. The Nunez-Neto Declaration Reveals Another Violation Of The Preliminary Injunction

Remarkably, Defendants' submissions in response to the States' motion reveals *yet another violation* of this Court's preliminary injunction. Specifically, the Fourth Nunez-Neto Declaration reveals that "DHS increased the maximum number of individuals who could be granted exceptions at POEs on June 4, July 13, September 7, and October 19." 4th Nunez-Neto Decl. ¶12.

8

The July 13 change was properly disclosed in DHS's report for the month of July. (Doc 155 at 6 n.1.) DHS reiterated this July 13 change in subsequent reports. DHS's repeated disclosures thus demonstrated the agency's awareness that such changes were required to be disclosed under this Court's injunction. The June 4 change was only belatedly disclosed in Defendants' September 16 report as a belated putative "clarif[ication,]" Doc. 155 at 6 n.1. But at least it was disclosed.

The same cannot be said about the September 7 change, which was revealed for the first time in Nunez-Neto's declaration—and only *after* the States had moved for an order to show cause. DHS's report for September contains no mention of that change *whatsoever*. (*See generally* Doc. 159.) Instead, it falsely asserts "that it has made no material changes to its policy on application of the Title 42 process." Doc. 159 at 7. While such statements had previously been caveated by noting the June 4 and/or July 13 changes,[2] *no such disclosure* was made in the report for September. (Doc. 159.)

This plainly violates this Court's preliminary injunction and alone warrants issuance of an order to show cause. And the fact that the States' motion has already revealed additional violations of this Court's injunction is all the more reason to issue an order to show cause requiring DHS to account for all of the changes to Title 42 policies that it has made—regardless of whether *it* self-servingly believes them to be lawful and/or non-material.

### C. DHS's Use Of Humanitarian Exceptions To Implement The Termination Order Violates The Preliminary Injunction

On November 16, Defendants provided to Plaintiffs with month-by-month breakdowns of DHS grants of humanitarian exceptions by nationality for May-October. Attached as Exhibit A is a copy of that report. The three nationalities that consistently received the highest number of humanitarian exceptions were migrants from Haiti, Mexico, and Honduras. Migrants from those three countries accounted for 78% of all humanitarian exceptions. As the Chart 2 *infra* demonstrates, the

---

[2] *See* Doc. 155 at 6 n.1 (disclosing June 4 and July 13 changes); Doc. 154 at 6 n.1 (disclosing only July 13 change and failing to disclose June 4 change).

number of humanitarian exceptions granted to the top three nationalities start out relatively similar pre-injunction—in May, there were 2,740 grants for Haiti, 2,188 for Mexico, and 1,686 for Honduras.

But, just as this Court's injunction took effect, that correlation broke down dramatically and permanently. DHS first increased the maximum number exceptions at POEs on June 4. And the effect is clearly apparent even then: humanitarian exceptions for Haitians went up substantially, to 3,908, while exceptions for Mexico and Honduras *declined materially*: to 1,853 and 1,402, respectively. In every month when DHS increased the humanitarian exception ceiling (DHS increased the limits on July 13, September 7, and October 19), the number of grants for Haitians went up significantly, while the number of grants for Mexicans and Hondurans went up only modestly.

Defendants' Response offers no plausible explanation why grants would go up significantly for Haitians—and only for Haitians—and not for aliens of other nationalities. The most reasonable explanation, and the only one that matches the evidence to date, is that Defendants are using humanitarian exceptions to circumvent this Court's Preliminary Injunction as to migrants from Haiti. DHS should be ordered to show cause as to these policy changes.

## III. Discovery Is Warranted To Investigate Defendants' Unlawful Actions

In their Response, Defendants actually admit that they made material changes in to their Title 42 policy. *Supra* at 8-9. The fact that Plaintiffs and this Court are only hearing about all of this now underscores the appropriateness of discovery here. In addition, Defendants' response regarding the internal planning document obtained by NBC News suggests legal hairsplitting: contending it has found only "internal deliberative emails discussing Haitian migration patterns." (Doc. 162-1 at 7 ¶16). This Court should order production of those documents *in camera* to evaluate that contention.

## CONCLUSION

For all of the reasons set forth above, the State's motion should be granted.

Dated: November 22, 2022

Respectfully submitted,
By: /s/ *Joseph S. St. John*

MARK BRNOVICH
   Attorney General
DREW C. ENSIGN*
   Deputy Solicitor General
JAMES K. ROGERS*
   Senior Litigation Counsel
ANTHONY R. NAPOLITANO *
   Assistant Attorney General
OFFICE OF THE ARIZONA ATTORNEY GENERAL
2005 North Central Avenue
Phoenix, AZ 85004
drew.ensign@azag.gov
james.rogers@azag.gov

*Counsel for Plaintiff State of Arizona*

STEVE MARSHALL
   Alabama Attorney General
EDMUND G. LACOUR JR.*
   Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

ELIZABETH B. MURRILL (La #20685)
   Solicitor General
J. SCOTT ST. JOHN (La #36682)
   Deputy Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

ERIC S. SCHMITT
   Attorney General
D. JOHN SAUER *
   Solicitor General
OFFICE OF THE MISSOURI ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
John.Sauer@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

TREG R. TAYLOR
   Attorney General of Alaska
CORI M. MILLS*
   Deputy Attorney General of Alaska
CHRISTOPHER A. ROBISON*
   Assistant Attorney General
Alaska Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov

*Counsel for Plaintiff State of Alaska*

LESLIE RUTLEDGE
   Arkansas Attorney General
NICHOLAS J. BRONNI*
   Solicitor General
DYLAN L. JACOBS*
   Deputy Solicitor General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov
Dylan.Jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

CHRISTOPHER M. CARR
   Attorney General of Georgia
STEPHEN J. PETRANY*
   Solicitor General
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

DEREK SCHMIDT
   Attorney General
DWIGHT R. CARSWELL*
   Deputy Solicitor General
Office of the Kansas Attorney General
120 SW 10th Ave., 3rd Floor
Topeka, KS 66612-1597
dwight.carswell@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

ASHLEY MOODY
   Attorney General
JAMES H. PERCIVAL*
   Deputy Attorney General of Legal Policy
OFFICE OF THE FLORIDA
ATTORNEY GENERAL
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
Phone: (850) 414-3300
james.percival@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

LAWRENCE G. WASDEN
   Attorney General,
BRIAN KANE*
   Chief Deputy Attorney General
Office of the Idaho Attorney General
700 W. Jefferson Street, Ste. 210
P.O. Box 83720
Boise, ID 83720
Telephone: (208) 334-2400
Email: Brian.Kane@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

DANIEL CAMERON
   Attorney General of Kentucky
MARC MANLEY*
   Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky
Tel: (502) 696-5478

*Counsel for Plaintiff Commonwealth of Kentucky*

LYNN FITCH
   Attorney General of Mississippi
JUSTIN L. MATHENY*
   Deputy Solicitor General
OFFICE OF THE MISSISSIPPI
ATTORNEY GENERAL
P.O. Box 220
Jackson, MS 39205-0220
Tel: (601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

AUSTIN KNUDSEN
  Attorney General
DAVID M.S. DEWHIRST*
  Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N Sanders St
Helena, MT 59601
P. (406) 444-2026
David.Dewhirst@mt.gov

*Counsel for Plaintiff State of Montana*

DOUGLAS J. PETERSON
  Attorney General
JAMES A. CAMPBELL*
  Solicitor General
OFFICE OF THE NEBRASKA ATTORNEY GENERAL
2115 State Capitol
Lincoln, Nebraska 68509
Tel: (402) 471-2682
jim.campbell@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. O'CONNOR
  Attorney General of Oklahoma
BRYAN CLEVELAND*
  Deputy Solicitor General
OKLAHOMA ATTORNEY GENERAL'S OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921

*Counsel for Plaintiff State of Oklahoma*

DAVE YOST
  Ohio Attorney General
BENJAMIN M. FLOWERS*
  Solicitor General
Office of the Ohio Attorney General
30 E. Broad St., 17th Fl.
Columbus, OH 43215
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

ALAN WILSON
  South Carolina Attorney General
THOMAS T. HYDRICK*
  Assistant Deputy Solicitor General
Post Office Box 11549
Columbia, SC 29211
(803) 734-4127
thomashydrick@scag.gov

*Counsel for the State of South Carolina*

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee
ANDRÉE S. BLUMSTEIN
  Solicitor General
CLARK L. HILDABRAND*
BRANDON J. SMITH*
  Assistant Solicitors General
Office of the Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
(615) 253-5642
Clark.Hildabrand@ag.tn.gov
Brandon.Smith@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

SEAN D. REYES
   Utah Attorney General
MELISSA HOLYOAK*
   Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for Plaintiff State of Utah*

BRIDGET HILL
   Attorney General of Wyoming
RYAN SCHELHAAS*
   Chief Deputy Attorney General
OFFICE OF THE WYOMING ATTORNEY GENERAL
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

\* Pro hac vice application granted or forthcoming

PATRICK MORRISEY
   Attorney General
LINDSAY SEE*
   Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for Plaintiff State of West Virginia*

# APPENDIX



